IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

———————————————————————

SAMUEL CABASSA,

                        Plaintiff,

                                                    Civ. Action No.
        v.                                          9:08-CV-480 (LEK/DEP)

JOSEPH T. SMITH, Superintendent; JOHN
MALY, Deputy Superintendent of Security
Services; DANIEL CONNOLLY, Captain;
GLENN S. GOORD, Commissioner;
DONALD SELSKY, Director of SHU/Disciplinary
Program; JOSE PICO, Hearing Officer; RAY
ROY, Inspector General; JOE DOE, Analyst;
JAMES DOE, Analyst; A.J. LOSCALZO,
Correctional Captain; L. PINGOTTI, Correctional
Lieutenant; and BOB DOE, IPC Review Committee,

                        Defendants.

———————————————————————


APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

SAMUEL CABASSA, *pro se*
84-A-0364
Wende Correctional Facility
P.O. Box 1187
Alden, NY 14004

FOR DEFENDANTS:

HON. ERIC T. SCHNIEDERMAN          ROGER W. KINSEY, ESQ.
Attorney General of                             Assistant Attorney General
the State of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

 *Pro Se* plaintiff Samuel Cabassa, a New York State prison inmate,

has commenced this action against various employees of the New York

State Department of Correctional Services ("DOCS"), including the

superintendent of the facility in which he was incarcerated at the relevant

times, pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights,

and additionally asserting claims under the Americans With Disabilities

Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* and section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794.  Plaintiff's complaint, which is

both comprehensive and wide ranging, asserts a variety of claims many of

which have as their genesis a grievance filed by Cabassa in April of 2005,

alleging that prison staff members utilized excessive force against a fellow

inmate.  Plaintiff maintains that his complaint regarding the matter led

prison officials to retaliate against him, including through the filing of

misbehavior reports, placing him into involuntary protective custody

2

("IPC"), and instituting watches of his mail.

As a result of an earlier motion filed by the defendants, plaintiff's claims have been significantly narrowed, and several of the defendants initially sued have been dismissed from the action.  The remaining defendants have now moved seeking the entry of summary judgment dismissing plaintiff's remaining claims on a variety of bases.  For the reasons set forth below, I recommend that their motion be granted.

I.     BACKGROUND[1]

Plaintiff is a New York State prison inmate entrusted to the custody of the DOCS; at the times relevant to his claims in this action, plaintiff was designated to the Shawangunk Correctional Facility ("Shawangunk") located in Wallkill, New York.  *See generally* Complaint (Dkt. No. 1). Plaintiff is to some degree visually challenged, requiring the use of contact lenses and/or a magnifying device to assist him in reading documents and other similar materials.[2]

---

[1]     In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]     According to his complaint, plaintiff has no sight in his left eye and was at the relevant times awaiting a replacement for a torn, eight-year-old contact lens. Complaint (Dkt. No. 1) ¶ 6 (29) - 6 (31); *see also Cabassa v. Goord*, 41 A.D.3d 1101, 1102, 840 N.Y.S.2d 161 (3d Dep't 2007).

The circumstances forming the basis for plaintiff's claims were set in motion on April 5, 2005 when he filed a grievance against defendants Joseph Smith, John Maly, Evan Gorelick, Daniel Connolly, Gerald Gardner, and L. Pingotti accusing them of using excessive force against a fellow inmate and alleging the existence of a conspiracy to cover up the assault, including by failing to conduct a fair and proper investigation into the incident. Complaint (Dkt. No. 1) § 6. Plaintiff filed a second grievance containing similar allegations on or about April 9, 2005. *Id.* at ¶¶ 6(4). Plaintiff filed a third grievance on May 18, 2005 accusing DOCS Commissioner Glenn Goord, Superintendent Smith, members of the DOCS Office of Inspector General ("IG"), and four other DOCS employees stationed at Shawangunk of harassing Cabassa and conspiring to recruit informants against him. *Id.* at ¶ 6(7). Plaintiff maintains that as a result of those grievances he was threatened by defendant Connolly and warned by others that the officer was upset concerning his complaints.[3] *Id.* at ¶¶ 6(1)-6(11).

On June 1, 2005, another inmate at Shawangunk was stabbed by

_____

[3]      Although it is unclear from his complaint precisely how many grievances plaintiff filed in the April and May 2005 timeframe, it appears that there were at least three others, including nos. SHG 21636-05, SHG-21631-05, and SHG-21662-05. *See* Complaint (Dkt. No. 1) ¶¶ 6(11), 6(15) and 6(20).

4

an unknown assailant.[4]  Complaint (Dkt. No. 1) ¶ 6 (21).  A few days later, plaintiff was removed from his cell and placed in the facility's special housing unit ("SHU") pending IPC proceedings.[5]  *Id.* at ¶ 6(24).  Plaintiff's transfer into the SHU was prompted by a statement allegedly made by plaintiff to defendant Maly, the Deputy Superintendent for Security at Shawangunk, indicating that Cabassa feared for his safety.  *Id.* at ¶ 6(25).

A hearing was conducted on June 6, 2005 to address the issue of whether Cabassa should be involuntarily placed into IPC.  Complaint (Dkt. No. 1) ¶ 6 (32) – 6 (53); Kinsey Aff. (Dkt. No. 48-7) Exh. E.  Presiding over the hearing was defendant Jose Pico.  *Id.*  During the hearing plaintiff was permitted to utilize a magnifying glass to accommodate his sight limitations.  Complaint (Dkt. No. 1) ¶¶ 6(29) – 6(31).   At the close of that

---

[4]        In his complaint, plaintiff alleges that the inmate involved in the June 1, 2005 incident "was fatally stabbed. . .".  Complaint (Dkt. No. 1) ¶ 6 (21).  During his deposition, however, plaintiff retreated from that position, acknowledging that the inmate involved may not have died from his wounds.  *See* Transcript of Cabassa Deposition held on July 20, 2009, Kinsey Decl. (Dkt. No. 48-15) Exh. H at p. 12.

[5]        Prisoners may be placed in SHU for a variety of reasons, in addition to for disciplinary purposes.  *Lee v. Coughlin*, 26 F. Supp.2d 615, 618 (S.D.N.Y. 1998) (quoting, *inter alia*, 7 N.Y.C.R.R. § 301.6); 7 N.Y.C.R.R. § 301.7.  Inmates in SHU are not completely restricted.  *Husbands v. McClellan,* 990 F. Supp. 214, 217 (W.D.N.Y. 1998); *see also* 7 N.Y.C.R.R. pt. 304.  They are allowed two showers per week and one of hour of outdoor exercise per day.  *Id.*  They are entitled to unlimited legal visits and one non-legal visit per week.  *Id.*  SHU inmates have access to counselors and sick call.  *Id.*  Additionally, they can participate in cell study programs and can receive books from the library.  *Id.*

proceeding Hearing Officer Pico, relying upon a recommendation by

Corrections Captain Connolly and based upon plaintiff's statements, found

that his presence in general population would endanger his safety and

ordered that he continue in IPC.  Kinsey Aff. (Dkt. No. 48-7) Exh. E at p.

20.  As a result of that determination and ensuing periodic reviews,

plaintiff remained on IPC status and was confined to the facility's SHU

from June 3, 2005 through October 3, 2007.  Complaint (Dkt. No. 1) ¶ 6

(72).

     In addition to challenging his placement in IPC, plaintiff's complaint

makes a claim for what he refers to as "mail censorship" by prison

officials, allegedly invoked in retaliation for plaintiff having engaged in

protected activity.  Complaint (Dkt. No. 1) Tenth Cause of Action.  The

record now before the court reflects that plaintiff was placed on mail watch

between December 12, 2005 and March 10, 2006.  Smith Decl. (Dkt. No.

48-5) ¶ 23; Maly Decl. (Dkt. No. 48-4) ¶ 22.  Plaintiff is characterized by

prison officials as a habitual mail offender, and the mail watch instituted in

December of 2005 was not the first, Cabassa having previously been

involved in allegedly unauthorized mail schemes and placed on mail

watch in 2004.  Maly Decl. (Dkt. No. 48-4) ¶ 20; Smith Decl. (Dkt. No. 48-

5) ¶ 21.  The more recent mail watch was initiated as part of an ongoing

6

investigation into the use of various addresses by inmates to "kite" mail, during the course of which a letter sent by Cabassa to a former inmate utilizing a Hong Kong address, in violation of DOCS rules, was intercepted.  Smith Decl. (Dkt. No. 48-5) ¶¶ 23-26 and Exh. C.  The letter appears to have been addressed to "David", a former inmate, and intimated the existence of plans to injure Superintendent Smith and Deputy Superintendent Maly and to cause a riot and hostage situation at Shawangunk.  *Id.* at ¶¶ 26-27 and Exh. C.  Plaintiff's mail watch was governed by DOCS Directives Nos. 4422 and 4421, under which any mail found to satisfy DOCS criteria would have been forwarded to the plaintiff. Smith Decl.  (Dkt. No. 48-5) ¶ 24.

Yet another issue raised by the plaintiff and attributed to retaliatory animus is the denial of his requests for transfer to another facility. Complaint (Dkt. No. 1) Eleventh Cause of Action.  In response to that claim defendants note that while at Shawangunk plaintiff was placed in the Close Supervision Unit ("CSU"), which is a part of general population designated for those inmates identified as in need of close supervision. Smith Decl. (Dkt. No. 48-5) ¶¶ 14-16.  Plaintiff was also designated as having Central Monitoring Case "A" status ("CMCA").  *Id.* at ¶ 14.  As a consequence of that CMCA designation, established DOCS protocol

7

required that any transfer requests submitted by the plaintiff be reviewed

by the IG, who would determine whether the potential receiving facility

provides the necessary level of security services to accommodate the

plaintiff and whether there are known enemies of the plaintiff being held in

that transferee facility.  *Id.* at ¶ 17; Roy Decl. (Dkt. No. 48-6) ¶ 9.

Honoring plaintiff's request for a transfer in this instance was complicated

by the fact that plaintiff's "separation list" had over fifty inmates on it during

the period in question.  Roy Decl. (Dkt. No. 48-6) at ¶ 18.

Due to his IPC status, plaintiff requested a transfer from

Shawangunk to another facility in July of 2005.  *Id.* at ¶ 18 and Exh. C.

After reviewing the matter and determining that there was no appropriate

facility into which plaintiff could be transferred in light of his separation list

and a survey of available maximum security facilities throughout the state,

it was recommended that the transfer be denied.  *Id.* at ¶¶ 19-20.

Following a second, independent review, the transfer was again denied.

*Id.* at ¶¶ 19-21.

Personnel at Shawangunk sought clarification regarding plaintiff's

facility transfer status in May of 2006.  Roy Decl. (Dkt. No. 48-6) ¶ 23.  In

response to that inquiry the matter was again reviewed, and it was again

determined that there existed no suitable facilities into which plaintiff could

be transferred.[6]  Roy Decl. (Dkt. No. 48-6) ¶ 23 and Exh. D.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on June 3, 2008. Dkt. No. 1.

Named as defendants in plaintiff's complaint are Joseph T. Smith, the

Superintendent at Shawangunk; John Maly, the Deputy Superintendent of

Security Services at the facility; Daniel Connolly, a Corrections Captain at

Shawangunk; Glenn S. Goord, the former Commissioner of the DOCS;

Donald Selsky, the former DOCS Director of the Special Housing

Unit/Inmate Discipline Program; Jose Pico, a Commissioner's Hearing

Officer; Brian Malone, the former Inspector General ("IG") of the DOCS;

Ray Roy, identified as the DOCS IG; Brian Bergmann, an investigator in

the office of the DOCS IG; David Miller, identified as the "HUB

Superintendent"; Evan Gorelick, the Deputy Superintendent for Program

Services at Shawangunk; A.J. Loscalzo, a Corrections Captain at the

facility; Gerald Gardner and L. Pingotti, two Corrections Lieutenants at the

prison; and M. Bertone, a Corrections Sergeant at Shawangunk.[7]

---

[6]      The issue of separation became moot on October 11, 2007 due to the issuance of a misbehavior report to Cabassa and a subsequent Tier III hearing, which resulted in a sentence of disciplinary confinement in a facility SHU, allowing for his transfer into a facility in which he would be housed in a single inmate cell and not permitted to interact with other potentially hostile inmates.  Roy Decl. (Dkt. No. 48-6) ¶¶ 24-26.

[7]      Three additional defendants named in plaintiff's complaint are identified only as "Doe" defendants, including John Doe, an Analyst, CMC Transfer Review;

Plaintiff's complaint sets forth eleven causes of action sounding principally in unlawful retaliation in violation of the First and Fourteenth Amendments to the United States Constitution, based upon actions allegedly taken toward plaintiff in return for his having filed grievances.

Following service of process upon the majority of the named defendants, those defendants moved on August 25, 2008 seeking dismissal of plaintiff's claims on several grounds. Dkt. No. 28. On April 10, 2009, I issued a report recommending that the defendants' motion, which plaintiff failed to oppose, be granted in part. Dkt. No. 31. That recommendation was adopted by District Judge Lawrence E. Kahn, with modification, in a decision and order issued on April 30, 2009 and later amended on May 5, 2009. Dkt. Nos. 32, 35. As a result of Judge Kahn's amended order plaintiff's first, second, and third causes of action were dismissed in their entirety; all claims against defendants Malone, Bergmann, and Miller were dismissed; all damage claims against the defendants in their official capacities were dismissed, except those arising under the ADA; all damage claims against defendants in their individual capacities brought pursuant to the ADA and section 504 were dismissed;

---

James Doe, an Analyst, Classification and Movement; and Bob Doe, identified as an IPC review committee member at Shawangunk. *See* Complaint (Dkt. No. 1) pp. 8-10 (unnumbered).

plaintiff's sixth cause of action against defendants Smith, Maly, and Pico in their individuals capacities was dismissed; and all claims against defendants Gorelick, Gardner, and Petrone were dismissed.

On March 12, 2010, following the completion of discovery in the action, the remaining defendants moved requesting summary judgment dismissing plaintiff's remaining claims, both on the merits and on the basis of qualified immunity.  Dkt. No. 48.  Plaintiff, whose time to respond to the motion was extended by the court, at his request, to January 31, 2011, has failed to submit papers in opposition to defendants' motion,[8] which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and the Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

---

[8]     Defendants' motion for summary judgment was filed with the court nearly a year ago, on March 12, 2010, and plaintiff was originally required to file a response by March 29, 2010.  Dkt. No. 48  By order dated April 6, 2010, plaintiff was granted a thirty-day extension of time to respond to defendants' summary judgment motion until April 30, 2010.  Dkt. No. 52.  That deadline expired, however, without plaintiff filing a response.  On June 7, 2010, plaintiff filed a motion for appointment of counsel, which was denied.  Dkt. Nos. 53 and 54.  In deference to plaintiff's *pro se* status and his vision limitation, the court *sua sponte* granted plaintiff another extension of time to file a response to defendants' motion for summary judgment of more than sixty days, until January 31, 2011.  *See* Dkt. No. 54.  After the expiration of that deadline, plaintiff requested yet another extension of time to respond defendants' motion for summary judgment, this time seeking an additional ninety days.  Dkt. No. 56.  In view of the foregoing, the court determined that plaintiff has had sufficient time to respond to defendants' motion for summary judgment and therefore denied his request for a further extension.  *See* Text Order of February 2, 2011.

III.   DISCUSSION

A.   Plaintiff's Failure to Oppose Defendants' Motion

Before turning to the merits of plaintiff's claims, a threshold issue to

be addressed is the legal significance, if any, of his failure to oppose

defendants' summary judgment motion, and specifically whether that

failure automatically entitles defendants to summary judgment dismissing

plaintiff's complaint.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the
> Court determines that the moving party has met its
> burden to demonstrate entitlement to the relief requested
> therein, the non-moving party's failure to file or serve any
> papers as this Rule requires shall be deemed as consent
> to the granting or denial of the motion, as the case may
> be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3).  Undeniably, *pro se* plaintiffs are entitled to some

measure of forbearance when defending against summary judgment

motions.  *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415

(N.D.N.Y. 1997) (McAvoy, C.J.).  The deference owed to *pro se* litigants,

however, does not extend to relieving them of the ramifications associated

with Local Rule 7.1(b)(3).  *Robinson v. Delgado*, No. 96-CV-169, 1998 WL

278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v.

Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23,

12

1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp.106, 106-07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.).  Accordingly, absent a showing of good cause defendants' unopposed summary judgment motion should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc*., 140 F. Supp.2d 229, 231-32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp. 2d 542, 545-46 (N.D.N.Y. 2000) (Kahn, J.).

It should also be noted that the plaintiff's failure to properly oppose defendants' summary judgment motion is not without further consequences.  By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statements unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement.[9] *See Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like

---

[9]    Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  *See* N.D.N.Y.L.R. 7.1(a)(3)(emphasis in original).

7.1(a)(3)). [10]

In view of plaintiff's failure to oppose defendants' motion, I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.[11]

---

[10]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[11]    Included within the body of defendants' notice of motion, which was served upon plaintiff, is a warning stating as follows:

> when a motion for summary judgment is made and properly supported, you may not simply rely upon your complaint, but you must respond, by affidavits or as otherwise provided in that rule, setting forth specific facts showing that there is a genuine issue of material fact for trial. Any factual assertions in our affidavits will be accepted by the District Judge as being true unless you submit affidavits or other documentary evidence contradicting our assertions. If you do not so respond, summary judgment, if appropriate, may be entered against you. If Summary Judgment is granted against you, your case will be dismissed and there will be no trial.

> NOTE ALSO that Local Rule 7.1 (a)(3) of the Northern District of New York requires that you must include a separate short and concise statement of any material facts as to which you contend there exists a genuine issue. In the absence of such a statement, all material facts set forth in our Rule 7.1 (a)(3) statement will be deemed admitted.

Dkt. No. 48.  Additionally, with their notice of motion defendants also served plaintiff with a separate form notice provided by this court entitled, "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion," which is a detailed notice designed to clearly advise *pro se* litigants of their obligations in responding to such motion and the result of their failure to do so.  *Id.; see* N.D.N.Y.L.R. 56.2.  Thus, it is clear that plaintiff was sufficiently apprised of the requirement of a response as well as the significant implications of his failure to do so.

B.    Summary Judgement Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of

Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir.

2004).  A fact is "material", for purposes of this inquiry, if it "might affect

the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at

248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d

549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in

dispute "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at

2510.

A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be

decided with respect to any essential element of the claim in issue; the

failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d

Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

    C.    <u>Plaintiff's IPC Claims</u>

        1.    <u>Due Process Considerations Generally</u>

When prison officials deprive a prison inmate of a cognizable liberty interest, due process must be afforded to the affected prisoner.  *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted).  The placement  of a prison inmate into administrative segregation is an event that can implicate a liberty interest protected under the Fourteenth Amendment if it results in an "atypical and significant hardship on inmate in relation to the ordinary incidents of prison life."  *Sandin v. Connor*, 515 U.S. 472, 484, 115 S. Ct. 2293 (1995); *see also Davis v. Barrett*, 576 F.3d 129 (2d Cir. 2009) (holding that forty-one days in administrative confinement could represent the deprivation of a cognizable liberty interest, depending upon the conditions to which the plaintiff inmate was subjected).  In this instance, the defendants have assumed that plaintiff's period of IPC segregation did result in the deprivation of a constitutionally significant liberty interest, and I will do likewise.

The next question presented is the extent of due process mandated

by the Constitution with regard to the administrative segregation determination.  Such a determination must be made against the backdrop of the well-accepted principle that "the safe and efficient operation of a prison on a day-to-day basis has traditionally been entrusted to the expertise of prison officials . . .."  *Hewitt v. Helms*, 459 U.S. 460, 470, 103 S. Ct. 864 (1983).  It should also be noted, moreover, that "[t]he requirements imposed by the [due process] Clause are, of course, flexible and variable dependent upon the particular situation being examined."  *Id.* at 472, 103 S. Ct. 864 (citations omitted).

Generally speaking, the procedural safeguards to which a prison inmate is entitled before being subjected to the deprivation of a constitutionally cognizable liberty interest for disciplinary reasons, include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense.  *Wolff v. McDonnell*, 418 U.S. 539, 564-67, 94 S. Ct. 2963, 2978-80 (1974); *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988).  In order to pass muster under the Fourteenth

Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence".  *Superintendent v. Hill*, 472 U.S. 445, 105 S. Ct. 2768 (1985).

While in this case it appears that the procedures leading up to his placement into administrative segregation may well have satisfied the more stringent requirements of *Wolff*, the Supreme Court recognized in its decision in *Hewitt* that in light of the paramount importance of preserving the safety of a prison, its guards, and inmates, the full panoply of rights guaranteed under *Wolff* are not required in every situation where administrative segregation is ordered, observing as follows:

> We think an informal, non-adversary evidentiary review sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him.  An inmate must merely receive some notice of charges against him [or her] and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation.  Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentation in cases where they believe a written would be ineffective.  So long as this occurs, and the decisionmaker reviews the charges and then–available evidence against the prisoner, the Due Process Clause is satisfied.

*Hewitt*, 459 U.S. at 476-77, 103 S. Ct. 864 (footnote omitted); *see also*

*Taylor v. Rodriguez*, 238 F.3d 188 (2d Cir. 2001) (holding that a prisoner

facing administrative segregation must be afforded a meaningful notice of the basis for the decision as well as a decision that is based upon "some evidence"). Provided that these safeguards are implemented, and additionally that periodic post-segregation reviews are conducted, *see Hewitt*, 499 U.S. at 477, n.9, 103 S. Ct. 864, the due process requirements of the Fourteenth Amendment are satisfied when a prison inmate is placed in administrative segregation.

The distinction to be drawn between disciplinary confinement, with its procedural requisites as discussed in *Wolff*, and administrative confinement subject to the requirements of *Hewitt*, is upon whether the segregation is punitive in nature. Plaintiff appears to assert that his administrative confinement was punitive in nature, rather than based upon legitimate penological concerns for his safety, or that of others. As the Second Circuit has observed,

> [t]he line between civil and criminal sanctions is often hard to draw, and this is nowhere more true than in the context of prisons, where the punitive character of the environment may make even purely regulatory sanctions appear punitive in nature. The need to maintain order, however, is a legitimate nonpunitive interest, even if it sometimes requires that prison officials take action of a punitive character.

*Porter v. Coughlin*, 421 F.3d 141, 148 (2d Cir. 2005), *see also Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007), *overruled on other grounds, sub nom.*

*Ashcroft v. Iqbal,* ___ U.S. ___. 129 S. Ct. 1937 (2009).  Accordingly, "[w]here a prisoner's placement in restrictive confinement has both a punitive and an administrative, non-punitive basis, the placement decision will not be found to have impaired a protected liberty interest."[12] *Rosenberg v. Meese*, 622 F. Supp. 1451, 1468-69 (S.D.N.Y. 1985) (citing *Sher v. Coughlin*, 739 F.2d 77, 81-82 (2d Cir. 1984)) (other citations omitted).

Additionally, since "administrative segregation may not be used as a pretext for indefinite confinement of an inmate[,]" prison officials must periodically review their decision to ascertain whether a prisoner remains a security risk.  *Hewitt*, 459 U.S. at 477 n.9, 103 S. Ct. at 874 n.9.  While these reviews must be "meaningful and not simply perfunctory", *McClary* v. Kelly, 4 F. Supp. 2d 195, 213 (W.D.N.Y. 1998) (citing *Giano v. Kelly*, 869 F. Supp. 143, 150-51 (W.D.N.Y. 1994)), the Supreme Court made it clear in *Hewitt* that they will not necessarily require that prison officials permit the submission of any additional evidence or statements, stating

> [t]he decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner – which will have been ascertained when determining [whether] to confine

---

[12]     More recent cases illustrate that the distinction between administrative segregation and SHU confinement for disciplinary or punitive reasons is not easily recognizable, and in the end when *Sandin's* liberty interest criteria are satisfied, basic due process is required regardless of intent.  *See Iqbal v. Hasty*, 490 F.3d at 164-65.

the inmate to administrative segregation – and on the officials'
general knowledge of prison conditions and tensions, which
are singularly unsuited for "proof" in any highly structured
manner.  Likewise, the decision to continue confinement of an
inmate pending investigation of misconduct charges depends
upon circumstances that prison officials will be well aware of –
most typically, the progress of the investigation.

*Hewitt*, 459 U.S. at 477 n.9, 103 S. Ct. at 874 n.9.[13]

Regardless of whether measured against *Wolff*, or instead the more

generous *Hewitt* standard, with the limited exception outlined below, it is

not clear from plaintiff's complaint that he was denied any of the

procedural safeguards guaranteed under the Fourteenth Amendment.

2.    Initial IPC Determination

In their motion defendants argue that the issues now raised by

---

[13]    At least one court has held that these essential elements of minimal due
process are easily satisfied by the detailed regulations that govern placement of
inmates in administrative segregation in DOCS facilities.  *McClary*, 4 F. Supp. 2d at
213. In the New York State prison system, administrative segregation is subject to a
comprehensive regulatory scheme which requires, *inter alia*, that a hearing be
conducted within fourteen days of an inmate's admission into administrative
segregation. 7 N.Y.C.R.R. § 301.4(a).  Administrative segregation admission results
from a determination by the facility that the inmate's presence in general population
would pose a threat to the safety and security of the facility."  7 N.Y.C.R.R. § 301.4(b).
The regulations also provide for periodic post-segregation review of the inmate's
circumstances at sixty-day intervals.  7 N.Y.C.R.R. § 301.4(d).

Ordinarily, administrative segregation inmates are housed in SHU and are
subject to most of the restrictions that apply to disciplinary SHU inmates.  *Edmonson v.*
*Coughlin*, 21 F. Supp. 2d 242, 248-249 (W.D.N.Y. Sep 30, 1998).  The record is
equivocal on the issue of where plaintiff was placed into IPC.  In his complaint
Cabassa allleged he was placed in SHU confinement on June 3, 2005 pending an IPC
Hearing.  Complaint (Dkt. No. 1) ¶ 6(24).  Defendants' submissions suggest that it was
not in a facility SHU, but rather in a part of the general population designated for CSU
inmates.  *See* Smith Decl. (Dkt. No. 48-5) ¶ 15.

plaintiff surrounding the initial IPC determination are not properly before the court, having previously been presented to and decided against the plaintiff by a New York State appeals court.  In support of that argument defendants rely upon a proceeding commenced by Cabassa pursuant to New York Civil Practice Law & Rules ("CPLR") Article 78 in Albany County Supreme Court, and later transferred to the New York State Supreme Court Appellate Division, Third Department, resulting in a decision rendered on June 28, 2007 in which the Third Department determined, *inter alia*, that "the [IPC] hearing was conducted in a fair and impartial manner and the determination did not flow from any bias on the part of the Hearing Officer."  *Cabassa v. Goord*, 41 A.D.3d 1101, 1102, 840 N.Y.S.2d 161 (3d Dep't 2007).  The appellate court also found that the hearing officer's determination upholding the IPC recommendation was supported by substantial evidence.[14]  *Cabassa*, 41 A.D.3d at 1101, 840 N.Y.S. 161.

Both the Full Faith and Credit Clause of the United States Constitution, *see* U.S. CONST. ART. IV, § 1, and the corresponding Full Faith and Credit statute, 28 U.S.C. § 1738, require that a federal court accord a state court judgment the same preclusive effect it would merit

---

[14]     Plaintiff's application for leave to appeal that determination to the New York Court of Appeals was denied on November 15, 2007.  *See Matter of Cabassa v. Goord,* 9 N.Y.3d 813, 848 N.Y.S.2d 24 (2007) (Table).

under the law of the state from which it originated.  *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S. Ct. 892, 896 (1984); *Kremer Chem. Constr. Corp.*, 456 U.S. 461, 466, 102 S. Ct. 1883, 1889-90 (1982); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  This principle applies fully to claims brought pursuant to 42 U.S.C. § 1983. *Migra*, 465 U.S. at 84-85, 104 S. Ct. at 897-98; *Allen v. McCurry*, 449 U.S. 90, 103-04, 101 S. Ct. 411, 419-20 (1980); *Giakoumelos v. Coughlin*, 88 F.3d 56, 59 (2d Cir. 1996).  Since the underlying state court determination at issue in this case originated in New York, the law of that state controls in determining the extent of the preclusive effect of which the Article 78 determination in response to Cabassa's petition is deserving.[15] *Giakoumelos*, 88 F.3d at 59; *see also Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002); *LaFleur v. Whitman*, 300 F.3d 256, 271-72 (2d Cir. 2002).

> a)    Claim Preclusion

As the Second Circuit explained in *Marvel*, claim preclusion, also known as *res judicata*, requires that a final judgment on the merits of an

---

[15]    While the law of New York, rather than federal principles, applies to determine the preclusive effect to be given to the state courts' determinations in response to plaintiff's Article 78 petition, this is a distinction without a difference since, as the Second Circuit has noted, "there is no discernable difference between federal and New York law concerning *res judicata* and collateral estoppel."  *Marvel*, 310 F.3d at 286 (citing *Pike v. Freeman,* 266 F.3d 78, 90 n.14 (2d Cir. 2001)).

action be given preclusive effect, barring parties as well as those in privity with them from relitigating in a subsequent action a claim which was or could have been raised in the prior suit.  *Marvel*, 310 F.3d at 286-87; *see also Fay v. South Colonie Cent. Sch. Dist.*, 802 F.2d 21, 28 (2d Cir. 1986) (citing, *inter alia*, *Migra*), *overruled on other grounds, Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768 (2d Cir. 2002).

In this case it is clear, based upon well-established case authority, that the prior unfavorable Article 78 determination did not serve to foreclose the plaintiff from commencing this subsequent section 1983 civil rights action for damages, since such relief is unavailable in an Article 78 proceeding.  *Davidson v. Capuano*, 792 F.2d 275, 278 (2d Cir. 1986); *Allen v. Coughlin*, No. 92 Civ. 6137, 1995 WL 117718, at *3 (S.D.N.Y. Mar. 17, 1995).  Accordingly, plaintiff's claims for damages in this section 1983 action are not barred by *res judicata* based upon the decision rendered in the prior Article 78 proceeding, even assuming that all of the requirements for claim preclusion are otherwise met.

### b)   Issue Preclusion

Issue preclusion, a more narrow doctrine often referred to as collateral estoppel, bars a party that has had a full and fair opportunity to litigate an issue of fact or law from relitigating the same issue once it has

25

been decided against that party or its privy.  *McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir. 2007); *Marvel*, 310 F.3d at 288-89.  Under New York law, in order for issue preclusion apply, 1) the issue must both "actually and necessarily" have been decided in a prior proceeding, and 2) the party against whom the doctrine is being urged must have been afforded a full and fair opportunity to litigate the issue in the first proceeding.  *McKithen*, 481 F.3d at 105; *see also Giakoumelos*, 88 F.3d at 59; *Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995).

The issues plaintiff now raises in support of his claim – that the due process requirements of the Fourteenth Amendment were not met in connection with this IPC determination – were squarely presented to and decided adversely to him by the Third Department.  Plaintiff's Seventh Cause of Action asserts that his due process rights were violated based upon defendant Pico's refusal to recuse himself.  This argument was raised before the Third Department, which in rejecting the contention noted, "[t]he record demonstrates that the hearing was conducted in a fair and impartial manner and the determination did not flow from any bias on the part of the Hearing Officer."  *Cabassa,* 41 A.D.2d at 1102, 840 N.Y.S.2d 161 (citation omitted).  The portion of the plaintiff's Seventh Cause of Action, which also alleges unlawful retaliation, asserting a due

26

process deprivation is therefore subject to dismissal.

Plaintiff's Eighth Cause of Action accuses defendants Goord and Selsky of violating his due process rights based upon their refusal to overturn the IPC determination.  In light of the Appellate Division's finding that no due process violation occurred, it logically follows that defendants Goord and Selsky cannot be held accountable for refusing to overturn that initial IPC determination, and so much of the Eighth Cause of Action as alleges a due process violation against them should therefore also be dismissed.

### 3.   Plaintiff's Periodic IPC Review Claims

Plaintiff's Ninth Cause of Action, which also asserts a due process violation as well as retaliation, centers upon the actions of various of the defendants in allegedly failing to provide meaningful periodic reviews of plaintiff's status following the initial IPC determination.  This argument does not appear to have been presented to or decided by the Third Department, and is therefore not precluded by that Court's Article 78 determination.  A review of the record, however, reveals no evidence from which a reasonable factfinder could conclude that plaintiff was denied meaningful periodic reviews of his IPC status following the initial determination.

27

Under New York's regulatory regime, following the initial IPC determination Cabassa was entitled to periodic reviews at thirty-day intervals in order to determine whether any change of circumstances warranted modification of the initial IPC placement.  *See* Smith Decl. (Dkt. No. 48-5) ¶ 32 and Exh. G.  The record discloses that such reviews were conducted in a timely manner, and in each instance resulted in a determination that there had been no change of circumstances warranting plaintiff's release from IPC status.  *Id.* at ¶¶ 33-37 and Exh. H.  Each of those reviews was conducted by a committee comprised of the SHU sergeant, the block sergeant, the deputy superintendent for programs, the guidance and counseling department, and the deputy superintendent for security.  *Id.* at ¶ 36.  The committee's recommendation was then subject to scrutiny by Superintendent Smith for a determination of whether the process was properly followed and no information overlooked.  *Id.* at ¶ 37.

In view of these undisputed facts, no reasonable factfinder could conclude, as alleged in plaintiff's Ninth Cause of Action, that plaintiff's due process rights were violated in connection with his continued relegation to IPC status following the initial determination.  I therefore recommend dismissal of the portions of plaintiff's Seventh, Eighth, and Ninth Causes

28

of Action that allege a due process deprivation.

     D.     Personal Involvement of Commissioner Goord

As the Supreme Court reiterated in its relatively recent decision in

*Iqbal*, 129 S. Ct. 1948-49, to be held accountable for a constitutional

deprivation under section 1983 a defendant must have had personal

involvement in the conduct giving rise to the deprivation.  *Wright v. Smith,*

21 F.3d 496, 501 (2d Cir. 1994) (*citing Moffitt v. Town of Brookfield,* 950

F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson*, 568 F.2d 930,

934 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087, 98 S. Ct. 1282 (1978);

*Scott v. Fischer*, 616 F.3d 100, 110 (2d Cir. 2010) ("In this Circuit personal

involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under [section] 1983.") (quoting

*McKinnon*).  In order to prevail on a section 1983 cause of action against

a defendant, a plaintiff must show some tangible connection between the

constitutional violation alleged and that particular individual.  *See Bass v.*

*Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).   Defendants argue that this

requirement cannot be met insofar as plaintiff's claims against defendant

Goord are concerned.

It may be that defendant Goord is named as a defendant by virtue of

his role as head of the DOCS.  As a supervisor, Commissioner Goord

cannot be liable for damages under section 1983 solely by virtue of his

position and based upon the conduct of other DOCS employees; there is

no *respondeat superior* liability under that provision.   *Richardson v.*

*Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.

Culpability on the part of a supervisory official for a civil rights violation

can, however, be established in one of several ways, including when that

individual 1) has directly participated in the challenged conduct; 2) after

learning of the violation through a report or appeal, has failed to remedy

the wrong; 3) created or allowed to continue a policy or custom under

which unconstitutional practices occurred; 4) was grossly negligent in

managing the subordinates who caused the unlawful event; or 5) failed to

act on information indicating that unconstitutional acts were occurring.[16]

---

[16]      Though the issue of supervisory liability for civil rights violation recently was addressed by the Supreme Court in *Iqbal*, the Second Circuit has yet to consider the impact of that case upon the categories of supervisory liability under *Colon*.  Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability.  *See Sash*, 674 F. Supp. 2d at 542-544; *see also Stewart v. Howard*, No. 9:09-CV-0069 (GLS/GHL), 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued vitality of some of the categories set forth in *Colon*.") (citations omitted), *report and recommendation adopted*, 2010 WL 3907137 (Sept. 30, 2010) .  While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No.07 CIV. 1801, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, Nos. 09 Civ. 7283 (JSR), 09 Civ. 9952 (JSR), 2010 WL 2428128, at *5 (S.D.N.Y. Jun. 15, 2010); *Qasem v. Toro*, No. 09 Civ. 8361 (SHS), 2010 WL 3156031, at *4 (S.D.N.Y. Aug. 10,

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501; *see also Richardson*, 347 F.3d at 435.

Plaintiff's Eleventh Cause of Action alleges that DOCS Commissioner Glenn Goord and five other defendants – two of whom are identified as "John Doe" and "James Doe", unlawfully retaliated against him by denying his transfer requests, allegedly motivated by his having engaged in protected activity.  Defendants' submissions describe in detail the procedures followed within the DOCS when addressing the transfer of an inmate who, like the plaintiff, has been designated as a CMC inmate. *See, e.g.,* Roy Decl. (Dkt. No. 48-6) ¶¶ 4-10.  In his declaration defendant Richard Roy, the Deputy Commissioner and IG for the DOCS, notes that Commissioner Goord was not involved in reviewing plaintiff's transfer request or in deciding whether it should be granted or denied.  *Id.* at ¶ 11.

Plaintiff has adduced no evidence to counter that assertion and demonstrate conduct on the part of Commissioner Goord sufficient to support a finding of his personal involvement in any alleged constitutional violation caused or created by the transfer request.  Accordingly, no reasonable factfinder could find in favor of the plaintiff and against defendant Goord on the Eleventh Cause of Action set forth in his

---

2010).

complaint, which should therefore be dismissed as against this defendant.

>    F.    Plaintiff's Retaliation Claims

At the heart of plaintiff's complaint is his claim that as a result of having engaged in protected activity, particularly by filing complaints and grievances regarding how he and other inmates were treated at Shawangunk, prison officials exacted retribution in several ways, including by designating him to IPC, placing him on mail watch, and denying his several requests for transfer to another prison facility.  Defendants contend that plaintiff's retaliation claims are unsupported.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies.  *See Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).  As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care."  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,*

32

534 U.S. 506 (2002); *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003),

*superseded by* 320 F.3d 346, 2003 WL 360053 (2d Cir. Feb. 10, 2003).

In order to state a *prima facie* claim under section 1983 for

retaliatory conduct, a plaintiff must advance non-conclusory allegations

establishing that 1) the conduct at issue was protected; 2) the defendants

took adverse action against the plaintiff; and 3) there was a causal

connection between the protected activity and the adverse action – in

other words, that the protected conduct was a "substantial or motivating

factor" in the prison officials' decision to take action against the plaintiff.

*Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287,

97 S. Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir.

2007); *Dawes*, 239 F.3d at 492 (2d Cir. 2001).  If the plaintiff succeeds in

shouldering this burden, then to avoid liability the defendants must show

by a preponderance of the evidence that they would have taken action

against the plaintiff "even in the absence of the protected conduct."  *Mount*

*Healthy*, 429 U.S. at 287, 97 S. Ct. at 576.  If taken for both proper and

improper reasons, state action may be upheld if the action would have

been taken based on the proper reasons alone.  *Graham v. Henderson*,

89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of

the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two.  When such claims, which are exceedingly case specific, are alleged in only conclusory fashion and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to dismissal of plaintiff's retaliation claims.  *Flaherty*, 713 F.2d at 13.  As is true of other types of section 1983 claims, a plaintiff claiming to have been the victim of unlawful retaliation must show that the defendant under consideration was personally involved in the First Amendment violation alleged.  *See Abascal v. Hilton*, No. 04-CV-1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D.J. and Lowe, M.J.).

### 1.   Lack of Protected Activity

The right to petition the government for redress of grievances is said to be among the most  fundamental of rights guaranteed by the Constitution, including its Bill of Rights.  *Graham*, 89 F.3d at 80 (citing *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 222, 88 S. Ct. 353 (1967)).  Within the confines of that right is the ability of prison inmates to file grievances concerning prison conditions.  *Graham*, 89 F.3d at 80.  Resort by a prison inmate to the available internal grievance

process is therefore regarded as activity protected by the First

Amendment.  *Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002)

(citing *Graham*), *overruled on other grounds by*, *Porter v. Nussle*, 534

U.S. 516, 122 S. Ct. 983 (2002).

In their motion defendants argue that because plaintiff lacked

standing to file grievances complaining of conduct toward a fellow inmate,

the filing of those grievances cannot be considered as protected activity

for purposes of any retaliation analysis.  Defendants contend that under

the DOCS Inmate Grievance program a grievance must be personal, *see*

7 N.Y.C.R.R. § 701.3,[17] and that a grievance that does not meet that

requirement does not merit constitutional protection.  Defendants,

however, have cited to no case directly supporting this proposition, nor

can they point to a case in which a court has determined that a grievance

ultimately found lacking in merit is not entitled to constitutional protection.

*Cf., e.g., Burke v. Seitz*, No. 9:01 CV 1396,   2006 WL 383513, at *6

(N.D.N.Y. Feb. 13, 2006) (Kahn, J. and Homer, M.J.)  (finding plaintiff

---

[17]     Section 701.3(b) provides that

[g]rievances must be personal. An inmate must be personally affected by
the policy or issue he/she is grieving, or must show that he/she will be
personally affected by that policy or issue unless some relief is granted or
changes made. All grievances must be filed in an individual capacity.

7 N.Y.C.R.R. § 701.3(b).

engaged in protected activity where grievance unsubstantiated); *Walker v. Pataro*, No. 99CIV.4607(GBD)(AJP), 2002 WL 664040, at *8 (S.D.N.Y. Apr. 23, 2002) (same).  Indeed, if this were the case, it seems likely that few retaliation cases based upon the filing of an inmate grievance would survive past the pleading stage.

It is worth emphasizing that the right to petition the government for the redress of grievances has long been recognized as a fundamental right that derives from the First Amendment, *Franco*, 854 F.2d at 590; the right does not arise out of the DOCS regulations.[18]  "*Franco* recognized that prisoners must be permitted the "free and uninhibited access"" to both administrative and judicial forums for the purpose of seeking redress of grievances."" *Alnutt v. Cleary*, 913 F. Supp 160, 169 (W.D.N.Y. 1996) (quoting *Franco*).  There can be little doubt that if prison officials were permitted to retaliate against inmates for filing grievances found to be lacking in merit, inmates' First Amendment rights would suffer a severe chilling effect for fear of reprisal.   Additionally, numerous cases both directly and implicitly, have recognized a grievance as protected conduct, even in circumstances in which the complaint was not necessarily

---

[18]     Conversely, it is well established that "[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim."  *Shell v. Brzesniak*, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005).

personal to the inmate who made it.  *See, e.g., Auleta v. LaFrance*, 233 F. Supp.2d 396 (N.D.N.Y. 2002) (plaintiff, placed in keeplock confinement for assisting another inmate appeal the denial of a grievance, held to state a retaliation claim); *see also Graham*, 89 F.3d 75 (act of filing a grievance and attempting to find inmates to represent the grievants  found to be constitutionally protected); *McCorkle v. Walker,* 871 F. Supp.2d 555 (N.D.N.Y. 1995) (retaliation claim stated by inmate alleging that prisoner nurse filed false charges against them in retaliation for his informing prison official she was the nurse on duty when another inmate nearly drowned in the infirmary); *Payne v. Axelrod*, 871 F.Supp 1551 (N.D.N.Y.1995) (inmate stated cause of action where he alleged that a razor blade was planted in his cell in retaliation for reporting that a corrections officer set a fire in another inmate's cell);  *Cale v. Johnson*, 861 F.2d 943 (6th Cir.1988) (inmate stated cause of action by alleging retaliation for complaining to associate warden concerning the poor quality of the food); *Morrison v. Lefevre*, 592 F.Supp 1052 (S.D.N.Y.1984) (inmate stated cause of action where he alleged retaliation, due, in part, to assistance he provided to other prisoners in filing lawsuits); *McDonald v. Hall*, 610 F.2d 16 (1st Cir.1979) (inmate stated cause of action where he alleged that he was transferred in retaliation for filing suits against prison

officials, and for giving legal assistance to other inmates).

In this instance, plaintiff alleges in his complaint that defendants retaliated against him based upon his petitioning prison officials for the redress of grievances.  Whether the grievances lodged were meritorious is not dispositive of plaintiff's First Amendment retaliation claim.  *See Burke v. Seitz*, 2006 WL 383513, at *6. I therefore recommend denial of the portion of defendants' motion seeking dismissal of plaintiff's retaliation claim on the basis that he lacked standing to file grievances on behalf of other inmates, and thus was not engaged in protected activity at the relevant times.

### 2.    Defendant Roy

In his Eleventh Cause of Action plaintiff asserts that defendant Roy, among others, retaliated against him for his filing of grievances by denying his various transfer requests.  Although plaintiff's complaint does not specify when his transfer requests were lodged with prison officials, it appears from the record that at least one such request was made in or about July of 2005.  Roy Decl. (Dkt. No. 48-6) ¶ 18.  Plaintiff apparently attributes the denial of that request to retaliatory animus due to his filing of grievances in the two months preceding that date.  As previously noted, the filing of such grievances plainly constitutes protected activity.  *Franco*,

854 F.2d at  588-90 .  The denial of a request to transfer Cabassa from one facility to another also could be viewed by a reasonable factfinder as an adverse action.  *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir.1998) ("prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights").  And, given the temporal proximity between the two, it appears that plaintiff has pleaded a *prima facie* claim of retaliation based upon the denial of that transfer request. *See Walker*, 2002 WL 664040, at *9.

In response to this claim, defendants have articulated legitimate, non-discriminatory reasons why plaintiff's request for a transfer could not be honored, maintaining that the extent of plaintiff's separation list, exceeding fifty inmates in number, rendered it impossible to locate a suitable transfer maximum security facility.[19] Roy Decl. (Dkt. No. 48-6) at ¶ 19.  In response, plaintiff has failed to adduce any evidence of pretext, or to show that the denial was in fact motivated by his protected conduct. Given these circumstances and the fact that the plaintiff relies solely upon

---

[19]     It should be noted that prison inmates have no constitutional right to be transferred or designated to a prison facility of their choice."  *Halloway v. Goord*, No. 9:03-CV-01524, 2007 WL 2789499, at * 5 (N.D.N.Y. Sept. 24, 2007) (Kahn, J. and Treece, M. J.) (citing *Wilkinson v. Austin*, 545 U.S. 209, 221-22, 125 S. Ct. 2384, 2392-94 (2005))  (other citation omitted); *see also*, *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (per curiam); *Davis*, 160 F.3d at 920.
.

the timing involved, I conclude that no reasonable factfinder could

determine that defendant Roy unlawfully retaliated against the plaintiff in

denying his transfer request, and therefore recommend dismissal of

plaintiff's Eleventh Cause of Action as against him as well. *See Isaac v.*

*City of New York*, 701 F. Supp. 2d 477, 496-97 (S.D.N.Y. 2010).

### 3.   Mail Watch

In his Tenth Cause of Action plaintiff accuses defendants Smith and

Maly of retaliating against him by placing him on mail watch in return for

his filing of grievances and in violation of his First Amendment right of free

speech.[20]

### a)   First Amendment

Despite their circumstances, sentenced inmates do not shed all of

the rights guaranteed to them under the constitution when passing

through the prison gates. *Hudson v. Palmer*, 468 U.S. 517, 523, 104 S.

Ct. 3194, 3198 (1984).  Analysis of whether, and if so to what extent, such

individuals enjoy the benefits of constitutional protection in many

instances is dependent upon the balancing of those rights against the

legitimate, penological interests of prison officials, which are often in

tension with those rights.

---

[20]     That cause of action also names the "IG Office".  That entity, however, is
not in and of itself named as a defendant in the action.

Among the protections enjoyed by prison inmates, though not unfettered, is the right "to the free flow of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek*, No. 05-CV-172, 2007 WL 3254373, at *6 (N.D.N.Y. 2007) (Sharpe, J.) (quoting *Davis v. Goord*, 320 F.3d at 351). That right, however, gives way to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities, in which case no constitutional violation has occurred. *U.S. v. Workman*, 80 F.3d 688, 699 (2d Cir. 1996), *cert. denied*, 519 U.S. 938, 117 S. Ct. 319 (1996).

Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987). Applying this precept, and for reasons which are obvious, "[c]ourts have constitutionally afforded greater protection . . . to outgoing mail than to incoming mail." *Davis v. Goord*, 320 F.3d at 351. Nonetheless, the Second Circuit has held that "'where good cause is shown, outgoing mail can be read' without violating inmates' First Amendment rights."

41

*Workman*, 80 F.3d at 698 (quoting *Wolfish v. Levi*, 573 F.2d 118, 130 n. 27 (2d Cir. 1978)*, rev'd in part on other grounds sub nom., Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861 (1979)).

In this case, the record reflects that plaintiff was placed on mail watch in December of 2005 pursuant to DOCS Directives Nos. 4421 and 4422.  Smith Decl. (Dkt. No. 48-5) ¶¶ 23-25.  The record also shows, without contradiction, that the mail watch resulted from interception of a letter, as part of an ongoing investigation into the use of various addresses to correspond with a former inmate in violation of prison rules, mailed by the plaintiff to a Hong Kong address and discussing plans to injure Superintendent Smith and Deputy Superintendent Maly and to cause a riot and hostage situation at Shawangunk.  *Id.* at ¶¶ 25-29 and Exh. C.  These circumstances provide ample basis for placing the plaintiff on mail watch, and plaintiff's First Amendment rights were therefore not infringed based upon defendants' conduct.[21]

b)   <u>Retaliation</u>

For purposes of applying the *prima facie* case retaliation claim

---

[21]     In their motion papers, defendants allege that the propriety of the mail watch was confirmed by a state appellate court, citing the Third Department's June 28, 2007 Article 78 decision.  *See* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 48-1) ¶ 17.  A review of that decision, however, fails to support that assertion and, in fact, the mail watch claim is not referenced in the Article 78 petition which gave rise to that determination.

42

paradigm, I will assume, without deciding, that plaintiff's filing of grievances in the April through June 2005 timeframe constituted protected activity, and the mail watch instituted in December 2005 could appropriately be viewed as adverse action.  *See Wheeler v. Beard*, No. Civ. A.03-4826, 2005 WL 1840159, at *3 (E.D.Pa. Aug. 3, 2005) (prisoner plaintiffs alleged adverse action in retaliation claim by claiming that defendants, among other things, denying medical treatment and prison-issued undergarments, destroying legal mail and other legal materials, planting contraband in cell to serve as basis for bogus misconduct report, and caused one plaintiff to lose his job); *but cf. Battice v. Phillip*, 04 Civ. 0669(FB), 2006 WL 2190565, at *6 (E.D.N.Y. Aug. 2, 2006) ("Even if intentional, [defendant's failure to deliver plaintiff's mail] is 'simply *de minimis* and therefore outside the ambit of constitutional protection .' '); *Rivera v. Pataki*, 04 Civ. 1286(MBM), 2005 WL 407710, at *19 (S.D.N.Y. Feb. 7, 2005) (dismissing prisoner's claim that correction officers actively prevented him from sending legal mail in retaliation for a pending lawsuit because the alleged conduct did not constitute "adverse action").  It is arguable that the timeframe involved between the two, being less than six months, could support the requisite nexus finding and thereby establish the final element of a *prima facie* case of retaliation.

43

*See Morales v. Mackalm*, 278 F.3d at 131.

Responding to plaintiff's *prima facie* claim, defendants have articulated a legitimate non-discriminatory basis for placing the plaintiff on mail watch. Confronted with defendants' explanation, plaintiff has offered nothing to establish pretext, nor has he produced any evidence from which a reasonable factfinder could conclude that the mail watch was implemented in retaliation for plaintiff's filing of several grievances.

Based upon the foregoing, I recommend that both the retaliation and First Amendment components of plaintiff's Tenth Cause of Action be dismissed.

F.    Plaintiff's ADA/Section 504 Claim

In support of his claim under section 504 plaintiff asserts that he is vision impaired and that defendants discriminated against him by not reasonably accommodating his impairment during the course of the IPC hearing. Defendants counter that this claim was decided against the plaintiff by the state appellate court, which concluded "[p]laintiff's limited vision disability was appropriately accommodated with a magnifying glass." *Cabassa*, 41 A.D.3d at 1102, 840 N.Y.S.2d 161.

Plaintiff is entitled to the protections afforded under Title II of the ADA, which has been held to apply to inmates confined within state

prisons.  *See Pennsylvania Dep't at Corrections v. Yesky*, 524 U.S. 206,

212, 118 S. Ct. 1952 (1998); *Beckford v. Portuondo,* 151 F. Supp.2d 204,

220 (N.D.N.Y. 2001).  Plaintiff is also entitled to the protections of section

504 of the Rehabilitation Act since, as defendants acknowledge,

Shawangunk is a public entity that receives federal funding.   *See*

Defendants' Memorandum (Dkt. No. 48-2) at p. 20.

    The requirements for establishing claims under these two sections

do not materially differ.  Title II of the ADA provides, in relevant part, that

"no qualified individual with a disability shall, by reason of such disability

be excluded from participation in or denied the benefits of services,

programs, or activities of a public entity, or be subjected to discrimination

by any such entity."  42 U.S.C. § 12132.  Section 504 similarly provides

that "[n]o otherwise qualified individual with a disability in the United

States. . . shall, solely by reason of his or her disability be excluded from

the participation and, be denied the benefits of, or be subject to

discrimination under any program or activity receiving Federal financial

assistance."  29 U.S.C. § 794(a).

    To state a claim under section 504 a plaintiff must allege that 1) he

or she is disabled; 2) he or she is otherwise qualified for the benefit

sought or participation on the program at issue; 3) he or she was excluded

from participation and/or denied the benefit of or was subject to discrimination solely by reason of his or disability; and 4) defendants are subject to requirements of section 504.  *Beckford*, 151 F.Supp.2d at 221. To establish a violation of the ADA, a plaintiff must show "1) [he is a] 'qualified [individual]' with a disability; 2) that the defendants are subject to the ADA; and 3) that [plaintiff was] denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiff's disabilities."  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (citing *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998)), *cert. denied*, 541 U.S. 936, 124 S. Ct. 1658 (2004).

Claims under the ADA and section 504 are generally are analyzed utilizing the under the *McDonnell Douglas* burden-shifting algorythm or a motivating fact analysis under *Price Waterhouse.*[22]  *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn,* 280 F.3d 98, 112 (2d Cir. 2001). Under the *McDonnell Douglas* protocol, a plaintiff must first establish a *prima facie* case of discrimination.  *McDonnell Douglas Corp.,* 411 U.S. at 802-03, 93 S. Ct. 1817; *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 76 (2d Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S.

---

[22]     *McDonnel Douglas Corp. v. L. Green*, 411 U.S. 792, 93 Ct. 1817 (1973); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775 (1989).

133, 142, 120 S. Ct. 2097, 2106 (2000)).  Upon establishment of a *prima facie* case, the burden of production shifts to the defendant, who at that juncture must come forward and articulate a legitimate, non-discriminatory reason for the adverse action in issue.  *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S. Ct. 1817; *Holtz,* 258 F.3d at 77 (quoting *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir. 2000)); *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).  Once the defendant has successfully shouldered this burden, the focus then reverts to the plaintiff, who must establish that the alleged, non-discriminatory rationale offered did not genuinely prompt the adverse action, but instead is a mere pretext for discrimination.  *McDonnell Douglas Corp.*, 411 U.S. at 804, 93 S. Ct. 1817; *Graham v. Long Island R.R.,* 230 F.3d 34, 43 (2d Cir. 2000) (citing *Hargett v. Nat'l Westminster Bank, USA,* 78 F.3d 836, 839 (2d Cir. 1996), *cert denied*, 519 U.S. 824, 117 S. Ct. 84 (1996)).  While under *McDonnell Douglas* the burden of production alternates back and forth between the parties, a plaintiff claiming intentional discrimination is tasked ultimately with establishing discrimination by a preponderance of the evidence. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S. Ct. 1089, 1093 (1981); *Holcomb v. Iona College,* 521 F.3d 130, 138 (2d Cir. 2008).

Under *Price Waterhouse*, if the plaintiff can establish that the prohibited discrimination played "a motivating part" in the adverse action, the defendant must then demonstrate that he or she "would have made the same decision in the absence of discrimination." *Price Waterhouse*, 490 U.S. at 252-53, 109 S. Ct. 1775.  A party seeking the benefit of this defense bears the burden of establishing by a preponderance of the evidence that it would have taken the same action, irrespective of the plaintiff's disability.  *See Bookman v. Merrill Lynch*, No. 02 CIV. 1108, 2009 WL 1360673, at *10-16 (S.D.N.Y. May 14, 2009).

In their motion defendants have apparently assumed that the plaintiff is disabled for purposes of the ADA and section 504, and have focused their motion on plaintiff's alleged inability to demonstrate that his disability was not reasonably accommodated during the course of the hearing in question.[23]

---

[23]    It should be noted that monocular vision, from which plaintiff appears to suffer, is not *per se* a disability within the meaning of the ADA and section 504.  *Hoehn v. Int'l Sec. Services & Investigations, Inc.,* 244 F. Supp. 2d 159, 167 (W.D.N.Y. 2002) (citing *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 556, 119 S. Ct. 2162, 2169 (1999)).  "[R]ather, whether monocular vision substantially limits a major life activity of a particular individual is to be determined on a case by case basis and in terms of the impairment's impact on the individual."  *Id.*; *see also Ditullio v. Village of Massena*, 81 F. Supp. 2d 397, 405 (N.D.N.Y. 2000).  To determine the particular impact of monocular vision upon a plaintiff, for purposes of the ADA disability calculus, the court should consider "1) the degree of visual acuity in the weaker eye; 2) the age at which the vision loss occurred; 3) the extent of the individual's compensating adjustments in visual techniques; and, 4) the ultimate scope of the restrictions on the individual's abilities."  *Hoehn,* 244 F. Supp. 2d at 167 (citing *Kirkingburg*, 527 U.S. at 566, 119 S.

In reviewing the IPC hearing determination the Third Department concluded that plaintiff's limited vision disability was appropriately accommodated during that proceeding by making available to him a magnifying glass. *Cabassa,* 41 A.D. 3d at 1102. This finding precludes plaintiff from attempting to relitigate the issue in this action. *Marvel*, 310 F.3d at 286-87.

Even if plaintiff were not collaterally estopped from arguing that defendants failed to reasonably accommodate his disability, the record now before the court plainly reflects that they did not. A review of the transcript of plaintiff's IPC hearing reflects that plaintiff was provided with a magnifying glass, and it was his conduct in abandoning the hearing before it was completed that interfered with his inability to participate fully in that process. Accordingly, no reasonable factfinder could conclude that plaintiff was denied the right to fully participate in the IPC hearing, and that the denial was the result of his disability and defendants' failure to provide a reasonable accommodation. I therefore recommend the entry of summary judgment dismissing plaintiff's ADA and section 504 claims.

G.    Doe Defendants

---

Ct. at 2169). Even though most people with monocular vision will meet the ADA's definition of disability, they are still required to prove their loss is substantial. *Id.*; *see also, Gibbs v. City of New York*, No. 02-CV-2424-LB, 2005 WL 497796, at *5 (S.D.N.Y. Jan. 21, 2005).

In his complaint plaintiff has included three defendants who are not identified by name, including "John Doe", whose official position is identified as a "CMC Transfer Review-IG Office"; "James Doe", whose position is listed as an "Analyst Classification and Movement"; and "Bob Doe" identified as a member of the "IPC Review Committee". Despite the fact that this action has been pending for some two and one-half years, and discovery in the case is closed, plaintiff has taken no steps to identify those individuals and to obtain service upon them.

Although defendants' motion does not explicitly request this relief, I have *sua sponte* determined to raise the question of whether plaintiff's remaining claims should proceed against the three unserved defendants. The decision to raise the issue is bottomed upon the requirement, imposed by Rule 4(m) of the Federal Rules of Civil Procedure, that service be made within 120 days of issuance of the summons, absent a court order extending that period.[24]  "[W]here good cause is shown, the court

---

[24]      That rule provides that

> [i]f a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. . . .

Fed. R. Civ. P. 4(m). This court's local rules shorten the time for service from the 120

has no choice but to extend the time for service, and the inquiry is ended."
*Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th Cir. 1996).
"If, however, good cause does not exist, the court may, in its discretion,
either dismiss the action without prejudice or direct that service be
effected within a specified time."  *Id.* (citing Fed. R. Civ. P. 4(m)); *Zapata
v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007) ("[D]istrict courts
have discretion to grant extensions even in the absence of good cause.");
*Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986).
When examining whether to extend the prescribed period for service, a
district court is afforded ample discretion to weigh the "overlapping
equitable considerations" involved in determining whether good cause
exists and whether an extension may be granted in the absence of good
cause.  *See Zapata*, 502 F.3d at 197.

A plaintiff's *pro se* status entitles him or her to a certain degree of
leniency insofar as service of process is concerned; courts generally favor
resolution of a case on its merits rather than on the basis of a procedural
technicality.  *Poulakis v. Amtrak*, 139 F.R.D. 107, 109 (N.D. Ill. 1991).
When a plaintiff proceeds *in forma pauperis*, such as is the case in this
instance, the court is obligated to issue the plaintiff's process to the United

---

day period under Rule 4(m) to sixty days.  *See* N.D.N.Y.L.R. 4.1(b).

States Marshal, who must in turn effect service upon the defendants, thereby relieving the plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint.  *Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996). That does not mean, however, that a *pro se* plaintiff may stand idly by upon being notified that efforts by the U.S. Marshals Service to serve a particular defendant have been unsuccessful.  *VanDiver v. Martin*, 304 F. Supp. 2d 934, 938-43 (E.D. Mich. 2004).  In such instances it is incumbent upon the plaintiff to develop, though pretrial discovery or otherwise, any additional information necessary to permit service by the United States Marshals Service.  *See VanDiver*, 304 F. Supp. 2d at 942.

I am mindful of the Second Circuit's recent decision in *Murray v. Pataki*, in which the court cautioned that

> [a] *pro se* prisoner proceeding *in forma pauperis* is only required to provide the information necessary to identify the defendant, *see, e.g. Sellers*, 902 F.2d at 602, and it is "unreasonable to expect incarcerated and unrepresented prisoner-litigants to provide the current business addresses of prison-guard defendants who no longer work at the prison," *Richardson v. Johnson*, 598 F.3d 734, 739-40 (11th Cir. 2010).

*Murray v. Pataki*, No. 09-1657, 2010 WL 2025613, at *2 (2d Cir. May 24, 2010) (summary order) (cited in accordance with Fed. R. App. Proc. 32.1).

In this case the defendants at issue have not been served or

otherwise appeared in the action within the appropriate time period.

Based upon a review of the record I am unable to find good cause

justifying plaintiff's failure to utilize the tools available to him through the

discovery process to identify the Doe defendants and to effectuate timely

service upon them, and find no sufficient basis presented to exercise my

discretion in favor of extending the governing period for effectuating

service.  Accordingly, since this court has never acquired jurisdiction over

them, the complaint should be dismissed as against those defendants,

without prejudice.  *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner &*

*Smith, Inc.,* 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989) (citing *Mississippi*

*Publishing Corp. v. Murphree*, 326 U.S. 438, 444-45, 66 S. Ct. 242, 245-

46 (1946)) (court lacks jurisdiction until defendants properly served with

summons and complaint).

IV.    SUMMARY AND RECOMMENDATION

      As the Third Department concluded in its decision in connection with

plaintiff's Article 78 challenge of that determination, plaintiff received due

process during the course of the hearing leading to his IPC confinement,

and his limited vision, assuming *arguendo* that it qualifies as a disability

under the ADA and section 504 of the Rehabilitation Act, was reasonably

accommodated during the course of that hearing.  The record reveals,

moreover, that plaintiff received the required, periodic reviews following the initial IPC determination period.

Based upon the record now before the court I find that plaintiff's retaliation claims are legally insufficient as a matter of law.  While plaintiff has established *prima facie* claims of retaliation based both upon the denial of his requests for a transfer to another facility and the institution of a watch of his mail, defendants have articulated legitimate, non-discriminatory reasons for taking those actions, and plaintiff has failed to provide evidence from which a reasonable factfinder could conclude that those stated reasons were pretextual and that defendants' actions were motivated by retaliatory animus.  I therefore also recommend dismissal of plaintiff's claims of retaliation.[25]

Based upon the foregoing it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 48) be GRANTED and that plaintiff's complaint in the action be DISMISSED in its entirety as against

---

[25]    In their motion defendants also seek dismissal of any pendent state law claims deemed to be included within plaintiff's complaint, arguing that such claims are precluded by New York Corrections Law § 24(1), and in any event once all federal claims are dismissed the court should decline to exercise supplemental jurisdiction over those state law claims.  Because plaintiff's complaint, even generously construed, does not appear to include any such claims, I have not addressed that aspect of defendants' motion.  In addition, in view of my recommendation on the merits, I have not considered defendants' claim of entitlement to qualified immunity from suit.

all remaining defendants.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:       February 22, 2011
             Syracuse, NY

55



Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and Donald Selsky, Director of Inmate Special Housing Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, Ellen Lacy Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

*1 Anthony Robinson, a former inmate incarcerated by the New York State Department of Corrections ("DOCS"), sued two DOCS employees, alleging that they violated his right to due process in the course of a disciplinary proceeding and subsequent appeal. On September 9, 1997, defendants moved for summary judgment. Defendants argued that plaintiff failed to demonstrate that the fifty days of keeplock confinement that he received as a result of the hearing deprived him of a liberty interest within the meaning of the Due Process Clause. Plaintiff did not oppose the summary judgment motion, and Magistrate Judge David N. Hurd recommended that I grant it in a report-recommendation filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only satisfy [myself] that there is no clear error on the face of the record in order to accept the recommendation." Fed.R.Civ.P. 72(b) advisory committee's note. After reviewing the record, I conclude that there is no clear error on the face of the record. After being warned by defendants' motion that he must offer proof in admissible form that his disciplinary confinement imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Robinson failed to offer any such proof. Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Consequently, he cannot maintain a due process challenge. Id. Therefore, it is

ORDERED that the report-recommendation is approved; and it is further

ORDERED that defendants' motion for summary judgment is granted and the complaint dismissed; and it is further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

of this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

*2 The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton Annex; T.J. Howard, Hearing Officer; J. Maggy, Sergeant; Byron Wind, Officer; Barry Rock, Officer; and Philip Coombe, Jr., Acting Commissioner, Defendants.
No. 95-CV-1733 (RSP/DNH).

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, New York, Darren O'Connor, Esq., Asst. Attorney General, of Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

**\*1** This matter comes to me following a report-recommendation by Magistrate Judge David N. Hurd, duly filed on the 29th of August, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995, he and some other inmates were attacked while incarcerated at Clinton Correctional Facility. Compl., Dkt. No. 1, ¶ 2. Cotto alleges that as a result of this incident he was charged with engaging in violent conduct and conduct which disturbed the order of the facility. *Id.* Although Cotto was found guilty of these charges and sentenced to a term of one year in the Special Housing Unit and loss of six months good time, his sentence was reversed on administrative appeal. *Id.* Cotto brought this action pursuant to 42 U.S.C. § 1983, alleging various violations of his rights under the Eighth and Fourteenth Amendments. *Id.*

By motion filed March 3, 1997, defendants sought summary judgment. Dkt. No. 17. Plaintiff filed no papers in opposition to the motion. In his report-recommendation, the magistrate judge recommended that I grant defendants' motion pursuant to Local Rule 7.1(b)(3), which provides that, absent a showing of good cause, failure to respond to a motion shall be deemed consent to the relief requested. Dkt. No. 19, at 2. Cotto has filed no objections to the report-recommendation.

After careful review of all of the papers herein, including the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby approved, and it is further

ORDERED that defendants' motion for summary judgement is GRANTED and the complaint against them dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the Honorable Rosemary S. Pooler, for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

Report-Recommendation pursuant to the Local Rules of the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

**\*2** NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I);

Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681*etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F.Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL
903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,*
1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v.
O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1
n. 2 (N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's
Child and Family Studies ("CFS") department in the
Spring of 1995. Successful completion of the doctoral
program required a student to (1) complete 60 credit hours
of course work; (2) pass written comprehensive
examinations ("comp.exams") in the areas of research
methods, child development, family theory and a specialty
area; (3) after passing all four comp. exams, orally defend
the written answers to those exams; (4) then select a
dissertation topic and have the proposal for the topic
approved; and (5) finally write and orally defend the
dissertation. Plaintiff failed to progress beyond the first
step.

Each student is assigned an advisor, though it is not
uncommon for students to change advisors during the
course of their studies, for a myriad of reasons. The
advisor's role is to guide the student in regard to course
selection and academic progress. A tenured member of the
CFS department, Dr. Jaipaul Roopnarine, was assigned as
plaintiff's advisor.

As a student's comp. exams near, he or she selects an
examination committee, usually consisting of three faculty
members, including the student's advisor. This committee
writes the questions which comprise the student's comp.
exams, and provides the student with guidance and
assistance in preparing for the exams. Each member of the
committee writes one exam; one member writes two. Two
evaluators grade each exam; ordinarily the faculty member
who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising
duties, was the coordinator of exams for the entire CFS
department. In this capacity, he was generally responsible
for selecting the evaluators who would grade each
student's comp. exam, distributing the student's answer to
the evaluators for grading, collecting the evaluations, and
compiling the evaluation results.

The evaluators graded an exam in one of three ways:
"pass," "marginal" or "fail." A student who received a
pass from each of the two graders passed that exam. A
student who received two fails from the graders failed the
exam. A pass and a marginal grade allowed the student to
pass. A marginal and a fail grade resulted in a failure. Two
marginal evaluations may result in a committee having to
decide whether the student would be given a passing
grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer. FN2 The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of
the evaluators may have written the question, and
the question may have been specific to just that
one student, one of the two or three evaluators
may have known the student's identity regardless
of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

### DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

### I. Hostile Environment

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U.S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

### A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the respondeat superior principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at \*5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at \*6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see* *supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd*, 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray*, 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1995 WL 117718 (S.D.N.Y.)

(Cite as: 1995 WL 117718 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Jimmie Lee ALLEN, Plaintiff,

v.

Thomas A. COUGHLIN III; Donald Selsky; Jose Pico;
Charles J. Scully; Wallace Oldham; C. Artuz; M.
Haubert; S. Phillips; and Kim Thornton; Jointly,
Severally, and Individually, Respectively, Defendants.

No. 92 Civ. 6137 (MGC).

Mar. 17, 1995.

Jimmie Lee Allen, plaintiff pro se.

G. Oliver Koppell, Atty. Gen. of the State of N.Y. by
Charles F. Sanders, Asst. Atty. Gen., New York City, for
defendants.

MEMORANDUM OPINION AND ORDER

CEDARBAUM, District Judge.

**\*1** Plaintiff, an inmate at the Attica Correctional
Facility, sues under 42 U.S.C. § 1983 on the claim that
defendants deprived him of due process of law by
withholding documents relevant to his defense in a
rehearing of disciplinary charges against him, by
sentencing him to time served without giving him notice
as to the possible range of sanctions, and by not
completing the rehearing in a timely manner. Plaintiff also
sues under 42 U.S.C. § 1983 to recover a fine that he
alleges was imposed in violation of the *ex post facto*
clause of the Constitution. Defendants have moved to
amend their answer to add the affirmative defenses of *res
judicata* and collateral estoppel and to dismiss the
complaint or, in the alternative, for summary judgment.
For the reasons discussed below, defendants' motion is
granted in part and denied in part.

*Background*

Plaintiff brought an Article 78 proceeding in the New
York State Supreme Court to challenge a prison
disciplinary determination that he had violated four of the
regulations of the New York Department of Correctional
Services ("DOCS"). The Article 78 court granted DOCS'
application to annul the hearing and remand the matter for
a new hearing. (Decision/Order of N.Y.Sup.Ct., Dutchess
Cty., Benson, A.J., Index No. 4216/91, dated March 13,
1992) After a rehearing, all charges against plaintiff were
dismissed except one, for which plaintiff was sentenced to
the time he had already served in the Special Housing Unit
as a result of the earlier determination. Because of the
determination at the rehearing, a $5.00 mandatory
disciplinary surcharge was imposed on plaintiff pursuant
to a regulation that had gone into effect after the
conclusion of the first hearing. *See* N.Y.Comp.Codes R. &
Regs. tit. 7, § 254.7(b) (1994).

Plaintiff filed an administrative appeal, which was
denied on July 1, 1992. Plaintiff then brought another
Article 78 proceeding in the New York State Supreme
Court, which was dismissed. (Decision and Order,
N.Y.Sup.Ct., Dutchess Cty., Index No. 5115/92, Hillery,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 117718 (S.D.N.Y.)

(Cite as: 1995 WL 117718 (S.D.N.Y.))

A.J., dated June 28, 1993)

Plaintiff filed this action in July of 1992. Defendants moved to dismiss the complaint pursuant to Rule 12(b)(6). That motion was denied on October 4, 1993. Defendants now move to amend their answer to add *res judicata* and collateral estoppel as affirmative defenses and to dismiss the complaint or, in the alternative, for summary judgment.

*Discussion*

*I. Motion to Amend Answer*

As a preliminary matter, it is necessary to decide whether defendants should be permitted to amend their answer to add the affirmative defenses of *res judicata* and collateral estoppel. Although defendants have styled this motion as one to "amend their answer," they cannot point to an answer to amend. Defendants have not filed an answer with the court. They assert that they served an answer upon plaintiff, but he denies ever having received an answer. Defendants have not candidly admitted this deficiency, but, in a reply brief, they refer to their motion as one "to amend or file their answer."

**\*2** If defendants are not permitted to file an answer, they will be in default. Therefore, it is appropriate to look to the standard for setting aside an entry of default to decide whether defendants should be permitted to file an untimely answer. *See In re Roth,* 172 B.R. 777 (Bankr.S.D.N.Y.1994) (where debtor sought to file answer more than one year after filing complaint and creditor refused to consent to late filing and sought default judgment, court applied standard of Rule 55(c) for setting aside entry of default, although no entry of default had yet been made); *see also John v. Sotheby's, Inc.,* 141 F.R.D. 29, 35 (S.D.N.Y.1992) ("The filing of a late answer is analogous to a motion to vacate a default.").

In determining whether to relieve a party of a default under Rule 55(c), courts must consider three factors: (1) whether the default was willful; (2) whether setting it aside would prejudice the adversary; and (3) whether a meritorious defense is presented. *Meehan v. Snow,* 652 F.2d 274, 277 (2d Cir.1981). "Defaults are not favored, particularly when the case presents issues of fact, and doubts are to be resolved in favor of trial on the merits." *Id.* (citing *Klapprott v. United States,* 335 U.S. 601 (1949)).

There is no evidence that defendants' failure to file an answer was willful. Although defendants make no effort to explain why they did not file an answer within the period prescribed by Rule 12(a), their conduct during the course of the litigation demonstrates a good faith intent to litigate the action. Defendants and plaintiff submitted a joint pre-trial order to the court on February 23, 1994, in which defendants stated their intention to assert the *res judicata* and collateral estoppel affirmative defenses. *See In re Roth,* 172 B.R. at 781 (pro se debtor who failed to file answer more than one year after filing of complaint held to have demonstrated "his intent to fulfill his obligations as a litigant" where he had appeared at depositions and corresponded with plaintiff's counsel during that period).

Plaintiff will not be unfairly prejudiced by the addition of these defenses. Plaintiff will not need additional discovery. Moreover, for more than a year, plaintiff has had notice that defendants intended to assert these defenses.

Finally, as discussed below, defendants' *res judicata* defense is meritorious with respect to some of plaintiff's claims, and collateral estoppel is a meritorious defense to other claims. Thus, an examination of the applicable factors shows that defendants should be permitted to file their answer.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 117718 (S.D.N.Y.)

(Cite as: 1995 WL 117718 (S.D.N.Y.))

*II. Res Judicata and Collateral Estoppel Defenses*

Since defendants are permitted to assert the *res judicata* and collateral estoppel defenses, I turn to defendants' motion for summary judgment on those grounds. A federal court must give the same preclusive effect to a state judgment as would be given in the state where it was rendered. *Migra v. Warren City School District Bd. of Educ.,* 465 U.S. 75, 81 (1984); *see also* 28 U.S.C. § 1738. Therefore, I look to the law of New York to determine the preclusive effect of plaintiff's second Article 78 proceeding.

**\*3** Under the doctrine of *res judicata,* when a court renders a final judgment on the merits, the parties are precluded from relitigating the claims that were or could have been raised in that action. *Fay v. South Colonie Central School Dist.,* 802 F.2d 21, 28 (2d Cir.1986). New York applies a "transactional approach" to *res judicata,* that is, claims that arise out of the same "factual grouping" that formed the basis for the prior judgment are considered to be part of the same claim and will be barred even if they are based upon different legal theories or seek additional relief. *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986); *Cepeda v. Coughlin,* 785 F.Supp. 385, 387 (S.D.N.Y.1992). However, a prior final determination does not bar another action arising from the same claims if the forum which issued the judgment does not have the power to award the full relief sought in the action. *See Davidson,* 792 F.2d at 278-80; *Cepeda,* 785 F.Supp. at 388 n. 1. Since damages may only be awarded under Article 78 when they are "incidental to the primary relief sought," N.Y.Civ.Prac.L. & R. § 7806, courts have held that damage claims under Section 1983 are not barred by prior Article 78 judgments. *See Davidson,* 792 F.2d at 278-80; *Natale v. Koehler,* No. 89 Civ. 6566 (PNL), 1991 WL 130192 (S.D.N.Y. July 9, 1991). Therefore, although plaintiff's claims for relief other than damages [FN1] are barred under the doctrine of *res judicata,* plaintiff's damage claims are not barred.

Defendants argue that *Davidson* does not prevent the application of *res judicata* in this case because the plaintiff in *Davidson* had prevailed in the Article 78 proceeding unlike the plaintiff in this case whose Article 78 claims were denied. The Second Circuit has rejected such a distinction. *Davis v. Halpern,* 813 F.2d 37, 39 n. 2 (2d Cir.1987).

Although plaintiff's claims for damages are not barred by *res judicata,* they are barred by collateral estoppel. Collateral estoppel precludes a party from relitigating an issue when (1) the identical issue was necessarily decided in another action; and (2) there was a full and fair opportunity to litigate the issue in the other action. *Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.) (citing *Halyalkar v. Board of Regents,* 72 N.Y.2d 261, 266, 527 N.E.2d 1222, 1224, 532 N.Y.S.2d 85, 87 (1988)), cert. denied, 498 U.S. 951 (1990).

With one exception, the issues that must be decided to determine whether plaintiff is entitled to damages in this action are identical to those decided in the Article 78 proceeding. In the Article 78 proceeding, plaintiff made the following claims of deprivation of due process that he also asserts in this action: (1) that he was denied access to documents necessary to his defense at the disciplinary hearing; (2) that he was not given notice of the range of sanctions that could be imposed as a result of the rehearing; and (3) that the hearing was untimely. The state court considered these issues and found that plaintiff "failed to demonstrate any grounds sufficient ... to support any allegation that the determination under review was ... in violation of law." (Decision and Order, N.Y.Sup.Ct., Dutchess Cty., Index No. 5115/92, Hillery, A.J., dated June 28, 1993) Therefore, these issues were necessarily decided in the Article 78 proceeding.

**\*4** The party opposing issue preclusion bears the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 117718 (S.D.N.Y.)

(Cite as: 1995 WL 117718 (S.D.N.Y.))

burden of establishing that he was not afforded a full and fair opportunity to litigate the issue in the other proceeding. *See Kirkland v. City of Peekskill,* 828 F.2d 104, 108 (2d Cir.1987). Plaintiff has not suggested that he did not have a fair opportunity to present the issues in this action to the Article 78 court.

    Plaintiff does raise one claim in this action which he did not assert in the Article 78 proceeding: that he was forced to pay a fine in the amount of $5.00 because a revision of a regulation was applied to him retroactively in violation of the *ex post facto* clause of the Constitution. Since that claim was not raised in any Article 78 proceeding, the doctrine of collateral estoppel does not preclude plaintiff from litigating that issue in this action.

    Although defendants have also argued that the complaint fails to state a claim, they have not addressed whether plaintiff's allegations regarding the violation of the *ex post facto* clause state a claim. Defendants also have failed to address the issue of whether the *ex post facto* claim could have been brought in the Article 78 proceeding, and, therefore, would be barred by *res judicata.* Until these issues are addressed, defendants' motion to dismiss the *ex post facto* claim must be denied.

### *Conclusion*

    For the foregoing reasons, defendants' motion is granted with respect to all claims except plaintiff's claim regarding violation of the *ex post facto* clause.

    SO ORDERED.

    FN1. Plaintiff's claims for relief other than for money damages are (1) for a declaratory

judgment that defendants violated his rights; (2) that his record be expunged; and (3) that his "prior status" be restored.

S.D.N.Y.,1995.

Allen v. Coughlin

Not Reported in F.Supp., 1995 WL 117718 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jesse L. STEWART, Jr., Plaintiff,

v.

Gary HOWARD, D. Monell, N. Marsh, D. Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D. Russell, Defendants.

No. 9:09-CV-0069 (GLS/GHL).

April 26, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for Defendants.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jesse L. Stewart alleges that Defendants, all employees of the Tioga County Jail, violated his constitutional rights by limiting his ability to send legal mail, depriving him of his mattress and bedding during daytime hours, subjecting him to excessive force, denying him medical care after the alleged use of excessive force, and conducting biased disciplinary hearings. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL SUMMARY

This action involves Plaintiff's experiences at Tioga County Jail, where he was incarcerated from August 19, 2008, to January 13, 2009. (Dkt. No. 30-4 at 14:2-11.) The complaint consists almost entirely of copies of grievances and letters that Plaintiff submitted to other individuals and organizations. The "facts" section of the civil complaint form merely directs the reader to "see attached." As such, the precise contours of Plaintiff's claims are difficult to discern. The documents attached to the complaint show that:

On September 22, 2008, Plaintiff requested a grievance form so that he could complain about the facility's legal mail procedures. (Dkt. No. 1 at 41.) A grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance form so that he could complain about being denied access to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

[Plaintiff] but he refuses to sign off. He states he needs these letters to go out to these courts because he's fighting extradition." *Id.*

On October 30, 2008, Defendant Officer Earl Hollenbeck issued an Inmate Rule Infraction Notice to Plaintiff accusing him of sending mail using another inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008, Plaintiff alleged that, pending disciplinary action against him, staff at the Tioga County Jail deprived him of his mattress, sheets, and blanket when temperatures were as low as fifteen degrees at night and forced him to sit directly on his steel bed for periods up to seventeen hours. (Dkt. No. 1 at 8.) In support of Defendants' summary judgment motion, Defendant Lt. David Monell declares that when inmates are accused of violating a disciplinary rule, they are placed in administrative segregation pending a hearing. During that time, the inmate's bedding is removed during the day. If this was not done, "inmates may intentionally violate rules in order to be assigned to administrative segregation so they could sleep in the cell all day instead of having to adhere to the normal inmate routine." (Dkt. No. 30-11 at 6 ¶ 12.) The parties agree that inmates' mattresses and bedding are returned at night. (Dkt. No. 1 at 10; Dkt. No. 30-11 at 6 ¶¶ 13-15.)

**\*2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8-9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell

and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14-15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30-11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so. Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9-10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

**\*3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46-47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

**\*4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing [FN1] and requesting that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23-24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

FN1. Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16-17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying

you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

**\*5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards-once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29-30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security

problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

*Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

*6 To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added).

"Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

*7 Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30-12 at 10-11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." FN3 *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30-4 at 9-17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14-15. Plaintiff then ended the deposition. *Id.* at 15:20-22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30-12 at 2-3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007).

**\*8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30-10 at 8-11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1-2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A) (3-4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5-8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30-11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

> **FN4.** The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at \*4, 2009 WL 1803454, at \*1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**\*9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8-10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23-24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

**C. Eighth Amendment Conditions of Confinement**

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9-10.) Defendants move for summary judgment of this claim. (Dkt. No. 30-12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson*

*v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

**D. Due Process**

*1. Bedding*

**\*10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30-12 at 5-6.) Defendants are correct.

An individual claiming that he was deprived of an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8-10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

***11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36-3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies *"could*

cause a great effect" and *"could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65-66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

**\*12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30-12 at 11-12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [FN10]

FN6. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN7. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN8. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN9. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN10. The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* --- F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, at *32-39, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be *GRANTED;* and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

▷

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jerome BELLAMY, Plaintiff,

v.

MOUNT VERNON HOSPITAL, in its official and individual capacity, Dr. Marc Janis, in his official and individual capacity, New York State Department Of Correctional Services, Dr. Lester Wright, in his official and individual capacity, and Dr. J. Pereli, in his official and individual capacity, Defendants.

No. 07 Civ. 1801(SAS).

June 26, 2009.

West KeySummary**Civil Rights 78** 🗝 **1358**

**78** Civil Rights

   **78III** Federal Remedies in General

      **78k1353** Liability of Public Officials

         **78k1358** k. Criminal law enforcement; prisons. Most Cited Cases

**Prisons 310** 🗝 **203**

**310** Prisons

   **310II** Prisoners and Inmates

      **310II(D)** Health and Medical Care

         **310k203** k. Reproductive issues. Most Cited Cases

**Sentencing and Punishment 350H** 🗝 **1546**

**350H** Sentencing and Punishment

   **350HVII** Cruel and Unusual Punishment in General

      **350HVII(H)** Conditions of Confinement

         **350Hk1546** k. Medical care and treatment. Most Cited Cases

   A correctional services doctor was not deliberately indifferent to a prisoner's serious medical needs under the Eighth Amendment in connection with the alleged denial of testosterone treatments. The prisoner brought a § 1983 action which alleged that he was denied the treatments which he needed after he developed hypogonadism after an epididymectomy. The doctor not liable for the alleged harm because he was not involved with any denials of the prisoner's treatment and did not create a policy that contributed to the prisoner's alleged harm. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Jerome Bellamy, Alden, NY, pro se.

Julinda Dawkins, Assistant Attorney General, New York, NY, for Defendants.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

*1 Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case [FN1], violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

FN1. The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

## II. BACKGROUND[FN2]

FN2. For more detailed background, see *Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801, 2008

WL 3152963 (S.D.N.Y. Aug. 5, 2008) (*"Bellamy I"*). Some of the facts recounted here are drawn from the prior opinion.

### A. Facts

### 1. Parties

Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York.[FN3] The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws.[FN4] Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS.[FN5] As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS.[FN6]

FN3. *See* Defendants' Rule 56.1 Statement of Facts ¶ 1.

FN4. *See id.* ¶ 2.

FN5. *See id.* ¶ 3.

FN6. *See id.*

### 2. Bellamy's Surgery

In August 2004, while in DOCS custody at Sing Sing

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy.[FN7] Bellamy was HIV positive at the time of his surgery.[FN8] Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone Cortisol.[FN9] As a result of these conditions, Bellamy was prescribed various medications, including a testosterone patch called "Androderm." [FN10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite.[FN11] However, he also experiences similar symptoms even with medication.[FN12]

> FN7. See *Bellamy I,* 2008 WL 3152963, at *1. An epididymectomy is defined as the surgical removal of the epididymis (the cord-like structure along the posterior border of the testicle). The epididymis is essential to the male reproductive system. *See* Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed.2007).

> FN8. *See* 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).

> FN9. See *Bellamy I,* 2008 WL 3152963, at *2. These conditions had many side effects, including sexual maladies and dramatic weight loss. *See id.* While Bellamy contends that the surgery caused the hypogonadism, his treating doctor claims "with a reasonable degree of medical certainty" that the hypogonadism preceded the surgery. *See* 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration of Julinda Dawkins, counsel to defendants, ¶ 4.

> FN10. *See, e.g.,* Amended Complaint ("Am.Compl."), Statement of Facts ¶¶ 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are made by noting first the relevant topic header and then the cited or quoted paragraph number.

> FN11. *See* 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. *See* Moorjani Aff. ¶¶ 4-5.

> FN12. *See* Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). *See also* Am. Compl., Statement of Facts ¶ 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

**3. Bellamy's Letters to Wright**

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility.[FN13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure-a nutritional supplement which had been provided at a previous facility. [FN14] Bellamy's third letter to Wright concerned several matters. [FN15] In particular, Bellamy claimed, *first,* that a female officer entered his cell and retrieved his HIV medication, *second,* that an officer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without Cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation.[FN16]

> **FN13.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 9. *See also* 7/5/05 Grievance Letter from Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants ("Dawkins Decl.").

> **FN14.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.

> **FN15.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 11. *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Deck

> **FN16.** *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates.[FN17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action.[FN18] Wright never sees the actual letters or their responses.[FN19] Inmate letters concerning medical care-such as Bellamy's-are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate.[FN20] The concerns are then investigated and addressed by the regional staff.[FN21]

> **FN17.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 12.

> **FN18.** *See id.*

> **FN19.** *See id.* ¶ 13.

> **FN20.** *See id.* ¶ 14.

> **FN21.** *See id.*

**\*2** All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter.[FN22] Pedro Diaz, the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter.[FN23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter.[FN24] Wright and Bellamy have never met each other, nor have they had any other personal contact.[FN25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters.[FN26]

> **FN22.** *See id.* ¶ 15.

> **FN23.** *See id.*

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN24. *See id.*

FN25. *See id.* ¶ 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., ¶ 9; Bellamy Dep. II at 20:23-25.

FN26. *See* Bellamy Dep. II at 26:17-20.

**4. Bellamy's Claims**[FN27]

FN27. In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims ¶ 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment.[FN28] Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff."[FN29] Bellamy charges the DOCS because he was in its custody when his claims arose.[FN30] Bellamy

specifically alleges that Wright-acting under color of state law-displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight [h] Amendment of the United States Constitution."[FN31] A similar claim is lodged against the DOCS.[FN32] Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with various New York State laws.[FN33] Finally, Bellamy seeks compensatory and punitive damages.[FN34]

FN28. *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").

FN29. *See* Am. Compl., Defendants ¶ 6.

FN30. *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.

FN31. *See id.,* Legal Claims ¶ 13. Bellamy brings his claims pursuant to section 1983 of Title 42 of the United States Code ("section 1983").

FN32. *See id.,* Legal Claims ¶ 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").

FN33. *See id.,* Legal Claims ¶ 18. Bellamy's original Complaint only requested injunctive

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memoranda are treated as if they were raised in his Complaints. *See Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief against Wright is dismissed. *See Polanco v. City of New York Dep't of Corr.,* No. 01 Civ. 759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss ... Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

FN34. *See* Am. Compl., Legal Claims ¶¶ 19-21.

**B. Procedural History**

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

**III. LEGAL STANDARD**

**A. Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FN35 An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " FN36 A fact is material when it " 'might affect the outcome of the suit under the governing law.' " FN37 "It is the movant's burden to show that no genuine factual dispute exists." FN38

FN35. Fed.R.Civ.P. 56(c).

FN36. *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

FN37. *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248).

FN38. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. FN39 "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

party's case, and on which that party will bear the burden of proof at trial.' " [FN40] To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " [FN41] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [FN42] However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " [FN43]

FN39. Fed.R.Civ.P. 56(c).

FN40. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *Accord In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

FN41. *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

FN42. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

FN43. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248-49).

**\*3** In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[FN44] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " [FN45] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." [FN46]

FN44. *See Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

FN45. *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249.

FN46. *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486-87 (2d Cir.2006)).

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," [FN47] and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." [FN48] However, a pro se plaintiff must still meet the usual requirements of summary judgment .[FN49] Thus, a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or her] attempt to oppose defendants' motion [for summary judgment] ineffectual." [FN50]

FN47. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). *Accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

FN48. *Burgos,* 14 F.3d at 790.

FN49. *See Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept.8, 2004). (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct.28, 1999)).

FN50. *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

**B. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions. [FN51] Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to

court at all." [FN52] Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." [FN53] Moreover, the exhaustion of administrative remedies must be proper-that is, in compliance with a prison grievance program's deadlines and other critical procedural rules-in order to suffice. [FN54] The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN55]

FN51. *See* 42 U.S.C. § 1997e(a) (providing that: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 732, 739 (2001).

FN52. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

FN53. *Id.*

FN54. *See Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

FN55. *Porter,* 534 U.S. at 532.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. FN56

FN56. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion." FN57 "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " FN58

FN57. *Marias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

FN58. *Id.* (quoting *Woodford,* 548 U.S. at 95).

**C. Eleventh Amendment Immunity**

**\*4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ..." FN59 "A state's Eleventh Amendment protection from suit extends to its agencies and departments." FN60 "This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity." FN61 To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." FN62 State agencies are not immune from suits asking for injunctive relief under the Eleventh Amendment. FN63

FN59. U.S. Const. amend. XI.

FN60. *Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 338 (S.D.N.Y.2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422 (S.D.N.Y.2001) (affirming the dismissal of a section 1983 claim against the DOCS and a correctional facility because Eleventh Amendment immunity abrogated the court's subject matter jurisdiction to hear the claim).

FN61. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN62. *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

FN63. *See, e.g., Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr. 30, 2007) (considering, but then denying, injunctive relief against a county's department of corrections).

**D. Section 1983**

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [FN64] In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. [FN65] "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983." [FN66] Thus, section 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." [FN67]

FN64. *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN65. *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004) (citation omitted).

FN66. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Accord Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005).

FN67. *Bryant,* 146 F.Supp.2d at 425.

Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " [FN68] Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." [FN69] In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [FN70] However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions,* has violated the Constitution." [FN71] The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." [FN72] Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." [FN73] For example, "[t]he allegation that plaintiff sent defendant[ ] letters complaining of prison conditions is not enough to allege personal involvement." [FN74]

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN68. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

FN69. *Ford v. Conway,* No. 03 Civ. 0927S, 2004 WL 1071171, at *4 (W.D.N.Y. Mar.16, 2004).

FN70. See *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

FN71. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (emphasis added).

FN72. *Id.* at 1949.

FN73. *Id.*

FN74. *Laureano v. Pataki,* No. 99 Civ. 10667, 2000 WL 1458807, at *4 (S.D.N.Y. Sept.29, 2000) (granting a motion to dismiss on similar facts). See also *Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

**E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

**\*5** The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[FN75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment."[FN76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983.[FN77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' "[FN78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals.[FN79]

FN75. U.S. Const. amend. XIII.

FN76. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *Accord Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotations and citations omitted).

FN77. See *Estelle,* 429 U.S. at 105-06.

FN78. *Candeleria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). *Accord Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

*8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").

FN79. *See Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

" 'The deliberate indifference standard embodies both an objective and a subjective prong.' " FN80 "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." FN81 "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." FN82 "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." FN83

FN80. *Morrison v. Mamis,* No. 08 Civ. 4302, 2008 WL 5451639, at *5 (S.D.N.Y. Dec.18, 2008) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

FN81. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

FN82. *Id.* (citing *Estelle,* 429 U.S. 105-06).

FN83. *Pabon v. Goord,* No. 99 Civ. 5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar.28, 2003) (citation omitted).

**F. Preliminary and Permanent Injunction**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." FN84 "A preliminary injunction is an extraordinary remedy never awarded as of right." FN85 "When the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-[he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." FN86 The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. FN87

FN84. *Winter v. Natural Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). *Accord Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund,* No. 08 Civ. 5520, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009) (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ.,* 5 19 F.3d 505, 508 (2d Cir.2008) ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.' ") (citation omitted).

FN85. *Winter,* 129 S.Ct. at 376 (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN86. *Mitchell v. New York State Dep't of Corr. Servs.,* No. 06 Civ. 6278, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009) (quoting *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008)).

FN87. *See Winter,* 129 S.Ct. at 381.

## IV. DISCUSSION

Bellamy asserts an Eighth Amendment deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting Eleventh Amendment immunity with respect to all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

### A. Exhaustion of Administrative Remedies

**\*6** This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no administrative remedy was available to him." [FN88] Thus, Bellamy's claims are not barred by the PLRA.

FN88. *Bellamy I,* 2008 WL 3152963, at *5

(citing *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004)).

### B. Eleventh Amendment Immunity

The Eleventh Amendment immunizes state agencies and state officials acting in their official capacity from suit under section 1983. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

### C. Section 1983 Claim of Deliberate Indifference Against Wright in His Individual Capacity

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal'* s "active conduct" standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal'* s muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated-situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

evidence that Wright was responsible for making any decisions regarding his testosterone medications.[FN89] Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute section 1983 liability.[FN90]

> FN89. *See, e.g.,* Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

> FN90. *See Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain-indeed Bellamy conceded that Wright was not involved in the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

**D. Preliminary and Permanent Injunction**

Bellamy asks this Court to order the DOCS-through an injunction-to provide him with adequate medical care and to comply with New York State laws. This request is denied.

**\*7** *First,* Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without re-addressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis.[FN91]

> FN91. *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period-while he was transferring facilities-and a few alleged short-term periods, although those dates are unspecified).

*Second,* Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs.[FN92] For the objective prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to warrant a preliminary injunction-especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment.[FN93] For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

> FN92. While the DOCS itself is immune from section 1983 liability, the following analysis

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

surrounds the DOCS and its employees generally.

FN93. Further, the defendants' affidavits question many of Bellamy's medical propositions. *See, e.g.,* Moorjani Aff. ¶ 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

**E. Supplemental Jurisdiction**

Bellamy asks this Court to compel the DOCS-through an injunction-to comply with New York State Public Health Laws.[FN94] To the extent that there are any remaining state law claims, this Court declines to exercise supplemental jurisdiction over those claims.[FN95]

FN94. *See* Am. Compl., Prayer for Relief ¶ 18.

FN95. *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims"). *See also Kshel Realty Corp. v. City of New York,* No. 01 Civ.

9039, 2006 WL 2506389, at *13 (S.D.N.Y. Aug.30 2006) ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' ") (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

**V. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Bellamy v. Mount Vernon Hosp.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**H**

United States District Court,

S.D. New York.

Matthew D'OLIMPIO and Michael Kaplan, Plaintiffs,

v.

Louis CRISAFI, in his individual capacity, Brendan
Vallely, in his individual capacity, Thomas
D'Amicantonio, in his individual capacity, James Giglio,
in his individual capacity, Michael Moffett, in his
individual capacity, Paul Nadel, in his individual
capacity, Jennifer Treacy, in her individual capacity,
Kenneth Post, in his individual capacity, and Timothy
Dewey, in his individual capacity, Defendants.

Louis Crisafi, Counterclaim-Plaintiff,

v.

Michael Kaplan, Counterclaim-Defendant.

Nos. 09 Civ. 7283(JSR), 09 Civ. 9952(JSR).

June 15, 2010.

**Background:** Arrestee and former narcotics enforcement
investigator brought action against another investigator
and other narcotics enforcement officials, alleging
malicious prosecution, false arrest, unlawful detention, and
other constitutional violations against arrestee, and First
Amendment retaliation against investigator. Defendant
investigator counterclaimed, alleging defamation by

plaintiff investigator. Defendants moved to dismiss for
failure to state a claim.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

(1) allegations were sufficient to state a claim of
supervisory liability against officials;

(2) law enforcement officers lacked even arguable
probable cause to make arrest;

(3) investigator's statements were not protected by First
Amendment; and

(4) plaintiff investigator was not liable for defamation.

Motions denied in part and granted in part.

West Headnotes

**[1] Civil Rights 78 �150⟶ 1358**

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases

Arrestee was not required to show discriminatory

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

purpose on the part of law enforcement officers in order to establish the personal involvement needed to support the officers' liability on his § 1983 claim alleging that his search, arrest, and prosecution violated the Fourth Amendment. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 ⌒        1395(6)**

78 Civil Rights

    78III Federal Remedies in General

        78k1392 Pleading

        78k1395 Particular Causes of Action

            78k1395(4) Criminal Law Enforcement; Police and Prosecutors

                78k1395(6) k. Arrest, search, and detention. Most Cited Cases

    Allegations against law enforcement officials were sufficient to state a claim under § 1983 that officials failed to supervise narcotics enforcement investigators; complaint incorporated by reference an investigatory report that described various acts of misconduct by investigator that took place prior to arrestee's arrest, and concluded that there was a lack of appropriate supervision by officials, and arrestee alleged that another investigator complained to official in writing regarding investigator's misconduct prior to arrestee's arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[3] Arrest 35 ⌒        63.4(2)**

35 Arrest

    35II On Criminal Charges

        35k63 Officers and Assistants, Arrest Without Warrant

            35k63.4 Probable or Reasonable Cause

                35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

    In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S.C.A. Const.Amend. 4.

**[4] Civil Rights 78 ⌒        1376(6)**

78 Civil Rights

    78III Federal Remedies in General

        78k1372 Privilege or Immunity; Good Faith and Probable Cause

            78k1376 Government Agencies and Officers

                78k1376(6) k. Sheriffs, police, and other peace officers. Most Cited Cases

    In the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. U.S.C.A. Const.Amend. 4.

**[5] Civil Rights 78 ⌒        1358**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

           78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Arrestee's allegations were sufficient to state a § 1983 supervisory liability claim against law enforcement officials, arising out of officials' creation of policy allowing narcotics enforcement investigators to initiate criminal charges based on a phone conversation or faxed affidavit, where arrestee alleged that his arrest for possession of a narcotic and criminal impersonation to obtain prescriptions was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of a prescription within a week, which prompted a narcotics enforcement official to call arrestee's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of arrestee's doctor. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

[6] Arrest 35 ⚷ 63.4(8)

35 Arrest

    35II On Criminal Charges

        35k63 Officers and Assistants, Arrest Without Warrant

           35k63.4 Probable or Reasonable Cause

                35k63.4(7) Information from Others

                    35k63.4(8) k. Reliability of informer. Most Cited Cases

Law enforcement officers lacked even arguable probable cause to arrest arrestee for possession of a narcotic and impersonation of a physician based solely on unauthenticated report by physician's staff denying knowledge of arrestee's prescription. U.S.C.A. Const.Amend. 4.

[7] Constitutional Law 92 ⚷ 1941

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

           92k1941 k. Discipline or reprimand. Most Cited Cases

A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee spoke as a citizen on a matter of public concern; otherwise, the employee's speech is outside the scope of the First Amendment. U.S.C.A. Const.Amend. 1.

[8] Constitutional Law 92 ⚷ 1955

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

           92k1955 k. Police and other public safety officials. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**Municipal Corporations 268 ⚷       185(1)**

268 Municipal Corporations

    268V Officers, Agents, and Employees

       268V(B) Municipal Departments and Officers Thereof

          268k179 Police

             268k185 Suspension and Removal of Policemen

               268k185(1) k. Grounds for removal or suspension. Most Cited Cases

    Law enforcement officer's complaints to supervisor about fellow officer's behavior, his workplace incident reports, and his complaint to the inspector general, was speech falling within officer's official duties, and thus was not protected under the First Amendment, as required to support employee's retaliation claim; statements were made privately though channels available through officer's employment and were made in a manner that would not be available to a non-public employee citizen, and subject of statements was that other officer was not performing his job properly. U.S.C.A. Const.Amend. 1.

**[9] Libel and Slander 237 ⚷       28**

237 Libel and Slander

    237I Words and Acts Actionable, and Liability Therefor

       237k26 Repetition

          237k28 k. By others in general. Most Cited Cases

    It was simply implausible that narcotics investigator in any legally relevant sense caused the republication of his statements in an investigatory report or newspaper article regarding actions of a fellow investigator, as required to state a claim of defamation under New York law.

**[10] Libel and Slander 237 ⚷       28**

237 Libel and Slander

    237I Words and Acts Actionable, and Liability Therefor

       237k26 Repetition

          237k28 k. By others in general. Most Cited Cases

    Under New York law, a plaintiff may not recover damages from the original author for slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication.

*342 James Brian Lebow, Sr., New York, NY, for Plaintiffs.

Christine Alexandria Rodriguez, Christine A. Rodriguez, Law Office, Ivan B. Rubin, Peter Sangjin Hyun, New York State Office of the Attorney General, New York, NY, for Defendants.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.

On August 18, 2009, Plaintiff Matthew D'Olimpio brought this action (docket-numbered 09 Civ. 7283) against defendants Louis Crisafi, Brendan Vallely, Thomas D'Amicantonio, James Giglio, Michael Moffett, and Paul Nadel for malicious prosecution, false arrest, unlawful detention, and various other violations of the Constitution and 42 U.S.C. §§ 1983 and 1988. An amended complaint filed on October 29, 2009 joined Michael Kaplan as a plaintiff and added a claim against defendants Nadel, Jennifer Treacy, Kenneth Post, and Timothy Dewey for unconstitutionally retaliating against Kaplan based on his reports of misconduct committed by defendant Crisafi, a fellow investigator employed by the New York State Department of Health's Bureau of Narcotics Enforcement, Metropolitan Area Regional Office ("BNE-MARO"), in violation of the First and Fourteenth Amendments and § 1983.

On December 18, 2009, defendants Giglio, Moffett, and Nadel moved to dismiss all of D'Olimpio's claims against them, and defendants Crisafi, Vallely, and D'Amicantonio moved to dismiss D'Olimpio's malicious prosecution claim. That same day, defendants Nadel, Treacy, Post, and Dewey moved to dismiss Kaplan's claims against them. Meanwhile, on December 3, 2009, Crisafi had filed what was styled as a complaint against Kaplan (docket-numbered 09 Civ. 9952) alleging that Kaplan defamed him through publication of the reports of Crisafi's misconduct discussed in Kaplan's complaint. On the parties' consent, the Court converted Crisafi's complaint into a compulsory counterclaim in the action docket-numbered 09 Civ. 7283 and consolidated the two cases. *See* Transcript, 1/14/10, *Crisafi v. Kaplan,* No. 09 **\*343** Civ. 9952. On January 22, 2010, Kaplan moved to dismiss that counterclaim.

By Order dated March 1, 2010 (the "March 1 Order"), the Court granted the motion of Nadel, Treacy, Post, and Dewey to dismiss Kaplan's retaliation claim; granted Kaplan's motion to dismiss Crisafi's defamation counterclaim; and denied all other motions to dismiss.[FN1] The Order also promised that a Memorandum would issue in due course stating the reasons for these rulings. With apologies to counsel for the extended delay, the Court here provides that Memorandum.

> FN1. Although the Order did not explicitly so state, all the dismissals were with prejudice (which, as it happens, is also the default position when an order does not state whether a dismissal is or is not with prejudice).

The Court turns first to the motions of defendants Crisafi, Vallely, and D'Amicantonio to dismiss D'Olimpio's malicious prosecution claim, as set forth in the First Amended Complaint ("FAC") filed on October 29, 2009.[FN2] The relevant allegations are as follows:

> FN2. The first five causes of action in the FAC are D'Olimpio's claims. The sixth cause of action is Kaplan's claim.

Sometime before November 16, 2007, D'Olimpio, a resident of Brooklyn, was prescribed Vicodin by his doctor. FAC ¶ 17. He called that prescription into his pharmacy and obtained the Vicodin. *Id.* ¶ 18. D'Olimpio's pharmacy contacted the BNE-MARO after it had not received a hard copy of the prescription from D'Olimpio's doctor within seven days. *Id.* ¶ 19. A MARO official called D'Olimpio's doctor's office and spoke to an unknown individual there, who either stated by phone that he was not aware of D'Olimpio's Vicodin prescription or provided a faxed affidavit purportedly signed by the doctor to that effect. *Id.* ¶ 20. Based on these occurrences, and without any further investigation, MARO investigator Crisafi began planning Crisafi's arrest. *Id.* ¶ 21.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

On or about November 16, 2007, D'Olimpio was exiting his doctor's office in Brooklyn and walking toward his car when Crisafi and defendants Vallely and D'Amicantonio, also MARO investigators, showed D'Olimpio their badges and asked to speak with him. *Id.* ¶¶ 4, 27–28. They asked D'Olimpio his name, where he was coming from, what he was doing at the doctor's office, and whether the car was his. *Id.* ¶ 29. D'Olimpio replied it was his wife's car. *Id.* ¶ 30. Crisafi asked D'Olimpio if they could search him for weapons; D'Olimpio consented to be frisked, but not to a full search. *Id.* ¶¶ 31–32. Crisafi then frisked D'Olimpio, reached into his pockets, and took out his car keys. *Id.* ¶ 33. Crisafi asked D'Olimpio whether he would consent to a search of the car; D'Olimpio refused, but Crisafi nonetheless carried out the search. *Id.* ¶¶ 34–36. During the search, Crisafi found a bag containing a bottle marked for Klonopin but containing both Vicodin and Klonopin pills, all of which were lawfully prescribed to Crisafi and which he carried in one bottle for convenience. *Id.* ¶¶ 37–38. Upon finding the bottle and discovering that there were two types of pills inside, Crisafi handcuffed D'Olimpio and moved him into the police car, without making any effort to find out whether the drugs were legally prescribed. *Id.* ¶¶ 39–40.

While D'Olimpio was being driven to the police precinct and again when he was being escorted to a bathroom prior to questioning, D'Olimpio requested an attorney, but these requests were denied. *Id.* ¶¶ 41–44. Before questioning began, D'Olimpio asked Crisafi to call an ambulance so that he could take the Klonopin that he needed; Crisafi told D'Olimpio to call his wife and ask her to come to the precinct with his medication. *Id.* ¶¶ 46–47. When **\*344** D'Olimpio's wife arrived, D'Olimpio was brought into a different room, and his wife was given his possessions. *Id.* ¶ 48. Crisafi then offered D'Olimpio a blue pill, which he took, but D'Olimpio now believes that pill was not a Klonopin pill, as he experienced side effects of confusion and drowsiness after taking it, which he had never felt previously when taking Klonopin. *Id.* ¶ 50. Crisafi began to interrogate D'Olimpio, and at one point

threatened to rescind his father's physician license. *Id.* ¶ 51. D'Olimpio at that point again requested an attorney, and Crisafi again denied his request. *Id.* ¶¶ 52–53.

During the interrogation, Crisafi asked D'Olimpio to confess to charges of criminal possession of a controlled substance for possessing the Vicodin and to charges of criminal impersonation for allegedly calling pharmacies and using false information to obtain prescriptions. D'Olimpio, under the influence of the pill, signed a one-page confession presented to him by Crisafi. *Id.* ¶ 54. At Crisafi's request, Vallely signed a form falsely indicating that he had seen Crisafi inform D'Olimpio of his *Miranda* rights. *Id.* ¶ 55. D'Olimpio's forged signature was also added to this "*Miranda* sheet." *Id.* ¶ 56. Crisafi, perhaps with the assistance of Vallely or D'Amicantonio, also wrote a four-page confession and forged D'Olimpio's signature and initials on it. *Id.* ¶ 57. Furthermore, Crisafi, possibly with the assistance of Vallely and D'Amicantonio, drafted an affidavit falsely attesting that D'Olimpio illegally possessed Vicodin and that he impersonated a doctor to obtain his prescriptions. *Id.* ¶ 58.

D'Olimpio was then taken to the Manhattan Detention Center, where he was held for 24 hours prior to being arraigned. *Id.* ¶¶ 59–60. Based on the four-page confession and the affidavit, he was arraigned on the criminal possession and impersonation charges and then released on his own recognizance. *Id.* ¶¶ 61–62. According to the Complaint, D'Olimpio appeared in court about seven times before the charges against him were finally dropped on September 4, 2008. *Id.* ¶ 76.

On the basis of these allegations, D'Olimpio's third cause of action claims that Crisafi, Vallely, and D'Amicantonio maliciously prosecuted D'Olimpio by initiating the criminal charges.[FN3] These defendants moved to dismiss this malicious prosecution claim, primarily on the basis that the charges against D'Olimpio remained pending against him as of the time of their motion, as

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

demonstrated by a Court Action Sheet of the Criminal Court, New York County. Decl. of Ivan Rubin, 12/22/09, Ex. 1. Because the favorable termination of the prosecution is a necessary element of a malicious prosecution claim under § 1983, *Green v. Mattingly*, 585 F.3d 97, 103 (2d Cir.2009), the pendency of criminal charges would be fatal to this cause of action.

> FN3. In the first, fourth, and fifth causes of action in the FAC, D'Olimpio respectively alleges that Crisafi, Vallely, and D'Amicantonio violated various constitutional rights, falsely arrested him, and unlawfully detained him. No motions to dismiss were filed with respect to these claims.

In his opposition to the motions to dismiss, D'Olimpio asserted that the Assistant District Attorney prosecuting D'Olimpio's criminal case had committed to move orally to dismiss that case at the next court hearing, which was scheduled for February 2, 2010. Based on that representation, this Court granted leave for D'Olimpio to file a Second Amended Complaint ("SAC") following that hearing. The Second Amended Complaint, filed on February 18, 2010, did indeed include the representation that the criminal charges were dismissed on February 2, 2010. SAC **345** ¶ 110. Since D'Olimpio had now sufficiently alleged the favorable termination of the criminal charges against him, the March 1 Order therefore denied the motions to dismiss D'Olimpio's malicious prosecution claim.[FN4]

> FN4. Defendants also asserted that the malicious prosecution claim should be dismissed because D'Olimpio's allegations failed to demonstrate the element of malice-*i.e.,* that there was "some deliberate act punctuated with awareness of 'conscious falsity' " with respect to the institution of criminal proceedings. *Bradley v. Vill. of Greenwood Lake*, 376 F.Supp.2d 528,

534-35 (S.D.N.Y.2005). But D'Olimpio's allegations regarding the false affidavits and confessions were clearly more than sufficient to plead malice.

Defendants Giglio, Moffett, and Nadel moved to dismiss D'Olimpio's second cause of action, which charged them with various constitutional violations based on their supervisory authority over Crisafi and their involvement with an alleged policy leading to D'Olimpio's false arrest. In this regard, the FAC contains the following allegations with respect to these defendants: At the time of the events alleged, James Giglio was the director of the BNE, and worked in the BNE's office in Troy, New York. *Id.* ¶ 5. Michael Moffett was the BNE's Section Chief with responsibility over BNE investigators, and also worked in the Troy office. *Id.* ¶ 6. Paul Nadel was the BNE's Program Director for the MARO, and worked in the same Manhattan office as Crisafi, Vallely, and D'Amicantonio. *Id.* ¶ 7. All three of these defendants had supervisory authority over Crisafi, Vallely, D'Amicantonio, and Kaplan. *Id.* ¶¶ 5-7.

The FAC further alleges that at the time of Crisafi's arrest, MARO followed the following protocol in order to determine whether a narcotics prescription was legitimate: First, when a patient called in a prescription to a pharmacy, the pharmacy would expect to receive a hard copy of the prescription from the patient's doctor within a week. Second, pharmacies were instructed to contact the MARO if they failed to receive a hard copy by the end of the seven-day period. Third, when the MARO was contacted by a pharmacy because the pharmacy did not receive a hard copy, a MARO officer would call the doctor's office and would either speak with the doctor to inquire whether the prescription was legitimate or would ask the doctor to fax an affidavit stating that the prescription was legitimate. *Id.* ¶ 11. With respect to this last step, MARO had a practice of confirming complaints from doctors by telephone and fax without taking any other steps to verify the doctors' identities. *Id.* ¶ 12.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

The FAC also includes the following allegations regarding the failure of Giglio, Moffett, and Nadel to supervise Crisafi: On March 22, 2007, the *New York Times* published an article detailing the abuse of parking placards by government officials. This article included a photograph of a car belonging to Crisafi. *Id.* ¶ 13. Shortly after the publication of that article, the New York State Inspector General's Office began an investigation of Crisafi, which unearthed evidence of other misconduct. *Id.* ¶ 14. Sometime before November 16, 2007, plaintiff Kaplan, a MARO investigator, sent Nadel a written complaint informing him that Crisafi was violating suspects' Fifth Amendment rights. *Id.* ¶ 15. Nadel took no action in response to this complaint. *Id.* ¶ 16. Kaplan followed up with a series of other complaints, including a report to the Inspector General, which are discussed more fully below in the context of Kaplan's retaliation claim. The Inspector General's investigation culminated in a report issued on December 8, 2008, written by Inspector General Joseph Fisch (the "Fisch Report"), which found that Crisafi committed numerous abuses, including many of those alleged by Kaplan, some of **346** which were assisted by Vallely and D'Amicantonio. The Fisch Report also found that Giglio and Moffett failed to supervise Crisafi and the MARO office, and noted the fact that Nadel, who was responsible for approving law enforcement operations, was a licensed pharmacist with no previous law enforcement experience. *Id.* ¶¶ 78-79.

Based on the above allegations, Crisafi in his second cause of action asserted § 1983 claims against Giglio, Moffett, and Nadel arising from (1) their creation of a policy allowing MARO personnel to initiate criminal charges based on a phone conversation or faxed affidavit without confirmation of the doctor's identity or that the alleged signature on the affidavit is authentic (the "Policy"); (2) their failure to supervise Crisafi and the MARO; (3) their allowing Nadel, a pharmacist with no prior law enforcement experience, to be the MARO Program Director; and (4) their deliberate indifference to D'Olimpio's rights. *Id.* ¶¶ 122-25.

Defendants attack these claims on several grounds. First, they assert that these claims are based on a broad theory of "supervisory liability" that has been discredited by the Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for showing that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a § 1983 claim. A plaintiff could plead personal involvement by showing any of the following:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Defendants argue that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* therefore rendering D'Olimpio's reliance on some of the *Colon* categories unwarranted.

By way of background, the plaintiff in *Iqbal* brought a " *Bivens* " action against several high-ranking federal officials, including the Attorney General and the Director of the Federal Bureau of Investigation, based on allegations that following the September 11 attacks, the FBI "arrested and detained thousands of Arab and Muslim men" substantially on the basis of their race, religion, or national origin, and that as a result plaintiff was unlawfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

subjected to harsh confinement conditions substantially on these discriminatory bases. 129 S.Ct. at 1951. The Supreme Court, however, held, *inter alia,* that the complaint failed to state a claim for intentional discrimination with respect to the Attorney General and FBI Director, and, as part of that discussion, observed that neither *Bivens* itself (*i.e., Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) nor § 1983 imposes supervisory liability simply on the basis of *respondeat superior;* rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948; *see also id.* at 1949 ("[T]he term 'supervisory liability' is a misnomer.... [E]ach Government official ... is only liable for his or her own misconduct."). The Court went on to note that the required showing of personal involvement "will vary with the **347** constitutional provision at issue"; as the plaintiff's claim in *Iqbal* was for "invidious discrimination" in violation of the First Amendment and Equal Protection Clause, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 1948. Accordingly, the Court rejected the plaintiff's theory that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949.

[1] The defendants here note that certain courts in this District have read these passages of *Iqbal* to mean that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ... [t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated." *Bellamy v. Mount Vernon Hosp.,* 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y. 2009) ("[P]assive failure to train claims pursuant to *section 1983* have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* 2009 WL 3321011, at *15 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim Iqbal eliminated."). This Court respectfully disagrees. As *Iqbal* noted, the degree of personal involvement varies depending on the

constitutional provision at issue; whereas invidious discrimination claims require a showing of discriminatory purpose, there is no analogous requirement applicable to D'Olimpio's allegations regarding his search, arrest, and prosecution. *See, e.g., Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). *Colon's* bases for liability are not founded on a theory of *respondeat superior,* but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. 58 F.3d at 873 (internal quotation marks omitted). Thus, the five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

[2] Apart from this argument based on *Iqbal,* Giglio and Moffett assert that D'Olimpio's claims against them should be dismissed insofar as they allege a failure to supervise the MARO investigators. They maintain that D'Olimpio's allegations in this regard are too conclusory to state a claim. The Court disagrees. The FAC incorporates by reference the Fisch Report, which summarizes an investigation beginning in March 2007, describes various acts of misconduct by Crisafi that took place prior to D'Olimpio's arrest, contains a section headed "Lack of Supervision of Crisafi and MARO," and indeed concludes that there was a "lack of appropriate supervision by [Crisafi's] supervisors at MARO and at

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

BNE's headquarters in Troy," where Giglio and Moffett were in charge. Fisch Report, 12/8/08, at 4, 16-17, *available at http:// www. ig. state. ny. us/ *348 pd fs/Investigationöf% 20Employee% 20Misconduct% 20at% 20the% 20DOH% 20Bureau% 20of% 20Narcotics% 20Enforcement.pdf* (cited in FAC ¶ 78). These findings by the Inspector General strongly suggest that defendants Giglio and Moffett "fail[ed] to act on information indicating unconstitutional acts were occurring," or were "gross[ly] negligen[t] in failing to supervise ... subordinates who commit ... wrongful acts," or were otherwise deliberately indifferent to suspects' rights, and also demonstrate "an affirmative causal link between the supervisor's inaction and [plaintiff's] injury." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). For the foregoing reasons, the March 1 Order held that the claims against Giglio and Moffett in this respect cannot be dismissed.

Nadel also argued that the claims against him for his failure to supervise Crisafi must be dismissed because there were no specific allegations of Nadel's personal involvement. The FAC does allege, however, that Kaplan complained to Nadel in writing of Crisafi's misconduct prior to D'Olimpio's arrest. FAC ¶ 15. The Fisch Report, although it does not dwell on Nadel's actions, cites Nadel's lack of prior law enforcement experience and describes complaints by MARO investigators that the lack of a Program Director with law enforcement experience allowed Crisafi "to attain an inappropriate degree of power within the office." Fisch Report at 1, 16. Because the Court, in ruling on a motion to dismiss, must "take all facts and draw all inferences in the light most favorable" to the plaintiff, *Gross v. Rell,* 585 F.3d 72, 75 n. 1 (2d Cir.2009), and because, as noted, the FAC incorporates by reference the allegations of the Fisch Report, the Fisch Report's conclusion that there was a general failure to supervise Crisafi must be taken for these purposes to apply to Nadel, Crisafi's immediate supervisor.[FN5] Thus, the March 1 Order denied the motion to dismiss the claim alleging Nadel's failure to supervise.

FN5. Defendants' reply memorandum asserted that contrary to what was pleaded in the FAC, Crisafi was a Senior Investigator at the time of D'Olimpio's arrest and thus did not report to Nadel at that time. In support of this, it cited to the Fisch Report, which mentions that Crisafi was temporarily promoted between 2006 and March 2008. Fisch Report at 16. The Report does not, however, state that Crisafi ceased reporting to Nadel during this period. The FAC alleges that Nadel, as MARO Program Director, had supervisory authority over all MARO investigators. FAC ¶ 7. In light of the allegations in the FAC, and taking all inferences in favor of D'Olimpio, the Court cannot conclude that Nadel lacked supervisory authority over Crisafi during this period. In any event, it is undisputed that Nadel supervised Vallely and D'Amicantonio, who are also alleged to have violated D'Olimpio's constitutional rights.

With respect to those aspects of plaintiff D'Olimpio's second cause of action that relate to the alleged "Policy," that Policy allegedly permitted BNE investigators to rely on unverified telephone communications with, or faxed affidavits from, doctors' offices to satisfy the requirement of probable cause to arrest suspects or initiate criminal charges. While defendants appear to concede that Giglio, Moffett, and Nadel were sufficiently involved with the formation and operation of this Policy to satisfy the personal involvement requirement of § 1983, they argue that the alleged Policy is not unconstitutional, or at the very least, that the doctrine of qualified immunity should bar further proceedings with respect to these allegations.

[3][4] "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is *349 committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). The probable cause determination is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

based on the "totality of the circumstances," and does not readily lend itself to being reduced to a "neat set of legal rules." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002) (internal quotation marks omitted). Furthermore, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Id.* (internal quotation mark omitted). The Supreme Court has held that tips from informants can provide probable cause to arrest, but only if either the informant or the information in his/her tips has been shown to be reliable or has been sufficiently corroborated. *See Illinois v. Gates,* 462 U.S. 213, 242, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[E]ven in making a warrantless arrest[,] an officer 'may rely upon information received through an informant, rather than upon his direct observations, *so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.'* " (emphasis added)); *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (anonymous call to police reporting that person was carrying a gun lacked indicia of reliability sufficient to satisfy "reasonable suspicion" standard with respect to a police officer's stop-and-frisk search, even though that standard requires a lesser showing than probable cause to arrest); *see also United States v. Elmore,* 482 F.3d 172, 179 (2d Cir.2007) ("Even a tip from a completely anonymous informant-though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable-can form the basis of reasonable suspicion or probable cause *if it is sufficiently corroborated.*" (emphasis added) (citation omitted)); *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994) ("Information about criminal activity provided by a single complainant can establish probable cause *when that information is sufficiently reliable and corroborated.*" (emphasis added)).

[5] Defendants argue that the Policy provides BNE officers with probable cause (either on the merits or sufficient to entitle them to qualified immunity) because the information provided by the doctors' offices is sufficiently reliable to support a reasonable belief that a crime has been committed. For this proposition, the defendants rely primarily on two out-of-circuit cases,

*United States v. Fooladi,* 703 F.2d 180 (5th Cir.1983), and *Edwards v. Cabrera,* 58 F.3d 290 (7th Cir.1995). While these cases do support the proposition that it may be error to discount information provided by disinterested informants absent reason to doubt these informants' veracity, even when their names are not known to the law enforcement officer, these cases do not stand for the proposition that such information alone suffices to establish probable cause. Rather, in *Fooladi,* the probable cause determination was not based solely on information provided by a representative of a glass manufacturer, which the Fifth Circuit held that the trial court had erroneously disregarded. Instead, the arrest was based not only on the employee's tip that the manufacturer had shipped glassware to a purported business address that was in fact the arrestee's personal address, but also on, among other things, the law enforcement agent's personal observation that the arrestee's residence emanated an odor characteristic of methamphetamine manufacturing and that the arrestee left the premises "holding his gloved hands away from his body as if a chemical were on them." 703 F.2d at 181-84. Similarly, in *Edwards,* the Seventh Circuit found that probable cause existed not just because of a tip from a bus **\*350** driver, relayed through a dispatcher, that the driver thought he saw several men participate in a drug transaction in a bus station, but also based on the police officer's own personal observations of several men, including the arrestee and his brother, who matched the driver's description standing together outside the bus station; the officer's personal observation that the arrestee's brother was so nervous that he appeared to have urinated on himself; and the officer's subsequent consent search of the brother's garment bag, which yielded a plastic bag appearing to contain marijuana. 58 F.3d at 292.

These cases are thus consistent with the law in this Circuit, as articulated in *Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir.2002). The plaintiff in *Caldarola,* a New York corrections officer challenged his arrest on charges that he was unlawfully collecting job injury benefits even though he was no longer a New York resident and thus was not qualified to receive such benefits. The arresting officer determined there was probable cause to believe the plaintiff had moved from New York to Connecticut based

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

on an investigative file containing reports from two private investigation firms that had been hired by the officer's supervisors. The reports themselves contained, among other things, summaries of investigators' personal interviews with the plaintiff's New York neighbors, surveillance tapes showing the plaintiff emerging from a home in Connecticut and dropping his children off at school, a deed and mortgage for a Connecticut home in the plaintiff's name indicating that it was his primary residence, and work attendance records indicating that the plaintiff had a Connecticut telephone number. The Second Circuit held that it was reasonable for the arresting officer to conclude that these private investigative firms hired by his supervisors were reliable and that the investigators' reports provided information corroborating their conclusions. *Id.* at 163-68. Thus, accepting *arguendo* defendants' assertion that *Caldarola* stands for the proposition that information gathered by private investigators can support probable cause even in the absence of personal knowledge by the arresting officer, the decision certainly does not suggest that an unadorned, unverified phone call or fax can, by itself, without further meaningful corroboration, satisfy probable cause or support qualified immunity.

[6] Returning to the allegations in the FAC, D'Olimpio has asserted that, consistent with the Policy, his arrest was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of the prescription within a week, which prompted a MARO official to call D'Olimpio's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of the doctor. None of the above-cited cases suggests that this information originating from an unidentifiable person in a doctor's office can even come close to satisfying probable cause to arrest, absent corroboration or other indicia of reliability. Unlike *Caldarola*, here there is no underlying data providing support for the informant's conclusion. There is no indication that the identity of the informant here could ever be determined. *Cf. J.L.*, 529 U.S. at 270, 120 S.Ct. 1375 ("Unlike a tip from a known informant whose

reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " (citation omitted)). There is no suggestion that the MARO investigators had any reason to rely on this particular doctor's office; to the contrary, there are numerous **351 reasons why a doctor or her staff might inadvertently provide inaccurate information, especially given that the relevant information is not affirmatively provided by a tipper, but rather can be elicited by the investigator from whoever happens to pick up the phone in the doctor's office. Moreover, if the doctor herself were involved in wrongdoing with respect to the prescription of narcotics, she would have an incentive to affirmatively mislead the investigators. In sum, while a report from a doctor or her staff denying knowledge of the prescription might be a reasonable basis for further investigation, it is patently deficient as the sole ground for an arrest.

For the foregoing reasons, under the facts alleged and the clearly established law cited herein, defendants lacked even arguable probable cause to arrest D'Olimpio. Because the circumstances of this arrest were consistent with the Policy (as alleged), and because defendants do not dispute that Giglio, Moffett, and Nadel had personal involvement with the establishment and enforcement of this Policy, the March 1 Order declined to dismiss the second cause of action with respect to these allegations.

The Court turns next to those portions of the FAC that assert claims by plaintiff Kaplan, all of which the defendants moved to dismiss. Kaplan's claim of retaliation for expressing his First Amendment rights (the sixth cause of action in the FAC) is based on the following allegations: Kaplan (as noted) is a MARO investigator. FAC ¶ 3. During at least some of the times covered by the FAC, Crisafi was Kaplan's supervisor. *Id.* ¶ 64. As described above, Kaplan complained to Nadel about Crisafi prior to November 16, 2007, but Nadel took no action. *Id.* ¶¶ 15-16. On or about November 17, 2007, Kaplan again went to Nadel and raised concerns about

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Crisafi: in particular, he stated that Crisafi took prescription narcotics while on duty; that Crisafi would experience facial tics and "zone out"; that Crisafi accidentally discharged his weapon while on duty; that Crisafi lied about his previous job experience; that Crisafi had investigators perform "ill-conceived" and dangerous arrests and searches; that Crisafi was violating suspects' *Miranda* rights; that Crisafi, without authorization, put sirens and lights on his car; and that Crisafi was working outside jobs during work hours. *Id.* ¶ 63. Despite the fact that Kaplan told Nadel that he was afraid of Crisafi and Nadel assured Kaplan that the conversation would be kept confidential, Nadel reported this conversation to Crisafi. *Id.* ¶¶ 63-64. Thereafter, on or about November 20, 2007, Crisafi threatened Kaplan by walking up behind him and saying, "Bang bang, you're dead." *Id.* ¶ 65. At around that same time, Kaplan filed a Workplace Incident Report with the Department of Health's Bureau of Employee Relations detailing these threats and reporting Crisafi's other misconduct, of which he had previously complained to Nadel. *Id.* ¶ 66. In response, Crisafi sabotaged Kaplan's work product on several occasions and began to spread rumors about him, including rumors that Kaplan appeared tired and slept while at the office. *Id.* ¶¶ 67-68. Kaplan then called the Inspector General to report these concerns about Crisafi, and the Inspector General then widened his ongoing investigation of Crisafi to address these issues. *Id.* ¶¶ 69-70. Because, however, the Inspector General's investigation led to interviews with all the MARO inspectors except for Kaplan, Crisafi and Nadel were able to infer that Kaplan was the whistleblower. *Id.* ¶ 71.

Kaplan, after spraining his ankle while on duty, went on workers' compensation leave on or about February 27, 2008. *Id.* ¶ 72. A bullet was shot at Kaplan's house on April 17, 2008, and on April 25, 2008, his house was vandalized. *Id.* ¶¶ 73-74. *352 On August 12, 2008, after Kaplan was notified that Employee Relations never received his first Workplace Incident Report, Kaplan resubmitted it. *Id.* ¶ 75.

After publication of the Fisch Report, Giglio resigned

as the director of the BNE. *Id.* ¶ 81. In December 2008, defendant Jennifer Treacy was appointed Deputy Director of the New York State Department of Health, with supervisory authority over the BNE and the MARO. *Id.* ¶ 82. The Inspector General attempted to persuade Kaplan to return to work, as Crisafi was on leave and would face discipline for his conduct. *Id.* ¶ 83. Kaplan agreed to return to work and received a physician's evaluation that he was fit to return. *Id.* ¶¶ 84-86. Nonetheless, Kaplan was required to undergo three additional physical examinations; after reviewing these, the relevant administrator concluded that Kaplan was fit to return, provided the he be closely monitored, specifically for falling asleep at work. *Id.* ¶¶ 87-90. He was scheduled to return to work on April 10, 2009. *Id.* ¶ 91. The FAC alleges that Treacy, who was romantically involved with Giglio, was upset about Giglio's resignation and blamed Kaplan for causing it; therefore, she ordered the acting director of the BNE not to allow Kaplan to return. *Id.* ¶¶ 92-93. On April 9, 2009, Kaplan was told not to return because of a lack of staff, and on April 23, the Department of Health sent him a letter informing him that he was terminated for failing to complete a study to confirm he did not have a sleep disorder. *Id.* ¶¶ 94-95. Kaplan filed a grievance and, after a hearing, was allowed to return to work. *Id.* ¶ 96.

In May 2009, defendant Kenneth Post was appointed as director of the BNE, and defendant Timothy Dewey was appointed as BNE Section Chief. *Id.* ¶¶ 97-98. In June 2009, Kaplan returned to work, and was informed that he would only be given a temporary assignment and would not perform fieldwork. *Id.* ¶ 99. After his reinstatement, Kaplan was denied access to a state car and was not given a badge, gun, or firearms training; he was confined to desk duties and menial document review. *Id.* ¶¶ 100-101. On July 14, 2009, Kaplan met with Dewey to complain about his treatment. *Id.* ¶ 102. D'Olimpio filed his original complaint in the instant action on August 18, 2009. In September 2009, Stephanie Jubic of Employee Relations confiscated the computers of Crisafi, Vallely, D'Amicantonio, and Kaplan-Kaplan believes Jubic downloaded his emails to find grounds to terminate him. *Id.* ¶ 105. On October 8, 2009, Kaplan was placed on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

administrative leave and told not to contact anyone at the BNE. *Id.* ¶ 108. On October 16, Jubic mailed Kaplan a letter stating that he would be interrogated on October 27 and would possibly face discipline. *Id.* ¶ 109. Also on October 16, Kaplan had a grievance hearing to discuss being denied his proper job responsibilities. At this hearing, Post stated that as BNE director, it was in his discretion to decide what duties Kaplan should have. *Id.* ¶ 110.

Based on these facts, Kaplan alleges in that defendants Treacy, Post, Dewey, and Nadel retaliated against him with respect to speech that was protected by the First Amendment. These defendants have moved to dismiss Kaplan's claim on several grounds, including that Kaplan's speech was made pursuant to his official duties and hence is not protected by the First Amendment.

[7] A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee "spoke as a citizen on a matter of public concern"; otherwise, the employee's speech is outside the scope of the First Amendment. *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (internal quotation *353 mark omitted). In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. Though not without reluctance, the Court concludes that this "official duties" exception, as recently elaborated on by the Second Circuit in *Weintraub v. Board of Education,* 593 F.3d 196 (2d Cir.2010), is fatal to Kaplan's retaliation claim.

*Weintraub* made clear that for purposes of determining whether a public employee's speech is protected, a public employee's "official duties" are to be

construed broadly. The plaintiff in *Weintraub* was a public school teacher, and the allegedly protected speech consisted of a grievance he filed with his union challenging a school administrator's decision not to discipline a disruptive student. Quoting *Garcetti,* the Court of Appeals stated that the inquiry into whether a public employee speaks pursuant his official duties is "a practical one," and that the employee's duties should not be interpreted narrowly. 593 F.3d at 202 (internal quotation marks omitted). Thus, *Weintraub* held:

[U]nder the First Amendment, speech can be "pursuant to" a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer. In particular, we conclude that Weintraub's grievance was "pursuant to" his official duties because it was "part-and-parcel of his concerns" about his ability to "properly execute his duties," as a public school teacher-namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning.... Weintraub's speech challenging the school administration's decision to not discipline a student in his class was a "means to fulfill," and "undertaken in the course of performing," his primary employment responsibility of teaching.

*Id.* at 203 (citations omitted). The court went on to note that its conclusion was supported "by the fact that [Weintraub's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." *Id.* Whereas actions like writing a letter to a newspaper or informally discussing politics with co-workers are equally available to government employees and ordinary citizens, "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens." *Id.* at 203-04.

[8] Here, the speech that Kaplan claims is protected falls within Kaplan's official duties as defined by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*Weintraub.* In the FAC, Kaplan alleges that the retaliation he allegedly suffered was in response to the following statements: (1) his complaints to Nadel about Crisafi's behavior; (2) his Workplace Incident Reports; and (3) his complaint to the Inspector General. With the possible exception of the latter, each of these statements, as Kaplan concedes, was "made privately though channels available through his employment, and was "made in a manner that would not be available to a non-public employee citizen." Kaplan Supp. Mem., 2/5/10, at 5. Moreover, the common theme of all these statements was that Crisafi was violating suspects' rights and was not performing his job properly, and by implication that Crisafi was interfering with Kaplan's ability to perform his own duties. It is clear that Kaplan's duties as a MARO officer included ensuring that investigations and arrests of narcotics abuses are lawfully conducted. *See, e.g.,* Fisch Report at 2-3 (describing policies and training manuals **354** applicable to BNE investigators). All of Kaplan's relevant speech was therefore, either directly or indirectly, " 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' " as a BNE investigator. *Weintraub,* 593 F.3d at 203. Just as the speech in *Weintraub* was in furtherance of the teacher's duty to maintain classroom discipline, Kaplan's speech here, which related to ensuring the "safety of citizens" and the "constitutional rights of suspects," Kaplan Supp. Mem. at 5, was made in furtherance of his law enforcement duties as an investigator endowed with the power to arrest. *Cf. Carter v. Inc. Vill. of Ocean Beach,* 693 F.Supp.2d 203, 211 (E.D.N.Y.2010) ( "All of plaintiffs' complaints to their superiors ... related to their concerns about their ability to properly execute their duties as police officers, as they expressed concern [that various acts] affected their ability to perform their job assignments safely and that they were told not to issue summonses to certain individuals and businesses.... Plaintiffs' speech in challenging ... defendants' alleged cover-ups of officer misconduct ... was undertaken in the course of performing one of their core employment responsibilities of enforcing the law and, thus, was speech made pursuant to their official duties."). Accordingly, Kaplan's allegations cannot support a First Amendment retaliation claim.

In addition, the speech contained in Kaplan's Workplace Incident Reports and his complaint to the Inspector General were unprotected by the First Amendment because these statements were required by law. *See* N.Y. Labor Law § 27-b(6)(a) ("Any employee ... who believes that a serious violation of a workplace violence protection program exists or that an imminent danger exists shall bring such matter to the attention of a supervisor in the form of a written notice."); N.Y. Exec. Law § 55(1) ("Every state officer or employee in a covered agency shall report promptly to the state inspector general any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment .... The knowing failure of any officer or employee to so report shall be cause for removal from office or employment or other appropriate penalty.").[FN6] Speech made pursuant to a public employee's legal obligations is not made "as a citizen."[FN7]

FN6. It is these statutory obligations, as well as *Weintraub's* broad definition of speech made in the course of official duties, that distinguish Kaplan's speech from that of the plaintiff in *Freitag v. Ayers,* 468 F.3d 528 (9th Cir.2006). The plaintiff in *Freitag,* a California correctional officer, claimed she was retaliated against after reporting to the California Inspector General that she and other prison guards were being sexually harassed. Although the Ninth Circuit held that the plaintiff "acted as a citizen" in complaining to the Inspector General and in writing letters to a state senator regarding this harassment, the court's holding was based on the fact that "[i]t was certainly not part of [plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly." *Id.* at 545. Under New York law, however, such complaints *are* within the official duties of BNE investigators.

FN7. Because Kaplan's speech was made

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

pursuant to his official duties and thus is not constitutionally protected, the Court need not reach other required elements of a First Amendment retaliation claim, including whether his speech addressed matters of "public concern," *see Sousa, 578 F.3d at 170,* and whether the complaint sufficiently alleges a causal connection between the protected speech and the retaliatory acts, *see Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir.2001).*

For the foregoing reasons, the March 1 Order denied the sixth cause of action in the FAC, and, as the Court now clarifies, the dismissal was with prejudice because it rests on a legal ground that cannot be **\*355** cured by repleading. *Cf. Oliver Schs., Inc. v. Foley, 930 F.2d 248, 252-53 (2d Cir.1991).* The Court notes, however, that the dismissal of Kaplan's First Amendment claim brought pursuant to § 1983 does not alter Kaplan's opportunity under applicable New York law to seek protection from the retaliatory acts he alleges. *See* N.Y. Labor Law § 27-b(6)(e) (prohibiting retaliation based on an employee's filing of a report of workplace violence); N.Y. Exec. Law. § 55(1) (providing that employees who report "improper governmental action" to the Inspector General "shall not be subject to dismissal, discipline or other adverse personnel action").

[9] The Court comes finally to Crisafi's counterclaim for defamation, which insinuates that the aforementioned Workplace Incident Reports filed by Kaplan, Kaplan's complaint to the Inspector General, and even Kaplan's allegations in the FAC are defamatory. Crisafi subsequently conceded, however, that the only potentially actionable statements not protected by privilege or barred by the statute of limitations are those that were allegedly republished on December 8, 2008 by the Inspector General and the *New York Times.* Crisafi Mem. Opp. Kaplan's Mot. to Dismiss, 2/5/10, at 4-5. In this respect, the counterclaim, which was filed on December 3, 2009, alleges the following: Kaplan filed Workplace Incident Reports on or about November 20, 2007 and August 12,

2008 reporting various misconduct by Crisafi, and made a complaint to the Inspector General to the same effect on or about November 20, 2007. Crisafi Compl. ¶¶ 15, 17, 20, Exs. C-E. Crisafi alleges, based on information and belief, that Kaplan's report to the Inspector General "prompted an investigation" focused on Crisafi and relating to Kaplan's complaints. *Id.* ¶ 19. Also upon information and belief, Crisafi alleges that a copy of the Fisch Report was provided to Kaplan in advance of its public release. *Id.* ¶ 35. This report was also provided to the *New York Times,* which described this report in an article published on December 8, 2008. *Id.* ¶ 36 & Ex. F. Upon information and belief, Crisafi alleges that Kaplan gave the Fisch Report to the *New York Times. Id.* ¶ 37. The Fisch Report was published on the *New York Times's* and Inspector General's websites, where it remains accessible. *Id.* ¶¶ 39-40. Crisafi alleges that the contents of the *New York Times* article and the Fisch Report reflect false and defamatory statements made by Kaplan, and have caused Crisafi to be vilified and his reputation to suffer. *Id.* ¶¶ 16, 18, 21, 23-33, 41-43. Accordingly, Crisafi asserted two causes of action alleging that Kaplan defamed him. Kaplan then moved to dismiss these counterclaims on the basis that Kaplan is not responsible for the republication of his allegedly defamatory statements by the *New York Times* or the Inspector General.

[10] Under New York law, a plaintiff "may not recover damages from the original author for ... slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 59 (2d Cir.2002).* Crisafi argues that a more lenient standard applies, permitting liability based on Kaplan's mere knowledge or reasonable expectation that his allegedly defamatory statements would be republished. *See, e.g., Campo v. Paar, 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963).* The Court need not resolve which standard applies: Crisafi's counterclaim is deficient under either test because it fails to "state a claim to relief that is plausible on its face." *Iqbal, 129 S.Ct. at 1949* (internal quotation marks omitted).

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Even accepting as true Crisafi's non-conclusory factual allegations, including **356** those made only on information and belief, it is simply implausible that Kaplan in any legally relevant sense caused the republication of his statements in the Fisch Report or *New York Times* article. Crisafi alleges that Kaplan's complaint prompted the Inspector General investigation, but this allegation is contradicted by the Fisch Report itself, which indicates that the investigation began after the *New York Times* published an article in March 22, 2007 describing abuses of government-issued parking placards. Fisch Report at 3-4. In any event, even if Kaplan's complaint served to expand the scope the investigation, and included allegations consistent with what the Fisch Report eventually concluded, the Report clearly did more than merely parrot Kaplan's charges. The Report, in a section headed "Methodology," states that the investigation was based on, among other things, interviews with Crisafi himself, other BNE employees, Giglio, and Moffett, as well as other police officers and district attorneys who had interacted with Crisafi. *Id.* at 4. Indeed, the Inspector General is required by statute to "investigate," not merely repeat, allegations of malfeasance. N.Y. Exec. Law § 53. And even if, as alleged, Kaplan acted to bring the Report to the attention of the *New York Times,* the *New York Times* article, which consists entirely of a summary of the Fisch Report, reflects Kaplan's allegations only to the extent that such charges were ratified by the Report itself. *See* Crisafi Compl., Ex. F.

For these reasons, the Court concluded that there is no basis for holding Kaplan liable for the republication of his allegedly defamatory statements, even if he intended that his allegations be republished in this manner and gave the *New York Times* a copy of the Fisch Report. "The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication." *Van-Go Transp. Co. v. N.Y. City Bd. of Educ.,* 971 F.Supp. 90, 102 (E.D.N.Y.1997) (internal quotation marks omitted). Here,

the duty of the Inspector General to investigate complaints prior to publishing a written report, the fact that the Fisch Report was based on numerous sources beyond Kaplan's allegations, and the fact that the *New York Times* article merely summarized the Fisch Report together sever any causal link that might exist between Kaplan's actions and the December 8, 2008 republications. Thus, the March 1 Order dismissed Crisafi's counterclaim with prejudice.[FN8]

FN8. This result is not inconsistent with *Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963), which declared that "[a]nyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damage caused by the publication." This broad pronouncement was made in the context of a narrower holding that the defendant, Jack Paar, could be held responsible for the *New York Post's* publication of his statement, made by him to a reporter during an interview, that the plaintiff "lacked certain qualities which would fit him to be a performer desirable to [Paar's] program." *Id.* at 365, 239 N.Y.S.2d 494. The causal link between Kaplan's statements and the findings of the Fisch Report, which were subsequently summarized by the *New York Times,* is obviously much more attenuated than the relationship in *Campo* between Paar's statement to the newspaper reporter during an interview and the reporter's publication of that statement.

For the foregoing reasons, the Court hereby confirms its decisions to dismiss the sixth cause of action (*i.e.,* all of Kaplan's claims) and to dismiss both of Crisafi's counterclaims, all with prejudice, and to otherwise deny the motions to dismiss. The Clerk of the Court is directed to close **357** the entries numbered 33, 34, 35, 42, and 47 on the docket of case number 09 Civ. 7283 and to close case number 09 Civ. 9952.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)


S.D.N.Y.,2010.

D'Olimpio v. Crisafi

718 F.Supp.2d 340


END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

**c**

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Gultela QASEM, Plaintiff,

v.

Luis A. TORO; Superintendent of Taconic Correctional Facility Delores Thornton; Deputy Superintendent for Security William Rogers; John Does 1-10, Defendants.

No. 09 Civ. 8361(SHS).

Aug. 10, 2010.

**Background:** Inmate brought a § 1983 suit against corrections officials regarding injuries suffered by the inmate at the hands of a corrections officer alleged to have sexually assaulted the inmate. Superintendent and deputy superintendent for security moved to dismiss claims that they were deliberately indifferent to the inmate's personal safety.

**Holdings:** The District Court, Sidney H. Stein, J., held that:

(1) inmate stated a claim against the movants for Eighth and Fourteenth Amendment violations, and

(2) movants were not entitled to qualified immunity.

Motion denied.

West Headnotes

[1] Civil Rights 78 ⟜ 1358

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases

Constitutional Law 92 ⟜ 4825

92 Constitutional Law

92XXVII Due Process

92XXVII(H) Criminal Law

92XXVII(H)11 Imprisonment and Incidents Thereof

92k4825 k. Use of Force; Protection from Violence. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

**Prisons 310** 🔑 **234**

310 Prisons

    310II Prisoners and Inmates

       310II(E) Place or Mode of Confinement

         310k234 k. Duty to Protect; Protective Confinement. Most Cited Cases

**Sentencing and Punishment 350H** 🔑 **1537**

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General

       350HVII(H) Conditions of Confinement

         350Hk1537 k. Protection from Violence. Most Cited Cases

    Inmate's allegations against superintendent and deputy superintendent for security in a § 1983 suit, claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, stated a claim for Eighth and Fourteenth Amendment violations; complaint alleged that the officials were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with another official, the investigation and response to complaints of staff misconduct. U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78** 🔑 **1335**

78 Civil Rights

    78III Federal Remedies in General

       78k1334 Persons Liable in General

         78k1335 k. In General. Most Cited Cases

    Degree of personal involvement required to overcome a motion to dismiss a § 1983 claim for failure to state a claim varies depending on the constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Civil Rights 78** 🔑 **1355**

78 Civil Rights

    78III Federal Remedies in General

       78k1353 Liability of Public Officials

         78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases

    Categories set forth in case law as supporting personal liability of supervisors under § 1983 apply as long as they are consistent the requirements applicable to the particular constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983.

**[4] Sentencing and Punishment 350H** 🔑 **1532**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement

         350Hk1532 k. In General. Most Cited Cases

Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. U.S.C.A. Const.Amend. 8.

**[5] Sentencing and Punishment 350H ⬷ 1533**

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement

         350Hk1533 k. Deliberate Indifference in General. Most Cited Cases

Official acts with the requisite deliberate indifference for an Eighth Amendment violation when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. U.S.C.A. Const.Amend. 8.

**[6] Civil Rights 78 ⬷ 1376(7)**

78 Civil Rights

   78III Federal Remedies in General

      78k1372 Privilege or Immunity; Good Faith and Probable Cause

         78k1376 Government Agencies and Officers

            78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

Superintendent and deputy superintendent for security were not entitled to qualified immunity in an inmate's § 1983 suit claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable, if not unintelligible, decisions made with respect to the inmate during the course of an investigation. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ⬷ 1376(2)**

78 Civil Rights

   78III Federal Remedies in General

      78k1372 Privilege or Immunity; Good Faith and Probable Cause

         78k1376 Government Agencies and Officers

            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

Individual defendants are shielded from liability for civil damages under § 1983 if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

Karen K. Won, Cooley Godward Kronish LLP, William O'Brien, Kronish, Lieb, Weiner & Hellman L.L.P., New York, NY, for Plaintiff.

Thomas Patrick McCloskey, Aliazzo, McCloskey & Gonzalez, LLP, Ozone Park, NY, Julia Hyun-Joo Lee, New York State Department of Law, New York, NY, for Defendants.

*OPINION & ORDER*

SIDNEY H. STEIN, District Judge.

**\*1** Plaintiff Gultela Qasem brings this action pursuant to 42 U.S.C. § 1983 against defendants Luis Toro, Delores Thornton, William Rogers, and John Does 1-10 in their individual capacities. The lawsuit arises from injuries allegedly suffered by Qasem at the hands of Corrections Officer Luis Toro while Qasem was an inmate under the custody of the New York State Department of Correctional Services ("DOCS") at Taconic Correctional Facility. The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) direct and repeated acts of sexual assault by Toro; (2) Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Defendants Thornton and Rogers have now moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief.

## I. BACKGROUND

The following facts are taken from the complaint and presumed to be true for the purposes of this motion.

### A. *Parties*

Plaintiff Gultela Qasem is currently an inmate at the Bedford Hills Correctional Facility. At the time of the acts alleged in the complaint, plaintiff was an inmate at the Taconic Correctional Facility. (Compl. ¶¶ 5, 21.) Defendant Toro-not a party to the present motion-is a DOCS Corrections Officer. At the time of the acts alleged in the complaint, defendant Delores Thornton was the Superintendent of Taconic and defendant Rogers was the Deputy Superintendent for Security of Taconic. (*Id.* ¶¶ 1, 8-9.)

### B. *This Action*

Qasem alleges defendants violated her Eighth and Fourteenth Amendment rights under the United States Constitution as they arise out of a repeated pattern of sexual assault and rape committed against her by Toro.

While an inmate at Taconic, Qasem was assigned to work in Building 93 from approximately February 2007 to November 2007, and for most of that time, she also lived there. (*Id.* ¶¶ 21-22.) Qasem alleges that, on or around March 27, 2007, Toro entered her cell during the afternoon "count time" [FN1] and sexually assaulted her by fondling her breasts, vaginal area, and buttocks while also exposing his penis and forcing Qasem to perform oral sex on him. (*Id.* ¶ 23.) Plaintiff alleges that later that evening Toro ordered her to the officers' station where he raped her. (*Id.* ¶ 24.) Toro then told Qasem that he would write up a disciplinary action against her if she told anyone what he had done to her. (*Id.* ¶ 24.)

Qasem alleges that a pattern of sexual assault emerged over the next eight months. Toro allegedly assaulted and raped Qasem in her cell on numerous occasions during the night count time, in the officers' station, in the shower area, and in the recreation room. (*Id.* ¶¶ 25-26.) Throughout these eight months, Qasem alleges that Toro

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

repeatedly threatened to kill her and her family if she reported his actions. As a result, she did not report Toro's conduct. (*Id.* ¶ 27.) Plaintiff alleges, however, that other corrections staff facilitated Toro's repeated sexual abuse by condoning Toro or plaintiff being in unauthorized areas and allowing Toro into plaintiff's housing area when he was not assigned there. (*Id.* ¶ 28.)

**\*2** Although Qasem did not file a report against Toro based on his conduct, others did, and on July 2, 2007, the DOCS Officer of Inspector General ("IG") commenced an investigation into Toro's actions. (*Id.* ¶¶ 31-33.) When interviewed by an IG representative, Qasem denied the allegations because of the prior threats that Toro had made; despite her denials, plaintiff was reassigned to a different building the day after her interview. (*Id.* ¶¶ 33-34.) As the IG continued its investigation, in August 2007 Qasem was transferred back to building 93, which was the building where Toro worked at that time. Plaintiff contends that by causing her to be transferred back to Toro's building, defendants Thornton and Rogers were deliberately indifferent to her safety and allowed Toro to have continued unfettered access to her, which enabled him to continue raping and sexually abusing her. (*Id.* ¶ 38.) Plaintiff alleges that once she returned to building 93 in August 2007, Toro resumed his sexual assaults, including but not limited to raping her and sodomizing her. (*Id.* ¶ 40.)

During this same time period, plaintiff was transferred in and out of the "keeplock" area in building 93. (*Id.* ¶¶ 39-47.) While she was in keeplock, at least one corrections officer delivered a message from Toro to her, while other corrections staff condoned and disregarded the alleged continuing assaults by Toro. (*Id.* ¶¶ 47-48.) In addition to physical, mental, and emotional injuries she suffered from the repeated rapes and sexual abuse, Qasem alleges that in October 2007 she was diagnosed with genital herpes, a sexually transmitted disease, which she believes was transmitted to her by Toro. (*Id.* ¶¶ 61-63.)

Plaintiff alleges that sometime in November 2007, Toro became aware of the IG investigation and started harassing her by asking her what questions the IG representative had asked her and what her responses were. (*Id.* ¶ 45.) Qasem contends that on November 26, 2007, after she was once again raped by Toro, she told him that she was going to report his conduct, and Toro became violent with her-twisting her arm and wrist. (*Id.* ¶ 50.) The next day, plaintiff was transferred out of Taconic and into Bedford. (*Id.* ¶ 51.)

Plaintiff alleges that Thornton and Rogers were deliberately indifferent to her safety and well-being and that despite ample evidence of the assaults, they permitted Toro to have repeated access to her instead of removing either her or Toro from building 93. (*Id.* ¶¶ 55-60.) Plaintiff maintains that Thornton and Rogers were responsible for the inadequate polices and practices that allowed her to be repeatedly raped and assaulted over a number of months, despite the fact that other corrections officers were aware of Toro's misconduct. (*Id.*)

## II. DISCUSSION

### A. *Rule 12(b)(6)* Standard

On a motion to dismiss a claim for relief pursuant to Rule 12(b)(6) a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). A complaint will be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal, 129 S.Ct. at 1949* (quoting *Twombly, 550 U.S. at 556, 127 S.Ct. 1955).*

B. *Supervisory Liability Post-Iqbal*

**\*3** [1] The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) the direct and repeated acts of sexual assault by Toro; (2) defendant Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Thornton and Rogers respond to the claims against them on several grounds.

First, they assert that Qasem's claims are based on a broad theory of "supervisory liability" that has been discredited by the U.S. Supreme Court in *Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).* Prior to *Iqbal,* well-established Second Circuit law provided five bases for alleging that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a section 1983 claim. A plaintiff could plead personal involvement by showing any of the following five courses of conduct:

(1) the defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were

occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Sanders v. N.Y. City Dep't of Corr.,* 07 Civ. 3390, 2009 WL 222161, at \*5, 2009 U.S. Dist. LEXIS 7709, at \*17-18 (S.D.N.Y. Jan. 30, 2009). Defendants contend that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* thereby rendering Qasem's reliance on *Colon* categories unwarranted.

The Second Circuit has not yet addressed how *Iqbal* affects the five categories of conduct that give rise to supervisory liability under *Colon.* As explained in detail in *D'Olimpio v. Crisafi,* No. 09 Civ. 7283, ---F.Supp.2d ----, ---- - ----, 2010 WL 2428128, at \*4-6, 2010 U.S. Dist. LEXIS 59563, at \*14-18 (S.D.N.Y. June 15, 2010), in the wake of *Iqbal,* certain courts in this district have found that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster," and that "[t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated," because only the first and third categories allege personal involvement sufficiently to permit supervisory liability to be imposed after *Iqbal. Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 WL 1835939, at \*1-2, 2009 U.S. Dist. LEXIS 54141, at \*6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* No. 08 Civ. 2824, 2009 WL 3321011, at \*15, 2009 U.S. Dist. LEXIS 96952, at \*42-43 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim *Iqbal* eliminated."). This Court, as did the Court in *D'Olimpio,* disagrees with this narrow interpretation of *Iqbal.*

**\*4** [2] As *Iqbal* noted, the degree of personal involvement required to overcome a Rule 12(b)(6) motion varies depending on the constitutional provision alleged to

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

have been violated. Invidious discrimination claims require a showing of discriminatory purpose, but there is no analogous requirement applicable to Qasem's allegations of repeated sexual assaults. *See Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (citing *Chao v. Ballista,* 630 F.Supp.2d 170, 178 n. 2 (D.Mass.2009)); *see also D'Olimpio,* --- F.Supp.2d at ----, 2010 WL 2428128, at *5, 2010 U.S. Dist. LEXIS 59563, at *16. *Colon's* bases for liability are not founded on a theory of respondeat superior, but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. *Id.* at ----, at *5, 2010 U.S. Dist. LEXIS 59563 at *17 (quoting *Colon,* 58 F.3d at 873).

[3] Thus, the five *Colon* categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *Id.*; *see also Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

Plaintiff's allegations and inferences, if proven, would entitle her to relief under the Fourteenth Amendment and Eighth Amendments. *See Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (sustaining substantive due process claims where state action shocks the conscience); *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the

Eighth Amendment.") (quoting *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

C. *Colon Categories*

Second and apart from their argument based on *Iqbal,* Thornton and Rogers assert that plaintiff has adequately alleged neither (1) that they were deliberately indifferent to her rights by failing to act on information that unconstitutional acts were occurring nor (2) that they were responsible for creating or maintaining policies or practices that failed to prevent Qasem from being repeatedly raped and assaulted.

[4][5] The Court finds that plaintiff has alleged sufficient facts that Thornton-the Superintendent of the DOCS facility where plaintiff resided-and Rogers-the Deputy Superintendent for Security at that same facility-were deliberately indifferent to her health and safety and that they were responsible for creating or maintaining policies and practices that failed to prevent plaintiff from being raped and assaulted. The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). "An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

**\*5** Specifically, the complaint alleges that defendants were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with the IG, the investigation and response to complaints of staff misconduct. Despite an investigation and what plaintiff alleges as substantial evidence of Toro's misconduct known to a variety of individuals (*id.* ¶ 56),

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

defendants Thornton and Rogers allowed plaintiff to be housed in the building where Toro worked (*id.* ¶ 58); they failed to remove him from guarding Qasem (*id.* ¶ 57); they failed to reassign Qasem to another building (*id.*); they allowed Qasem to be transferred back to the building where Toro worked (*id.* ¶ 58); and they did not increase supervision of Toro despite their knowledge of allegations of Toro's assaults and the IG's investigation of him (*id.* ¶ 59). The complaint also alleges that a number of acts occurred under defendants' supervision that were violations of DOCS rules and regulations (*id.* ¶¶ 28, 47), and that defendants Thornton and Rogers allowed those practices to take place.

Although discovery may ultimately reveal that defendants Thornton and Rogers made every reasonable effort to prevent the alleged sexual abuse, Qasem has alleged sufficient facts to allow the Court "to draw the reasonable inference" that the defendants "are liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949.

D. *Qualified Immunity*

[6] Third, Thornton and Rogers claim that qualified immunity requires dismissal of this litigation as to them. So far as the Court can ascertain, defendants contend that they are entitled to immunity principally because Qasem herself initially denied the sexual relationship when asked about it by prison security officers. In their view, her denials by themselves operate as a "reasonable" basis for the decision to place plaintiff back into the building where Toro had unfettered access to her.

[7] Individual defendants are " 'shielded from liability for civil damages' " under 42 U.S.C. § 1983 if " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d

396 (1982)); *accord Gilles v. Repicky,* 511 F.3d 239, 243 (2d Cir.2007). "A right is clearly established if (1) the law is defined with Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)).

This Court cannot find the defendants immune from suit on this record. It is well established that the sexual exploitation of prisoners by prison guards amounts to a constitutional violation. *See Schwenk v. Hartford,* 204 F.3d 1187, 1197 (9th Cir.2000) ("In the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established ... and no reasonable prison guard could possibly have believed otherwise."); *Daskalea v. District of Columbia,* 227 F.3d 433, 440, 343 U.S.App.D.C. 261 (D.C.Cir.2000) (affirming prisoner's Eighth Amendment claim after prison guards sexually assaulted her); *Berryhill v. Schriro,* 137 F.3d 1073, 1076 (8th Cir.1998); *Barney v. Pulsipher,* 143 F.3d 1299, 1310 (10th Cir.1998) ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."). *Cf. Farmer v. Brennan,* 511 U.S. 825, 833-34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' ") (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable-if not unintelligible-decisions made with respect to plaintiff during the course of the IG's investigation, the Court cannot say at this stage of the litigation that Thornton and Rogers are entitled to qualified immunity for their alleged actions.

**III. CONCLUSION**

*6 Because plaintiff has alleged enough facts to raise

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

a plausible claim to relief against the supervisory officials Thornton and Rogers and they are not entitled to qualified immunity on the basis of the record at this stage of the litigation, the motion by Thornton and Rogers to dismiss the complaint is denied.

>
> FN1. Count time is time during which all activity stops and essentially all inmates are locked into their cells, and corrections staff verify that no inmates are missing. (Compl. ¶ 23 n. 1.)

S.D.N.Y.,2010.

Qasem v. Toro

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



320 F.3d 346

(Cite as: 320 F.3d 346)

▷

United States Court of Appeals,

Second Circuit.

Robert DAVIS, Plaintiff-Appellant,

v.

Glenn S. GOORD; Christopher Artuz; Sabina Kaplan;
John P. Keane; Mervat Makram; Frank Lancellotti; Janice
Diehl; Thomas Briggs; Tim Terbush; and Thomas Egan,
Defendants-Appellees.

Docket No. 01-0116.

Submitted Sept. 4, 2002.

Decided Feb. 10, 2003.

Amended June 25, 2003.

Corrected July 21, 2003.

Prison inmate filed cause of action under § 1983 to
recover for prison officials' alleged violation of his free
speech and free access rights, as well as for their alleged
unlawful retaliation against him for filing prison grievance.
The United States District Court for the Southern District of
New York, Charles L. Brieant, J., dismissed complaint with
prejudice, and inmate appealed. The Court of Appeals, Stein,
District Judge for the Southern District of New York, sitting
by designation, held that: (1) allegations in inmate's pro se
civil rights complaint, that prison official on two occasions
opened his legal mail outside of his presence, were

insufficient to state a claim for denial of access to courts or
violation of free speech right, and (2) complaint sufficiently
alleged requisite causal connection between actions of prison
officials and his earlier protected activity in filing grievance,
and thus was sufficient to state First Amendment retaliation
claim.

Vacated and remanded.

West Headnotes

**[1] Federal Civil Procedure** 170A ☞ 1773

170A Federal Civil Procedure

  170AXI Dismissal

    170AXI(B) Involuntary Dismissal

      170AXI(B)3 Pleading, Defects In, in General

        170Ak1773 k. Clear or Certain Nature of
Insufficiency. Most Cited Cases

Complaint may be dismissed for failure to state claim
only if court finds that it appears beyond doubt that plaintiff
can prove no set of facts in support of his claim which would
entitle him to relief. Fed.Rules Civ.Proc.Rule 12(b)(6), 28
U.S.C.A.

**[2] Federal Civil Procedure** 170A ☞ 657.5(3)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

320 F.3d 346

(Cite as: 320 F.3d 346)

170A Federal Civil Procedure

  170AVII Pleadings and Motions

    170AVII(A) Pleadings in General

      170Ak654 Construction

        170Ak657.5 Pro Se or Lay Pleadings

          170Ak657.5(3) k. Prisoners' Pleadings. Most Cited Cases

    Where prison inmate who filed civil rights complaint was proceeding pro se, court had to construe complaint with particular generosity in deciding whether it could properly be dismissed as failing to state claim. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[3] Constitutional Law 92 ☞ 2301

92 Constitutional Law

  92XVIII Freedom of Speech, Expression, and Press

    92XVIII(Z) Prisons and Pretrial Detention

      92k2300 Legal Mail or Papers

        92k2301 k. In General. Most Cited Cases

  (Formerly 92k90.1(1.3))

Constitutional Law 92 ☞ 4827

92 Constitutional Law

  92XXVII Due Process

    92XXVII(H) Criminal Law

      92XXVII(H)11 Imprisonment and Incidents Thereof

        92k4827 k. Access to Courts. Most Cited Cases

  (Formerly 92k305(2))

    Interference with legal mail implicates prison inmate's rights of access to the courts and free speech as guaranteed by the First and Fourteenth Amendments. U.S.C.A. Const.Amends. 1, 14.

[4] Constitutional Law 92 ☞ 3957

92 Constitutional Law

  92XXVII Due Process

    92XXVII(E) Civil Actions and Proceedings

      92k3956 Access to Courts; Right to Seek Remedy

        92k3957 k. In General. Most Cited Cases

  (Formerly 92k305(2))

    To state a claim for denial of access to the courts in violation of Fourteenth Amendment, plaintiff must allege that defendant took, or was responsible for, actions that hindered plaintiff's efforts to pursue legal claim. U.S.C.A. Const.Amend. 14.

[5] Constitutional Law 92 ☞ 2289

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

320 F.3d 346

(Cite as: 320 F.3d 346)

92 Constitutional Law

  92XVIII Freedom of Speech, Expression, and Press

    92XVIII(Z) Prisons and Pretrial Detention

      92k2288 Incoming Mail

        92k2289 k. In General. Most Cited Cases

  (Formerly 92k90.1(1.3))

**Constitutional Law 92 &ctdot; 2296**

92 Constitutional Law

  92XVIII Freedom of Speech, Expression, and Press

    92XVIII(Z) Prisons and Pretrial Detention

      92k2295 Outgoing Mail

        92k2296 k. In General. Most Cited Cases

  (Formerly 92k90.1(1.3))

Prisoner's right to free flow of incoming and outgoing mail is protected by First Amendment. U.S.C.A. Const.Amend. 1.

**[6] Constitutional Law 92 &ctdot; 2284**

92 Constitutional Law

  92XVIII Freedom of Speech, Expression, and Press

    92XVIII(Z) Prisons and Pretrial Detention

      92k2283 Mail in General

        92k2284 k. In General. Most Cited Cases

  (Formerly 92k90.1(1.3))

Restrictions on prisoners' mail are justified, and will not violate First Amendment, only if they further one or more of the substantial governmental interests of security, order and rehabilitation, and must be no greater than is necessary or essential to protection of particular governmental interest involved. U.S.C.A. Const.Amend. 1.

**[7] Prisons 310 &ctdot; 264**

310 Prisons

  310II Prisoners and Inmates

    310II(G) Access to Courts and Public Officials

      310k264 k. Communication with Courts, Officers, or Counsel. Most Cited Cases

  (Formerly 310k4(12))

While prison inmate has right to be present when his legal mail is opened, isolated incident of mail tampering is usually insufficient to establish Constitutional violation; rather, inmate must show that prison officials regularly and unjustifiably interfered with incoming legal mail.

**[8] Civil Rights 78 &ctdot; 1395(7)**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

320 F.3d 346

(Cite as: 320 F.3d 346)

78 Civil Rights

   78III Federal Remedies in General

      78k1392 Pleading

         78k1395 Particular Causes of Action

            78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases

   (Formerly 78k235(7))

   Allegations in inmate's pro se civil rights complaint, that prison official on two occasions opened his legal mail outside of his presence, were insufficient to state a claim for denial of access to courts, where inmate did not allege that such interference with his mail either constituted an ongoing practice of unjustified censorship or caused him to miss court deadlines or in any way prejudiced his legal actions. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[9] Constitutional Law 92 &#9752;    2314**

92 Constitutional Law

   92XIX Rights to Open Courts, Remedies, and Justice

      92k2313 Conditions, Limitations, and Other Restrictions on Access and Remedies

      92k2314 k. In General. Most Cited Cases

   (Formerly 92k328)

   Mere delay in being able to work on one's legal action or communicate with courts does not rise to the level of violation of right of access to courts.

**[10] Civil Rights 78 &#9752;    1395(7)**

78 Civil Rights

   78III Federal Remedies in General

      78k1392 Pleading

         78k1395 Particular Causes of Action

            78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases

   (Formerly 78k235(7))

   Allegations in inmate's pro se civil rights complaint, that prison official on two occasions opened his legal mail outside of his presence, were insufficient to state a claim for violation of his free speech rights, where inmate alleged neither facts that would establish ongoing practice by prison officials of interfering with his mail nor facts that set forth any harm he claimed to have suffered from such tampering. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[11] Federal Civil Procedure 170A &#9752;    1838**

170A Federal Civil Procedure

   170AXI Dismissal

      170AXI(B) Involuntary Dismissal

         170AXI(B)5 Proceedings

            170Ak1837 Effect

               170Ak1838 k. Pleading Over. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

320 F.3d 346

(Cite as: 320 F.3d 346)

Though pro se civil rights complaint, based on two occasions on which prison official had allegedly opened inmate's legal mail outside of his presence, was insufficient to state claim for violation of inmate's free speech rights or right of access to courts, district court should have dismissed complaint without prejudice to allow inmate to amend pleading to allege requisite injury, especially where inmate alleged that prison official opened his outgoing legal mail, which was entitled to greater protection. U.S.C.A. Const.Amends. 1, 14; 42 U.S.C.A. § 1983.

[12] Constitutional Law 92 ⌾⇁   1196

92 Constitutional Law

92X First Amendment in General

92X(B) Particular Issues and Applications

92k1193 Prisons

92k1196 k. Retaliation. Most Cited Cases

(Formerly 92k82(13))

Courts properly approach prisoner retaliation claims with skepticism and particular care, as virtually any adverse action taken against prisoner by prison official, even those otherwise not rising to level of constitutional violation, can be characterized as constitutionally proscribed retaliatory act. U.S.C.A. Const.Amend. 1.

[13] Civil Rights 78 ⌾⇁   1395(1)

78 Civil Rights

78III Federal Remedies in General

78k1392 Pleading

78k1395 Particular Causes of Action

78k1395(1) k. In General. Most Cited Cases

(Formerly 78k235(1))

In order to survive motion to dismiss for failure to state cause of action, complaint for First Amendment retaliation must allege: (1) that speech or conduct at issue was protected; (2) that defendant took adverse action against plaintiff; and (3) that there was causal connection between protected speech and adverse action. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

[14] Constitutional Law 92 ⌾⇁   1438

92 Constitutional Law

92XV Right to Petition for Redress of Grievances

92k1438 k. Prisoners. Most Cited Cases

(Formerly 92k91)

Filing of prison grievances is activity protected by the First Amendment. U.S.C.A. Const.Amend. 1.

[15] Civil Rights 78 ⌾⇁   1395(7)

78 Civil Rights

78III Federal Remedies in General

78k1392 Pleading

320 F.3d 346

(Cite as: 320 F.3d 346)

78k1395 Particular Causes of Action

78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases

(Formerly 78k235(7), 170Ak1838)

Although allegations in prison inmate's pro se complaint, concerning hostile and disparaging comments allegedly directed at him by officials in medium-security prison to which he was transferred after filing prison grievance were de minimus, allegations that officials at previous facility sent negative message about inmate and that oficials at medium security prison denied him a high fiber diet and made him wait for medical appointment were sufficient to support inference of causal relationship between such actions and his earlier protected activity in filing grievance, and thus were sufficient to state First Amendment retaliation claim. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

[16] Constitutional Law 92 ⟨⟩ 1171

92 Constitutional Law

92X First Amendment in General

92X(B) Particular Issues and Applications

92k1171 k. Retaliation in General. Most Cited Cases

(Formerly 92k1170, 92k1166, 92k82(3))

Only retaliatory conduct that would deter similarly situated individual of ordinary firmness from exercising his or her First Amendment rights constitutes "adverse action," of kind needed to support retaliation claim; otherwise, retaliatory act is simply de minimis and outside ambit of constitutional protection. U.S.C.A. Const.Amend. 1.

[17] Constitutional Law 92 ⟨⟩ 1438

92 Constitutional Law

92XV Right to Petition for Redress of Grievances

92k1438 k. Prisoners. Most Cited Cases

(Formerly 92k91)

In deciding whether prison officials' alleged unlawful retaliatory acts against inmate who filed a grievance qualified as "adverse action," of a kind required to support First Amendment retaliation claim, court's inquiry had to be tailored to different circumstances in which retaliation claims arise, and court had to bear in mind that inmates may be required to tolerate more than average citizens before retaliatory action taken against them is considered "adverse." U.S.C.A. Const.Amend. 1.

[18] Constitutional Law 92 ⟨⟩ 1196

92 Constitutional Law

92X First Amendment in General

92X(B) Particular Issues and Applications

92k1193 Prisons

92k1196 k. Retaliation. Most Cited Cases

(Formerly 92k82(13))

Insulting or disrespectful comments directed at prison inmate generally do not rise to level of "adverse action," of a kind required to support First Amendment retaliation

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

320 F.3d 346

(Cite as: 320 F.3d 346)

claim. U.S.C.A. Const.Amend. 1.

**[19]** Constitutional Law 92 &#9901; 1553

92 Constitutional Law

   92XVIII Freedom of Speech, Expression, and Press

      92XVIII(A) In General

         92XVIII(A)3 Particular Issues and Applications in General

            92k1553 k. Retaliation. Most Cited Cases

   (Formerly 92k90.1(1))

In order to allege causal connection between protected speech and adverse action, of kind required to state First Amendment retaliation claim, plaintiff's allegations must be sufficient to support inference that speech played a substantial part in adverse action. U.S.C.A. Const.Amend. 1.

**\*349** Robert S. Davis, pro se, Comstock, NY.

Allison Penn, Assistant Solicitor General, State of New York, New York, N.Y. (Caitlin J. Halligan, Solicitor General; Michael S. Belohlavek, Deputy Solicitor General; Eliot Spitzer, Attorney General of the State of New York, New York, NY, on the brief), for Defendants-Appellants.

Before: CALABRESI and B.D. PARKER, JR., Circuit Judges, and STEIN, District Judge.[FN1]

FN1. The Honorable Sidney H. Stein of the United States District Court for the Southern District of New York, sitting by designation.

STEIN, District Judge.

Davis appeals from a judgment of the United States District Court for the Southern District of New York (Charles L. Brieant, *Judge*) that dismissed his civil rights complaint with prejudice. Davis alleged that various personnel at two New York prisons committed medical malpractice, conspired to deprive him of his civil rights, interfered with his legal mail and retaliated against him after he filed a grievance against prison officials in 1998. On March 5, 2002, we granted Davis' *pro se* motion to proceed *in forma pauperis* as to his claims regarding interference with his legal mail and retaliation by defendants Keane, Makram, Lancellotti and Terbush, and dismissed the remaining claims as lacking an arguable basis in law or fact. We agree with the district court that Davis' complaint did not state a claim for interference with his legal mail, but we hold that Davis should have been allowed an opportunity to file an amended complaint. Moreover, we hold that Davis' complaint, read charitably, does state a claim of retaliation, and therefore the defendants' 12(b)(6) motion to dismiss should have been denied. On February 10, 2003, this panel issued an opinion in this action; the February 10, 2003 opinion is superceded by this one.

I. BACKGROUND

The following facts are as alleged in the complaint:

In May 1998, Robert Davis, then an inmate at Green Haven Correctional Facility, a New York state maximum security prison, filed a civil rights action pursuant to 42 U.S.C. § 1983 against defendants Artuz, Kaplan and other prison officials. Soon thereafter, Davis was transferred to a medium security prison, Woodbourne Correctional Facility.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

320 F.3d 346

(Cite as: 320 F.3d 346)

Upon his arrival at Woodbourne, defendants Drs. Lancellotti and Makram-medical doctors at Woodbourne-allegedly delayed placing Davis on his "medically prescribed high fiber diet," and instead gave him medication that, in combination with the delay, had the effect of worsening his medical condition. When Davis told Lancellotti and Makram about his worsened condition, they ignored him and told him that "they had heard all about [him]." When Davis reported the prison doctors to the prison grievance office for refusing to provide his high fiber diet, Lancellotti and Makram gave him a medical appointment and made him "sit in a prison waiting area for approximately 3 hours" before refusing to see him. They also allegedly treated Davis in a "sarcastic"**350 and "disrespectful" manner by "calling [him] stupid," failed to respect his medical confidentiality by sending the results of a blood test to prison administrative officials and eventually ordered the prison cafeteria to stop providing his high fiber diet.

Subsequently, Davis filed a grievance with defendant Keane, the superintendent at Woodbourne, because the grievance office, supervised by defendant Terbush, had allegedly ignored his earlier grievance against Drs. Lancellotti and Makram. In retaliation for this grievance, Keane allegedly had Davis' cell searched while Terbush "vindictively hid" the earlier grievance against the prison doctors, forcing Davis to file yet another grievance to have his prior grievance "excavated from Terbush's hidden files." Later, when Davis filed yet an additional grievance against Lancellotti, his cell was again searched.

In addition, on one occasion defendant Diehl, the senior mailroom clerk at Woodbourne, allegedly opened a letter from Davis, addressed to a state court, outside his presence. She subsequently returned the letter to him, claiming that he had failed to follow procedures for addressing legal mail; namely, that Davis had failed to spell out the name of Woodbourne Correctional Facility in full on his return address. On another occasion, Diehl opened incoming legal mail outside Davis' presence. Davis contends that Keane

permitted Diehl to interfere with his legal mail.

Defendants moved to dismiss Davis' complaint pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction and Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. On March 22, 2001, Judge Brieant issued a Memorandum and Order dismissing Davis' complaint, with prejudice, in its entirety. Although Judge Brieant dealt with a panoply of allegations in the complaint, only two remain at issue subsequent to our March 5, 2002 Order: whether defendants improperly interfered with Davis' legal mail and whether defendants retaliated against him for having filed grievances. With respect to these issues, Judge Brieant did not explicitly address Davis' claim of interference with his legal mail in his Memorandum and Order of March 22, 2001, and dismissed the alleged retaliation incidents as "petty charges against the management of the institution."

This appeal followed, with Davis contending principally that the complaint adequately sets forth claims upon which relief can be granted. Defendants contend that Davis failed to allege any facts showing that the incidents of interference with his legal mail prejudiced his access to the courts and that his retaliation claims do not meet the pleading standard required to allege retaliation properly.

II. DISCUSSION

A. The Legal Standards

[1][2] A plaintiff's claims can be dismissed for failure to state a claim only if we find that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

320 F.3d 346

(Cite as: 320 F.3d 346)

The complaint need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Swierkiewicz v. Sorema,* 534 U.S. 506, 512, 112 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (quoting Fed.R.Civ.P. 8(a)(2)). Moreover, because Davis' "complaint alleges civil rights violations and he proceeded *pro se* in the district court, we must construe his complaint with particular generosity." *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002) (per curiam) (citing *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999)). With those standards in mind, we turn to Davis' contentions.

**\*351 B. Interference with Legal Mail**

[3][4] Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution. To state a claim for denial of access to the courts-in this case due to interference with legal mail-a plaintiff must allege that the defendant "took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (citing *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 2180, 135 L.Ed.2d 606 (1996)); *see also Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at \*4 (S.D.N.Y. Mar. 29, 2001) ("[I]n order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim.") (citing *Lewis,* 518 U.S. at 353, 116 S.Ct. at 2181).

[5][6] In addition to the right of access to the courts, a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment. *See Heimerle v. Attorney General,* 753 F.2d 10, 12-13 (2d Cir.1985); *Hudson v. Greiner,* No. 99 Civ. 12339, 2000 WL 1838324, at \* 5 (S.D.N.Y. Dec.13, 2000). Restrictions on prisoners' mail are justified only if they "further[ ] one or more of the substantial governmental interests of security, order, and rehabilitation ...[and] must be no greater than is necessary or

essential to the protection of the particular governmental interest involved." *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) (internal citations and quotation marks omitted). In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail. *See Thornburgh v. Abbott,* 490 U.S. 401, 413, 109 S.Ct. 1874, 1881-82, 104 L.Ed.2d 459 (1989); *Washington,* 782 F.2d at 1138-39; *Davidson v. Scully,* 694 F.2d 50, 53 (2d Cir.1982).

[7] While a prisoner has a right to be present when his legal mail is opened, *Wolff v. McDonnell,* 418 U.S. 539, 574-76, 94 S.Ct. 2963, 2983-85, 41 L.Ed.2d 935 (1974), an isolated incident of mail tampering is usually insufficient to establish a constitutional violation. *See Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975); *Washington,* 782 F.2d at 1139. Rather, the inmate must show that prison officials "regularly and unjustifiably interfered with the incoming legal mail." *Cancel,* 2001 WL 303713 at \*6 (citing *Washington,* 782 F.2d at 1139).

In *Washington,* we determined that as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received. 782 F.2d at 1139. Following *Washington,* district courts have generally required specific allegations of invidious intent or of actual harm where the incidents of tampering are few and thus the implication of an actionable violation is not obvious on its face. *See, e.g., Cancel,* 2001 WL 303713 at \*6 (dismissing claim where only two incidents of tampering alleged and no other indications of a continuing practice); *John v. N.Y.C. Dep't of Corrections,* 183 F.Supp.2d 619, 629 (S.D.N.Y.2002) (requiring plaintiff to allege facts that show defendants acted with invidious intent and plaintiff was harmed by the interference); *Hudson,* 2000 WL 1838324 at \*5 (same); **\*352** *Johnson v. Morton,* No. 95 Civ. 949, 1996 WL

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

320 F.3d 346

(Cite as: 320 F.3d 346)

518078, at *1 (E.D.N.Y. Aug. 26, 1996) (noting that "[c]ourts have consistently applied *Morgan* [*v. Montayne*] to dismiss suits by inmates alleging unconstitutional opening of their legal mail without any showing of damages"); *see also Lewis,* 518 U.S. at 351, 116 S.Ct. at 2180 (holding that inmate must establish actual injury, rather than "theoretical deficiency" with legal library or legal assistance program to state constitutional claim for interference with access to courts).

[8][9][10] Davis' allegations of two instances of mail interference are insufficient to state a claim for denial of access to the courts because Davis has not alleged that the interference with his mail either constituted an ongoing practice of unjustified censorship or caused him to miss court deadlines or in any way prejudiced his legal actions. Mere "delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)). Similarly, Davis fails to state a constitutional claim for violating his right to send and receive legal mail because he alleges neither the establishment of an ongoing practice by prison officials of interfering with his mail nor any harm suffered by him from the tampering.

[11] However, the district court should have given Davis leave to amend his complaint to attempt to allege such an injury, if possible. *See Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) (per curiam) ("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the [*pro se*] complaint gives any indication that a valid claim might be stated."). This is especially true since Davis alleges that Diehl opened his outgoing legal mail, which is subject to greater constitutional protection because of the lesser security concerns presented. *See Thornburgh,* 490 U.S. at 413, 109 S.Ct. at 1881-82; *Davidson,* 694 F.2d at 53. While it is unlikely that Davis will be able to sustain a constitutional claim if the letter simply was returned for an insufficient return address,[FN2] additional factual allegations

regarding the nature of the interference could possibly establish that Davis' rights were violated and he should be given an opportunity to allege those facts. *See Gomez,* 171 F.3d at 795-96.

> FN2. It should be noted that defendants proffer no justification for apparently requiring that the name "Woodbourne Correctional Facility" be spelled out in full on return addresses.

C. Retaliation

[12][13][14][15] Courts properly approach prisoner retaliation claims "with skepticism and particular care," because "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). *See also Phelps v. Kapnolas,* 308 F.3d 180, 187 n. 6 (2d Cir.2002). Thus, in order to survive a motion to dismiss a complaint, a plaintiff asserting First Amendment retaliation claims must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes,* 239 F.3d at 492. Since the filing of prison grievances is a constitutionally protected**353 activity, Davis meets the first prong of the test. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988). We turn now to the second and third prongs of the test set forth in *Dawes v. Walker, supra.*

1. Adverse Actions

Davis alleges that after he filed a grievance against Lancellotti and Makram, the doctors continued to retaliate against him by calling him "stupid," failed to respect his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

320 F.3d 346

(Cite as: 320 F.3d 346)

medical confidentiality by sending the results of a blood test to prison officials, and again discontinued providing his high fiber diet. Davis alleges that defendant Terbush "underhandedly tried to hide plaintiff's grievances" against Makram and Lancellotti and that he failed to forward Davis' grievances to the appeals level within the required time. Davis states that after he filed a grievance against Terbush, Terbush further retaliated against him by speaking to him in a "hostile" manner, "burying" his grievances and discussing Davis' grievance with another prison official, and that Keane retaliated against Davis' grievance filings by ordering a "retaliatory cell search." Defendants contend that Davis' submissions show that his grievances against Makram and Lancellotti went through the necessary appeals, and that Davis has not shown that any of these actions by prison officials constituted adverse action sufficient to state a retaliation claim.

[16][17] "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes,* 239 F.3d at 493. *See also Thaddeus -X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999) (retaliation against an inmate must be likely to "chill a person of ordinary firmness from continuing to engage" in a protected activity). "Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 493. In making this determination, the court's inquiry must be "tailored to the different circumstances in which retaliation claims arise," bearing in mind that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.* (quoting *Thaddeus -X,* 175 F.3d at 398).

[18] Insulting or disrespectful comments directed at an inmate generally do not rise to this level. *Dawes,* 239 F.3d at 492 (calling inmate a "rat" not a constitutional violation); *see also Morales,* 278 F.3d at 131. Thus, Lancellotti and Makram's "sarcastic" comments do not, without more, constitute an adverse action. Similarly, Davis' allegations regarding conversations between Terbush and other prison officials are speculative and complaints of Terbush's "hostile manner" are *de minimis.*

However, it is possible that there were adverse effects resulting from his not being given his high fiber diet or having to wait for a medical appointment. In addition, although his grievances against Lancellotti and Makram were eventually resolved, Davis' repeated efforts to surmount Terbush's alleged barriers to timely filing could be construed as efforts beyond what is reasonably expected of an inmate with "ordinary firmness." *Dawes,* 239 F.3d at 493. In other words, Davis should not be denied remedy because his extraordinary efforts resulted in the resolution of grievances that would have deterred a "similarly situated individual of ordinary firmness from exercising his constitutional rights." *Id.;* **\*354**Crawford-El v. Britton, 93 F.3d 813, 826 (D.C.Cir.1996) (en banc), rev'd on other grounds, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) ("the effect on freedom of speech of retaliations 'need not be great in order to be actionable.' "); *Walker v. Pataro,* No. 99 Civ. 4607, 2002 WL 664040, at *9 (S.D.N.Y. Apr.23, 2002) (favorably contrasting *Dawes* in determining that "[t]he test, however, is not whether plaintiff ... himself was chilled (if that were the standard, no plaintiff likely would prevail, for the very commencement of a lawsuit could be used by defendants to argue that the plaintiff was not chilled) ..."). Therefore, "at this early state, the[se] allegation[s] ... must be construed as describing an adverse action," and, if the causal connection between the protected speech and the adverse action is sufficiently pled, Davis "should have the opportunity to develop facts that would demonstrate that [the actions] would deter a reasonable inmate from pursuing grievances." *Morales,* 278 F.3d at 131-32 (citations omitted).

**2. Causal Connection Between Protected Speech and Adverse Action**

Davis alleges that Makram and Lancellotti retaliated against him for filing his previous lawsuit at Green Haven by, in part, delaying his placement on his medically prescribed high fiber diet and making him wait to be seen by a doctor. These actions occurred prior to Davis filing any

320 F.3d 346

(Cite as: 320 F.3d 346)

grievances against them. Defendants do not dispute that they took adverse action against Davis but claim that the retaliation allegation must be dismissed because "plaintiff alleges no specific facts establishing a causal connection between the adverse actions taken against him by defendants at Woodbourne ... and the filing of his prior lawsuit against the Green Haven officials."

[19] In order to satisfy the causation requirement, allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Dawes,* 239 F.3d at 492 (internal quotation marks and citation omitted). Davis' complaint alleges that the prison officials at Green Haven "sent a negative message" about him to the officials at Woodbourne, and that the adverse actions against him at Woodbourne began immediately upon his arrival. Moreover, it alleges that defendant Makram and Lancellotti "continued a retaliatory course of conduct on plaintiff (via Green Haven officials)" by, inter alia, failing to prescribe his high fiber diet, and that "Defendant Keane's actions toward plaintiff were continuous courses of 'retaliatory conduct' (via Green Haven Officials) due to prior § 1983." Though inartfully pled, these allegations are sufficient to support an inference of a causal relationship. *See, e. g., Morales,* 278 F.3d at 131 (short time frame between grievance and retaliatory action, along with allegation of the defendant's involvement, sufficed to support an inference of a retaliatory motive).

We therefore vacate that portion of the district court's judgment that dismissed plaintiff's retaliation claims against defendants Keane, Makram, Lancellotti and Terbush.

## III. CONCLUSION

The district court correctly dismissed the portion of the complaint that alleged interference with plaintiff's legal mail, since the complainant did not state a claim on which relief could be granted with respect to those allegations. However, the district court should have granted Davis leave to replead

those claims rather than dismissing them with prejudice. The district court erred in granting defendants' 12(b)(6) motion on plaintiff's retaliation claims since, charitably read, the complaint does state a claim on which relief could be granted as to those allegations. Therefore, for the reasons set forth above, we vacate the judgment **355 and remand for further proceedings consistent with this opinion.

C.A.2 (N.Y.),2003.

Davis v. Goord

320 F.3d 346

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Isidro ABASCAL, Plaintiff,

v.

Bryan HILTON, Psychologist, and Mitchell Langbart, M.D., Defendants.

No. 9:04-CV-1401 (LEK/GHL).

Jan. 30, 2008.

Isidro Abascal, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Richard Lombardo, Esq., Assistant Attorney General, of Counsel, Albany, NY, Counsel for Defendant Hilton.

**DECISION AND ORDER**

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on December 28, 2007, by the Honorable George H. Lowe, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 41). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff Isidro Abascal, which were filed on January 7, 2008. Objections (Dkt. No. 42).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 41) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED** that Defendant Hilton's Motion to dismiss (Dkt. No. 37) is **GRANTED;** and it is further

**ORDERED,** that Plaintiff's claims against Defendant Hilton that are not the subject of Defendant Hilton's Motion to dismiss (Dkt. No. 37) are **DISMISSED** pursuant to the Court's authority to do so under 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b), and/or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

Fed.R.Civ.P. 12(h)(3), for the reasons stated above; and it is further

**ORDERED,** that Plaintiff's claims against Defendant Langbart are **DISMISSED** with prejudice for failure to serve, for the reasons stated above; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

#### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Isidro Abascal ("Plaintiff"), while an inmate at Attica Correctional Facility, commenced this *pro se* civil rights action, pursuant to 42 U.S.C. § 1983, against, *inter alia,* two medical care providers employed (at the time) by the State of New York-Bryan Hilton and Mitchell Langbart. Generally, Plaintiff's Third Amended Complaint alleges, in pertinent part, that, between December 27, 2001, and October 29, 2002, while he was incarcerated at Auburn Correctional Facility, Defendants Hilton and Langbart violated his rights under the First, Eighth and Fourteenth Amendments by wrongfully treating or classifying him as mentally ill and wrongfully transferring him to the Central New York Psychiatric Center as a form of punishment and/or retaliation for writing to public officials about certain "symptoms and body scars" that Plaintiff had allegedly experienced or sustained while in the custody of DOCS. (*See generally* Dkt. No. 24 [Plf.'s Third Am. Compl.].)

**\*2** Currently pending before the Court is Defendant Hilton's motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 37.) For the reasons that follow, I recommend that Defendant Hilton's motion be granted. I also recommend that those of Plaintiff's claims against Defendant Hilton that are not the subject of Defendant Hilton's motion to dismiss be *sua sponte* dismissed pursuant to the Court's authority to do so under 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b), and/or Rule 12(h)(3) of the Federal Rules of Civil Procedure. Finally, I recommend that Plaintiff's claims against Defendant Langbart be *sua sponte* dismissed with prejudice for failure to serve, pursuant to Rules 4(m) and 16(f) of the Federal Rules of Civil Procedure.

#### I. BACKGROUND

#### A. Relevant Procedural History

Throughout the course of this action, Plaintiff has, in his several pleadings, asserted claims against a number of individuals. All of those claims have been dismissed by Judge Kahn under Rules 8, 10 and/or 12 of the Federal Rules of Civil Procedure, except Plaintiff's claims against Defendants Hilton and Langbart.

Specifically, on January 5, 2005, Judge Kahn dismissed Plaintiff's claims, asserted in his original Complaint, against Defendants Jarkos, Tatum, Graham, Filion, Goodman, and Lape. (Dkt. No. 5, at 9.) On March 1, 2005, Judge Kahn struck Plaintiff's Amended Complaint from the docket, under Rules 8, 10 and 12 of the Federal Rules of Civil Procedure. (Dkt. No. 10.) On June 15, 2006, Judge Kahn dismissed Plaintiff's claims, asserted in his Second Amended Complaint, against

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

Defendants Muse, Smith, Pena, and "Unknown HTE Operators." (Dkt. No. 23, at 8.) On November 6, 2006, Judge Kahn dismissed Plaintiff's claims, asserted in his Third Amended Complaint, against Defendants Burge, Stone, Goord and Conway. (Dkt. No. 25, at 3.)

Remaining in the case, following Judge Kahn's Order of November 6, 2006, were Plaintiff's claims against Defendants Hilton and Langbart. (*Compare* Dkt. No. 25 [Order of 11/6/06] *with* Dkt. No. 24 [Plf.'s Third Am. Compl.].)

**B. Plaintiff's Failure to Serve Defendant Langbart**

Prior to Judge Kahn's Order of November 6, 2006, regarding Plaintiff's Third Amended Complaint, none of Plaintiff's prior pleadings had been served on Defendants Hilton or Langbart. (*See generally* Docket.) On November 6, 2006, Judge Kahn ordered, *inter alia,* that (1) "the Clerk shall issue summonses and forward them, along with copies of the [Third] Amended Complaint, to the United States Marshall for service on the [two] remaining Defendants," and (2) "Plaintiff shall ... comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action." (Dkt. No. 25, at 3-4.) On January 27, 2007, the summonses for Defendants Hilton and Langbart were returned unexecuted because Plaintiff had, on the USM-285 Forms, listed their addresses as Auburn C.F., and both had left Auburn C.F. several years before. (Dkt. No. 27.)

**\*3** On February 5, 2007, the Clerk's Office for this Court sent a letter to the Deputy Counsel for the New York State DOCS requesting his assistance in determining whether DOCS has a current address on file for Defendants Hilton and Langbart (or whether, perhaps, Defendants Hilton and Langbart would designate an agent for service of process). (Dkt. No. 28.) On March 21, 2007, the Deputy Counsel responded with Defendant Hilton's current address but stated that Defendant Langbart was

neither currently employed by DOCS nor was he previously employed by DOCS (but by the Central New York Psychiatric Center). (Dkt. No. 29.)

On March 22, 2007, the Clerk's Office reissued summonses for Defendants Hilton and Lanbart. (Dkt. No. 30.) On March 26, 2007, an acknowledgment of service was filed as to Defendant Hilton. (Dkt .33.) However, on April 26, 2007, the summons for Defendant Langbart was returned unexecuted because Plaintiff had, on the USM-285 Form, listed his address as "750 E. Adams St., Syr. N.Y. 13210," and Langbart was "no longer [t]here." (Dkt. No. 34.)

On June 28, 2007, in his motion to dismiss Plaintiff's Third Amended Complaint, Defendant Hilton stated, *inter alia,* that "[o]n April 27, 2007, the summons was returned unexecuted as to defendant Langbart." (Dkt. No. 37, Part 2, at 1, n. 1.) However, the docket contains no record of Plaintiff having completed another USM-285 Form as to Defendant Langbart. Consequently, it appears he was never served with a copy of Plaintiff's Third Amended Complaint.

Because Plaintiff has not offered "good cause" for his failure to enable the Marshals Service to effect service on Defendant Langbart, Plaintiff has violated Rule 4(m) of the Federal Rules of Civil Procedure. Alternatively, Plaintiff has violated Rule 16(f) of the Federal Rules of Civil Procedure due to the fact that he violated Judge Kahn's Order of November 6, 2006 (directing him to comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action," *see* Dkt. No. 25, at 4) by failing to complete new USM-285 Forms listing Defendant Langbart's current address.

As a result, the Court should dismiss Plaintiff's claims against Defendant Langbart. I note that the Court need not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

issue such an order only upon motion of defense counsel but may do so *sua sponte. See* Fed. R. Civ. 4(m) ("[T]he Court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time."); Fed. R. Civ. 16(f) ("[T]he judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just....").

Remaining in the case, then, are only Plaintiff's claims against Defendant Hilton.

## C. Summary of Plaintiff's Claims Against Defendant Hilton

In federal court, all pleadings must be liberally construed. *See* Fed.R.Civ.P. 8(e). Generally, pleadings filed by *pro se* civil rights litigants must be construed with an *extra* degree of liberality or leniency. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" or extra leniency that is normally afforded *pro se* litigants.[FN1] Generally, the rationale for withdrawing of this extra leniency (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience,* the lack of which is the reason for extending extraordinary leniency to a *pro se* litigant in the first place.[FN2]

FN1. *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept.26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted].

FN2. *Koehl,* 2007 WL 2846905, at *3 & n. 18

[citations omitted].

**\*4** Here, Plaintiff is certainly no stranger to the court system, having filed some 13 federal or state court actions or appeals (other than the current action).[FN3] I note that, by the time Plaintiff filed his Third Amended Complaint in this action on July 14, 2006, Plaintiff had filed some 12 federal or state court actions or appeals.[FN4] Ordinarily, I would find that the Court should withdraw from Plaintiff, or at least diminish, the extraordinary leniency normally afforded to *pro se* litigants. However, because Plaintiff, may well have been laboring under a mental illness at the time he drafted his Third Amended Complaint (for the reasons discussed below in this Report-Recommendation), I will continue to afford him special solicitude.[FN5]

FN3. **Federal Court Actions:** *Abascal-Montalvo v. I.N.S.,* 901 F.Supp. 309 (D.Kan.1995) (habeas corpus proceeding, filed by Plaintiff *pro se* ); *Abascal v. Thornburgh,* 90-CV-1399, Order of Dismissal (W.D. Okla. filed March 13, 1991) (habeas corpus proceeding, filed by Plaintiff *pro se* ).

**Federal Court Appeals:** *Abascal v. Thornburgh,* No. 91-6136, 1993 WL 118840 (10th Cir. Apr.13, 1993) (appeal from decision by W.D. Okla., in habeas corpus proceeding, filed by Plaintiff *pro se* ).

**State Court Actions:** *Abascal v. Marshall,* Index No. 000520/2007 (N.Y. Sup.Ct., Bronx County) (Walker, J.) (Article 78 proceeding, filed by Plaintiff *pro se* on 1/11/07); *Abascal v. City of New York,* Index No. 401171/2006 (N.Y. Sup.Ct., New York County) (Feinman, J.) (Article 78 proceeding, filed by Plaintiff *pro se* on 5/31/06); *Abascal v. N.Y.S. Bd. of*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

*Parole,* Judgment of Dismissal (N.Y. Sup.Ct., Albany County, filed March 1, 2005) (Canfield, J.); *Abascal v. Maczek,* Judgment of Dismissal (N.Y. Sup.Ct., Albany County, filed Aug. 6, 2004) (Canfield, J.); *Abascal v. Roach,* Judgment of Dismissal (N.Y. Sup.Ct., Albany County, filed Fed. 14, 2004) (Teresi, J.) (dismissing Article 78 proceeding, filed by Plaintiff *pro se* ); *Abascal v. Levy,* Index No. 402959/2003 (N.Y. Sup.Ct., New York County) (Wetzel, J.) (Article 78 proceeding, filed by Plaintiff *pro se* on 9/12/03).

**State Court Appeals:** *Abascal v. Maczek,* 5 N.Y.3d 713, 806 N.Y.S.2d 164, 840 N.E.2d 133 (N.Y.2005) (denying motion for poor person relief during appeal from decision by Third Department in Article 78 proceeding, filed by Plaintiff *pro se* ); *Abascal v. N.Y.S. Bd. of Parole,* 23 A.D.3d 740, 802 N.Y.S.2d 803 (N.Y.App.Div., 3d Dept., 2005) (appeal from decision by N.Y. Sup.Ct. in Article 78 proceeding, filed by Plaintiff *pro se* ); *Abascal v. Roach,* 802 N.Y.S. 569 (N.Y.App. Div., 3d Dept ., 2005) (appeal from decision by N.Y. Sup.Ct. in Article 78 proceeding, filed by Plaintiff *pro se* ); *Abascal v. Maczek,* 19 A.D.3d 913, 796 N.Y.S.2d 757 (N.Y.App.Div., 3d Dept., 2005) (appeal from decision by N.Y. Sup.Ct. in Article 78 proceeding, filed by Plaintiff *pro se* ).

FN4. (*Id.*)

FN5. I note that Plaintiff appears to have made a material misrepresentation to the Court in his Third Amended Complaint. Specifically, in his Third Amended Complaint (which was verified), Plaintiff swore that, as of July 8, 2006 (the date of his Third Amended Complaint), the only

"lawsuit[ ] [that Plaintiff had ever filed] in any state [or] federal court relating to [his] imprisonment" was the action of *Abascal v. New York,* Index No. 107872 (N.Y. Ct. of Cl.) (Minarik, J.) (action filed on 6/12/03, and judgment entered for Plaintiff on 11/22/04). (Dkt. No. 24, ¶ 6 [Plf.'s Third Am. Compl.].) While I have not found any record of this action in the New York State Unified Court System's electronic docketing system (and I therefore have not taken it into account in assessing Plaintiff's litigation experience), I have found record of at least *seven* other actions regarding Plaintiff's imprisonment which had been filed by Plaintiff before July 8, 2006. (*See, supra,* note 3 of this Report-Recommendation.) Generally, such information is material in prisoner civil rights actions since it enables the Court to determine one or more of the following issues: (1) whether any of the issues in the action have been previously litigated and decided (for purposes of the doctrines of res judicata and collateral estoppel); (2) whether the plaintiff had, prior to being granted *in forma pauperis status* in this action, earned "three strikes" for purposes of 28 U.S.C. § 1915(g); (3) whether the plaintiff had a record of frivolous litigation sufficient to warrant either (a) what is known as a "bar order" (i.e., an order barring him from litigating further in that court without meeting certain preconditions) pursuant to 28 U.S.C. § 1651(a), or (b) an order declaring plaintiff to be a "vexatious" litigator pursuant to 28 U.S.C. § 1927; and (4) whether the plaintiff's litigation experience was so extraordinary that it effectively dispenses with the need to afford him special solicitude. While a plaintiff is under no duty to provide this information in order to state an actionable civil rights claim, here, Plaintiff chose to provide the information and swore to the truthfulness of it. Ordinarily, I would find such a material misrepresentation to be sanctionable. However, because Plaintiff may well have been laboring under a mental illness at the time he drafted his Third Amended Complaint, I will not recommend that the Court sanction him for his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

material misrepresentation.

Construed with an *extra* degree of liberality, Plaintiff's Third Amended Complaint alleges as follows.

1. On December 27, 2001, Plaintiff was transferred from the Central New York Psychiatric Center ("CNYPC") to Auburn Correctional Facility ("Auburn C.F."), where he was interviewed by Defendant Hilton. (*Id.* at ¶ 10.) During the interview, Defendant Hilton asked Plaintiff if he wanted to live in the Intermediate Care Program ("ICP"). (*Id.*) Plaintiff responded that he neither wanted to live in ICP nor take psychotropic medication, but that he wanted to live in the prison's general population. (*Id.*)

2. At some point between December 27, 2001, and April 25, 2002, Plaintiff sent a letter to then-Governor George Pataki concerning "symptoms and body scars" that Plaintiff had experienced or sustained while in the custody of DOCS. (*Id.* at ¶ 12.) While Plaintiff does not attach a copy of this letter to his Third Amended Complaint, he does describe the substance of the letter in some detail. (*Id.* at ¶ 12.a.-12.d.) Among the symptoms described in the letter were the following: (1) the sensation that Plaintiff's "mind was being read" and that he had been subjected to the "broadcasting of [his] thoughts [by someone else]"; (2) the sensation that Plaintiff had also been subjected to "sleep deprivation," "changes to [his] hearing," "waking visions ... synced with body motions," "wild flailing of arms and legs, sometimes followed by rigor mortis," "very high body heat," "sudden, violent itching" in "hard-to-reach areas," "electrical shock[s]," "cigarette burn type scars," and "penis shriveling"; and (4) the fact that he had been "sexually provoked by female staff for many years while in the custody of the DOCS." (*Id.*)

3. Apparently, Plaintiff alleges that these symptoms and scars were caused by the "pscyho-electronic weapons" and "behavior modification experimentation" (including "personality breaking techniques") to which he has been involuntarily subjected by DOCS. (*Id.* at ¶¶ 16, 40, 41 & Ex. 8.)

4. On April 25, 2002, Defendant Hilton "interviewed" Plaintiff because of the letter he had sent to Governor Pataki. (*Id.* at ¶ 12.)

**\*5** 5. At some point before June 17, 2002, Plaintiff sent a letter to DOCS Deputy Commissioner of Corrections Lucien LeClaire, concerning the above-described "symptoms and body scars." (*Id.* at ¶ 13 .)

6. On June 17, 2002, Defendant Hilton "interviewed" Plaintiff because of the letter he had sent to Deputy Commissioner LeClaire. (*Id.*) During the meeting, Defendant Hilton asked Plaintiff if the symptoms he alleged were becoming worse, and Plaintiff responded that they were. (*Id.*)

7. At some point before July 18, 2002, Plaintiff sent a letter to the DOCS Inspector General concerning the above-described "symptoms and body scars." (*Id.* at ¶ 14.)

8. On July 18, 2002, a correctional sergeant informed Plaintiff that he could not leave his cell until he had been interviewed by a Mental Health Unit psychologist because of the letter he had written to the DOCS Inspector General, concerning the above-described "symptoms and body scars." (*Id.*)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

9. On July 19, 2002, Defendant Hilton "interviewed" Plaintiff because of the letter he had written to the DOCS Inspector General. (*Id.* at ¶ 15.) During the meeting, Plaintiff told Defendant Hilton that he just wanted to be left alone so that he could pursue his college education. (*Id.*) In addition, Plaintiff showed Defendant Hilton his "irritated face," which bore "multiple little bumps, and patches of redness." (*Id.*)

10. At some point before October 24, 2002, Plaintiff sent a letter to a New York State senator concerning the above-described "symptoms and body scars." (*Id.* at ¶ 16.)

11. On October 24, 2002, Defendant Hilton "interviewed" Plaintiff because of the letter he had written to the New York State senator. (*Id.*) During the meeting, Defendant Hilton (and Dr. Mitchell Langbart, who was also present) tried to persuade, or "coerce," Plaintiff to stop writing such letters. (*Id.*) Specifically, Dr. Langbart asked Plaintiff, "Do you want to be transferred to CNYPC and miss your college semester, or stay in the facility and be able to finish it?" (*Id.*) [FN6] Plaintiff responded that he would "do what he had to do," and that Langbart and Hilton would do "what they wanted to do." (*Id.*) Defendant Hilton responded that "all the pain and discomfort that plaintiff was suffering was maybe a revenge." (*Id.*) Subsequently, Plaintiff was placed in a "strip cell" with just his underwear and a mattress. (*Id.*)

FN6. Apparently, during the time in question, Plaintiff had already received his college degree and was pursuing an advanced degree at Cornell University. (Dkt. No. 24, Ex. 5 [Plf.'s Third Am. Compl., attaching Plaintiff's letter of 31/1/03 to James L. Stone, Commissioner of New York State Office of Mental Health]; *see also* Dkt. No. 24, Ex. 8 at 3 [attaching medical record summarizing Plaintiff's education].)

12. On October 29, 2002, Plaintiff was transferred back to CNYPC. (*Id.* at ¶ 18.) While at CNYPC, Plaintiff was told by Dr. Qamar Abassi that he had been sent to CNYPC because he had not been eating. (*Id.*) Plaintiff responded that that was false. (*Id.*)

13. On December 6, 2002, Plaintiff was again transferred from CNYPC to Auburn C.F. (*Id.* at ¶ 28.) Plaintiff alleges that, during the two months that followed the transfer, he wrote a letter to a politician concerning the above-described "symptoms and body scars," and that he was "interviewed" by "an individual from [the Mental Health Unit]" because of the letter (and apparently urged not to write such letters). (*Id.* at ¶ 29.) He also alleges that, during the six months that followed the interview, he was interviewed by two other psychologists. (*Id.* at ¶¶ 37, 39.) However, he does not allege that any of these three interviews were conducted by, or even were caused by, Defendant Hilton. (*See generally id.* at ¶¶ 28-45 [not mentioning Defendant Hilton]; *see also id.* at Exs. 1-3, 5 [attaching grievances and complaint-letters not mentioning Defendant Hilton].)

## D. Summary of Arguments on Defendant Hilton's Motion to Dismiss

**\*6** In his memorandum of law, Defendant Hilton argues that Plaintiff's claims against him, asserted in Plaintiff's Third Amended Complaint, should be dismissed for failure to state a claim for two alternative reasons: (1) Plaintiff fails to allege facts plausibly suggesting that Defendant Hilton was personally involved in any of the constitutional violations alleged by Plaintiff; and (2) even assuming as true all of the factual allegations of Plaintiff's Third Amended Complaint, Defendant Hilton is protected from liability by the doctrine of qualified immunity, as a matter of law. (Dkt. No. 37, Part 2, at 4-7.)

In his memorandum of law, Plaintiff responds to both of Defendant Hilton's arguments. With regard to Defendant Hilton's personal-involvement argument,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

Plaintiff argues that (1) Paragraphs 10, 15 and 18 of his Third Amended Complaint allege facts plausibly suggesting that Defendant Hilton "arbitrarily classified plaintiff as mentally ill," (2) Paragraphs 12, 13, 14 and 16 of his Third Amended Complaint allege facts plausibly suggesting that Defendant Hilton "persecuted him for writing to public officials," (3) Paragraph 16 of his Third Amended Complaint alleges facts plausibly suggesting that Defendant Hilton "threatened" and "coerced" him not to write to public officials, (4) Paragraphs 14 and 16 of his Third Amended Complaint allege facts plausibly suggesting that Defendant Hilton, wrongfully "secluded" him in a "strip cell," and (5) Paragraph 18 of his Third Amended Complaint allege facts plausibly suggesting that Defendant Hilton transferred Plaintiff to the Central New York Psychiatric Center for writing to a State Senator. (Dkt. No. 40, Part 1, at 3-6.)

With regard to Defendant Hilton's qualified immunity argument, Plaintiff essentially argues that Defendant Hilton fails to appreciate that it was clearly established that the First Amendment forbade Defendant Hilton from inhibiting Plaintiff from, or retaliating against him for, exercising his right to send letters of complaint to public officials about his prison conditions. (*Id.* at 6-9.)

## II. GENERAL LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2); [FN7] or (2) a challenge to the legal cognizability of the claim. [FN8]

FN7. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency

of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN8. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ( "There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8 [a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys.,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [FN9] The purpose of this rule is to "facilitate a proper decision on the merits." [FN10] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN11]

FN9. *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (quoting *Conley,* 355 U.S. at 47); *see also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley,* 355 U.S. at 47).

FN10. *See Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48).

FN11. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

*7 The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [FN12] However, it is well established that even this liberal notice pleading standard "has its limits." [FN13] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard. [FN14]

FN12. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN13. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN14. *See, e.g., Bell Atlantic Corp. v. Twombly,*

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

---U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord,* Dura Pharmaceuticals, 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See* Khan v. Ashcroft, 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1968-1969, 167 L.Ed.2d 929 (2007).[FN15] Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 standard turns on the

"plausibility" of an actionable claim. *Id.* at 1965-1974. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.; see also* Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly*] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in original],

FN15. The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

It must be remembered that, "[i]n reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN16] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"[FN17] In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality. Indeed, "courts must construe *pro se* pleadings broadly, and interpret them to raise the

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

strongest arguments that they suggest." [FN18] Moreover, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN19]

FN16. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN17. *Hernandez,* 18 F.3d at 136 (citation omitted); *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

FN18. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

FN19. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

**\*8** Of course, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading. [FN20] Moreover, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN21] This is because, even when a plaintiff is proceeding

*pro se,* "all normal rules of pleading are not absolutely suspended." [FN22]

FN20. *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at \*2, n. 14 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at \*5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at \*2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at \*4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at \*5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at \*4, n .16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

FN21. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted).

FN22. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at \*6, n. 27 (N.D.N.Y.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

## III. ANALYSIS

### A. Whether Plaintiff Has Failed to State a First Amendment Claim

Liberally construed, Plaintiff's Third Amended Complaint asserts two related but different types of First Amendment claims against Defendant Hilton: (1) a claim that Defendant Hilton retaliated against Plaintiff for engaging in speech or activity that was protected by the First Amendment; and (2) a claim that Defendant Hilton impermissibly interfered with Plaintiff's right to petition the government for the redress of grievances. (Dkt. No. 24, ¶ 47 & Prayer for Relief, ¶ A.1.)

### 1. Retaliation for Engaging in Protected Activity

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment.[FN23] Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights.[FN24] Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care.[FN25] As the Second Circuit has noted,

FN23. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004).

FN24. *See Gill,* 389 F.3d at 381-383.

FN25. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

This is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.[FN26]

FN26. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001)* [citations omitted], *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

To prevail on a First Amendment claim of retaliation under 42 U.S .C. § 1983, a plaintiff must prove by a preponderance of the evidence the following: (1) that the speech or conduct at issue was "protected"; (2) that the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) that there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.[FN27] Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone.[FN28]

> FN27. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d Cir.2001] ).

> FN28. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) [citations omitted].

**\*9** Here, Plaintiff appears to argue that the "protected" speech or conduct in which he had engaged when he was punished by Defendant Hilton consisted of sending letters to four New York State officials (Governor George Pataki, DOCS Deputy Commissioner Lucien LeClaire, the DOCS Inspector General, and a New York State senator) concerning "symptoms and body scars" that he had allegedly experienced or sustained while in the custody of DOCS. (Dkt. No. 24, ¶¶ 12-14, 16.) Although Plaintiff does not specifically allege that his letters contained complaints of mistreatment and requests for intervention, I liberally construe them as doing so. Furthermore, for the sake of argument, I will assume that

such letters constituted speech or conduct that was "protected" by the First Amendment.

The first problem with Plaintiff's retaliation claim is that, by and large, it fails to allege any facts plausibly suggesting that Defendant Hilton took any "adverse action" against Plaintiff. For example, Plaintiff alleges that, following his letters to Governor Pataki, Deputy Commissioner LeClaire, and the Inspector General, Defendant Hilton only "interviewed" Plaintiff about the subject matter of the letters. (Dkt. No. 24, ¶¶ 12, 13, 15, 16.) It is difficult for me to imagine circumstances under which an inquiry by a prison psychologist about a prisoner's complaints that his "mind was being read," and he was being subjected to "waking visions," "changes to [his] hearing," and the involuntary "flailing of [his] arms and legs" could be construed as anything other than sound medical treatment. (I certainly cannot conceive of it as being "adverse action.") I note that, in the sole detailed account of these "interviews" that Plaintiff provides in his Third Amended Complaint, he acknowledges that Defendant Hilton had asked him if the symptoms alleged in his letters were getting worse. (*Id.* at ¶ 13.)

The only "adverse action" that Plaintiff has even remotely alleges is Plaintiff's placement in a "strip cell with just his underwear and mattress" on October 24, 2002, after Defendant Langbart tried to "coerce" Plaintiff to stop writing letters like his recent letter to a New York State senator concerning his alleged "symptoms and body scars," and Plaintiff had responded that he would "do what he had to do." (*Id.* at ¶ 16.) For the sake of argument, I will assume this is "adverse action." Even it were an "adverse action," Plaintiff's retaliation claim would fail.

This is because the second problem with Plaintiff's retaliation claim is that he alleges absolutely no facts plausibly suggesting that this particular instance of "adverse action" was *causally connected* to the "protected conduct" in which Plaintiff had engaged. Plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

allegation that, immediately before he was placed in a "strip cell," Defendant Hilton told him that "all the pain and discomfort that plaintiff was suffering was maybe a revenge" is too cryptic and innocuous to plausibly suggest a causal link between the "protected conduct" and the "adverse action." (*Id.*) Moreover, any shred of a conceivable causal connection between Defendant Hilton's statement and Plaintiff's placement in a "strip cell" is severed when one considers the *nature* of the symptoms of which Plaintiff had complained, which included a belief that his "mind was being read," that his hearing was being manipulated, that he saw "waking visions," that he felt "violent itching" which could not be stopped, that he lacked control of his arms and legs, that he was being scarred and burned by "electrical shock[s]," and that he was being "provoked by female staff." (*Id.* at ¶ 12.) By any rational assessment, it was these symptoms, and not Defendant Hilton, that *caused* Plaintiff to be placed in a strip cell.

   **\*10** Indeed, Plaintiff does not even allege sufficient facts to plausibly suggest that it was Defendant Hilton, and not Defendant Langbart, who took the "adverse action" of placing Plaintiff in the "strip cell." (*Id.* at ¶ 16.) I note that it was Defendant Langbart, not Defendant Hilton, whom Plaintiff alleges wrongfully transferred him to the CNYPC less than a week after this October 24, 2002, placement in a "strip cell." (Dkt. No. 24, ¶ 18 & Exs. 1-2.) As a result, I am persuaded that Defendant Hilton's lack-of-personal-involvement argument serves as an alternative ground for dismissing Plaintiff's retaliation claim against Defendant Hilton.[FN29]

   FN29. I note that none of the paragraphs (of Plaintiff's Third Amended Complaint) cited in Plaintiff's opposition memorandum of law actually alleges facts plausibly suggesting Defendant Hilton's personal involvement in any constitutional violation. (Dkt. No. 40, Part 1, at 4.) For example, Paragraphs 10, 15 and 18 of Plaintiff's Third Amended Complaint do not allege facts plausibly suggesting either that it was

Defendant Hilton who "classified" Plaintiff as mentally ill or that such classification was "arbitrary," as Plaintiff argues in his memorandum of law. (*See* Dkt. No. 47, ¶¶ 10, 15, 18.) Nor do Paragraphs 12, 13, 14 and 16 of Plaintiff's Third Amended Complaint allege facts plausibly suggesting that Defendant Hilton "persecuted" Plaintiff for writing to public officials, as Plaintiff argues in his memorandum of law. (*See* Dkt. No. 47, ¶¶ 12-14, 16.) Nor does Paragraph 18 of Plaintiff's Third Amended Complaint allege facts plausibly suggesting that it was Defendant Hilton who caused Plaintiff to be transferred to CNYPC, as Plaintiff argues in his memorandum of law. (*See* Dkt. No. 47, ¶ 18.)

   For both of these alternative reasons, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim against Defendant Hilton.

**2. Interference with Right to Petition Government**

   It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances."[FN30] This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights."[FN31] "However, this right is not 'an abstract, freestanding right to a law library or legal assistance' and cannot ground a Section 1983 claim without a showing of 'actual injury.' "[FN32] As a result, to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury.[FN33] It is worth noting that "[t]his actual injury requirement 'is not satisfied by just any type of frustrated legal claim,' because the Constitution guarantees only the tools that 'inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement."[FN34] " 'Impairment of any *other* litigating capacity is simply one of the incidental (and

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

perfectly constitutional) consequences of conviction and incarceration.' " [FN35]

FN30. *See* U.S. CONST. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

FN31. *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

FN32. *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

FN33. *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr.12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

FN34. *Collins,* 423 F.Supp.2d at 415-16 (quoting *Lewis,* 518 U.S. at 355).

FN35. *Id.*

Here, Plaintiff has not alleged facts plausibly suggesting that Defendant Hilton acted *deliberately* and *maliciously* in interfering with Plaintiff's right to petition government officials for the redress of grievances. The closest that Plaintiff comes to doing so is when he alleges that, immediately before he was placed in a "strip cell" on October 24, 2002, Defendant Hilton told him that "all the pain and discomfort that plaintiff was suffering was maybe a revenge." (Dkt. No. 24, ¶ 16.) Again, this is too cryptic and innocuous a statement to plausibly suggest deliberate malice, especially when one considers Plaintiff's other allegations, which plausibly suggest that Defendant Hilton (who was a prison psychologist) rather promptly responded to Plaintiff's claims of experiencing delusional symptoms, at least one time with an inquiry as to whether the symptoms were getting worse. (*Id.* at ¶¶ 12, 13, 15, 16.)

**\*11** Even if Plaintiff had alleged such facts, he has not alleged facts plausibly suggesting that Plaintiff suffered any actual injury or that such actual injury was *caused* by Defendant Hilton (as opposed to being caused by someone else, such as Defendant Langbart). For example, as stated earlier, it was Defendant Langbart, not Defendant Hilton, whom Plaintiff alleges wrongfully transferred him to the CNYPC less than a week after this October 24, 2002, placement in a "strip cell." (*Id.* at ¶ 18 & Exs. 1-2.) As a result, I am persuaded that Defendant Hilton's lack-of-personal-involvement argument serves as an alternative ground for dismissing Plaintiff's interference claim against Defendant Hilton.[FN36]

FN36. As stated earlier, I note that none of the paragraphs (of Plaintiff's Third Amended Complaint) cited in Plaintiff's opposition memorandum of law actually allege facts plausibly suggesting Defendant Hilton's personal involvement in any constitutional violation. (*See, supra,* note 29 of this Report-Recommendation.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

For both of these alternative reasons, I recommend that the Court dismiss Plaintiff's First Amendment interference claim against Defendant Hilton.

**B. Whether Plaintiff Has Failed to State an Eighth Amendment Claim**

Liberally construed, Plaintiff's Third Amended Complaint asserts two related but different types of Eighth Amendment claims against Defendant Hilton: (1) a claim that Defendant Hilton was deliberately indifferent to Plaintiff's serious medical needs (for example, by "arbitrarily classifying him as mentally ill"); and (2) a claim that Defendant Hilton subjected Plaintiff to "cruel and unusual" prison conditions by harassing him for writing to public officials, and by placing him, without justification, in a "strip cell with just his underwear and a mattress." (Dkt. No. 24, ¶¶ 16, 47 & Prayer for Relief, ¶ A.1.)

**1. Deliberate Indifference to a Serious Medical Need**

Generally, to prevail on such a claim, a plaintiff must show two things: (1) that the plaintiff had a sufficiently serious medical need; and (2) that the defendant was deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Here, the only serious medical needs that Plaintiff plausibly alleges are (1) a mental illness involving delusions and/or (2) a collection of skin irritations coupled with possible exposure to cold temperatures (due to his placement in a "strip cell" with only his underwear and a mattress for five days). (Dkt. No. 24, ¶¶ 15, 16, 18, 47.) For the sake of argument, I will set aside the fact that Plaintiff appears to deny that he is, in fact, mentally ill. (*Id.* at ¶¶ 10, 47.) I will also assume that, taken together, these conditions constitute a *serious medical need* for purposes of the Eighth Amendment.

The problem is that Plaintiff has asserted no facts plausibly suggesting that Defendant Hilton acted with any deliberate indifference with regard to this (presumed) serious medical need. To the contrary, Plaintiff alleges facts plausibly suggesting that Defendant Hilton "interviewed" him five times regarding his mental condition, always promptly responding to Plaintiff's claims of experiencing delusional symptoms, and at least once specifically inquiring as to whether the symptoms were getting worse. (*Id.* at ¶¶ 10, 12, 13, 15, 16.) [FN37] Granted, Plaintiff also alleges that, immediately before he was placed in a "strip cell" on October 24, 2002, Defendant Hilton told him that "all the pain and discomfort that plaintiff was suffering was maybe a revenge." (*Id.* at ¶ 16.) However, this statement-in addition to being cryptic in nature-is too innocuous to plausibly suggest that Defendant Hilton possessed the state of mind necessary to be *deliberately indifferent,* which is a state of mind akin to *criminal recklessness.*[FN38] Plaintiff is not alleging facts plausibly suggesting criminal recklessness, only facts plausibly suggesting negligence or malpractice. (*See, e.g., id.* at 47 [alleging that Defendant Hilton "arbitrarily classif[ied] plaintiff as mentally ill"].) A claim of negligence or malpractice by a prison medical care provider is not actionable under 42 U.S.C. § 1983.[FN39]

FN37. I note that Plaintiff also alleges facts plausibly suggesting that, during the relevant time period (December 27, 2001, to October 29, 2002), he received medical care from other employees of Auburn C .F. (*See, e.g.,* Dkt. No. 24, ¶ 11, 16.)

FN38. *Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.), *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.), *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

FN39. *Farmer,* 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim....

Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].

**\*12** For both of these alternative reasons, I recommend that the Court dismiss Plaintiff's Eighth Amendment inadequate-medical-care claim against Defendant Hilton.

**2. Inadequate Prison Conditions**

Generally, to prevail on such a claim, a plaintiff must show two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005).

Here, the only serious conditions of confinement that Plaintiff plausibly alleges are (1) repeated "interviews" by Defendant Hilton (regarding Plaintiff's complaints of the symptoms described above in Part I.C. of this Report-Recommendation), which conceivably caused Plaintiff to experience anxiety or pressure, and/or (2) incarceration in a "strip cell" for five days (with only his underwear and a mattress) when Plaintiff was suffering from a skin irritation and presumably a mental illness. (Dkt. No. 24, ¶¶ 15, 16, 18, 47.) I have some difficulty concluding that these conditions of confinement, even taken together, are *sufficiently serious* for purposes of the Eighth Amendment. *See Lock v. Clark,* 90-CV-0327, 1992 U.S. Dist. LEXIS 21991, at *1, 11-12, 1992 WL 559660 (N.D.Ind. March 17, 1992) ("The deprivations alleged by Mr. Lock in this case [which consisted of being confined

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

for seven days in a "strip cell" in a segregation unit] fail to satisfy the objective component of his Eighth Amendment conditions claim, and they do not rise to the level of a constitutional violation."); *Dunkley v. Tate,* 07-CV-0465, 2007 U.S. Dist. LEXIS 73166, at *2-4, 2007 WL 2900169 (W.D.Va. Oct. 1, 2007) (confinement in "strip cell" for three days did not violate Eighth Amendment as a matter of law).[FN40] For example, Plaintiff does not allege that, while in the "strip cell" for five days, he was deprived of "the minimal civilized measure of life's necessities," *Farmer,* 511 U.S. at 834, such as medical care, food, water, warmth or a toilet.

FN40. *See also Lewis v. Angelone,* 00-CV-0161, 2001 U.S. Dist. LEXIS 25539, at *12 (E.D.Va. May 16, 2001) ("Lewis has failed to allege facts which suggest his [24-hour] confinement in the strip cell and his confinement in segregation were sufficiently severe and prolonged as to give rise to an Eighth Amendment claim.") [citation omitted]; *Winn v. Delaware Dept. of Corr.,* 02-CV-0034, 2003 U.S. Dist. LEXIS 18678, at *11, 2003 WL 21456628 (D.Del. Sept. 30, 2003) ("Plaintiff has not presented any facts proving that State Defendants' placing him on strip cell status involves the wanton and unnecessary infliction of pain [sufficient to establish an Eighth Amendment claim.").

Moreover, I note that, in this cruel-and-unusual *punishment* claim, Plaintiff has alleged facts plausibly suggesting that he was placed in a strip cell not as *punishment* but for non-punitive reasons such as (1) to protect his own safety,[FN41] (2) to protect other prisoners' safety,[FN42] (3) to protect prison employees' safety,[FN43] and/or (4) to await a transfer to CNYPC.[FN44]

FN41. (Dkt. No. 24, ¶¶ 7, 9, 12 [alleging that he was physically assaulted by other inmates on November 23, 2001, and December 24, 2001,

and that, *inter alia,* he felt "violent itching" which could not be stopped, and he lacked control of his arms and legs].)

FN42. (*Id.* at ¶ 7 [alleging that, on November 23, 2001, Plaintiff got in a fight with another inmate].)

FN43. (*Id.* at ¶¶ 12, 40, 42 [alleging that the symptoms he experienced included a belief that his "mind was being read" by DOCS, that his hearing was being manipulated by DOCS, that he was being scarred and burned by "electrical shock[s]" administered by DOCS, and that he was being "sexually provoked by female staff."].)

FN44. (*Id.* at ¶¶ 16, 18 [alleging that, five days after Plaintiff was placed in a "strip cell," he was transferred to CNYPC].)

However, even if one were to assume that, taken together, the conditions of confinement alleged by Plaintiff are *sufficiently serious* for purposes of the Eighth Amendment, Plaintiff's inadequate-prison-conditions claim would fail. This is because, again, Plaintiff has asserted no facts plausibly suggesting that Defendant Hilton acted with any deliberate indifference to Plaintiff's health or safety. (*See, supra,* Part III.B.1. of this Report-Recommendation.) Indeed, the allegations of Plaintiff's Third Amended Complaint plausibly suggest that Defendant Hilton acted with due regard to Plaintiff's health or safety. (*Id.*) I note that the "symptoms" of which Plaintiff repeatedly complained to public officials included a belief that his "mind was being read," that he saw "waking visions," that he felt "violent itching" which could not be stopped, that he lacked control of his arms and legs, that he was being scarred and burned by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

"electrical shock[s]," and that he was being "provoked by female staff." (*Id.* at ¶ 12.) Simply stated, Plaintiff's allegations plausibly suggested that he was a danger to himself (and others) and in need of "interviews" conducted by Defendant Hilton, and placement in a "strip cell" for five days pending a transfer to the CNYPC, where he could receive further evaluation and appropriate treatment.

**\*13** For this reason, I recommend that the Court dismiss Plaintiff's Eighth Amendment prison-conditions claim against Defendant Hilton.

**C. Whether Plaintiff Has Failed to State a Fourteenth Amendment Claim**

Liberally construed, Plaintiff's Third Amended Complaint asserts two different Fourteenth Amendment claims against Defendant Hilton: (1) a claim that Defendant Hilton violated Plaintiff's substantive due process and/or procedural due process rights; and (2) a claim that Defendant deprived Plaintiff of equal protection under the laws. (Dkt. No. 24, ¶ 47 & Prayer for Relief, ¶ A.1.)

**1. Due Process**

The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks and citation omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125-126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is

complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

**a. Substantive Due Process**

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91-CV-1196, *Memorandum-Decision and Order* (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

The first step in a substantive due process analysis is to identify the constitutional right at stake. Plaintiff does not indicate what right he is claiming. For the sake of argument, I will assume that Plaintiff possessed a protected liberty interest in remaining free from confinement in a strip cell and/or transfer to CNYPC unless DOCS has obtained reasonable grounds to believe that he was suffering from a mental illness involving delusions to such an extent that he poses a threat to himself or others in the correctional facility.[FN45]

FN45. I note that I do *not* liberally construe Plaintiff's Third Amended Complaint as alleging that he was forcibly injected with anti-psychotic medications (or that he possessed a protected liberally interest in being free from such forcible injections)-a constitutional claim that I understand he tried to assert in his original Complaint. (*See* Dkt. No. 5, at 5-6 [Order of Judge Kahn, referring to this attempted claim].) The closest Plaintiff comes to making this claim is when he alleges that, on December 27, 2001, he told Defendant Hilton that he did not want to

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

"take any psychotrophic medication." (Dkt. No. 24, ¶ 10.) Notably missing is any allegation that he was subsequently forced (by Defendant Hilton or anyone) to take any such medication.

The next step in a substantive due process analysis is to consider whether the state action was arbitrary in the constitutional sense and therefore violative of substantive due process. Here, I find that Plaintiff has alleged no facts plausibly suggesting that the state action was arbitrary in the constitutional sense and therefore violative of substantive due process. Indeed, Plaintiff has alleged facts plausibly suggesting that, far from being arbitrary, the actions of Defendant Hilton were reasonable and appropriate. In addition to the litany of delusional symptoms acknowledged by Plaintiff (described above), I note that, when "interviewed" about them, Plaintiff steadfastly persisted in his beliefs,[FN46] and refused treatment.[FN47]

FN46. (Dkt. No. 24, ¶¶ 13, 15, 16.)

FN47. (*Id.* at ¶¶ 10, 15 & Exs. 8-9.)

**\*14** As a result, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment substantive due process claim against Defendant Hilton.

**b. Procedural Due Process**

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989).

Here, I find that the Due Process Clause does not give Plaintiff a liberty interest in remaining free from confinement to a "strip cell," given the duration and conditions of that confinement, as alleged by Plaintiff (described above). *See Dunkley v. Tate,* 07-CV-0465, 2007 U.S. Dist. LEXIS 73166, at *2-4, 2007 WL 2900169 (W.D.Va. Oct. 1, 2007) ("In this case, while the conditions of Dunkley's confinement in the strip-cell [for three days] were more restrictive than those applied to inmates in the general population and possibly even segregation, they were not nearly so restrictive and atypical as those at issue in *Wilkinson [v. Austin,* 545 U.S. 209, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) ]. Therefore, the court finds that Dunkley did not have a liberty interest in remaining out of the strip-cell and, thus, his due process claim fails.").[FN48]

FN48. *See also Winn v. Delaware Dept. of Corr.,* 02-CV-0034, 2003 U.S. Dist. LEXIS 18678, at *8, 14, 2003 WL 21456628 (D.Del. Sept. 30, 2003) ("Because plaintiff does not have a constitutionally protected liberty interest at issue, plaintiff's claims [arising from his placement in a 'strip cell' apparently several times for periods of 24 hours] will be dismissed.").

Even if I were to find that Plaintiff possessed a limited such liberty interest, I would find that Plaintiff was, according to his own allegations, given all the process to which he was due under the circumstances. For example, I note that Plaintiff's placement in a "strip cell," and transfer to the CNYPC, was immediately proceeded by not only three "interviews" with a psychologist about claims of delusional symptoms but a fourth "interview" with both a psychologist *and* a psychiatrist. (Dkt. No. 24, ¶¶ 12, 13, 15, 16.) This last "interview," conducted by two doctors, is reminiscent of the examination conducted by two physicians, under the New York State law, prior to a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

patient's involuntary commitment to a psychiatric hospital. *See* N.Y. Correction Law § 402(1); N.Y. Mental Hygiene Law ¶ 9.27(a). Furthermore, here, Plaintiff was not even involuntarily *committed* to a psychiatric hospital, only temporarily *transferred* to one (where he previously had been committed) on an emergency basis (for "closer observation" and "diagnostic clarification" as stated in one medical record).[FN49]

FN49. (Dkt. No. 24, ¶¶ 8, 10, 18 & Ex. 9.)

As a result, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Hilton.

**2. Equal Protection**

To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he was intentionally treated differently from others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *Travis v. N.Y. State Div. of Parole,* 96-CV-0759, 1998 U.S. Dist. LEXIS 23417, at *11, 1998 WL 34002605 (N.D.N.Y. Aug. 26, 1998) (Sharpe, M.J.), *adopted,* 96-CV-0759, Decision and Order (N.D.N.Y. filed Nov. 2, 1998) (McAvoy, C.J.). Where the alleged classification involves a "suspect class" or "quasi-suspect class," the alleged classification is subject to "strict scrutiny" by a court. *Travis,* 1998 U.S. Dist. LEXIS 23417, at *11, 1998 WL 34002605. However, neither prisoners nor the mentally ill comprise a suspect or quasi-suspect class for Equal Protection purposes. *See Holley v. Carey,* 04-CV-2708, 2007 U.S. Dist. LEXIS 64699, *23, 2007 WL 2533926 (E.D.Cal. Aug. 31, 2007) ("[N]either prisoners nor persons with mental handicaps are a suspect class entitled to heightened scrutiny.") [citations omitted]; *Coleman v. Martin,* 04-CV-72534, 363 F.Supp.2d 894, 902 (E.D.Mich.2005). As a result, the alleged classification is subject to only "rational basis scrutiny." *Holley,* 2007 U.S. Dist. LEXIS 64699, at *23, 2007 WL 2533926; *Coleman,* 363 F.Supp.2d at 902. To

survive such scrutiny, the alleged classification need only be "rationally related" to a "legitimate state interest." *Holley,* 2007 U.S. Dist. LEXIS 64699, at *23, 2007 WL 2533926; *Coleman,* 363 F.Supp.2d at 902.

**\*15** Here, Plaintiff has not even alleged facts plausibly suggesting there has been any *classification* at all in this case, i.e., that he was treated differently from anyone else. In any event, he has not alleged any facts plausibly suggesting that the "discrimination" he allegedly experienced was not rationally related to a legitimate state interest, namely, the preservation of safety and order in its prisons, and the diagnosis and treatment of mentally ill prisoners.

As a result, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment equal protection claim against Defendant Hilton.

**D. Defendant Hilton's Qualified Immunity Argument**

Because I have already concluded that adequate grounds exist upon which to base a recommendation of dismissal of Plaintiff's claims against Defendant Hilton, I need not, and do not, reach the merits of Defendant Hilton's alternative argument in favor of dismissal, namely, his qualified immunity argument.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendant Hilton's motion to dismiss (Dkt. No. 37) be *GRANTED;* and it is further

**RECOMMENDED** that those of Plaintiff's claims

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

(Cite as: 2008 WL 268366 (N.D.N.Y.))

against Defendant Hilton that are not the subject of Defendant Hilton's motion to dismiss (Dkt. No. 37) be **DISMISSED** pursuant to the Court's authority to do so under 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b), and/or Fed.R.Civ.P. 12(h)(3), for the reasons stated above; and it is further

**RECOMMENDED** that Plaintiff's claims against Defendant Langbart be **DISMISSED** with prejudice for failure to serve, for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.

Abascal v. Hilton

Not Reported in F.Supp.2d, 2008 WL 268366 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Lamont H. WALKER, Plaintiff,

v.

Joseph PATARO, Steven Lowry, David Thacker, sued in their individual capacities, and Ada Perez, Robert Ercole and Wayne Strack, sued in their individual and official capacities, Defendants.

No. 99CIV.4607(GBD)(AJP).

April 23, 2002.

REPORT AND RECOMMENDATION

PECK, Magistrate J.

**\*1** Pro se plaintiff Lamont Walker brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants retaliated against him-by moving him to a different housing unit which resulted in his loss of his higher paying prison job-for filing a grievance against a correction officer while in custody at the Fishkill Correctional Facility. (Dkt. No. 2: Compl.)

Defendants moved for summary judgment, arguing that: (1) Walker's damage claims against defendants in their official capacities should be dismissed pursuant to

the Eleventh Amendment (Dkt. No. 31: Defs. Br. at 20-21); (2) defendants Lowry, Perez, Strack and Ercole were not personally involved in Walker's housing and job transfers (*id.* at 13-17); (3) Walker was moved to a different housing unit to accommodate his initial grievance (*i.e.,* to move him away from the correction officer he claimed was harassing him), not in retaliation for it, and the resulting job change was incidental to his housing move (*id.* at 7-12); and (4) defendants are entitled to qualified immunity (*id.* at 17-19).

For the reasons set forth below, defendants' summary judgment motion should be: (1) GRANTED as to defendants in their official capacities because the Eleventh Amendment bars such damage claims; (2) GRANTED as to defendants Lowry and Perez for lack of personal involvement; and (3) DENIED in all other respects. The parties shall file their Joint Proposed Pretrial Order by May 31, 2002.

FACTS

*The Parties*

Lamont Walker is an inmate under the custody of the New York State Department of Correctional Services ("DOCS"); at the time relevant to this action (December 1998 and January 1999), Walker was incarcerated at the Fishkill Correctional Facility. (Walker 56.1 Stmt. ¶ 1; Dkt. No. 33: Defs. 56.1 Stmt. ¶ 1; Dkt. No. 2: Compl. ¶ 1.) <sup>FN1</sup> At the relevant time, all defendants were employed by DOCS at Fishkill: Joseph Pataro as a Lieutenant, Steven Lowry and David Thacker as Captains, Ada Perez as the Deputy Superintendent for Correctional Facility Program Services, Robert Ercole as the Deputy Superintendent for Security Services, and Wayne Strack as Superintendent. (Walker 56.1 Stmt. ¶¶ 2-6; Defs. 56.1 Stmt. ¶¶ 2-7; Compl. ¶¶ 2-6; Dkt. No. 32: Pataro Aff. ¶ 1; Lowry Aff. ¶ 2; Thacker Aff. ¶ 1; Perez Aff. ¶ 2; Ercole Aff. ¶ 1; Strack

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

Aff. ¶ 1.)

FN1. Reference to paragraphs in the complaint are to the sub-paragraphs in Section IV of the complaint.

Walker's Grievance Against Correction Officer Woodard and Prison Officials' Move of *Walker to a Different Housing Unit, Resulting in a Job Change*

On November 24, 1998, Walker filed a grievance about an incident involving Correctional Officer ("C.O.") Woodard, alleging that C.O. Woodard verbally harassed and abused Walker, disrespected Walker, abused his authority, and threatened Walker with Special Housing Unit ("SHU") confinement. (Dkt. No. 2: Compl. ¶ 8; Walker 56.1 Stmt. ¶ 7; Walker Aff. ¶ 2 & Ex. 1: 11/24/98 Inmate Grievance Complaint; Dkt. No. 33: Defs. 56.1 Stmt. ¶ 8.)

**\*2** On December 1, 1998, Sergeant Pickett interviewed Walker as part of Fishkill's investigation of his grievance. (Compl. ¶ 8; Walker 56.1 Stmt. ¶ 8; Defs. 56.1 Stmt. ¶ 9; *see also* Walker Aff. ¶ 2.) Sgt. Pickett's report stated that Walker said that he tries to avoid C.O. Woodard and that Walker felt "uncomfortable" in his current housing unit when C.O. Woodard was on duty. [FN2] (Walker Aff. Ex. 2: 12/1/98 Grievance Investigation Memo; Dkt. No. 32: Ercole Aff. ¶ 4 & Ex. 1; Dkt. No. 32: Thacker Aff. ¶ 4 & Ex. 1.)

FN2. Sgt. Pickett records that Walker told him: "Now I try to avoid [C.O. Woodard]. He now works on nights ... and I'm uncomfortable on my unit, I leave the TV room when he's on to avoid him ...." (Walker Aff. Ex. 2.) Walker also cited two specific incidents in which he alleged that C.O. Woodard harassed him in the stairwell and

threatened to punish him for advising his fellow porters how to perform their duties correctly. (*Id.*)

On December 18, 1998, Acting Superintendent Ercole responded to Walker's grievance, as follows:

Your grievance # 17055-98 filed 11/24/98 has been investigated by Sgt. Pickett. You were interviewed on 12/1/98 concerning your allegations toward Officer Woodard.

At this time you verbalized your complaint but failed to show any harassing language or verbal abuse from Officer Woodard.

Officer Woodard was interviewed and stated that he has at no time "verbally abused or threatened" you.

Based upon review of information received in investigation reports I can find nothing to substantiate your grievance at this time.

However, *to make you feel more comfortable while at Fishkill, I will have you moved to another [housing] unit where you will be under the supervision of other Officers.*

(Compl. Ex. A: 12/18/98 Ercole Memo to Walker, emphasis added; *see also* Defs. 56.1 Stmt. ¶ 10; Ercole Aff. ¶ 5; Walker 56.1 Stmt. ¶ 9; Walker Aff. ¶ 4.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

At the time of his grievance, Walker was housed in Building 21A, the building in which C.O. Woodard was stationed. (Pataro Aff. ¶ 3; Walker 56.1 Stmt. ¶ 9; Compl. ¶ 9; Defs. 56.1 Stmt. ¶ 10.) Walker was employed as a "porter pool group leader assistant" for Building 21A, which required that Walker live in Building 21A or the adjoining Building 21. (Walker Aff. ¶ 3; Compl. ¶ 9; Walker 56.1 Stmt. ¶ 14; Defs. 56.1 Stmt. ¶ 15; Dkt. No. 32: Steckelman Aff. Exs. 1-2: Walker Dep. at 35-37; Perez Aff. ¶¶ 5-6.)

On December 18, 1998, at the direction of Captain Thacker, Lieutenant Pataro arranged for Walker to be moved from Building 21A to the Main building at Fishkill. (Walker Aff. ¶ 3; Pataro Aff. ¶ 3; Thacker Aff. ¶ 5; see Walker 56.1 Stmt. ¶¶ 13-14; Defs. 56.1 Stmt. ¶ 12.) Walker alleges that a C.O. Sylvester informed Lt. Pataro that Walker would lose his job if he was transferred out of the 21 complex and that Lt. Pataro responded "he's going to have to get another job." (Compl. ¶ 9; Walker Aff. ¶ 3.)

The position of porter pool group leader assistant in the Main building was filled by another inmate and thus not available to Walker. (Steckelman Aff. ¶ 4 & Ex. 3: Walker Dep. at 39; Perez Aff. ¶ 6; Defs. 56.1 Stmt. ¶ 16.) As a result, Walker worked in the general porter pool for the Main building. (Perez Aff. ¶ 6; Defs. 56.1 Stmt. ¶¶ 14-17.) The pay rate for a porter pool group leader assistant is greater than for the general porter pool.[FN3] (Walker Aff. Ex. 12: Inmate Program Assignment; Steckelman Aff. Ex. 4: Walker Dep. at 40.)

FN3. A porter pool group leader earned approximately 25 cents per hour while porter pool workers earned approximately 10 cents per hour. (Steckelman Aff. Ex. 4: Walker Dep. at 40.)

*3 Walker worked in the Main building porter pool until January 6, 1999, when he requested and was granted a transfer to the barbershop.[FN4] (Compl. Ex. F: 1/6/99 Request for Change of Program; Perez Aff. ¶ 5 & Ex. 1; see Walker Aff. Ex. 12; Steckelman Aff. Ex. 4: Walker Dep. at 39-40; Defs. 56.1 Stmt. ¶ 17.)

FN4. The hourly pay rate for the barbershop job was approximately 18 cents. (Steckelman Aff. Ex. 4: Walker Dep. at 40.)

On July 15, 1999, Walker was transferred to the position of porter pool group leader assistant for Building 21. (Steckelman Aff. Ex. 4: Walker Dep. at 40.)

*Walker's Retaliation Grievance*

On December 21, 1998, Walker filed another grievance, alleging that his transfer to the Main building was in retaliation for his prior grievance against C.O. Woodard, and requesting that he be reinstated to his original housing and job assignments.[FN5] (Compl. ¶ 11 & Ex. B: 12/21/98 Inmate Grievance Complaint; Walker 56.1 Stmt. ¶ 26; Walker Aff. ¶ 4; Defs. 56.1 Stmt. ¶ 18.)

FN5. Walker also noted in the grievance that he had not requested the transfer in his housing or employment assignment. (Compl. Ex. B: 12/21/98 Inmate Grievance Complaint.)

On January 20, 1999, Superintendent Strack responded to this grievance by memo to Walker:

Your original grievance # 17055-98 dated 11/24/98

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

was filed against Officer Woodard for harassment. This grievance was unsubstantiated based upon information received during the investigation.

Due to your complaint, in order to make you feel more comfortable while at Fishkill, you were moved at the discretion of a supervisory decision where you would be under the supervision of other Officers as it appeared you had a problem with Officer Woodard. You have been interviewed by Lt. Szymanowicz concerning your grievance and will not be moved back to H.U. [Housing Unit] J at this time.

(Compl. Ex. C: 1/20/99 Strack Memo; *see* Walker Aff. ¶ 5; Defs. 56.1 Stmt. ¶ 19; Strack Aff. ¶ 4 & Ex. 1.)

On January 28, 1999, Walker wrote a letter to Superintendent Strack explaining his situation in more depth and reasserting his retaliation claim. (Compl. ¶ 12 & Ex. D: 1/28/99 Letter to Strack; Defs. 56.1 Stmt. ¶ 20; Walker Aff. ¶ 6; Steckelman Aff. Ex. 10: Walker Dep. at 63.) Walker also appealed Supt. Strack's denial of his grievance to the Central Office Review Committee ("CORC"), which held a hearing on February 23, 1999. (Compl. ¶ 13 & Ex. C; Walker Aff. ¶ 7; Defs. 56.1 Stmt. ¶ 22.) On February 24, 1999, the CORC sustained Supt. Strack's decision, finding that "there is insufficient evidence to indicate retaliation by staff related to the grievant's previous use of the grievance process." (Ercole Aff. ¶¶ 6-7 & Ex. 2: 2/24/99 CORC Report; Defs. 56.1 Stmt. ¶ 22.)

On February 25, 1999, Ada Perez, the Deputy Superintendent for Program Services, responded to Walker's letter to Supt. Strack, informing Walker that he was in his "current assignment of Barber Shop as per [his] own request" and that he would be eligible to request a change of assignment after ninety days, *i.e.,* after April 18,

1999. (Compl. ¶ 14 & Ex. E: 2/25/99 Perez Letter; *see* Walker Aff. ¶ 7; Defs. 56.1 Stmt. ¶ 21.) As noted above, Walker returned to the porter pool group leader assistant position in Building 21 on July 15, 1999. (Steckelman Aff. Ex. 4: Walker Dep. at 40.)

### Walker's Federal Lawsuit

**\*4** Walker's pro se § 1983 complaint is dated April 12, 1999, was received by the Court's Pro Se Office on April 15, 1999 and filed as of June 25, 1999. (Dkt. No. 2: Compl.) On November 2, 1999, defendants moved to dismiss the complaint. (Dkt.Nos.7-9.) On December 22, 1999, Judge Scheindlin (to whom the case then was assigned) denied the motion to dismiss. (Dkt. No. 14: Opinion & Order.) *Walker v. Patero,* 99 Civ. 4607, 1999 WL 1243865 at *1-3 (S.D.N.Y. Dec. 22, 1999).

At the conclusion of discovery, defendants filed the present summary judgment motion. (Dkt.Nos.31-33, 36.)

### ANALYSIS

I. *SUMMARY JUDGMENT STANDARDS IN* SECTION 1983 *CASES* [FN6]

FN6. For additional cases authored by this Judge discussing the summary judgment standards in Section 1983 cases, in language substantially similar to that in this entire section of this Report and Recommendation, *see, e.g., Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *5-7 (S.D.N.Y. May 7, 2001)(Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *5 (S.D.N.Y. Apr. 23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *4 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

at *4 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *4 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Greenfield v. City of New York,* 99 Civ. 2330, 2000 WL 124992 at *3 (S.D.N.Y. Feb. 3, 2000) (Peck, M.J.); *Salahuddin v. Coughlin,* 999 F.Supp. 526, 534 (S.D.N.Y.1998) (Rakoff, D.J. & Peck, M.J.); *Watson v. McGinnis,* 981 F.Supp. 815, 817 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.).

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment-here, defendants. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *see also, e.g., Chambers v. TRM,* 43 F.3d at 36; *Gallo v. Prudential,* 22 F.3d at 1223. The Court draws all inferences in favor of the nonmoving party-here, Walker-only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM,* 43 F.3d at 37.

**\*5** In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 1907 S.Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. United States Fire Ins.*

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

*Co.,* 804 F.2d at 11-12.

"The Court recognizes that it must 'extend extra consideration' to pro se plaintiffs" such as Walker and that "pro se parties are 'to be given "special latitude on summary judgment motions." " ' *Salahuddin v. Coughlin,* 999 F.Supp. at 535 (citing cases); *see also, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest' "). "Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v.. Artuz,* 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing cases).

## II. THE ELEVENTH AMENDMENT BARS DAMAGE CLAIMS AGAINST *DEFENDANTS IN THEIR OFFICIAL CAPACITIES*

" 'It is black letter law that a suit against a state official in his official capacity seeking damages is barred by the Eleventh Amendment ...' " *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *1 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.) (quoting *Jackson v. Johnson,* 30 F.Supp.2d 613, 618 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.) ( & cases cited therein). Since Walker's complaint seeks only damages, his claims against defendants in their official capacities should be dismissed.

## III. *RETALIATION UNDER* SECTION 1983

### A. *Legal Standard*

To prevail in a Section 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55 (1988); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).[FN7] "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749 (1994).[FN8]

FN7. *Accord, e.g.,* *Soldal v. Cook County,* 506 U.S. 56, 60 n.6, 113 S.Ct. 538, 543 n.6 (1992); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *7 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *7 (S.D.N.Y. Apr. 23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *5 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *6 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *5 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Greenfield v. City of New York,* 99 Civ. 2330, 2000 WL 124992 at *4 (S.D.N.Y. Feb. 3, 2000) (Peck, M.J.); *Ali v. Szabo,* 81 F.Supp.2d 447, 453 (S .D.N.Y.2000) (Pauley, D.J. & Peck, M.J.).

FN8. *Accord, e.g.,* *Espinal v. Goord,* 2001 WL 476070 at *7; *Fulmore v. Mamis,* 2001 WL 417119 at *7; *Freeman v. Strack,* 2000 WL 1459782 at *5; *Culp v. Koenigsmann,* 2000 WL 995495 at *6; *Carbonell v. Goord,* 2000 WL 760751 at *5.

1. A § 1983 *Claim Can Be Asserted if a Prisoner is Reassigned from a Prison Job in Retaliation for Filing a Prison Grievance*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

**\*6** An inmate does not have any constitutional, statutory, or regulatory right to a particular prison job. *E.g., Davis v. Artuz,* No. 96-2911, 133 F.3d 906 (table), 1998 WL 29763 at \*1 (2d Cir. Jan. 28, 1998); *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) ("New York law does not give a prisoner 'any statutory, regulatory or precedential right to his prison job.' ") (quoting *Cooper v. Smith,* 63 N.Y.2d 615, 616, 479 N.Y.S.2d 519, 519 (1984)); *Frazier v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996).[FN9]

prisoners for the exercise of that right"); *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988) (" 'An act in retaliation for the exercise of a constitutional right is actionable under [S]ection 1983 even if the act, when taken for a different reason, would have been proper.' "); *Meriwether v. Coughlin,* 879 F.2d 1037, 1045-46 (2d Cir.1989) ("Although prison officials have broad discretion to transfer prisoners ... [t]hey may not, however, transfer them solely in retaliation for the exercise of constitutional rights.").[FN10]

FN9. *See also, e.g., Muhammad v. Warithu-Deen Umar,* 98 F.Supp.2d 337, 345 (W.D.N.Y.2000); *Guillen v. Tierney,* 93 Civ. 8853, 1995 WL 479406 at \*4 (S.D.N.Y. Aug. 11, 1995); *West v. Keane,* 93 Civ. 6680, 1995 WL 434306 at \*2 (S.D.N.Y. July 24, 1995); *James v. Artuz,* 93 Civ.2056, 1994 WL 174005 at \*8 (S.D.N.Y. May 4, 1994); *Saunders v. Coughlin,* 92 Civ. 4289, 1994 WL 88108 at \*4 (S.D.N.Y. Mar. 15, 1994); *Laureano v. Vega,* 92 Civ. 6056, 1994 WL 68357 at \*7 (S.D.N.Y. Feb. 25, 1994), *aff'd,* No. 94-2140, 40 F.3d 1237 (table) (2d Cir. Oct. 18, 1994).

FN10. *See also, e.g., Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 283-84, 97 S.Ct. 568, 574 (1977) (even though non-tenured teacher could have been fired for any reason, he may have a § 1983 claim if fired for exercising constitutionally protected First Amendment rights); *Higgins v. Davis,* 95 Civ. 3011, 2001 WL 262930 at \*5 (S.D.N.Y Mar. 15, 2001); *Smith v. Deckelbaum,* 97 Civ. 1265, 2000 WL 1855128 at \*3 (S.D.N.Y. Dec. 19, 2000); *Rivera v. Goord* 119 F.Supp.2d 327, 339-40 (S.D.N.Y.2000); *Oyague v. State,* 98 Civ. 6721, 2000 WL 1231406 at \*4 (S.D.N.Y. Aug. 31, 2000), *aff'd,* 2001 WL 668466, 13 Fed. Appx. 16 (2d Cir. June 12, 2001), *cert. denied,* 122 S.Ct. 484 (2001); *Shabazz v. Vacco,* 97 Civ. 3761, 1998 WL 901737 at \*3 (S.D.N.Y. Dec. 28, 1998); *Bey v. Eggleton,* 96 Civ. 4288, 1998 WL 118158 at \*2 (S.D.N.Y. Mar. 17, 1998); *Pacheco v. Vanwyk,* No. 94-CV-456, 1997 WL 642540 at \*7 (N.D.N.Y. Oct. 15, 1997) (Pooler, D.J.), *aff'd,* No. 97-2767, 164 F.3d 618 (table), 1998 WL 716572 (2d Cir. Oct. 9, 1998); *Lowrance v. Coughlin,* 862 F.Supp. 1090, 1101 (S.D.N.Y.1994).

Nevertheless, "a claim for relief may be stated under section 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights." *Gill v. Mooney,* 824 F.2d at 194; *accord, e.g., Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) ("prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights"); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983"); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("Prisoners, like non-prisoners, have a right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against

Specifically, the Second Circuit has held that, "[w]hile a prisoner may not have a constitutional right to a specific job assignment, this Circuit has recognized that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." *Davis v. Artuz,* 1998 WL 29763 at *1; *accord, e.g., Davis v. Kelly,* 160 F.3d at 920 ("prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights, ... and [plaintiff] had a constitutionally protected right to petition the court for redress of grievances"); *Gill v. Mooney,* 824 F.2d at 194 (a claim for relief under § 1983 may be made if prison official's decisions to change inmate's work assignments "are made in retaliation for the exercise of constitutionally protected rights"); *Saunders v. Coughlin,* 1994 WL 88108 at *4 ("cognizable claim under § 1983 can be asserted based on an allegation that a prisoner was reassigned [from a particular prison job assignment] in retaliation for the exercise of his constitutional rights"); *Laureano v. Vega,* 1994 WL 68357 at *7 ("a claim for relief arising out of actions taken in connection with a prison job may be stated 'if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights'"); *Van Pelt v. Finn,* 92 Civ. 2977, 1993 WL 465297 at *4 (S.D.N.Y. Nov. 12, 1993); *Baker v. Zlochowon,* 741 F.Supp. 436, 439 (S.D.N.Y.1990) ("It is well established a claim for relief can be stated under section 1983 for job reassignments or terminations which were in retaliation for an inmate's efforts to seek vindication of his legal rights ...."); *see, e.g., DeWalt v. Carter,* 224 F.3d 607, 612-13, 618-19 (7th Cir.1999) (joining the Second Circuit and holding that while "prisoners have no right to hold a particular prison job" plaintiff still can bring Section 1983 "retaliation claims arising from the loss of that job."); *see also* cases cited at pages 17-18, 36-37 below.

2. *Plaintiff's Burden of Proof For a § 1983 Retaliation Claim*

**\*7** The Second Circuit has clearly set forth a plaintiff's burden of proof in proving a § 1983 retaliation claim, as follows:

The plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. If the plaintiff carries that burden, the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff "even in the absence of the protected conduct." Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.

*Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted); *see, e.g., Ebron v. CTO Huria,* No. 99-0087, 205 F.3d 1322 (table), 2000 WL 241576 at *1 (2d Cir. Feb. 1, 2000); *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *Duamutef v. Hollins,* No. 97-2692, 159 F.3d 1346 (table), 1998 WL 537838 at *1 (2d Cir. July 7, 1998); *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998); *Davidson v. Kelly,* No. 96-2066, 131 F.3d 130 (table), 1997 WL 738109 at *3 (2d Cir. Nov. 24, 1997); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 82 (2d Cir.1984).[FN11]

FN11. *See also, e.g., Walker v. Keyser,* 98 Civ. 5217, 2001 WL 1160588 at *6 (S.D.N.Y. Oct. 2, 2001); *Williams v. Muller,* 98 Civ. 5294, 2001 WL 936297 at *3 (S.D.N.Y. Aug. 17, 2001); *Jackson v. Johnson,* 15 F.Supp.2d 341, 363-64 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.); *Campbell v. Kuhlmann,* 91 Civ. 6766, 1998 WL 249196 at *4 (S.D.N.Y. May 15,1998).

A number of factors can be considered in determining whether a causal connection exists between the plaintiff's protected activity and the prison official's actions, including "any statements made by the defendant concerning his motivation" and "the temporal proximity between the protected activity and the defendant's adverse action." *Williams v. Muller,* 2001 WL 936297 at *3 (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995));

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

*see, e .g., Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002); *Gill v.. Jones,* 95 Civ. 9031, 2001 WL 1346012 at *6 (S.D.N.Y. Nov. 1, 2001); *Walker v. Keyser,* 2001 WL 1160588 at *6; *Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

"While ... the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim. Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation. Otherwise, the retaliatory act is simply *de minimis,* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001) (citations omitted); *accord, e.g., Morales v. Mackalm,* 278 F.3d at 131; *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999); *Thaddeus-X v. Blatter,* 175 F.3d 378, 396-98 (6th Cir.1999) (to be actionable, retaliation against a prisoner must be likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment); *Crawford-El v. Britton,* 93 F.3d 813, 826 (D.C.Cir.1996) (en banc), *rev'd on other grounds,* 523 U.S. 574, 118 S.Ct. 1584 (1998).[FN12]

FN12. *See also, e.g., Walker v. Keyser,* 2001 WL 1160588 at *6; *Wagnoon v. Gatson,* 00 Civ. 3722 & 99 Civ. 5872, 2001 WL 709276 at *6 (S.D.N.Y. June 25, 2001); *Rivera v. Goord,* 119 F.Supp.2d at 340.

*8 Prisoners' claims of retaliation, of course, must be examined with skepticism and particular care because they are " 'prone to abuse' since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson,* 89 F.3d at 79 (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *accord, e.g., Dawes v. Walker,* 239 F.3d at 491; *Colon v. Coughlin* 58 F .3d at 872; *Jackson v.*

*Johnson,* 15 F.Supp.2d at 364 ( & cases cited therein).

B. *Analysis of Walker's Retaliation Claim*

Walker's § 1983 action alleges that defendants transferred him out of Building 21A in retaliation for the administrative grievance he filed against C.O. Woodard.

1. *Walker's Initial Grievance Was A Protected Activity*

Defendants do not dispute that Walker's November 24, 1998 grievance against C.O. Woodard was a protected activity. (Dkt. No. 31: Defs. Br. at 8.) *See, e.g., Moore v. Gardner,* 00-CV-6076, 2002 WL 553708 at *9 (W.D.N.Y. May 12, 2002) ("filing an inmate grievance is constitutionally protected activity"); *Walker v. Keyser,* 98 Civ. 5217, 2001 WL 1160588 at *6 (S.D.N.Y. Oct. 17, 2001); *Wagnoon v. Gatson,* 00 Civ. 3722 & 99 Civ. 5872, 2001 WL 709276 at *5 (S.D.N.Y. June 25, 2001) ("A prisoner's filing of an internal [prison] grievance against a corrections officer is protected by the First Amendment, such that retaliation in response to such a grievance may form the basis for a retaliation claim.") (citing *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996)).

2. *Threat of a 60% Pay Cut is Substantial Enough to Deter a Reasonable Inmate From Pursuing Prison Grievances*

The next question is whether Walker's transfer to another housing unit, costing him his prison job, constituted an adverse action sufficient to sustain a claim for retaliation, *i.e.,* whether it was substantial enough to deter a similarly situated inmate from exercising his constitutional right to file a prison grievance. (*See* cases cited on pages 15-16 above.) As a result of his transfer out of Building 21A, Walker lost a job that paid twenty-five cents an hour and was given a job that paid ten cents an hour. (Steckelman Aff. Ex. 4: Walker Dep. at 40.) This Court cannot conclude as a matter of law that the threat of such a substantial reduction in a prisoner's hourly pay rate

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

would not discourage a reasonable inmate from exercising his constitutional right to file a prison grievance. *See Van Pelt v. Finn,* 92 Civ. 2977, 1993 WL 465297 at *4-5 (S.D.N.Y. Nov. 12, 1993) (denying defendants' summary judgment motion since plaintiff's "transfer from porter to clerk to recreational supervisor, and his corresponding decreases in pay," was sufficient to sustain a reasonable inference of retaliation); *Baker v. Zlochowon,* 741 F.Supp. 436, 439-40 (S.D.N.Y. June 29, 1990) (decision not to pay plaintiff for his absences from work and to transfer him to a lower paying job after filing an Article 78 proceeding challenging prison officials' actions could sustain reasonable inference of retaliation sufficient to defeat summary judgment); *see also* cases cited at page 18 n.14 below.[FN13]

FN13. Defendants argue that any injury was *de minimis* because Walker was able to acquire a job in the prison barbershop, paying approximately eighteen cents an hour, two weeks after the transfer. (Defs. Br. at 12; *see* page 7 above.) The fact that Walker was able to secure a new job which paid more than the job he was assigned after the alleged retaliatory transfer but less than the job he lost in Building 21A does not change the Court's analysis.

**\*9** Defendants argue that, since Walker filed another grievance soon after his housing and job transfer, there was no "chilling effect" on his constitutional rights. (Defs. Br. at 12.) The test, however, is not whether plaintiff Walker himself was chilled (if that were the standard, no plaintiff likely would prevail, for the very commencement of a lawsuit could be used by defendants to argue that the plaintiff was not chilled), but rather whether the retaliatory conduct "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional right." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001).[FN14] The Court cannot say that a prison housing transfer that results in an inmate's loss of a higher-paying prison job and a sixty percent pay cut would not deter a similarly situated reasonable inmate from filing a prison

grievance.

FN14. *See, e.g., Morales v. MacKalm,* 278 F.3d 126, 131-32 (2d Cir.2002) (at motion to dismiss stage, "the allegation that defendants transferred [plaintiff] to a psychiatric facility must be construed as describing an adverse action. [Plaintiff] should have the opportunity to develop facts that would demonstrate that the prospect of confinement in a psychiatric facility would deter a reasonable inmate from pursuing grievances."); *Davidson v. Chestnut,* 193 F.3d 144, 150-51 (2d Cir.1999) (issue of whether alleged retaliatory acts would chill reasonable inmate is "factual in nature"); *Rivera v. Goord,* 119 F.Supp.2d 327, 339-40 (S.D.N.Y.2000) (finding that assault by prison officials "would chill a person of ordinary firmness from continuing to engage in his First Amendment activity," but that verbal harassment is "*de minimis* and would not chill a person of ordinary firmness from exercising his First Amendment rights"); *Wells v. Wade,* 96 Civ. 1627, 2000 WL 1239085 at *2-4 (S.D.N.Y. Aug. 31, 2000) ("a rational trier of fact could find that the filing of a frivolous misbehavior report that resulted in thirteen days of pre-hearing keeplock confinement would be likely to chill a person of ordinary firmness from continuing to engage in activity protected by the First Amendment: namely, pursuing a prison grievance.") (internal quotations omitted).

3. Whether Walker's Initial Grievance Was a Substantial or Motivating *Factor Cannot Be Decided on This Summary Judgment Motion*

The remaining and decisive inquiry is whether Walker's initial grievance was a "substantial or motivating factor" in the decision to transfer him out of Building 21A. While temporal proximity can raise an inference of causal connection (*see* cases cited at page 15 above), here, defendants concede that the housing move *was* caused by

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

Walker's initial grievance, but deny any improper motive, arguing that the decision to transfer Walker was an "accommodation" to Walker's concerns as expressed in his grievance. (Dkt. No. 31: Defs. Br. at 8-9; *see also* discussion at page 4 above.) Defendants argue that Deputy Superintendent Ercole's decision to transfer Walker was motivated by the desire to resolve Walker's complaint that he felt "uncomfortable" when C.O. Woodard was on duty and to avoid a "possibly volatile situation." (Defs. Br. at 9, 11; *see also* page 4 above.)

Defendants, however, have not submitted evidence that it was a standard or even common practice to transfer inmates who had filed a complaint alleging harassment by specific correctional officers to a different housing unit. *See, e.g., Nicholas v. Mantello,* No. 96-2391, 104 F.3d 353 (table), 1996 WL 671276 at *1 (2d Cir. Oct. 20, 1996) (summary judgment for defendant reversed where defendant "has pointed to no prison regulation or other documentary evidence confirming his assertion about" reasons he took action which plaintiff claimed was retaliatory); *cf. Moore v. Gardner,* No. 00-CV-6076, 2002 WL 553708 at *9-11 (W.D.N.Y. Mar. 12, 2002) (summary judgment in favor of prison officials is appropriate where adherence to DOCS "policy and procedure" refutes retaliatory motive).

Moreover, Walker asserts that when a corrections officer informed Lt. Pataro that Walker would lose his job if transferred, Lt. Pataro responded that Walker was "going to have to get another job." (Dkt. No. 2: Compl. ¶ 9; Walker Aff. ¶ 3.) Defendants do not address this alleged statement in their papers. While Lt. Pataro's statement may be interpreted in more than one way, at least one possible interpretation is that Lt. Pataro intended to deprive Walker of his higher-paying job in retaliation for his grievance.

**\*10** Finally, perhaps the most persuasive circumstantial evidence of defendants' intent is the way they handled Walker's second grievance. Defendants claim

that they transferred Walker to a different building to make him more "comfortable," *i.e.,* for his benefit. But within three days of the transfer, Walker filed a second grievance, requesting that he be reinstated to his original housing and job assignments. (*See* pages 5-6 above.) Rather than transferring Walker back when defendants learned that the supposedly beneficial transfer was not what Walker wanted, defendants denied his second grievance. (*See* pages 6-7 above.) A reasonable jury could infer from this that defendants did not transfer Walker to another housing unit to make him "comfortable," but rather in retaliation for his original grievance against a corrections officer.

Based on all these factors, the issue of whether, in admitted response to Walker's initial grievance, defendants' transfer of Walker to another housing unit, causing him to lose a higher-paying job, was for Walker's benefit or in retaliation for the grievance, "runs to matters of credibility and weight of the evidence, which are matters for the jury and should not be decided on summary judgment." *Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996).

IV. *PERSONAL INVOLVEMENT UNDER SECTION 1983*

A. *Legal Standard*

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *accord, e.g., Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999); *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1109 (S.D.N.Y.1995) (Sotomayor, D.J. & Peck, M.J.) ("In

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

order to maintain a cause of action [under § 1983] against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of *respondeat superior* does not apply to § 1983 actions .").[FN15]

FN15. *See also, e.g., Brown v. Peters,* No. 97-2725, 175 F.3d 1007 (table), 1999 WL 106214 at *1 (2d Cir. Feb. 26, 1999); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *10 (S.D.N.Y. May 7, 2001)(Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *8 (S.D.N.Y. Apr. 3, 2001) (Peck, M.J.) ( & cases cited therein); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *7 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *6 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Ali v. Szabo,* 81 F.Supp.2d 447, 462 (S.D.N.Y.2000) (Pauley, D.J. & Peck, M.J.).

"The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) *the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,* (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d at 873 (emphasis added).[FN16]

FN16. *Accord, e.g., Wright v. Smith,* 21 F.3d at 501; *Espinal v. Goord,* 2001 WL 476070 at *10; *Fulmore v. Mamis,* 2001 WL 417119 at *8 ( & cases cited therein); *Freeman v. Strack,* 2000

WL 1459782 at *7; *Carbonell v. Goord,* 2000 WL 760751 at*7; *Zamakshari v. Dvoskin,* 899 F.Supp. at 1109; *see also, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

**B. Defendants Lowry and Perez are Entitled to Summary Judgment for Lack of Personal Involvement, But Defendants Ercole and Strack Were Personally *Involved***

**\*11** Defendants argue that defendants Captain Lowry, Deputy Superintendent Perez, Deputy Superintendent Ercole and Superintendent Strack are entitled to summary judgment for lack of personal involvement in Walker's alleged retaliatory transfer. (Dkt. No. 31: Defs. Br. at 13-17.)[FN17]

FN17. Defendants have not moved for summary judgment for lack of personal involvement with respect to defendants Lt. Pataro and Capt. Thacker.

*1. Deputy Superintendent Ercole*

Defendants contend that summary judgment should be granted for Deputy Superintendent Ercole because he had no involvement in the decision to transfer Walker. (Dkt. No. 31: Defs. Br. at 14-15; Dkt. No. 36: Defs. Reply Br. at 4-5.) Deputy Supt. Ercole stated in his affidavit that while he oversees general prison security, his duties "do not include assigning inmates to specific housing units within the facility or assigning inmates to [job] programs." (Dkt. No. 32: Ercole Aff. ¶¶ 2-3.) However, Deputy Supt. Ercole wrote a memo responding to Walker's initial grievance against C.O. Woodard, in which he informed Walker that to make him "more comfortable while at Fishkill," Deputy Supt. Ercole "will have you moved" to another housing unit where Walker would be under the supervision of other officers. (Compl. Ex. A: 12/18/98 Ercole Memo; Defs. 56.1 Stmt. ¶ 10; Ercole Aff. ¶ 5; Walker 56.1 Stmt. ¶ 9; Walker Aff. ¶ 4.) Thus, it is crystal

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

clear that Deputy Supt. Ercole was personally and directly involved in the decision to transfer Walker to another housing unit-he ordered it.[FN18] Defendant's motion on his behalf on this issue is frivolous and borders on sanctionable conduct. Summary judgment therefore should be denied as to Supt. Ercole's personal involvement.

FN18. Deputy Supt. Ercole's statement that he is involved in prison security and not housing or job assignments is circumstantial evidence that Walker's transfer was not to make Walker more "comfortable" but may have been done to prevent Walker from fighting with C.O. Woodard. (*See also* Walker Aff. Ex. 1: 11/22/98 Grievance, where Walker stated that "this is the final time I request" that something be done about C.O. Woodard "or I will take the necessary steps to ensure I'm no longer harassed [and] verbally abused by this officer.")

2. *Superintendent Strack*

Walker alleges that Superintendent Strack was personally involved in the alleged retaliation against him and points to the following evidence: (1) Walker's December 21, 1998 prison grievance to Supt. Strack claiming that his transfer was made in retaliation for his prior grievance against C.O. Woodard; (2) Supt. Strack's January 20, 1999 memo to Walker in response to the second grievance, justifying the transfer decision and denying relief; and (3) Walker's January 28, 1999 response to Supt. Strack reiterating his retaliation claim. (*See* pages 5-6 above.)

As noted above, the Second Circuit holds that: "The personal involvement of a supervisory defendant may be shown by evidence that: ... (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong ... or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing

to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986))); *accord, e.g., Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999); *Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997).[FN19]

FN19. In *Colon v. Coughlin,* the Second Circuit affirmed summary judgment for Commissioner Coughlin and Supt. Senkowski on the ground, *inter alia,* that the contents of the inmate's letters to them was not in the record and "we do not know, therefore, whether the letter was one that reasonably should have prompted [defendants] to investigate." *Colon v. Coughlin,* 58 F.3d at 873, 874 n.8.

In *Wright v. Smith,* the Second Circuit affirmed summary judgment for Commissioner Coughlin where plaintiff's letter to him was not specific, but found personal involvement by Supt. Smith because he received detailed notice, through a habeas petition, that plaintiff had not received a meaningful hearing before being placed in administrative confinement. *Wright v. Smith,* 21 F.3d at 501-02.

In *Williams v. Smith,* the Second Circuit found Supt. Smith personally involved where he affirmed plaintiff's disciplinary punishment on appeal. *Williams v. Smith,* 781 F.2d at 324.

In *Sealy v. Giltner,* the Second Circuit affirmed summary judgment for Commissioner Coughlin where he referred plaintiff's appeal letter to the prison superintendent. *Sealy v. Giltner,* 116 F.3d at 51.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

**\*12** On the other hand, district court decisions in this Circuit have held that " 'it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." ' *Higgins v. Artuz,* 94 Civ. 4810, 1997 WL 466505 at \*7 (S.D.N.Y. Aug. 14, 1997) (Sotomayor, D.J.) (quoting *Greenwaldt v. Coughlin,* 93 Civ. 6551, 1995 WL 232736 at \*4 (S.D.N.Y. Apr. 19, 1995)); *accord, e.g., Ramos v. Artuz,* 00 Civ. 0149, 2001 WL 840131 at \*7 (S.D.N.Y. July 25, 2001) (Swain, D.J. & Pitman, M.J.) ("Notwithstanding the fact that a supervisory official may be held liable for failing to remedy a constitutional violation after learning of the violation through a report or appeal, inaction following receipt of letters from a prisoner regarding alleged violations does not automatically render an official personally liable under Section 1983.... District courts have generally been reluctant to find personal liability where a prison official's involvement is limited to the receipt of a prisoner's letters or complaints."). *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability.").[FN20]

FN20. *See also, e.g., Rivera v. Goord,* 119 F.Supp.2d 327, 344 (S.D.N.Y.2000) (Defendant "merely asserts that he wrote to these [supervisory] defendants [including the Commissioner and Supt.] complaining about the conduct of various Medical and Correctional Defendants and that his complaints were ignored. These allegations are insufficient to hold these Official/Supervisory Defendants liable under § 1983."); *Woods v. Goord,* 97 Civ. 5143, 1998 WL 740782 at \*6 (S.D.N.Y. Oct. 23, 1998) ("Receiving letters or complaints, however, does not render [Supt.] Artuz personally liable under § 1983."); *Cox v. Cosgrove,* 94 Civ. 6361, 1998 WL 148424 at \*9 (S.D.N.Y. Mar. 27, 1998) ("

'It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations ." ') (quoting *Higgins v. Artuz,* cited above).

Thus, where a supervisory official like the Commissioner of Corrections or a prison Superintendent receives letters or similar complaints from an inmate and does not personally respond, the supervisor is not personally involved and hence not liable. On the other hand, where a supervisor receives an inmate grievance or other complaint and responds to it, the supervisor may be liable (*see* cases cited at pages 26-27 below). At first glance, these holdings might seem counter-intuitive, as giving supervisors an incentive to inaction in order to avoid personal liability. However, it must be noted that the Commissioner and individual prison Superintendents receive innumerable letters and other forms of inmate complaints and delegate subordinates to handle them. *See, e.g., Amaker v. Goord,* 98 Civ. 3634, 2002 WL 523371 at \*16 (S.D.N.Y. Mar. 29, 2002) (Commissioner "Goord has testified that he receives thousands of letters each year as the Commissioner and Chief Executive Officer of DOCS, and that his office generally forwarded the letters to the appropriate personnel to handle the problems in question."); *Ramos v. Artuz,* 2001 WL 840131 at \*8 (no personal involvement by Supt. Artuz where he forwarded inmate's complaint letters to appropriate subordinates); *Higgins v. Artuz,* 1997 WL 466505 at \*6 ("In an affidavit, defendant [Supt.] Artuz responded that all complaints filed with him by inmates are referred to 'the appropriate deputy superintendent to investigate and take corrective action if warranted' "); *Watson v. McGinnis,* 964 F.Supp. at 130 ("as soon as Supt. McGinnis received the letter he forwarded it to Capt. Many who immediately informed [plaintiff] that the matter would be investigated"). Thus, if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement by Supt. Artuz, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability. (*See* cases cited on page 21 above.)[FN21]

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

subsequent complaints of retaliation.").[FN22]

FN21. It would appear to this Court that implicit (but not articulated as such) in the decisional law in this Circuit is that the more senior the defendant DOCS official, more will be needed in order to find personal involvement. This Court also believes that officials are more likely to be held personally involved where the inmate's complaint is about an ongoing problem that the official's action could eliminate (*e.g.,* prison housing assignments) than about a concluded action (*e.g.,* a corrections officer's use of excessive force), although again this distinction is not clearly articulated in the case law.

**\*13** On the other hand, where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint), personal involvement will be found under the second *Colon* prong: "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Colon v. Coughlin,* 58 F.3d at 873; *see, e.g., Ramos v. Artuz,* 2001 WL 840131 at \*8-10 (no personal involvement by Supt. who forwarded letters to others to respond, but personal involvement found for prison Health Services Administrator Zwillinger whose "involvement extends beyond the mere receipt of letters. Zwillinger sent plaintiff numerous letters containing some explanation or justification concerning the issues raised by plaintiff in his letter to defendant [Supt.] Artuz."); *Booker v. Strack,* 97 Civ. 2418, 1999 WL 983878 at \*5-6 (S.D.N.Y. Oct. 29, 1999) (grievances sent to Superintendent may show personal involvement); *James v. Artuz,* 93 Civ.2056, 1994 WL 174005 at \*7 (S.D.N.Y.May4, 1994) (personal involvement where Supt. Artuz "conducted a *de novo* review" of prison disciplinary hearing); *Van Pelt v. Finn,* 92 Civ. 2977, 1993 WL 465297 at \*6 (S.D.N.Y. Nov. 12, 1993) (Superintendent found to have personal involvement where he reviewed plaintiff's grievances and also plaintiff wrote to Superintendent about correction officer's alleged threats, yet Superintendent "consistently denied plaintiff's

FN22. The Court notes that there are some district court decisions that hold that affirming denial of a grievance is not enough to constitute personal involvement, *e.g., Joyner v. Greiner,* 01 Civ. 7399, 2002 WL 550092 at \*5 (S.D.N.Y. Mar. 28, 2002) ("The fact that Superintendent Greiner affirmed the denial of plaintiff's grievance-which is all that is alleged against him-is insufficient to establish personal involvement...."), while conversely other decisions hold that informing a supervisory official of a problem by letter can be enough for personal involvement, *e.g., Saar v. United States Dep't of Justice,* 705 F.Supp. 999, 1006 (S.D.N.Y. Feb. 7, 1989) (personal involvement by warden where plaintiff informed warden by letter and orally of the alleged deprivations). The Court declines to follow such decisions that appear to deviate from the mainstream of decisions within the Circuit.

With this background, the Court turns to the facts concerning Supt. Strack's involvement here. Supt. Strack did not simply receive complaints from Walker about concluded conduct; rather, he evaluated Walker's second grievance and defended the transfer decision at a time when he could have righted the alleged wrong by ordering Walker reinstated to his old housing unit and old job.

Walker alleged in his December 21, 1998 grievance to Supt. Strack, that:

On 12/18/98, I was removed from my program assignment (B/21A PP Group lead. Asst). This removal only occurred because I exercised my constitutional protected rights. Which was the grievance complaint I

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

filed [against] C.O. Woodard dated 11/23/98. In that complaint I requested that no retaliation action be taken for filing such grievance complaint. Now by my exercising my 1st Amendment Right, I am subjected to have my 5th and 14th Amendment Rights violated.

(Compl. ¶ 11 & Ex. B: 12/21/98 Inmate Grievance Complaint; *see* Walker 56.1 Stmt. ¶ 26; Walker Aff. ¶ 4; Defs. 56.1 Stmt. ¶ 18.) Supt. Strack responded to Walker's grievance as follows:

Your original grievance # 17055-98 dated 11/24/98 was filed against Officer Woodard for harassment. This grievance was unsubstantiated based upon information received during investigation.

Due to your complaint, in order to make you feel more comfortable while at Fishkill, you were moved at the discretion of a supervisory decision where you would be under the supervision of other Officers as it appeared you had a problem with Officer Woodard. You have been interviewed by Lt. Szymanowicz concerning your grievance and will not be moved back to H.U.J. at this time.

**\*14** (Compl. Ex. C: 1/20/99 Strack Memo; *see* Walker Aff. ¶ 5; Defs. 56.1 Stmt. ¶ 19; Strack Aff. ¶ 4 & Ex. 1.)

Responses to grievances (or other inmate complaints) which attempt to defend or explain alleged constitutional violations have been found sufficient to sustain a plaintiff's claim of personal involvement. *See* cases cited at pages 26-27 above. This Court, therefore, cannot conclude as a matter of law on this summary judgment motion that Supt. Strack was not personally involved in the alleged violation. Accordingly, summary judgment should be denied as to Supt. Strack's personal involvement.

3. *Deputy Superintendent Perez*

Walker alleges that Deputy Superintendent Ada Perez was personally involved in retaliation against him because Deputy Supt. Perez knew he had lost his job as a result of his grievance against C.O. Woodard and should have "stopped this from occurring, at least until the matter could have properly been resolved." (Steckelman Aff. ¶ 10 & Ex. 9: Walker Dep. at 57.)

Deputy Supt. Perez testified that she did not know why Walker had been moved out of Building 21A, had no knowledge of Walker's original grievance against C.O. Woodard until the filing of this lawsuit, and has no involvement in inmate housing transfers at Fishkill. (Dkt. No. 32: Perez Aff. ¶¶ 7-9.) In response to Walker's January 28, 1999 letter to Supt. Strack explaining his retaliation claim, Deputy Supt. Perez wrote a February 25, 1999 memo to Walker informing him that he was "in [his] current assignment of Barber Shop as per [his] own request" and would be eligible for "a change of assignment after 90 days, on 4/18/99." (Compl. ¶ 14 & Ex. E: 2/25/99 Perez Letter; *see* Walker Aff. ¶ 7; Defs. 56.1 Stmt. ¶ 21.)

As noted above, a response to an inmate's letter which does little more than provide information does not establish personal involvement. *E.g., Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (defendant not personally involved where he responded to inmate's status inquiry by informing inmate that a decision had been reached regarding his grievance); *Amaker v. Goord,* 98 Civ. 3774, 2002 WL 523371 at \*16 (S.D.N.Y. Mar. 29, 2002) (response letter from Commissioner that indicated matter would be handled by someone else not sufficient for personal involvement). Moreover, Deputy Supt. Perez's duties did not include the assignment of inmates to housing units within the facility (Perez Aff. ¶ 4), and there is no evidence that she participated in the initial decision

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

to change Walker's housing unit or that she could have caused him to be returned to Building 21A in February 1999 when she learned of Walker's second grievance. *See, e.g., Saar v. United States Dep't of Justice,* 705 F.Supp. 999, 1006 (S.D.N.Y.1989) (where supervisor was informed of plaintiff's complaint but "had no control over plaintiff's segregation, he cannot be held personally liable for any due process violations arising out of that segregation.").

**\*15** Deputy Superintendent Perez should be granted summary judgment for lack of her personal involvement in Walker's housing unit transfer.

4. *Captain Lowry*

Captain Lowry asserts that he was not personally involved in Walker's housing or job assignments and that he was unaware of Walker's original grievance against C.O. Woodard until the filing of this lawsuit. (Dkt. No. 32: Lowry Aff. ¶¶ 5-6.) Walker does not dispute Lowry's position. In fact, Walker conceded at his deposition that Lowry "does not have any say over supervisory decisions." (Steckelman Aff. ¶ 8 & Ex. 7: Walker Dep. at 56.) Walker's own statements, therefore, support the grant of summary judgment to Capt. Lowry for lack of personal involvement. *See, e.g., Bellamy v. McMickens,* 692 F.Supp. 205, 214 (S.D.N.Y.1988) (§ 1983 claim based on alleged denial of access to counsel fails where plaintiff "by his own admission was allowed to contact his attorney by telephone").[FN23]

FN23. *See also, e.g., Williams v. NYC Dep't of Sanitation,* 00 Civ. 7371, 2001 WL 1154627 at *17 (S.D.N.Y. Sept. 28, 2001) (Peck, M .J.); *Gonzalez v. New York City Transit Authority,* 00 Civ. 4293, 2001 WL 492448 at *14 (S.D.N.Y. May 9, 2001) (Peck, M.J.); *Wheeler v. Corporation Counsel of N.Y.C.,* 93 Civ. 5184, 2000 WL 1760947 at *9 (S.D.N.Y. Nov. 30,

2000), *aff'd* 2002 WL 136088, 28 Fed. Appx. 90 (2d Cir. Jan. 29, 2002).

In any event, Walker has not submitted any evidence to contradict Capt. Lowry's claim that he was not involved in Walker's transfer. (*See* Dkt. No. 36: Defs. Reply Br. at 4.) After "discovery, undisputed allegations that [a] supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case." *Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir.1998); *see also, e.g., Neitzke v. Williams,* 490 U.S. 319, 324 n.2, 109 S.Ct. 1827, 1831 n.2 (1989) (affirming Court of Appeals' finding that plaintiff in a § 1983 action "alleged no personal involvement on the part of three ... defendants ... and that these defendants' prison jobs did not justify an 'inference of personal involvement ...' "); *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (defendant "documented his assertion of no personal involvement [and plaintiff] offers no concrete evidence to the contrary"); *Saar v. United States Dep't of Justice,* 705 F.Supp. 999, 1006 (S.D.N.Y.1989) (where "Plaintiff has not contradicted defendant" supervisor's assertion that "he had no power to act to remedy the violation," § 1983 claim against that defendant dismissed). Summary judgment therefore should be granted to Capt. Lowry for lack of personal involvement.

V. *QUALIFIED IMMUNITY*

A. *Legal Standard*

"Qualified immunity shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Poe v. Leonard,* 282 F.3d 123, 132 (2d Cir.2002); *see also, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). Qualified immunity is " 'an entitlement not to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

stand trial or face the other burdens of litigation." ' *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 2156 (2001) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815 (1985)).

As the Second Circuit has explained, government actors are entitled to qualified immunity from liability for civil damages when they perform discretionary functions "if either (1) their conduct 'did not violate clearly established rights of which a reasonable person would have known,' or (2) 'it was objectively reasonable to believe that [their] acts did not violate these clearly established rights." ' *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998); *accord, e.g., Poe v. Leonard, 282 F.3d at 132-33; Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001); *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001); *Martinez v. Simonetti,* 202 F.3d 625, 633-34 (2d Cir.2000); *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998).[FN24] "The availability of the defense depends on whether a reasonable [official] could have believed his action to be lawful, in light of clearly established law and the information [he] possessed." *Weyant v. Okst,* 101 F.3d 845, 858 (2d Cir.1996).[FN25]

FN24. *See also, e.g., Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *11 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *7 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.) ( & cases cited therein); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *8 (S.D.N.Y. July 19, 2000) (Peck, M J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *7 & n. 16 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Salahuddin v. Coughlin,* 999F.Supp. 526, 536-37 (S.D.N.Y.1998) (Rakoff, D.J. & Peck, M.J.).

FN25. *See also, e.g., Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 536 (1991); *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034,

3040 (1987); *Martinez v. Simonetti,* 202 F.3d at 634; *Freeman v. Strack,* 2000 WL 1459782 at *7; *Culp v. Koenigsmann,* 2000 WL 995495 at *8; *Carbonell v. Goord,* 2000 WL 760751 at *7.

**\*16** "In a suit against [a government official] for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence." *Saucier v. Katz,* 533 U.S. at 200, 121 S.Ct. at 2155; *accord, e.g., Poe v. Leonard,* 282 F.3d at 133; *Smith v. Menifee,* 00 Civ. 2521, 2002 WL 461514 at *4 (S.D.N.Y. Mar 26, 2002).

"A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. at 201, 121 S.Ct. at 2156 (citing *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793 (1991)); *accord, e.g., Poe v. Leonard,* 282 F.3d at 132; *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 251 (2d Cir.2001); *Smith v. Menifee,* 00 Civ. 2521, 2002 WL 461514 at *4 (S.D.N.Y. Mar. 26, 2002). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz,* 533 U.S. at 201, 121 S.Ct. at 2156; *accord, e.g., Poe v. Leonard,* 282 F.3d at 132; *Smith v. Menifee,* 2002 WL 461514 at *4.

The "right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 1700 (1999); *accord, e.g., Smith v. Menifee,* 2002 WL 461514 at *4-5. The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

*Katz,* 533 U.S. at 201, 121 S.Ct. at 2156; *accord, e.g., Poe v. Leonard,* 282 F.3d at 135; *Smith v. Menifee,* 2002 WL 461514 at *4-5.* " '[T]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." ' *Saucier v.. Katz,* 533 U.S. at 202, 121 S.Ct. at 2156 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039 (1987)); *see also, e.g., Wilson v. Wayne,* 526 U.S. at 614-15, 119 S.Ct. at 1699; *Smith v. Menifee,* 2002 WL 461514 at *5.* Therefore, to determine whether a right is clearly established, the Court must consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. at 202, 121 S.Ct. at 2156; *see also, e.g.,* Anderson v. Leighton, 487 U.S. at 640, 107 S.Ct. at 3029; *Smith v. Menifee,* 2002 WL 461514 at *5.*

**\*17** "In determining whether a particular legal principle was 'clearly established' for purposes of qualified immunity, [the Second Circuit] has considered three factors: 'whether the right was defined with reasonable specificity; whether the decisional law of the Supreme Court and the applicable circuit court supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his acts were unlawful." ' *Powell v. Schriver,* 175 F.3d 107, 113 (2d Cir.1999) (internal quotes omitted); *accord, e.g., Cerrone v. Brown,* 246 F.3d at 199; *Mollica v. Volker,* 229 F.3d 366, 371 (2d Cir.2000); *Powell v. Schriver,* 175 F.3d 107, 113 (2d Cir.1999); *Cahill v.. O'Donnell,* 75 F.Supp.2d 264, 277 (S.D.N.Y. Dec. 7, 1999) (B.D.Parker, D.J.).

Moreover, where the qualified immunity issue is raised in connection with a supervisor's liability, "both the subordinate's and the supervisor's actions (or lack thereof) are relevant." *Poe v. Leonard,* 282 F.3d at 134. A plaintiff "must show that both laws were clearly established to lay the predicate for demonstrating that [the supervisor]

lacked qualified immunity: the law violated by [the subordinate official] and the supervisory liability doctrine under which [plaintiff] wishes to hold [the supervisor] liable." *Poe v. Leonard,* 282 F.3d at 134.

Finally, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine ... will apply to a factual situation the officer confronts.... If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier v. Katz,* 533 U.S. at 205, 121 S.Ct. at 2158; *accord, e.g., Poe v. Leonard,* 282 F.3d at 133. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier v. Katz,* 533 U.S. at 202, 121 S.Ct. at 2156-57. "[E]ven if the plaintiff's federal rights were clearly established at the time of the alleged violation, the defendants may nevertheless enjoy qualified immunity if it was objectively reasonable for them to believe that their actions did not violate those rights." *Lennon v. Miller,* 66 F.3d at 423. " 'Thus, if the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant['s] conduct under the circumstances,' qualified immunity applies." *Poe v. Leonard,* 282 F.3d at 133 (quoting *Lennon v. Miller,* 66 F.3d at 421). " 'A defendant is therefore entitled to summary judgment on qualified immunity grounds if a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that officers of reasonable competence could disagree on the legality of the defendant's actions." ' *Poe v. Leonard,* 282 F.3d at 146 (quoting *Cerrone v. Brown,* 246 F.3d 194, 202 (2d Cir.2001)); *see also, e.g., Tierney v. Davidson,* 133 F.3d at 196.

**B. Defendants are Not Entitled to Summary Judgment on Qualified Immunity** *Grounds*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

**\*18** The first question is whether Walker has alleged a constitutional violation. Walker alleges that he was transferred in retaliation for an administrative grievance he filed against C.O. Woodard. (Dkt. No. 2: Compl.) The law is clear that prison officials may not retaliate against an inmate for exercising his constitutional rights, including the right to file a prison grievance. *See, e.g., Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ( "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983"); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("Prisoners, like non-prisoners have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988); *see also* cases cited at pages 12-13 & n.10 above. Thus, Walker's claim that he was transferred in retaliation for filing a grievance, if proved, clearly would demonstrate violation of a constitutional right.

The next inquiry is whether Walker's particular right in this case was "clearly established," *see. e.g., Saucier v. Katz,* 533 U.S. at 194, 201, 121 S.Ct. at 2151, 2156; *Poe v. Leonard,* 282 F.3d 123, 132 (2d Cir.2002), that is, whether it would have been clear to a reasonable prison official that it was impermissible to transfer Walker in retaliation for his grievance. Retaliatory transfer of a prisoner's housing and/or job assignment has long been prohibited in this Circuit. *See, e.g., Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) ("prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights"); *Meriwether v. Coughlin,* 879 F.2d 1037, 1046 (2d Cir.1989) ("Retaliatory transfers were clearly illegal in 1980."); *Hohman v. Hogan,* 597 F.2d 490, 493 (2d Cir.1979) (retaliatory transfer to another prison and segregated confinement would be impermissible); *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976) (impermissible to transfer inmate in retaliation for exercise of constitutional rights), *cert. denied,* 431 U.S. 967, 97 S.Ct. 2925 (1977); *Bennet v. Tucker,* 95 Civ. 8029, 1996 WL 288202 at *4 (S.D.N.Y. May 30, 1996) (qualified

immunity defense denied for alleged retaliatory prison transfer; "This court has held that the doctrine of qualified immunity does not shield officials from § 1983 liability for engaging in retaliatory conduct in response to an inmate's exercise of rights."); *Lowrance v. Coughlin,* 862 F.Supp. 1090, 1098 (S.D.N.Y.1994) (retaliatory transfers held to be constitutionally impermissible); *Van Pelt v. Finn,* 92 Civ. 2977, 1993 WL 465297 at *7 (S.D.N.Y. Nov. 12, 1993) ("Qualified immunity will not save these defendants from suit because retaliatory job assignments, and retaliatory transfers, have both been held in this Circuit to violate constitutional rights, and were so held throughout the relevant period.") (citations omitted); *Baker v. Zlochowon,* 741 F.Supp. 436, 440 (1990) ("Defendants['] contention that they have qualified immunity from suit for damages does not warrant granting their summary judgment motion.... The Second Circuit has held that at least with respect to transfers in retaliation for exercise of constitutional rights, 'a reasonable jury could find that a reasonable commissioner of corrections would be aware of [the illegality of his actions],' and thus might not be able to establish the defense of qualified immunity. We believe that the same can be said with respect to retaliatory job reassignments.") (citations omitted; bracketed material in original); *see also* cases cited at pages 13-14 above. Given this abundance of case law, a reasonable prison official should have been aware that transferring Walker's housing and/or job assignment in retaliation for filing a grievance was unlawful.

**\*19** Since Walker's right not to be transferred in retaliation for his grievance was "clearly established" long before December 1998, the final question is whether it should have been clear to defendants that their conduct was unlawful in the situation they confronted. *E.g., Saucier v. Katz,* 533 U.S. at 202, 121 S.Ct. at 2156. The relevant question is whether a reasonable jury would conclude that "officers of reasonable competence could disagree" on the legality of defendants' actions under the circumstances. *Poe v. Leonard,* 282 F.3d at 146.

Defendants Strack, Ercole, Thacker and Pataro

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

concede in their affidavits that they were aware of Walker's grievance against C.O. Woodard and indeed that Walker's grievance was the reason for his transfer out of Building 21A. (Dkt. No. 32: Strack Aff. ¶ 4; Ercole Aff. ¶¶ 4-5; Thacker Aff. ¶¶ 4-5; Pataro Aff. ¶ 3.) Defendants argue, however, that their transfer of Walker out of Building 21A was a reasonable response to Walker's grievance that he was "uncomfortable" around C.O. Woodard. (*See* Defs. Br. at 19; *see also* discussion at page 19 above.) [FN26] While defendants contend that Walker's December 18, 1998 transfer was undertaken to accommodate Walker's interests, Walker immediately informed prison officials that he would lose his job as a result of the move and that he needed and wanted to stay in Building 21A or 21. (Walker Aff. ¶ 3; *see also* pages 4-5 above.) [FN27] Walker also filed a formal grievance three days later, on December 21, 1998, informing prison officials that he had lost his job as a result of the housing transfer and that he wished to be moved back to his original housing unit. (*See* pages 5-6 above.) Finally, after his second grievance was denied, Walker wrote to Superintendent Strack reiterating his desire to be moved back to Building 21A. (*See* page 6 above.) Taken together, these grievances should have put prison officials on notice that their transfer of Walker had a negative impact on Walker and as a result did not serve to make him "more comfortable." Causation here is conceded; the only issue is whether defendants moved Walker for his benefit or in retaliation for his initial grievance. The Court cannot say that the only conclusion a reasonable jury could reach, viewing the evidence in the light most favorable to Walker, is that reasonable prison officials could disagree about the legality of defendants' actions if they changed his prison housing assignment to retaliate for his grievance.

FN26. As noted above, where the qualified immunity issue is raised as to a supervisor's liability "both the subordinate's and the supervisor's actions (or lack thereof) are relevant." *Poe v. Leonard,* 282 F.3d at 134; *see* page 34 above. Here, however, defendants' brief spent only two pages on the qualified immunity argument and treated all defendants together.

(*See* Dkt. No. 31: Defs. Br. at 17-19; *see also* Dkt. No. 36: Defs. Reply Br. at 6-7 .) The Court accordingly will also consider the qualified immunity issue as to all defendants as a group.

FN27. Walker stated that he "explained to C.O. Sylvester that his job required him to live in B/21 or B/21A. C.O. Sylvester informed Lt. Patero, the official in charge of movement at [Fishkill], of plaintiff's relocation problem." (Walker Aff. ¶ 3.)

Summary judgment for the remaining defendants on qualified immunity grounds should be denied.

CONCLUSION

For the reasons set forth above, defendants' summary judgment motion should be: (1) GRANTED as to defendants in their official capacities because the Eleventh Amendment bars such damage claims; (2) GRANTED as to defendants Lowry and Perez for lack of personal involvement; and (3) DENIED in all other respects.

Pursuant to the Court's prior scheduling order, the parties are to submit a joint proposed Pretrial Order by May 31, 2002.

FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

**\*20** Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

(Cite as: 2002 WL 664040 (S.D.N.Y.))

with the Clerk of the Court, with courtesy copies delivered
to the chambers of the Honorable George B. Daniels, 40
Centre Street, Room 410, and to my chambers, 500 Pearl
Street, Room 1370. Any requests for an extension of time
for filing objections must be directed to Judge Daniels.
Failure to file objections will result in a waiver of those
objections for purposes of appeal. *Thomas v. Arn,* 474
U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension
Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert.
denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v.
Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,*
968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038,
113 S.Ct. 825 (1992); *Small v. Secretary of Health &
Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v.
Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988);
*McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d
Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a),
6(e).

S.D.N.Y.,2002.

Walker v. Pataro

Not Reported in F.Supp.2d, 2002 WL 664040 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)

(Cite as: 2007 WL 2789499 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Dashon [FN1] HALLOWAY, Plaintiff,

FN1. Upon information and belief, the correct spelling of Plaintiff's name is "Deshon" as reflected in both his Complaint, Dkt. No. 1, and the Department of Correctional Services' Inmate Locator Website, *available at* http://nysdocslookup.docs.state.ny .us.

v.

Glenn S. GOORD, et al, Defendants.

No. 9:03-CV-1524 (LEK/RFT).

Sept. 24, 2007.

Deshon Holloway, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, New York State Department of Law, Stephen M. Kerwin, Esq., Assistant Attorney General, of Counsel,

Albany, NY, for Defendants.

*DECISION AND ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on August 29, 2007 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 87). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff Deshon Halloway, which were filed on September 14, 2007. Objection (Dkt. No. 88).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 87) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)

(Cite as: 2007 WL 2789499 (N.D.N.Y.))

**ORDERED,** that the defendants motion for summary judgment (Dkt. No. 80) is **GRANTED** and the Complaint (Dkt. No. 1) is **DISMISSED;** it is further **ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

***REPORT-RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Deshon Holloway brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging the above named Defendants violated his due process rights pursuant to the Fourteenth Amendment when he was transferred from Elmira Correctional Facility to Upstate Correctional Facility without first receiving a hearing. According to Plaintiff, when he was housed at Elmira, he was serving a keeplock disciplinary sentence in his cell, whereas upon his transfer to Upstate, he served the remainder of that sentence in a Special Housing Unit (SHU). *See generally* Dkt. No. 1, Compl.

Presently before the Court is Defendants' Motion for Summary Judgment, to which, despite being granted multiple extensions of time, Plaintiff has failed to respond. Dkt. No. 80, Defs.' Mot. Summ. J., filed on Jan. 17, 2007; 81, Order, dated June 5, 2007 (*sua sponte* extending Plaintiff's time to respond to July 9, 2007); 83, Order, dated July 3, 2007 (granting Plaintiff's request and extending his response time to July 31, 2007).

Instead of submitting opposition to the Motion, Plaintiff filed a letter, dated July 15, 2007, seeking permission to withdraw his action. Dkt. No. 84. Court staff inquired whether Defendants would consent to Plaintiff's voluntary withdrawal, to which Defendants tendered

consent only upon the proviso that such dismissal be with prejudice. Dkt. Nos. 85, Notice to Defs.' Counsel, dated July 20, 2007; 86, Defs.' Resp., dated Aug. 21, 2007. In light of the ample passage of time since the initiation of this lawsuit and the filing of Defendants' Motion, and in light of the Defendants' posture to withhold any consent to discontinue lest it be on the merits, the Court finds it prudent to address Defendants' Motion on the merits.

**I. FACTS**

**A. Effect of Plaintiff's Failure to Respond**

**\*2** Defendants filed their Motion for Summary Judgment on January 17, 2007, setting Plaintiff's response deadline for February 12, 2007. Dkt. No. 80. In accordance with the Local Rules of Practice for the Northern District of New York, Defendants provided Plaintiff with notice of the consequences that may befall him should he elect not to respond to such Motion.[FN2] Dkt. No. 80; N.D.N.Y.L.R. 56.2. Approximately six months later, on June 5, 2007, this Court, in view of the fact that Plaintiff had not filed a response, *sua sponte* extended his time to respond and further emphasized the consequences of his failure to do so.[FN3]

FN2. Specifically, Defendants included in their Notice of Motion the following warning:

PLEASE NOTE that, pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, when a motion for summary judgment is made and properly supported, you may not simply rely upon your complaint, but you must respond by affidavits or as otherwise provided in that rule, setting forth specific facts showing that there is a genuine issue of material fact for trial. Any factual assertions in the moving parties' affidavits will be accepted by the Magistrate-Judge as being true unless you submit affidavits or other documentary

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)

(Cite as: 2007 WL 2789499 (N.D.N.Y.))

evidence contradicting defendants' assertions. If you do not so respond, summary judgment, if appropriate, may be entered against you. If summary judgment is granted against you, your case will be dismissed and there will be no trial.

Dkt. No. 80 (emphasis in original).

FN3. Specifically, the Court issued an Order stating:

*Plaintiff is warned that failure to oppose Defendants' Motion will result in this Court accepting the facts set forth by Defendants as true.* See N.D.N.Y.L.R. 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*" (emphasis in original)). *Plaintiff is further warned that failure to respond may, if appropriate, result in the granting of Defendants' Motion, in which there will be no trial.* See N.D .N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the nonmoving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.").

Dkt. No. 81 at pp. 1-2 (emphasis in original).

Pursuant to this District's Local Rules, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file to serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown ." N.D.N.Y.L.R. 7.1(b)(3); *see also Douglas v. New York State Div. of Parole, 1998 WL 59459, at \*1 (N.D.N.Y. Feb. 10, 1998)* (noting that plaintiff's failure to oppose defendants' dispositive motion, and his failure to show good cause for the omission, may alone justify granting the motion). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz, 76 F.3d 483, 486 (2d Cir.1996).* Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c); N.D.N.Y.L.R. 7.1(b)(3). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Rule 7.1 Statement of Facts, supplemented by Plaintiffs' verified Complaint, as true. *See* Dkt. Nos. 1, Compl.; 80-9, Defs.' 7.1 Statement; *see also Lopez v. Reynolds, 998 F.Supp. 252, 256 (W.D.N.Y.1997).*

**B. Uncontested Facts**

At all times relevant to the Complaint, Plaintiff was an inmate in the custody of the New York State Department of Correctional Services (DOCS). On January 5, 2001, Holloway was transferred from Elmira Correctional Facility, a maximum security prison, to Upstate Correctional Facility, a maximum security prison. Defs.' 7.1 Statement at ¶ 2; Dkt. No. 80-2, Donald Selsky Decl., dated Oct. 13, 2006, Ex. B (Pl.'s Transfer History). This transfer is the subject of his civil rights claims.

As indicated on Holloway's Transfer History Report, the reason for Plaintiff's transfer was his "unsuitable behavior." Selsky Decl., Ex. B. This is not the first time Plaintiff was transferred to another facility due to his unsuitable behavior.FN4 In fact, Plaintiff's transfer to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)

(Cite as: 2007 WL 2789499 (N.D.N.Y.))

Elmira from Southport Correctional Facility was also due to his unsuitable behavior. *Id.* (Transfer, dated November 28, 2000). Upon his arrival at Elmira, Plaintiff had an aggregate disciplinary keeplock sentence of approximately 270 days, stemming from six Disciplinary Hearings Plaintiff previously received during a span of six months. Defs.' 7.1 Statement at ¶ 6. These disciplinary sentences were based on various Misbehavior Reports Plaintiff received while incarcerated at Marcy Correctional Facility and Mid-State Correctional Facility. *Id.* at ¶¶ 7-10. For each of the six Misbehavior Reports issued, Plaintiff received a separate Disciplinary Hearing resulting in six separate guilty determinations, each with its own separate sentence. *Id.* Plaintiff only filed appeals in three of these Hearings, all of which were affirmed. *Id.* at ¶¶ 8 & 11-12. [FN5] Plaintiff makes no allegations as to the inadequacy of any of these Hearings and none of the Hearing Officers who presided over the six Disciplinary Hearings is named as a Defendant.

FN4. In reviewing Plaintiff's Transfer History, we note at least four transfers due to his "unsuitable behavior" between May 1998 and December 2000. Dkt. No. 80-2, Donald Selsky Decl., dated Oct. 13, 2006, Ex. B (Pl.'s Transfer History).

FN5. Indeed Plaintiff's Disciplinary History is startling and certainly is not confined to the six instances noted above. Focusing only on the disciplinary sentences to be served upon his arrival at Upstate, we offer the following synopsis. Two of the sentences stem from Misbehavior Reports Plaintiff was issued while at Marcy, dated April 15, 1999, and May 14, 1999. Defs.' 7.1 Statement at ¶ 7; Selsky Decl., Ex. A (Holloway Disciplinary History). The Hearing determinations for these two Reports, which included, *inter alia,* an aggregate keeplock sentence of 180 days, were affirmed on appeal. Defs.' 7.1 Statement at ¶ 8. While at Mid-State, and again as relevant to the aggregate sentence to

be served at Upstate, Plaintiff received four separate Misbehavior Reports on August 15, 1999, September 2, 1999, October 12, 1999, and October 22, 1999. *Id.* at ¶ 9. On each, he was provided a Hearing, found guilty, and received a sentence of, *inter alia,* thirty days keeplock (per infraction); he only appealed the Hearing determination regarding the October 12th Misbehavior Report, and such was affirmed on appeal. *Id.* at ¶¶ 10-12.

**\*3** Prior to his transfer to Upstate, Holloway was held in long-term keeplock at Elmira for approximately one month and eight days. *Id* . at ¶ 14. The cell Plaintiff was confined in could also be used for a general population inmate or an inmate transitioning to general population from SHU. Dkt. No. 80-5, Dan Kress Decl., dated Jan. 11, 2007, at ¶ 2. Under the keeplock confinement, Plaintiff was locked in his cell for twenty-three hours a day. Dkt. No. 80-6, James Thompson Decl., dated Jan. 10, 2007, at ¶ 3. A cell-confined inmate in this circumstance requires additional services by prison staff such as meal delivery and cell visitation by medical staff. *Id.* Though use of a general population cell for such restricted confinement is feasible on a short-term basis, "[a]s a long-term proposition, ... it [is] an inefficient use of the department's resources[.]" *Id.* On the other hand, Upstate is a prison specially designed to handle cell-confined inmates and, given the length of Plaintiff's keeplock sentence of approximately 240 days, it was more practical for Plaintiff to be transferred to Upstate to serve out the remainder of that keeplock sentence. *Id.* at ¶ 4. For these reasons, on December 27, 2000, Defendant Dan Kress, Corrections Counselor at Elmira, recommended that Holloway be transferred to Upstate to serve his 240-day keeplock sentence. Defs. 7.1 Statement at ¶ 16. This recommendation was approved by Defendant James Thompson, Senior Counselor at Elmira and by John Carvill [FN6] in DOCS' Office of Classification and Movement, who issued the order that Plaintiff be transferred to Upstate from Elmira; as aforementioned, such transfer took place on January 5, 2001. *Id.* at ¶ 17. Defendants Glenn Goord, then-Commissioner of DOCS, Floyd Bennett, then-Superintendent of Elmira, Thomas

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)

(Cite as: 2007 WL 2789499 (N.D.N.Y.))

Ricks, then-Superintendent of Upstate, and John Glasheen, then-Assistant Director of the Office of Classification and Movement, were not involved in the decision to transfer Plaintiff to Upstate. *Id.* at ¶ 33.

> FN6. John Carvill is not a Defendant in this action.

While serving his sentence at Upstate, Plaintiff was treated the same as any other inmate sentenced to keeplock confinement at Upstate. *Id.* at ¶ 27. After his arrival at Upstate, Plaintiff incurred, in just four months, over a year's worth of additional keeplock for disciplinary violations. *Id.* at ¶ 18. He also accumulated seventy-four months of SHU time for more serious violations involving violent conduct on staff and an unhygienic act. *Id.* at ¶ 19. Pursuant to Department Regulations, Plaintiff began serving all of this additional SHU time at Upstate on May 5, 2001. *Id.* at ¶ 20.

## II. DISCUSSION

### A. Standard of Review

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247 (1986); accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for

trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000) (quoting FED. R. CIV. P. 56(e)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994) (alteration and emphasis in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

**\*4** Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *LaFond v. Gen. Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir.1995). This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001).

More specifically, this District's Local Rules provide that *"[a]ny facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original). Local Rule 7.1(a)(3) further requires that the non-movant shall file a Statement of Material Facts which mirrors the movant's statement in matching numbered paragraphs and which sets forth a specific reference to the record where the

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)

(Cite as: 2007 WL 2789499 (N.D.N.Y.))

material fact is alleged to arise. *Id.* The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 2002 WL 368534, at *2 (N.D.N.Y. Mar. 1, 2002) (citing, *inter alia, Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 2001 WL 237218, at *1 (N.D.N.Y. Mar. 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, as previously discussed, Holloway did not file a response to the Defendants' Motion for Summary Judgment. Consequently, this Court has accepted the properly supported facts contained in the Defendants' 7.1 Statement as true for purposes of this Motion. With this standard in mind, the Court now addresses the sufficiency of Holloway's claims.

**B. Due Process and Plaintiff's Intrastate Prison Transfer**

Holloway asserts he should have received a hearing prior to his transfer to Upstate and in the absence of such hearing, his due process rights were violated. Defendants Kress and Thompson were directly involved in the decision to transfer Plaintiff, thus we consider Plaintiff's due process claim to be asserted against them. Plaintiff's claim, however, is wholly without merit.

**\*5** To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected

liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are typically derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.*

With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners.' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). The Due Process clause does not protect against "every change in the conditions of confinement having a substantial adverse impact" on inmates if those changes are "within the normal limits or range of custody which the conviction has authorized the state to impose." *Sandin v. Conner,* 515 U.S. 472, 478 (1995). Instead, the Due Process Clause protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner." *Id.* at 484 (quoted in *Arce v. Walker,* 139 F.3d at 333).

It is well-settled that an inmate has no right under the Due Process clause to be incarcerated in any particular correctional facility, and transfers among facilities do not need to be preceded by any particular due process procedure. *See Wilkinson v. Austin,* 545 U.S. 209, 221-22 (2005) (citing *Meachum v. Fano,* 427 U.S. 215, 224-25 (1976)) (noting that the Constitution does not "guarantee that [a] convicted prisoner will be placed in any particular prison" nor does "the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system[ ]"); *see also Fox v. Brown,* 2007 WL 586724, at *9-10 (N.D.N.Y. Feb. 21, 2007). Though Holloway complains that his restrictions at Upstate were much greater than that experienced at Elmira, the fact that "life in one prison is much more disagreeable than in another does not itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules." *Meachum v. Fano,* 427 U.S.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)

(Cite as: 2007 WL 2789499 (N.D.N.Y.))

at 225; *see also* *Olim v. Wakinekona,* 461 U.S. 238, 244-45 (1983) (citing, *inter alia,* *Meachum v. Fano,* 427 U.S. 215 (1976) & *Montanye v. Haymes,* 427 U.S. 236 (1976) for the proposition that inmates have no constitutional right to be housed in a particular prison or a particular dormitory within a prison. Thus, the Due Process Clause itself clearly does not afford Holloway the protection sought.

Our inquiry does not end there, however, since liberty interests may also arise under state statutes and regulations. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr.,* 490 U .S. at 460). To assert a state created liberty interest, an inmate must establish that his confinement or restraint (1) created an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin v. Connor,* 515 U.S. at 484, *and* (2) that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Regardless of whether Plaintiff can establish that he was subjected to an atypical and significant hardship, it is patently clear that New York has **not** created, by regulation or statute, any liberty interest in remaining at one particular prison. Indeed, it is the DOCS who possesses sole discretion to determine "where a [state] inmate will be housed." *Grullon v. Reid,* 1999 WL 436457, at *10 (S.D.N.Y. Jun. 24, 1999) (citing *United States v. Williams,* 65 F.3d 301, 307 (2d Cir.1995)); *see also* *Smolen v. Lanier,* 2007 WL 2027841, at *2 (W.D.N.Y. July 11, 2007). Furthermore, not only do New York State Regulations permit keeplock sentences to be served in SHU, but further contemplate that assignments to SHU will be subject to the same property, visiting, package, commissary, telephone, and correspondence limitations typically experienced in SHU confinement. N.Y. COMP.CODES R. & REGS. tit. 7 §§ 301.6 & 302.2.

**\*6** Thus, regardless of whether Plaintiff alleges his due process rights were violated when he was transferred to another institution or when he was forced to serve his

keeplock sentence in SHU, since Holloway had no liberty interest in remaining at one specific facility to serve his keeplock sentence or to remain in cell confinement to serve such sentence, there was no need to provide him with a hearing prior to his transfer to another prison and into SHU. Accordingly, this Court recommends **granting** Defendants' Motion for Summary Judgment and **dismissing** Defendants Kress and Thompson from this action.

### B. Personal Involvement

As to the remaining Defendants, Plaintiff alleges that 1) Defendant Goord failed to stop Plaintiff's transfer to Upstate and knew of or should have known of his subordinates' acts, yet failed to take action, Compl. at ¶¶ 48-50; 2) Defendant Glasheen approved the transfer and failed to provide Plaintiff with a hearing prior to such transfer, Compl. at ¶¶ 51-53; 3) Defendant Bennett failed to stop Plaintiff's transfer to Upstate and failed to provide Plaintiff with a hearing prior to such transfer, Compl. at ¶¶ 54-57; and 4) Defendant Ricks failed to transfer Plaintiff from Upstate back to Elmira and failed to provide Plaintiff with a hearing prior to keeping him confined at Upstate, Compl. at ¶¶ 58-60.

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), and furthermore, the doctrine of respondeat superior is inapplicable to § 1983 claims, *Polk County v. Dodson,* 454 U.S. 312, 325 (1981) (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658 (1978)); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973).

Despite Plaintiff's allegations to the contrary, and in light of his failure to oppose Defendants' Motion, it is uncontested that Defendants Goord, Glasheen, Bennett, and Ricks played no part in the decision to transfer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)

(Cite as: 2007 WL 2789499 (N.D.N.Y.))

Plaintiff. To the extent Plaintiff seeks to hold any one of these Defendants liable on the basis of supervisory liability,[FN7] such claim similarly fails since, as explained above, Plaintiff's transfer to Upstate without a hearing did not violate his due process rights. Therefore, this Court recommends **dismissing** these Defendants as well.

FN7. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)); *see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (defendant may not be held liable simply because he holds a high position of authority).

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 80) be **GRANTED** and the entire Complaint **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2007.

Halloway v. Goord

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Elvin LeBRON, Plaintiff,

v.

D. SWAITEK, et al., Defendants.

No. 9:05-CV-172 (GLS/DRH).

Nov. 2, 2007.

Elvin LeBron, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, New York Attorney General, Stephen M. Kerwin, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

### *MEMORANDUM-DECISION AND ORDER*

GARY L. SHARPE, U.S. District Judge.

#### I. *Introduction*

**\*1** Plaintiff Elvin LeBron brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, ninety-two

employees of the New York State Department of Correctional Services ("DOCS"), violated his constitutional rights under the First and Fourteenth Amendments. LeBron's amended complaint was referred to Magistrate Judge David R. Homer pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Northern District of New York. Upon the motion of sixty-nine of the defendants, Judge Homer issued a Report-Recommendation and Order recommending dismissal of all claims against the moving defendants. *See Report-Recommendation and Order; Dkt. 127.*[FN1] Additionally, Judge Homer recommended that the amended complaint be dismissed without prejudice as to the non-moving defendants, for failure to serve. *Id.* Now pending before the court is LeBron's timely objection to the Report-Recommendation. *See Dkt. 130.*

> FN1. The Clerk is directed to append Judge Homer's Report-Recommendation to this decision, and familiarity is presumed. *See Dkt. 127.*

Upon careful consideration of the arguments, the record, and the applicable law, the court concludes that five of LeBron's seven claims should be dismissed in their entirety. However, the claim denominated "Claim Four" in LeBron's amended complaint survives, but only to the extent that it states a due process claim against certain defendants, and to the extent that it states a First Amendment retaliation claim against certain defendants. Additionally, the claim denominated "Claim Seven" survives, but only to the extent that it states a First Amendment claim of interference with mail. Thus, for the reasons stated below, the Report-Recommendation is adopted in part and rejected in part.

#### II. *Standard of Review*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

Before entering final judgment, this court routinely reviews all report-recommendations in cases it has referred to a Magistrate Judge. If a party has objected to specific elements of the Magistrate Judge's findings and recommendations, this court reviews those findings and recommendations *de novo*. See *Almonte v. N.Y. State Div. of Parole,* No. 9:04-CV-484, 2006 WL 149049, *6-7 (N.D.N .Y. Jan. 18, 2006)*. Even in those cases where no party has filed an objection, this court reviews the findings and recommendations of a Magistrate Judge under a clearly erroneous standard. *Id*.

LeBron has filed several specific objections to Judge Homer's Report-Recommendation. *See generally Dkt. 130.* First, LeBron objects to Judge Homer's recommendation that Claims One and Two be dismissed as untimely.[FN2] Second, LeBron objects to Judge Homer's determination that LeBron was not subjected to the type of atypical and significant confinement that is required to establish a due process claim. Third, LeBron argues that Judge Homer erroneously concluded that the named defendants lacked the authority to expunge his disciplinary record. Finally, LeBron asserts that Judge Homer failed to consider his First Amendment claims, and that the Report-Recommendation erroneously recommended dismissal of Claim Four in spite of Judge Homer's determination that said claim was not barred by the statute of limitations. In light of LeBron's specific objections, the court has reviewed the foregoing determinations *de novo*. The court has reviewed the remainder of Judge Homer's Report-Recommendation for clear error.

FN2. LeBron also argues that Claim Five is not barred by the statute of limitations. However, Judge Homer did not hold that Claim Five was time-barred.

### III. *Discussion*

#### A. *Equal Protection and Fourth Amendment Claims*

**\*2** LeBron asserts seven claims in his amended complaint, each alleging "First Amendment, due process, and equal protection violations." *See Dkt. 6 at ¶¶ 38, 84, 112, 200, 251, 291, 352 .* Judge Homer determined that LeBron's amended complaint is devoid of any allegations that would support an equal protection claim. LeBron has not challenged this determination, and this court agrees with Judge Homer's conclusion. Accordingly, LeBron's equal protection claims are dismissed.

On its face, LeBron's amended complaint asserts no Fourth Amendment claims. However, reading the amended complaint liberally, Judge Homer recognized that LeBron may have alleged a deprivation of his Fourth Amendment protection against unreasonable searches and seizures. Even assuming that LeBron had alleged a Fourth Amendment violation, Judge Homer concluded that LeBron had no viable claim on that ground. *See Dkt. 127, p. 15, n. 14.* LeBron has not objected to this conclusion, and the court is in full agreement with Judge Homer. Accordingly, LeBron's Fourth Amendment claims, if any, are dismissed.

#### B. *Due Process Claims*

Judge Homer has recommended that the due process claims asserted in Claims One, Two, Five, Six, and Seven be dismissed in their entirety. The Report-Recommendation may also be construed as recommending dismissal of the due process claim asserted in Claim Four, although it mentions this claim only in passing. *See Dkt. 127, p. 12, n. 11.*[FN3]

FN3. As to Claim Three, Judge Homer construed this claim as asserting only a violation of LeBron's right of access to the courts. Thus, neither Judge Homer's Report-Recommendation, nor this opinion, should be read as ignoring the purported "due process" claim asserted in Claim

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

Three. Rather, as discussed below, Claim Three is dismissed in its entirety, because LeBron has failed to state a claim for denial of access to the courts.

Upon *de novo* review, the court agrees with and adopts Judge Homer's recommendation that the due process claims asserted in Claims One, Two, Four, Six and Seven should be dismissed. With respect to Claim Four, the court concludes that the due process claim asserted therein should survive dismissal only with respect to those defendants whose personal involvement is alleged.

**1. Claims One and Two are Barred by the Statute of Limitations**

Judge Homer recommended dismissal of Claims One and Two on statute of limitations grounds. In his objections to the Report-Recommendation, LeBron asserts that a prisoner must exhaust his state remedies as well as his administrative remedies before bringing a § 1983 claim. Thus, with respect to Claim Two, he argues that his state action tolled the running of the statute of limitations until January 14, 2002, the date that the results of the subject disciplinary proceedings were administratively reversed. *See Dkt. 130, p. 1.* [FN4]

FN4. LeBron also argues that Claims Five, Six, and Seven are not time-barred. *See Dkt. 130, p. 1.* However, Judge Homer did not base his dismissal of these claims on the statute of limitations. LeBron also argues that Claim One constituted an ongoing violation for which the statute of limitations did not accrue until July 2, 2000. *Id.* Even accepting this as true, the complaint, deemed filed on January 13, 2005, was still untimely with respect to Claim One.

LeBron's contention that pursuit of state remedies

tolls the statute of limitations in a § 1983 action is an incorrect statement of law. *See Abbas v. Dixon,* 480 F.3d 636, 641 (2d Cir.2007) ("We have held ... that a plaintiff's pursuit of a state remedy, such as an Article 78 proceeding, does not toll the statute of limitations for filing a claim pursuant to section 1983."). Thus, under the three year statute of limitations applicable to LeBron's § 1983 claims,[FN5] Claims One and Two are time-barred. As Judge Homer noted, the statute of limitations began to run on these claims when LeBron knew his rights were violated. *See Singleton v.. City of New York,* 632 F.2d 185, 191 (2d Cir.1980). As such, LeBron's first and second causes of action accrued, at the latest, on June 19, 2000 and August 24, 2000, respectively, the dates that his administrative appeals were denied. Therefore, LeBron's objections based on tolling of the statute of limitations are without merit.

FN5. *See Veal v. Geraci,* 23 F.3d 722, 724 (2d Cir.1994).

**\*3** Accordingly, defendants' motion to dismiss is granted as to the due process claims asserted in Claims One and Two. Moreover, to the extent that Claims One and Two assert equal protection and First Amendment claims, such claims are dismissed as untimely as well.

**2. Claims One, Two, Five, Six and Seven Fail to State a Due Process Claim**

In Claims One, Two, Five, Six and Seven, LeBron asserts due process violations arising out of procedurally improper disciplinary hearings. As a threshold matter, in order to establish a due process violation, a prisoner must demonstrate that a liberty interest has been infringed. *See Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Id.* (quoting *Sandin v. Conner,* 515 U.S. 472, 484

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

(1995)).

　　With respect to Claims One, Two, Five, and Seven, Judge Homer determined that LeBron could not establish, as a matter of law, that the confinement to which he was subjected was "atypical and significant," because in each case LeBron was sentenced to keeplock of 30 days or less. *See Dkt. 127, pp. 11-12.* The court concurs with Judge Homer's conclusion-which LeBron does not contest-that, absent additional allegations of atypicality, keeplock of 30 days or less is not alone "atypical and significant" confinement. *See Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006); *Davidson v. Murray,* 371 F.Supp.2d 361, 368-69 (W.D.N.Y.2005).[FN6] Therefore, LeBron has not established that a liberty interest has been infringed. Accordingly, the due process claims asserted in Claims One, Two, Five, and Seven are dismissed.

　　FN6. LeBron's amended complaint contains no allegations that would indicate that the keeplock confinement to which he was sentenced was atypical and significant. In his objections to the Report-Recommendation, LeBron has attempted to supplement the allegations in his amended complaint by setting forth a laundry list of deprivations to which he was subjected. The court will not consider these belated allegations. *See Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1998) (noting that it is within the district court's discretion to refuse to allow supplementation of the record upon its review of a Report-Recommendation); *Bester v. Dixion,* No. 03-cv-1041, 2007 WL 951558, *3 (N.D.N.Y. March 27, 2007) ("Allowing Plaintiff to raise in his objections legal and factual arguments not presented to the Magistrate Judge defeats the very purpose of the report and recommendation procedure ....").

　　With respect to Claim Six, LeBron has alleged that he

was sentenced to 180 days in the special housing unit ("SHU"). The court need not decide whether a sentence of this length is "atypical and significant," because, as Judge Homer noted, LeBron's sentence was administratively reversed before he had served any portion of it. *See Dkt. 127, pp. 12-14.* LeBron has not contested Judge Homer's finding in this regard. The court agrees with Judge Homer that LeBron suffered no interference with a liberty interest with respect to Claim Six, and, accordingly, the due process claim asserted in Claim Six is dismissed.

**3. Claim Four States a Due Process Claim With Respect to Certain Defendants**

　　The court agrees with Judge Homer that Claim Four is not barred by the statute of limitations. *See Dkt. 127, pp. 10-11.* Since LeBron has alleged a loss of good time credit as a result of the subject disciplinary hearing, LeBron's cause of action did not accrue until October 23, 2002, when the disciplinary hearing was administratively reversed.[FN7] *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999).

　　FN7. Moreover, it appears that the last event giving rise to Claim Four occurred on January 21, 2002, *see Dkt. 6, ¶ 164,* within three years of the deemed filing of LeBron's complaint on January 13, 2005.

　　Although Claim Four survives dismissal on statute of limitations grounds, it fails to adequately allege the personal involvement of many of the defendants. It is axiomatic that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (citation and quotation omitted).[FN8]

　　FN8. In assessing whether Claim Four states a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

due process claim, the court has considered only the issue of personal involvement. The parties have not briefed the issue of whether the disciplinary hearing conducted on or about January 16, 2002, was, in fact, procedurally improper, and the court will not address that issue at this time.

**\*4** Under a liberal construction of LeBron's amended complaint, defendants Mehrmann, Faulkner, and McLaughton are the only defendants who are alleged to have conducted or participated in the allegedly procedurally defective disciplinary hearing conducted on or about January 16, 2002. *See Dkt. 6, ¶¶ 149-162.* Accordingly, LeBron has stated a due process claim with respect to these three defendants.[FN9]

FN9. However, as discussed below, these defendants have not been served, and thus, the amended complaint is dismissed without prejudice as to them.

LeBron has also alleged that certain defendants failed to reverse his sentence upon being notified of the due process violations that occurred at his disciplinary hearing. *See Dkt. 6, ¶¶ 166-198.* The Second Circuit has held that an official has the requisite personal involvement for liability under § 1983 when, *inter alia,* "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995).* A number of district courts have held that the language in *Colon* should not be construed so broadly as to impose liability on any and all officials to whom a prisoner complains. *See, e.g., Johnson v. Wright, 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)* (collecting cases). This makes eminent sense; certain officials, even those in supervisory positions, simply may not have the authority to review and redress a prisoner's complaints. However, personal involvement will be found "where a supervisory official receives and acts on a

prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Id.* LeBron's amended complaint adequately alleges, for purposes of withstanding a motion to dismiss under Rule 12(b)(6), that the following defendants reviewed his appeals, and declined to rectify the alleged constitutional violations: L. Leclaire,[FN10] Sanders, Ricks, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, LeFevre, Pasquil, Annucci, Murphy, and McCoy. *See Dkt. 6, ¶¶ 166-198.* Accordingly, LeBron has stated a due process claim with respect to these defendants.[FN11]

FN10. LeBron's amended complaint does not specify which of the three "LeClaire" defendants is alleged to have denied his grievances; however, the defendants have indicated that it was "L. LeClaire." *See Dkt. 112, p. 14.*

FN11. However, as discussed below, several of these defendants have not been served, and thus, the amended complaint is dismissed without prejudice as to them.

LeBron also alleges that certain defendants planted evidence and wrote misbehavior reports prior to the January 16, 2002, disciplinary hearing. *See Dkt. 6, ¶¶ 134-147.* However, the filing of a misbehavior report-even a false one-"does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." *Williams, 781 F.2d at 324.* Similarly, the act of planting evidence does not, of itself, violate due process. Due process is implicated only at the point that a prisoner is denied the procedural protections that would enable him to prove that the evidence against him has been fabricated. *See Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir.1986)* ("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest. The plaintiff, as all other prison inmates, has the right not to be

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

deprived of a protected liberty interest without due process of law."). Accordingly, LeBron fails to state a due process claim with respect to those defendants who are only alleged to have engaged in conduct prior to the disciplinary hearing.

**\*5** In summary, Claim Four states a due process claim only with respect to the following 18 defendants: Mehrmann, Faulkner, McLaughton, L. LeClaire, Sanders, Ricks, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, Lefevre, Pasquil, Annucci, Murphy, and McCoy. Accordingly, with the exception of these 18 defendants, the due process claims asserted in Claim Four are dismissed *with prejudice* as to all other defendants. Moreover, the due process claims asserted in Claim Four are dismissed *without prejudice* as to Mehrmann, Faulkner, McLaughton, Sanders, Ricks, Lefevre, and Pasquil, for failure to serve. [FN12]

FN12. The docket indicates that John Mehrmann has been served. *See Dkt. 80.* However, the acknowledgment of service indicates that, in fact, a "James Meehan" was served. *Id.*

## C. *First Amendment Claims*

In his objections to the Report-Recommendation, LeBron notes that Judge Homer failed to analyze his First Amendment claims. [FN13] This is only partly correct. Judge Homer did address LeBron's claim of denial of access to courts, which is a species of First Amendment claim. *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003); *Cancel v. Goord,* No. 00-cv-2042, 2001 WL 303713, \*3 (S.D.N.Y. March 29, 2001). Nevertheless, to the extent that LeBron's amended complaint may also be read as alleging First Amendment retaliation claims and claims of interference with outgoing mail, the court will address the merits of such claims in the first instance herein.

FN13. Each of LeBron's seven claims may be read as asserting some form of First Amendment claim. However, as noted above, Claims One and Two are barred by the statute of limitations. Thus, in this section, the court discusses only the First Amendment claims asserted in Claims Three through Seven.

## 1. *Retaliation Claims*

With respect to Claims Four, Five, and Six, LeBron's objections to the Report-Recommendation clarify that he believes that defendants retaliated against him after he had engaged in protected speech. *See Dkt. 130, p. 3.* To survive dismissal, a plaintiff asserting a First Amendment retaliation claim must advance non-conclusory allegations "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis,* 320 F.3d at 352 (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). In regards to causation, "the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation." *Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002) (citation omitted).

In Claim Four, LeBron alleges that his complaints of harassment and his filing of a "facility claim" led to multiple acts of retaliation, including random searches of his cell, the planting of contraband in his cell, and the fabrication of misbehavior reports. *See Dkt. 6, ¶¶ 115-141.* With respect to the first prong of a retaliation claim, LeBron's complaints of harassment constituted protected speech. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). As to the second prong, LeBron has alleged that the defendants took adverse action against him, in the form of retaliatory misbehavior reports and the retaliatory planting of evidence. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004); *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239-240 (S.D.N.Y.2005). [FN14] Finally, LeBron has sufficiently alleged the causation element of a First Amendment

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

retaliation claim by showing a temporal proximity between his protected speech and the adverse actions taken against him. *See Dkt. 6, ¶¶ 132-147.*

FN14. By contrast, the alleged searches of LeBron's cell provide no support for a First Amendment retaliation claim. Inmates have no reasonable expectation of privacy in their prison cells, and thus "no constitutional right to be free from cell searches of any kind, including retaliatory cell searches." *Rodriguez v. McClenning, 399 F.Supp.2d 228, 239 (S.D.N.Y.2005)* (collecting cases).

*6 Thus, Claim Four states a claim for First Amendment retaliation. Accordingly, the defendants' motion to dismiss the First Amendment retaliation claim asserted in Claim Four is denied with respect to all defendants, with the exception of defendants Woodroof, Olson, M. LeClaire, and Bushie. The First Amendment retaliation claim asserted in Claim Four is dismissed with respect to defendants Woodroof, Olson, M. LeClaire, and Bushie, because LeBron has not alleged that these defendants participated in any prohibited retaliatory conduct.[FN15]

FN15. Additional defendants named in Claim Four have also moved for dismissal, arguing lack of personal involvement. *See Dkt. 112, pp. 13-15.* However, the court is unable to conclusively determine, at this stage, that these additional defendants were not involved in the alleged retaliatory conduct (or the failure to redress). Hence, the retaliation claim alleged in Claim Four is dismissed only with respect to Woodruff, Olson, M. LeClaire, and Bushie.

Turning now to Claims Five and Six, LeBron has

failed to state a retaliation claim. There are, quite simply, no allegations of retaliation in Claim Five. LeBron asserts that he was issued a misbehavior report, *see Dkt. 6, ¶ 217,* but nowhere in the amended complaint does he state that this misbehavior report was issued in retaliation for his exercise of First Amendment rights.[FN16] The same is true of Claim Six; the claim does not allege, even in conclusory terms, that any retaliatory conduct occurred.

FN16. In his opposition to the motion to dismiss, LeBron makes conclusory allegations of retaliation. *See Dkt. 121, p. 7.* However, unlike Claim Four, discussed above, the allegations in Claim Five of the amended complaint provide no basis for believing that circumstantial evidence might exist that would support LeBron's bare allegations of retaliation. *See Boddie v. Schnieder, 105 F .3d 857, 862 (2d Cir.1997)* (dismissing, upon motion pursuant to Rule 12(b)(6), allegations of retaliation that were "unsupported, speculative, and conclusory").

**2. *Access to Courts Claims***

Construing LeBron's amended complaint broadly, Judge Homer interpreted Claims Three and Five as alleging a denial of access to courts. Judge Homer recommended that these claims be dismissed. LeBron has not objected to this recommendation. The court agrees with Judge Homer's conclusion that Claims Three and Five do not state a claim for denial of access to courts, because LeBron has failed to allege any actual injury. *See Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir.1997)* ("In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused 'actual injury,' *i.e.,* took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' ") (citing *Lewis v. Casey, 518 U.S. 343, 349-51 (1996)*) (internal citations omitted). Accordingly, to the extent that Claims Three and Five allege a denial of access to courts, these claims are dismissed.[FN17] Moreover, to the extent that Claim Six may be read as alleging a denial of access to courts, this claim is dismissed as well,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

for the same reasons.

**FN17.** The court declines to provide LeBron the opportunity to amend his complaint, yet again, to include allegations of injury. In a Conditional Order of Dismissal, dated March 7, 2005, the court explicitly advised LeBron that his allegations regarding denial of access to courts were inadequate, and that "[i]n order to establish standing for a claim for denial of access to courts, an inmate must show that he has suffered an actual injury traceable to the challenged conduct of prison officials." *See Dkt. 4, p. 5.* The court accepted LeBron's amended complaint because it cured many of the defects of the original complaint. *See Dkt. 7.* However, upon closer review, at least insofar as the denial of access to courts claims are concerned, LeBron's amended complaint suffers from the same infirmities as his original complaint.

**3. *Interference With Mail Claim***

In Claim Seven, LeBron alleges that two of his outgoing letters were confiscated. *See Dkt. 6, ¶¶ 296, 299.* LeBron does not assert that the confiscation of the two letters interfered with his access to the courts, and, indeed, does not even allege that the letters constituted legal mail. Thus, he has not stated a claim for denial of access to courts. Accordingly, to the extent that Claim Seven may be read as asserting a claim of denial of access to courts, such claim is dismissed.

However, apart from the right of access to courts, "a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis,* 320 F.3d at 351; *see Moore v. Gardner,* 199 F.Supp.2d 17, 33 (W.D.N.Y.2002) ("Although prisoners' First Amendment mail claims are often intertwined with claims for denial of court access, they may exist separately."). Thus, the court will address whether LeBron has stated a claim for the violation of his First Amendment rights arising out of the confiscation of two pieces of outgoing mail.

**\*7** In short, for purposes of a Rule 12(b)(6) motion, he has. The Second Circuit has held that restrictions on a prisoner's mail are justified only if they further the substantial governmental interests of security, order, and rehabilitation. *Davis,* 320 F.3d at 351 (citation omitted). Moreover, "courts have consistently afforded greater protection ... to outgoing mail than to incoming mail." *Id.* (citations omitted). This is because "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989).

It may be the case that the confiscation of LeBron's outgoing mail was justified by legitimate governmental interests. However, the defendants have not proffered any reasons for the confiscation,[FN18] and thus, it would be inappropriate to dismiss LeBron's claim at this time. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (reversing the district court's dismissal of claims relating to interference with plaintiff's outgoing and incoming mail, and noting that even two instances of mail interference may be sufficient to suggest a continuing activity); *Knight v. Keane,* 247 F.Supp.2d 379, 384 (S.D.N.Y.2002) (affirming magistrate judge's determination that dismissal was inappropriate where the record evidence was insufficient to establish that inspection of plaintiff's mail was based on good cause). Accordingly, Claim Seven survives to the extent that it alleges a violation of LeBron's First Amendment right to send mail.[FN19]

**FN18.** The defendants' brief in support of their motion to dismiss did not address the First Amendment claim asserted in Claim Seven. *See Dkt. 112, pp. 23-25.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

FN19. In holding that the First Amendment mail claim asserted in Claim Seven survives, the court rejects the defendants' argument that LeBron has failed to exhaust his administrative remedies with respect to Claim Seven. The parties dispute the issue of exhaustion, and the court is not able to resolve this dispute on the basis of the facts before it. Moreover, LeBron has suggested that even if he did not exhaust his administrative remedies, such failure to exhaust may be attributed to inhibitions imposed by the defendants. *See* Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir.2004) ("Defendants may ... be estopped from raising non-exhaustion as an affirmative defense when prison officials inhibit an inmate's ability to utilize grievance procedures.").

Additionally, the court rejects the defendants' argument that venue for Claim Seven is improper. As defendants correctly note, venue is proper in "a judicial district where any defendant resides ." 28 U.S.C. § 1391(b). In this case, at least one defendant named in Claim Seven resides in the Northern District of New York. *See Dkt. 11 (Acknowledgement of Service as to Anthony Annucci).* The defendants have not argued that Annucci was not personally involved in the First Amendment violations asserted in Claim Seven; indeed, as stated above, the defendants' brief does not address Claim Seven insofar as it asserts a First Amendment claim. Moreover, for the reasons discussed above in connection with Claim Four, the court is unwilling to hold, at this stage of the proceedings, that LeBron's amended complaint does not state a claim with respect to defendants such as Annucci, who are alleged only to have failed to remedy a claimed constitutional violation.

**D. Injunctive Relief**

Judge Homer recommended that LeBron's request for injunctive relief be denied because LeBron has sued the defendants in their individual capacities only. LeBron has objected to this recommendation, arguing that "it is a given that the named defendants are in a position to expunge the disciplinary determinations made against plaintiff." *Dkt. 130, p. 3.* Notwithstanding LeBron's unsupported assertion to the contrary, the court agrees with Judge Homer that the injunctive relief LeBron seeks is unavailable because the defendants have been sued in their individual capacities. *See* Ziemba v. Armstrong, No. 3:02-cv-2216, 2004 WL 1737447, *2 (D.Conn. July 30, 2004) ("Injunctive relief may only be recovered from parties in their official capacities.") (citations omitted). Accordingly, LeBron's claims for injunctive relief are dismissed.

**IV. *Conclusion***

Having considered LeBron's objections and reviewed Judge Homer's findings of fact and conclusions of law, the court adopts Judge Homer's Report-Recommendation to the extent that it recommends dismissal of all of LeBron's equal protection and Fourth Amendment claims, as well as the due process claims asserted in Claims One, Two, Three, Five, Six, and Seven. The court rejects the Report-Recommendation to the extent that it recommends the complete dismissal of the due process claim asserted in Claim Four. The due process claim asserted in Claim Four is dismissed as to all defendants *except* L. LeClaire, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, Annucci, Murphy, and McCoy.

**\*8** As to the First Amendment claims, the court adopts Judge Homer's Report-Recommendation to the extent that it recommends dismissal of the denial of access to courts claims asserted in Claims Three and Five. Additionally, all First Amendment claims asserted in Claims One, Two, Three, Five, and Six are dismissed. The First Amendment retaliation claim asserted in Claim Four survives as to all defendants except Woodroof, Olson, M. LeClaire, and Bushie. The First Amendment claim of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

interference with mail asserted in Claim Seven survives as to all defendants.

Finally, the court adopts the Report-Recommendation to the extent that it recommends dismissal of LeBron's requests for injunctive relief.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Judge Homer's September 25, 2006 Report-Recommendation (*Dkt. No. 127* ) is accepted in part and rejected in part; and it is further

**ORDERED** that Claims One, Two, Three, Five, and Six are dismissed in their entirety; and it is further

**ORDERED** that the equal protection claims asserted in Claims Four and Seven are dismissed; and it is further

**ORDERED** that the Fourth Amendment claims asserted in Claims Four and Seven, if any, are dismissed; and it is further

**ORDERED** that the due process claim asserted in Claim Seven is dismissed; and it is further

**ORDERED** that the due process claim asserted in Claim Four is dismissed as to all defendants *except* L. LeClaire, Roy, Burke, McNulty, Goord, Selsky, Donelli,

Racette, Annucci, Murphy, and McCoy, and that such dismissal is *without prejudice* as to Mehrmann, Faulkner, McLaughton, Sanders, Ricks, LeFevre, and Pasquil, but is *with prejudice* as to all other defendants; and it is further

**ORDERED** that the defendants' motion to dismiss the First Amendment retaliation claim asserted in Claim Four is DENIED as to all defendants *except* that the motion to dismiss the First Amendment retaliation claim asserted in Claim Four is GRANTED as to defendants Woodroof, Olson, M. LeClaire, and Bushie; and it is further

**ORDERED** that the denial of access to courts claim asserted in Claim Seven is dismissed as to all defendants; and it is further

**ORDERED** that the defendants' motion to dismiss the First Amendment claim of interference with outgoing mail asserted in Claim Seven is DENIED; and it is further

**ORDERED** that the defendants' motion to dismiss LeBron's claims for injunctive relief is GRANTED; and it is further

**ORDERED** that the Clerk of the Court provide copies of this Order to the parties by mail.

**IT IS SO ORDERED.**

N.D.N.Y.,2007.

LeBron v. Swaitek

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

**H**

Only the Westlaw citation is currently available.

United States District Court,

E.D. Pennsylvania.

Aaron C. WHEELER, et. al., Plaintiffs

v.

Jeffrey BEARD, et. al., Defendants

No. Civ.A.03-4826.

Aug. 3, 2005.

Aaron C. Wheeler, Graterford, PA, pro se.

Theodore B. Savage, Graterford, PA, pro se.

James S. Pavlichko, Graterford, PA, pro se.

Derrick D. Fontroy, I., Graterford, PA, pro se.

Jeffrey A. Beard, Graterford, PA, Beth Anne Smith, Office of Attorney General, Carl W. Hittinger, Neil C.

Schur, Stevens and Lee, P.C., Philadelphia, PA, for Defendants.

Memorandum and Order

YOHN, J.

**\*1** *Pro se* plaintiffs Aaron C. Wheeler, Theodore B. Savage, James S. Pavlichko, and Derrick D. Fontroy are prisoners currently incarcerated at State Correctional Institution Graterford ("SCIG") in Pennsylvania. Defendants are the Pennsylvania Department of Corrections ("DOC"), SCIG, the SCIG Medical Department, the SCIG Mental Health Department, the SCIG "CERT" Team, and DOC employees Arroyo, Beard, Burke, Canino, Clayton, Conrad, Cook, Croll, DiGuglielmo, Feilds, Geist, Grassmeyer, Hardnett, Hatcher, Horn, Hosband, James, Jones, Klem, Knauer, Kovalchik, Kyler, Matello, Martin, Maue, McVey, Mooney, Moyer, Murray, O'Hara, Rosso, Smith, Spencer, Stachelek, Ulisney, Unvarsky, Vaughn, and Wolfe (collectively "DOC Defendants"). Also named as defendants are various vendors with which the DOC has or had contracts to sell products and services to inmates incarcerated in Pennsylvania prisons (collectively "Vendor Defendants").

Presently before the court are separately filed motions by three subsets of the DOC Defendants to dismiss plaintiffs' Second Amended Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons described herein, the motions will be granted in part and denied in part.

Background and Procedural History

On August 8, 2003, plaintiffs filed their initial *pro se*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

complaint in this matter. The pleading was twice amended before being filed in its present form on September 8, 2004. In addition to federal antitrust claims and common law fraud and misrepresentation claims, plaintiffs raise a host of constitutional claims pursuant to 42 U.S.C. § 1983. More than 70 pages of the sprawling 120-page complaint are comprised of allegations that various prison officials, acting individually and in concert, retaliated against plaintiffs in response to plaintiffs' filing administrative grievances within the prison system and a federal lawsuit in May 2002 against defendants Vaughn, Hatcher, Beard, and Ulisny. *See Fontroy v. Schweicker,* No. 02-2949 (E.D.Pa.). The remainder of the complaint challenges the constitutionality of plaintiffs' conditions of confinement and includes claims under § 1983 relating to the DOC's grievance and appeals process, its mail policy, its provision of medical services to inmates, its management of funds, and its maintenance of facilities.

Several defendants in the case filed motions to dismiss prior to the submission of the Second Amended Complaint. These motions were renewed, and, in some cases modified or supplemented, following submission of the Second Amended Complaint. To date in the case, 12(b)(6) motions have been filed by the DOC Defendants and by Vendor Defendants Access Catalog Co. ("Access"), Jack L. Marcus, L.L.C. ("JLM"), Verizon Pennsylvania, Inc. ("Verizon"), and Mike's Better Shoes ("MBS"). The motions filed by Access, JLM, Verizon, and MBS are the subject of a separate disposition, as are the portions of the motions filed by the DOC Defendants that argue for dismissal of plaintiffs' antitrust and common law fraud claims. This opinion addresses the DOC Defendants' motions to dismiss the remaining claims in the Second Amended Complaint.

Discussion

**\*2** A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of a complaint. *Johnsrud v. Carter,* 620 F.2d 29, 33 (3d Cir.1980) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In

evaluating a motion to dismiss, all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party. *Rocks v. Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989) (citing *Wisniewski v. Johns-Manville Corporation,* 759 F.2d 271, 273 (3d Cir.1985)). The court may dismiss a complaint, "only if it is certain that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swin Resource Systems, Inc. v. Lycoming County, Pennsylvania, acting through the Lycoming Company Solid Waste Department,* 883 F.2d 245, 247 (3d Cir.1989) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

"A *pro se* complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers' and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting from *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)).

*I. First Amendment Claims*

*A. Retaliation*

Plaintiffs allege that the DOC defendants individually and, in some instances, concertedly engaged in a pattern of illegal conduct to retaliate against them for exercising their constitutionally protected right to petition the government for redress of grievances. The Second Amended Complaint catalogs numerous allegedly retaliatory actions taken against each of the four plaintiffs. *See* Second Amended Complaint ("SAC") at 12-78.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

To state an actionable claim for retaliation, a prisoner-plaintiff must prove that (1) the conduct which led to the alleged retaliation was constitutionally protected; (2) he suffered some adverse action that was sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was a substantial or motivating factor in the decision to take adverse action. *Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir.2001).

The Commonwealth argues that plaintiffs' § 1983 retaliation claims should be dismissed because plaintiffs' allegations of causation are wholly conclusory in virtually every instance. To wit, the Commonwealth maintains that plaintiffs allege neither close temporal proximity between the filing of their suit and the alleged retaliatory actions, nor any improper motive on the part of DOC defendants (excepting Kovalchik and Cook). Furthermore, the Commonwealth contends, much of the conduct complained of is neither sufficiently adverse to support a retaliation claim, nor sufficiently serious to deter a person of ordinary firmness from exercising his or her constitutional rights.

**\*3** Plaintiffs in this case identify their *pro se* prosecution of a federal lawsuit challenging the constitutionality of a prison mail regulation as the basis for the retaliation they have allegedly suffered at the hands of the DOC defendants. Plaintiffs also assert that they have suffered retaliation for filing grievances within the prison system. Because plaintiffs as state prisoners have a right under the First and Fourteenth Amendments to petition the government for redress of grievances and to enjoy free access to the courts, *Milhouse v. Carlson,* 652 F.2d 371, 373-374 (3d Cir.1981), their Second Amended Complaint meets the first element of a cause of action for retaliation.

To establish the second element, a prisoner-plaintiff

need not allege that the adverse action on which his claim is based involved the violation of a constitutional right. "Government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for the protection of a constitutional right." [FN1] *Mitchell v. Horn,* 318 F.3d 523, 530 (3d Cir.2003). Adverse government actions that have been deemed sufficient to support a retaliation claim include filing false misconduct reports against a prisoner, *see Smith v. Mensinger,* 293 F.3d 641 (3d Cir.2002); detaining a prisoner in administrative segregation, *see Allah v. Seiverling,* 229 F.3d 220 (3d Cir.2000); denying a prisoner parole, *see Rauser;* transferring a prisoner to a distant prison, *see id.;* reducing a prisoner's wages, *see id.;* placing a prisoner lower on a promotion ranking list, *see Suppan v. Dadonna,* 203 F.3d 228 (3d Cir.2000); and transferring a prisoner from a single to a double cell, *see Pratt v. Rowland,* 65 F.3d 802 (9th Cir.1995) (cited by the Third Circuit with approval in *Allah* ).

FN1. I will go on to evaluate the independent constitutional merits of many of the claims that plaintiffs raise in the context of their case for retaliation. These claims will be addressed on their own merits in addition to being discussed in the context of retaliation, because, construing the complaint liberally, plaintiffs appear in many instances to be proceeding under both theories.

Plaintiffs have alleged adverse actions sufficient to establish the second element of the prima facie retaliation case. Wheeler alleges that his incoming personal mail was intercepted, SAC at 16, and his outgoing legal mail was delayed, *id.* at 17-18; that he was denied medical treatment, *id.* at 14-15; that his grievances were either not processed or not processed in a timely fashion, *id.* at 14; that his cell was ransacked, *id.* at 15; and that he was denied prison-issued necessary supplies (i.e., underwear), *id.* at 19. Savage alleges that he was placed in the prison's Restricted Housing Unit ("RHU") on the basis of a false charge, *id.* at 27; that he was denied single-cell housing

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

status, *id.* at 33-35; that he lost his job, *id.* at 35-36; that his cell was ransacked, *id.* at 26, 37; that contraband was planted in his cell to serve as the basis for a bogus misconduct report, *id.* at 37-41; that his custody level was wrongfully increased, leading to the loss of privileges, *id.* at 54; and that his grievances were repeatedly rejected for spurious reasons, *id.* at 55.

**\*4** Pavlichko alleges that his legal materials were seized, *id.* at 68; that he was transferred to another prison despite having withdrawn a previously submitted transfer request, *id.* at 69-70; that he was transferred within SCIG to a housing unit apart from his co-plaintiffs, *id.* at 71-72; that he was assigned to the RHU for not having permission to be in an area that he was actually authorized to visit, *id.* at 73-75; and that he lost his job, *id.* at 76. Fontroy alleges that his legal mail and other legal materials were destroyed or confiscated, *id.* at 78-81; that false disciplinary charges were filed against him, resulting in his segregation in the RHU, *id.* at 79-80; that his outside purchase forms were arbitrarily denied, *id.* at 82; and that catalog merchandise he ordered was returned to vendors undelivered, *id.*

While plaintiffs may not ultimately be able to prove that the adverse actions alleged in their complaint actually occurred, or, if such actions did occur, that they would have deterred a person of ordinary firmness from exercising his constitutional rights, the court must accept the allegations as true for purposes of this motion and is guided by existing Third Circuit case law establishing what is minimally required to satisfy the element of adverse action in a prima facie retaliation case.[FN2]

[FN2.] In its brief, the Commonwealth cites cases from the Second, Fourth, Sixth, and Tenth Circuits, but none from the Third Circuit, to stand for the proposition that *de minimis* adverse actions are insufficient to support a retaliation claim. While it is true that some of the actions plaintiffs allege are *de minimis* as a matter of law, insofar as they would not conceivably deter a prisoner of ordinary firmness from exercising his constitutional rights (*e.g.,* Wheeler's allegation that he was denied new underwear), not all of plaintiffs' allegations are so clearly trivial.

The third element of the prima facie retaliation case is causation. For purposes of establishing causation, evidence of "suggestive temporal proximity" is relevant. *Rauser,* 241 F.3d at 334. The Third Circuit has held that the mere mention of the word "retaliation" in a prisoner's *pro se* complaint "sufficiently implie[d] a causal link" between the prisoner's complaints and the misconduct charges filed against him to survive *sua sponte* dismissal by the district court. *Mitchell,* 318 F.3d at 530.

Plaintiffs expressly allege that the adverse actions taken against them were taken because they filed a federal lawsuit and because they frequently file administrative grievances. Savage alleges that Matello, Kovalchik, Jones, and Cook made direct and unambiguous statements linking their adverse actions to his involvement in litigation. Wheeler is quite systematic in his allegations of temporal proximity, arguing in plaintiffs' reply brief that such allegations are sufficient to establish circumstantial evidence of causation. It is true that not all of the plaintiffs allege equally relevant or compelling facts, but at this stage, they have alleged enough to establish the element of causation.

Given that plaintiffs have satisfied the elements of a prima facie case for retaliation, the Commonwealth's motion to dismiss the retaliation claims in the Second Amended Complaint must be denied. However, prison officials may still prevail on the issue of retaliation if they can prove by a preponderance of the evidence that they would have taken the same actions, absent the protected conduct, for reasons reasonably related to a legitimate penological interest or interests. *Carter v. Dragovich,* 292

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

F.3d 152, 159 (3d Cir.2002).

B. *Regulation Banning Nude Photographs and Obscene Sexually Explicit Periodicals*

**\*5** In the section of the Second Amended Complaint labeled "Personal and Nude Photographs Claim," plaintiffs mount a First Amendment challenge to the portions of the DOC inmate mail policy that bar inmates from possessing nude photographs [FN3] and from receiving publications that contain obscene sexually explicit material.[FN4] *See* DC-ADM 803 Part VI. A. 11 (nude photographs); Part VI. F. 2. d. (sexually explicit publications). Plaintiffs allege that two nude photographs of Savage's wife, four photographs of Wheeler's wife dressed in lingerie, and copies of *Fox* and *Gallery* magazine were intercepted by SCIG officials pursuant to the challenged policy, which, plaintiffs argue, is unconstitutional because it has no "just or valid penological interest or justification." With respect to the ban on "obscene" sexually explicit publications, plaintiffs contend that the DOC may not set standards for obscenity that are stricter than those that apply to publications sold at newsstands throughout the Commonwealth.

FN3. DC-ADM 803 defines "nude" to mean "showing the human male or female genitals, pubic area or buttocks with less than a fully opaque covering, or showing the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple." It defines "photograph" to mean "an image of a person, place, or object made using a camera or device, which exposes a photosensitive surface to light." The policy excludes from the definition of "photograph" "pictures in a magazine or other publication of general circulation." *See* DC-ADM 803 at IV. J.

FN4. DC-ADM 803 defines "obscene" according

to eight criteria and prohibits materials that depict non-consensual sex, violent or assaultive sex, sex involving domination and humiliation, sex involving minors, sex involving actual penetration, bodily excretory functions, bestiality, bondage, and sadomasochism. *See* DC-ADM 803 at VI. F. 3. b.

The standard for evaluating claims that prison regulations violate prisoners' constitutional rights was set by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), a case in which the Court recognized the need to balance the principle that the "federal courts must take cognizance of the valid constitutional claims of prison inmates" with the competing principle that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Id.* at 84 (citing *Procunier v. Martinez,* 416 U.S. 396, 413-414, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)). The Court held in *Turner* that prison regulations are valid if they are "reasonably related to legitimate penological interests." *Id.* at 87.

To determine whether a given regulation is reasonably related to legitimate penological interests, federal courts, following *Turner,* must consider the following four factors: (1) whether there is a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there are "alternative means of exercising the right that remain open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there is "an absence of ready alternatives" by means of which the asserted goal could be accomplished. *Turner,* 482 U.S. at 89-90.

The Third Circuit has held that, when deciding a motion to dismiss a prisoner's First Amendment challenge

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

to a prison regulation, a district court may not, as a rule, rely solely on common sense to determine whether "the requisite rational connection between a prison restriction and a legitimate penological interest can be found." *Ramirez v. Pugh,* 379 F.3d 122, 127 (3d Cir.2004) (testing the constitutionality of a law prohibiting the use of federally appropriated prison funds for the distribution of sexually explicit materials in prisons). An element-by-element *Turner* analysis is required. *Wolf v. Ashcroft,* 297 F.3d 305, 307 (3d Cir.2002). In *Wolf,* the Third Circuit reversed a district court's dismissal of a prisoner's challenge to a restriction on the screening of R- and NC-17-rated movies in federal prisons because the district court's analysis of the *Turner* factors was insufficient. *Wolf,* 297 F.3d at 307. The panel concluded that the case had been improperly dismissed and directed the district court on remand to "describe the interest served, consider whether the connection between the policy and the interest is obvious or attenuated-and, thus, to what extent some foundation or evidentiary showing is necessary-and, in light of this determination, evaluate what the government has offered." *Id.*

**\*6** Here, the Commonwealth's brief contains no statement concerning the penological interests served by the two provisions in DC-ADM 803 that plaintiffs challenge. While judgment on the pleadings may be appropriate if the relationship between the challenged regulation and the interest assertedly served is an obvious one, the party defending the regulation must first identify the interests served and demonstrate that the regulation's drafters could rationally have seen a connection between the regulation and those interests. *Wolf,* 297 F.3d at 308.

It is true, as the government points out, that a similar regulation restricting inmate access to sexually explicit materials has been upheld in this circuit. *See Waterman v. Farmer,* 183 F.3d 208 (3d Cir.1999) (upholding a restriction on pornographic materials in a facility for sex offenders). Other circuits have also upheld similar restrictions. *See Giano v. Senkowski,* 54 F.3d 1050 (2d Cir.1995) (upholding a policy banning nude or semi-nude

photographs of inmates' spouses and girlfriends); *Trapnell v. Riggsby,* 622 F.2d 290 (7th Cir.1980) (declining to overturn a regulation banning nude and pornographic photographs).[FN5] Nevertheless, the *Turner* analysis is required before a judgment can be made about the constitutionality of the provisions challenged in this suit.

> **FN5.** Plaintiffs cite *Pepperling v. Risley,* 739 F.2d 443 (9th Cir.1984), which affirmed the Ninth Circuit's prior holding in *Pepperling v. Crist,* 678 F.2d 787, 790 (9th Cir.1982), that a prison rule completely banning nude photographs of wives and girlfriends was too restrictive to satisfy the requirements of the First Amendment. *Pepperling* is not precedential in this circuit, however. And its continuing vitality in the Ninth Circuit is questionable in light of the more recently decided *Unger v. United States,* 1997 U.S.App. LEXIS 5330 (9th Cir.1997) (holding that a prison's outright ban on personal nude photographs satisfied *Turner* ).

While it is plausible that the challenged provisions in DC-ADM 803 will ultimately be shown to satisfy the requirements of *Turner,* the Commonwealth is not thereby relieved of its obligation, when moving for dismissal or summary judgment, to identify the interest served by the challenged provisions and to show that the limits embodied in those provisions are reasonably related to that interest. I cannot conclude from the Commonwealth's brief that even the first prong of the *Turner* test is met in this case. Absent a showing that the provisions in question satisfy *Turner,* the government's motion to dismiss the claims challenging the provisions must be denied.

*C. Access to the Courts*

Plaintiffs allege that numerous defendants have interfered with their constitutionally guaranteed access to the courts in violation of their First Amendment right to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

petition the government for redress of grievances. Wheeler alleges that SCIG officials wrongfully delayed mailing his legal mail to courts, including the Third Circuit Court of Appeals and the Prothonotary of Schuylkill County. SAC at 17, 19. He alleges that the prison's delay in mailing materials to the Third Circuit caused him to miss a filing deadline by at least six days. *Id.* at 19. Savage alleges that his copy of the complaint in this case was confiscated and never returned to him. *Id.* at 38. He also alleges that he was denied access to the law library at times when he could meet with his co-plaintiffs to discuss prosecution of this suit. *Id.* at 42. In addition, Savage alleges that prison officials refused to process multiple grievances alleging constitutional violations, in order to prevent him from exhausting administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), and, thereby, to prevent him from gaining access to the federal courts. *Id.* at 45, 54, 57. Fontroy alleges that his legal materials were confiscated and his law books and legal mail were destroyed during a cell search. *Id.* at 78. Pavlichko similarly alleges that his legal pleadings and materials were confiscated during a cell search. *Id.* at 68.

**\*7** In addition to these specific allegations, plaintiffs make general allegations that the legal resources provided at SCIG are constitutionally inadequate. SAC at 117. They also allege generally that the grievance and appeals process is manipulated by prison officials to deny them access to the courts by preventing them from exhausting their constitutional claims administratively.[FN6]

FN6. The Commonwealth, in its motion to dismiss, treats plaintiffs' claim relating to the grievance and appeals process as a procedural due process claim; however, as plaintiffs make clear in their reply brief (and as they stated in the Second Amended Complaint), they attempt to state a claim for denial of access to courts and the right to petition the government. *See* SAC at 86; Reply Brief at ¶ 69.

"It is well settled that prisoners have a constitutional right to access to the courts, which requires access to 'adequate law libraries or adequate assistance from persons trained in the law' for filing challenges to criminal sentences, both direct and collateral, and civil rights actions." *Allah,* 229 F.3d at 224 (quoting *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). When an inmate shows that an actionable claim challenging his sentence or his conditions of confinement has been lost or rejected, or that the presentation of such a claim is currently being prevented, because the capability of filing suit has not been provided, he establishes actual injury sufficient to state a claim for denial of his constitutional right to access to courts. *Lewis v. Casey,* 518 U.S. 343, 356, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

In its brief, the Commonwealth argues that plaintiffs' claims relating to access to the courts are insufficient as a matter of law, because plaintiffs have not alleged the loss or rejection of a non-frivolous legal claim. With respect to the grievance and appeals process specifically, the Commonwealth argues that plaintiffs have no constitutional entitlement to a grievance procedure or to have the claims raised in their grievances investigated.[FN7]

FN7. The court notes that the Commonwealth provides little elaboration of this argument and cites no precedential authority to support it.

The allegations plaintiffs make concerning deliberate obstruction of their legal efforts by prison officials are serious, and, if true, troubling. However, under *Lewis,* it takes more than proof of obstruction to make out a constitutional claim that access to the courts has been denied. With the possible exception of Wheeler's allegation that a deliberate delay in sending his legal mail resulted in his missing specific filing deadlines, none of the plaintiffs has alleged that he suffered any actual injury in the form of loss or rejection of a claim, or prevention of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

the presentation of a claim, resulting from any defendant's alleged obstruction of his efforts to pursue legal relief.[FN8] Nor do plaintiffs allege that the putative dearth of legal resources available to them at SCIG has meaningfully compromised their capability of filing suit.[FN9]

> FN8. It is unclear from the face of the complaint whether Wheeler is suggesting that he suffered any actual prejudice as a result of the mailing delays he alleges.

> FN9. On the contrary, the length of the docket in this case and other cases brought by plaintiffs provides ample evidence that plaintiffs' have continually and energetically demonstrated their capability of accessing the courts.

As for the question of exhaustion, while it is true that the PLRA requires inmates to exhaust claims administratively before bringing a § 1983 claim in federal court, lack of exhaustion is not a jurisdictional bar; rather, it is an affirmative defense which must be asserted by the defendant. *Ray v. Kertes,* 285 F.3d 287, 295 (3d Cir.2002). The Commonwealth, in its motion, does not attempt to obtain dismissal by arguing that plaintiffs have failed to exhaust any claim.[FN10] Even if plaintiffs can prove their grave allegation that officials at SCIG have manipulated the grievance process to try to keep them out of federal court, they have not alleged that such manipulation resulted in any actual prejudice with respect to any specific claim(s).

> FN10. The Third Circuit has suggested in dicta that defendants may raise failure to exhaust as the basis for a motion to dismiss in cases where the defense would present an insuperable obstacle to the plaintiff's recovery. *Ray,* 285 F.3d at 295 n. 8.

*8 Absent allegation of actual injury of the type required by *Lewis,* plaintiffs cannot state a claim that their access to the courts has been unconstitutionally denied. The Commonwealth's motion to dismiss plaintiffs' claims relating to access to the courts is therefore granted as to all claims and plaintiffs except as to Wheeler's claim based on the alleged delay in mailing materials to the Third Circuit or the Prothonotary of Schuylkill County.

*II. Eighth Amendment Claims*

*A. General Environmental Conditions*

Plaintiffs allege a litany of Eighth Amendment violations relating to their living conditions at SCIG. The Second Amended Complaint contains an extensive list of complaints, including overcrowding; inadequate sanitation and sewage disposal; unsanitary food preparation and service; lack of healthy diet; exposure to environmental asbestos, lead-based paints, and water-borne toxins; and vermin infestation. Plaintiffs claim that their living conditions at SCIG constitute cruel and unusual punishment.[FN11] SAC at 108, 115-116.

> FN11. In its brief, the Commonwealth refers to claims relating to family picnics and lack of Saturday mail service. Plaintiffs also refer to these claims in their response. Both parties, however, appear to be referring to an earlier version of the complaint. Because these claims do not appear in the Second Amended Complaint, which superseded all prior versions of the complaint, the court assumes that plaintiffs have dropped them.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

The Commonwealth argues for dismissal of plaintiffs' claims involving general environmental conditions at SCIG on the ground that the claims are both frivolous and barred by the doctrine of *res judicata* The Commonwealth maintains that plaintiffs' claims challenging the constitutionality of the conditions of confinement at SCIG are nothing more than a rote duplication of claims previously settled in *Austin v. Pennsylvania Deptartment of Corrections,* 876 F.Supp. 1437 (E.D.Pa.1995).[FN12] Plaintiffs reject the Commonwealth's position that *Austin* settled the claims raised in their complaint.

> FN12. *Austin* was a sweeping and extensively litigated class action filed a decade ago on behalf of inmates in thirteen Pennsylvania prisons, including SCIG. The suit challenged allegedly inhumane and unconstitutional conditions of confinement ranging from overcrowding and inadequate medical and legal services to substandard environmental, health, and fire-safety conditions. *See id.* at 1444-1445.

The class certified in *Austin* included "all persons who are now or who will in the future be confined by the [DOC] in a facility other than [SCI Muncy or SCI Pittsburgh]." *Id.* at 1444. The four plaintiffs in this case, all of whom are incarcerated at SCIG, are therefore within the *Austin* class. Although the Commonwealth may be correct in its assertion that plaintiffs are attempting to relitigate claims raised in *Austin,* it is mistaken insofar as it believes that the settlement in *Austin* has any preclusive effect on this litigation.

The court in *Austin* took the unprecedented step of accepting a settlement that provided for a dismissal of the suit without prejudice to the rights of class members to seek monetary or injunctive relief in a subsequent suit. *Id.* at 1455. The court explained that, pursuant to the settlement agreement, "any class member will be able to file an individual claim or, if appropriate, a representative claim on the issues covered by the settlement" after dismissal. *Id.* at 1456. Because class counsel in *Austin* negotiated for and won a dismissal of the class's claims without prejudice, the Commonwealth's argument that plaintiffs' claims relating to general environmental conditions at SCIG are barred by the doctrine of *res judicata* cannot succeed.

**\*9** If it is true, as the Commonwealth contends, that sections of the Second Amended Complaint in this case are identical to sections of the *Austin* complaint, plaintiffs are cautioned that the filing of claims that are repetitious or that litigants know to be frivolous entitles a district court "to resort to its power of injunction and contempt to protect its process." *Abdul-Akbar v. Watson,* 901 F.2d 329 (3d Cir.1990) (upholding a district court injunction directing that the inmate litigant not file any claim under § 1983 without leave of the court).

It is not apparent from the face of plaintiffs' complaint that their pursuit of claims already litigated in *Austin* is malicious or frivolous. Nearly ten years have passed since the court accepted the settlement in *Austin,* and, given the immature state of the record in this case, it is impossible to assess to what extent or in what manner conditions at SCIG have changed as a result of the settlement in the prior suit. Should it become apparent as this case progresses that plaintiffs are pursuing Eighth Amendment claims that they know to be non-meritorious, this court will take necessary action to protect the integrity of the legal process.

*B. Excessive Heat in Dining Halls*

Plaintiffs allege in the Second Amended Complaint that excessive heat and inadequate ventilation in four inmate dining halls at SCIG violate their Eighth Amendment right to be free from cruel and unusual

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

punishment. SAC at 105-107. According to plaintiffs, the dining halls, which were newly opened in 2001, do not have air conditioning or proper ventilation. During the summer months, temperatures in the dining halls exceed one hundred degrees, and the lack of ventilation makes the facilities so unbearable that inmates have simply elected to forego eating rather than be subject to the conditions in the dining halls. Because of the excessive heat, plaintiffs allege, they are effectively being denied two of the three meals they would ordinarily eat in a day. Plaintiffs have filed multiple grievances with SCIG authorities complaining of the problem and have received no redress. They further allege that they have exhausted their administrative remedies with respect to this issue.

"The Eighth Amendment applies to prisoner claims of inadequate cooling and ventilation. Cooling and ventilation are distinct prison conditions, and a prisoner may state an Eighth Amendment claim by alleging a deficiency as to either condition in isolation or both in combination." *Chandler v. Crosby,* 379 F.3d 1278, 1294 (11th Cir.2004). However, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

**\*10** In its motion to dismiss, the Commonwealth maintains that, even if the facts alleged by plaintiffs concerning excessive heat in SCIG's dining halls are true, their claim must fail because they have not alleged, as required by *Farmer,* that the conditions in the dining halls pose a substantial risk of serious harm. Reading the complaint liberally, I conclude that plaintiffs have alleged facts sufficient at least to establish the basis for an inference that they have been subjected to the requisite risk of harm.

Plaintiffs have alleged that they are forced, as a practical matter, to skip as many as two meals a day during the summer months due to the excessive heat in the dining halls. Taking this allegation to be true, as I must for present purposes, the question of whether such deprivation rises to the level of serious harm cannot be answered absent evidence of the duration and severity of the heat. In *Chandler, supra,* the case on which the government relies to support its position that plaintiffs have failed to allege facts sufficient to sustain an Eighth Amendment claim, the trial judge based his conclusion on a range of facts in the record, including daily temperature readings taken over the course of the summer months and specific information concerning the design and operation of the prison's ventilation system. *See Chandler,* 379 F.3d at 1297. As it now stands, there is no record in this case that establishes such probative facts.

As the *Chandler* court acknowledged, the bar is very high for prisoners seeking to prove that excessive heat and/or poor ventilation rise to the level of an Eighth Amendment violation. Absent further development of the factual record on this issue, however, it is impossible to say whether plaintiffs in this case will be able to adduce sufficient proof to meet their heavy burden. The government's motion to dismiss plaintiffs' claim relating to excessive heat and poor ventilation in the SCIG dining halls is therefore denied.

*C. Medical Issues*

*1. General Medical Issues*

In the sections of the Second Amended Complaint entitled "Health and Psychiatric Issues" and "HIV/AIDS Health Issues," defendants complain that the DOC fails to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

deliver adequate healthcare services to Pennsylvania inmates due to such factors as chronic staff shortages and inadequate facilities. SAC at 109-114. The Commonwealth argues that the claims asserted in these sections of the complaint should be dismissed because they were already litigated in *Austin, see supra,* and because plaintiffs fail to allege any specific constitutional wrongdoing on the part of any DOC employee.

"In order to succeed in an action claiming inadequate medical treatment, a prisoner must show more than negligence; he must show 'deliberate indifference' to a serious medical need." *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir.1993). The "deliberate indifference to serious medical needs" standard can be met in a number of circumstances: (1) when a physician intentionally inflicts pain on a prisoner; (2) when prison authorities deny reasonable requests for medical treatment, and such denial exposes the inmate to undue suffering; (3) when knowledge of the need for medical care is accompanied by the intentional refusal to provide that care. *Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir.2004) (internal quotations omitted).

*\*11* While many of plaintiffs' allegations in these sections of the complaint undoubtedly touch upon serious medical needs, plaintiffs do not allege that any of the deficiencies of which they complain results from deliberate indifference to inmate health or safety on the part of any DOC defendant. Rather, plaintiffs acknowledge that "[a]ll these deficiencies in medical and mental health care reflect inadequate funding for medical staff, support staff and equipment." SAC at 111. Plaintiffs make the same acknowledgment relating to the provision of HIV/AIDS-related services: "These deficiencies arise out of the same systemic failures that prevent the delivery of adequate general medical care." *Id.* at 113. Allegations of inadequate funding do not equate with allegations of deliberate indifference. Because plaintiffs have not alleged any deliberate indifference to their serious medical needs on the part of any named defendant in this case, their generalized claims concerning inadequate healthcare at

SCIG must be dismissed for failure to state a claim upon which relief can be granted.

**2. Denial of Surgery**

In the section of the Second Amended Complaint entitled "Medical Denial Due to Cost," Wheeler claims that his Eighth Amendment right to be free from cruel and unusual punishment was violated when prison officials at SCIG declined to authorize surgery to remove a lump on his left arm. SAC at 93-94. According to Wheeler, the lump was first discovered when he was incarcerated at SCI Frackville ("SCIF"), and it was initially diagnosed as a carbon deposit. The diagnosis was later changed to tendinitis. When Wheeler was transferred from SCIF to SCIG, he again sought treatment for the lump, which was diagnosed first as a cyst and later as a tumor. He alleges that no treatment was provided subsequent to any diagnosis, though he was, at one time, on the waiting list at SCIG for minor surgery to have the lump removed. Wheeler alleges that, after several months, he was taken off SCIG's waiting list for surgery when an unidentified medical consultant disapproved the surgery. The denial of surgery, Wheeler claims, was in violation of the DOC's duty of care to inmates and was based on economic rather than medical considerations.

In its motion to dismiss, the Commonwealth argues, citing *Durmer,* 991 F.2d at 64, that "nothing under the Eighth Amendment requires prison officials who are laymen at medicine to override, question, or second guess decisions by medical personnel." The Commonwealth argues that Wheeler's claim must fail as a matter of law, because nothing in the complaint "suggests that [he was] ever exposed to any substantial risk of serious harm about which defendants knew." Wheeler counters that the prison's failure to treat the lump on his arm was the result of deliberate indifference by prison officials, that the lump may be cancerous, and that abnormal blood test results he recently received could be related to the failure to remove the lump.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

**\*12** As stated above in Section II. C. 1., "[i]n order to succeed in an action claiming inadequate medical treatment, a prisoner must show more than negligence; he must show 'deliberate indifference' to a serious medical need." _Durmer,_ 991 F.2d at 67. Wheeler has alleged deliberate indifference in that he claims he repeatedly sought medical treatment at SCIG for the lump on his arm but never received any treatment, even though the lump had been diagnosed on at least one occasion as a tumor. As to whether his medical need is sufficiently serious that a deliberate failure to treat him rises to the level of a constitutional violation, the record is not adequately developed for the court to make a determination.

Given Wheeler's allegations, which must be accepted as true at this juncture, that the lump has not been definitively diagnosed and that it has most recently been diagnosed as a tumor, which presumably could be cancerous, I cannot now conclude as a matter of law that Wheeler will be unable to prove that he has a serious medical need to which prison officials have shown deliberate indifference by failing to treat him. The government's motion to dismiss Wheeler's Eighth Amendment claim relating to the lump on his arm must therefore be denied.

*3. Denial of Electric Shaver*

Wheeler alleges an Eighth Amendment violation based on SCIG's policy banning the possession of electric shavers by inmates. SAC at 95-97. Wheeler alleges the following facts: He suffers from a dermatologic condition common to African American men and other men with curly facial hair. The condition causes his face and neck to become badly irritated and infected when he shaves with a standard disposable razor. When Wheeler was at SCIF, a physician there recommended that he use an electric shaver, which he was allowed to do until he was transferred to SCIG. When he arrived at SCIG, Wheeler was required to give up his electric shaver, pursuant to a

newly implemented policy, and to shave instead with a disposable razor. This caused him to develop facial infections, which were treated by a dermatologist at SCIG using a variety of methods, none of which succeeded to Wheeler's satisfaction. Wheeler filed grievances in an attempt to get authorization to use an electric shaver or to go to the barbershop once a week to have his face shaved. He was denied relief of the kind he requested.

The Commonwealth argues that "it diminishes the significance of the Eighth Amendment to suggest that a ban on the possession of an electric razor or beard trimmer amounts to cruel and unusual punishment." Wheeler argues that his dermatologic condition is a serious medical condition, and that, by denying him the use of an electric shaver yet requiring him to keep his facial hair trimmed, SCIG officials acted with deliberate indifference to his serious medical needs in violation of the standard articulated in _Farmer v. Brennan,_ 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).[FN13]

FN13. Wheeler cannot persuasively argue that he is caught in a Catch-22 here. He does not allege that he is required by prison regulations to remain entirely free of facial hair; he alleges only that he is required to keep his facial hair trimmed. The prison has not, therefore, denied him the only hygienic means by which he may comply with regulations.

The Third Circuit has held that mere disagreement as to the proper medical treatment for an inmate's medical condition is insufficient to establish a constitutional violation. _Spruill,_ 372 F.3d at 235. Wheeler does not allege that SCIG officials denied him treatment for his facial infections. On the contrary, he avers that he was seen by a dermatologist, who "prescribed various acne creams, antibiotics, and other drugs to try and cure" his condition. SAC at 95.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

**\*13** The Eighth Amendment does not entitle an inmate to his preferred course of treatment for a medical condition, or even to the continuation of a specific course of treatment that was previously prescribed by a treating physician at another facility. Wheeler may not like the therapeutic approach taken by the dermatologist who treated him at SCIG, but his disagreement with prison medical personnel over how best to ameliorate his shaving-induced skin condition is not a basis for constitutional relief. The Commonwealth's motion to dismiss Wheeler's claim relating to his possession and use of an electric shaver is therefore granted.

*III. Fourteenth Amendment Due Process Claims*

*A. Taking and Destruction of Personal Property*

Plaintiffs allege in various portions of the Second Amended Complaint that they have been subject to the destruction or unwarranted confiscation of various items of personal property during cell searches by DOC defendants. Plaintiffs claim that their right to procedural due process with respect to the taking of their property has thereby been violated.

Wheeler alleges that defendants Clayton and Hardnett confiscated twenty-nine packs of cigarettes from his cell, even though prison regulations allow inmates to have up to thirty packs at a time. SAC at 12. Wheeler filed a grievance to complain of the confiscation, and the grievance was denied. *Id.* Wheeler appealed to defendant Vaughn, who denied his appeal. *Id.* at 13. Wheeler then appealed to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"), which also denied the appeal.[FN14] *Id.* Wheeler alleges that decisions in response to both of his appeals were impermissibly delayed beyond the

maximum time set forth DC-ADM 804, the regulation that governs the inmate grievance process. *Id.* at 12-13.

FN14. The DOC grievance process provides for three stages of review: initial review; appeal to the facility manager; and appeal to the Secretary's Office of Inmate Grievance and Appeals. *See* DC-ADM 804 Part VI; *Spruill,* 372 F.3d at 232 (discussing the grievance process in the context of the PLRA's exhaustion requirement).

Wheeler also alleges that guards "trashed" his cell on December 18, 2002 and broke both his radio and his TV antenna. SAC at 15. He filed a grievance, which was evaluated by defendant Conrad and decided in Wheeler's favor. *Id.* Conrad recommended that Wheeler be compensated for the cost of repairing the broken items. *Id.* This recommendation was approved by defendant Hatcher but ultimately disapproved, upon review, by defendant Vaughn. *Id.* Wheeler appealed the denial to SOIGA, and the denial was upheld. *Id.*

Savage alleges that, after a cell search by SCIG guards, his wristwatch was missing, and his typewriter was broken. SAC at 26. He alleges that he "made demand for reimbursement" for the loss of his watch and the damage to his typewriter; however, he does not allege that he pursued the complaint through the prison's formal grievance procedure. *Id.* Savage also claims that a copy of the complaint in this case was confiscated from his cell, but he was never given a "Confiscated Item Receipt," which is required by prison regulations. *Id.* at 38. Again, he does not allege that he filed a formal grievance to complain of the confiscation or the failure to provide a receipt.[FN15]

FN15. Plaintiffs make a blanket claim in the

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

section of the Second Amended Complaint entitled "Exhaustion of Administrative Remedies" that they have exhausted or unsuccessfully attempted to exhaust "[a]ll claims set forth in this complaint." SAC at 118. For purposes of the 12(b)(6) motion, this claim must be accepted as true.

**\*14** Pavlichko claims that SCIG guards searched his cell and confiscated all his legal materials. SAC at 68. He does not allege that he filed a grievance concerning the incident, nor does he state whether the materials were subsequently returned. Fontroy, too, alleges that all his legal materials were confiscated. *Id.* at 78. He further alleges that the materials remain in the possession of SCIG officials. *Id.* It appears from the face of the complaint that Fontroy was in possession of legal materials exceeding limits allowed by DOC policy. He makes reference to grievances he filed requesting "retention of excess Core Legal materials." *Id.* He does not say whether those grievances were denied or whether he appealed any denial he may have received.

The Commonwealth argues, citing *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), that the destruction of an inmate's property is not prohibited by the Fourth Amendment, where, as here, there is an available post-deprivation remedy in the form of a grievance procedure. Therefore, "to the extent plaintiffs complain of the unreasonable searches of their cells or the confiscation or destruction of their property, such claims should be dismissed." Commonwealth's Memorandum of Law (Doc. # 204) at 18.

Plaintiffs concede that the Fourth Amendment prohibition against unreasonable searches and seizures does not apply to an inmate's cell. Plaintiffs' Reply Memorandum (Doc. # 190) at ¶ 93. They argue that they nevertheless have a Fourteenth Amendment due process right to notice and a hearing concerning confiscation of

property or damage to property caused during cell searches. *Id.* at ¶¶ 93-95.

In *Hudson, supra,* the Supreme Court held that intentional deprivations of inmate property do not violate the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available. *Hudson,* 468 U.S. at 533. Here, a post-deprivation remedy in the form of a formal grievance procedure is available to plaintiffs. The DOC grievance system has been held by courts in this circuit to provide an adequate post-deprivation remedy to inmates, in satisfaction of the Due Process Clause. *See McEachin v. Beard,* 319 F.Supp.2d 510, 514-515 (E.D.Pa.2004) (citing *Tillman v. Lebanon County Correctional Facility,* 221 F.3d 410, 422 (3d Cir.2000); *Allah v. Al-Hafeez,* 208 F.Supp.2d 520, 537 (E.D.Pa.2002)).

Of the four plaintiffs, only Wheeler, who alleges that two appeals of the denial of his grievance relating to the confiscation of his cigarettes were decided untimely, makes any factually specific allegation that DOC employees failed to adhere to the requirements of the DOC's internal grievance process with respect to handling formal complaints pertaining to damaged or confiscated inmate property. The failure he alleges, however, amounts only to a temporary delay which resulted in no prejudice to him. While temporarily delayed adjudications may be relevant to Wheeler's retaliation claim, they do not, standing alone, constitute a meaningful or actionable denial of post-deprivation due process.

**\*15** To the extent that plaintiffs have grieved their alleged property deprivations in accordance with the DOC's established process and have successfully exhausted their remedies thereunder, they have availed themselves of the post-deprivation remedy to which they are entitled by the Fourteenth Amendment. Plaintiffs would do well to assimilate the idea that an adverse

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

response to a grievance does not constitute a federal constitutional violation. *McEachin,* 319 F.Supp.2d at 515.

Because plaintiffs have been afforded an adequate post-deprivation remedy in the form of the DOC's grievance process, and because they have not alleged that they have been meaningfully denied due process with respect to any of their property-related grievances, the Commonwealth's motion to dismiss plaintiffs' property-related due process claims is granted.

*B. Misappropriation of Inmate General Welfare Fund Monies*

Plaintiffs allege that DOC Defendants Beard, Vaughn, DiGuglielmo, Croll, Spencer, and Wolfe misappropriated funds from the Inmate General Welfare Fund ("IGWF") by using money from the fund for their own personal use, instead of for the proper uses documented in the IGWF Monthly Accounting Report. Plaintiffs maintain that the IGWF was "created to help pay for some of the cost involved in providing programs and necessities to inmates during their incarceration." SAC at 104. Plaintiffs infer, based on their own experience of the allegedly deficient programs and facilities at SCIG, that defendants could not possibly be using the money for the purposes itemized in the monthly reports. *Id.*

The Commonwealth, which interprets plaintiffs' claim as one arising under state law, argues that any claim relating to the misappropriation of monies in the IGWF is barred by the doctrine of state sovereign immunity. Plaintiffs counter that they intended to state a constitutional claim; they argue that they have a protected property interest in the IGWF and in how monies in the fund are collected, distributed, and spent. Plaintiffs' Reply Brief at ¶ 100.

Plaintiffs correctly assert that they have a property interest in funds held in their inmate accounts. Thus, they are entitled to due process with respect to any deprivation of that money. *Reynolds v. Wagner,* 128 F.3d 166, 179 (3d Cir.1997) (internal citations omitted). However, whether the IGWF is an inmate account of the kind contemplated in *Reynolds*-which seems doubtful-or a trust account of the type ostensibly involved in *Urbano v. Board of Managers of New Jersey State Prison,* 415 F.2d 247 (3d Cir.1969) (holding that abstention was proper because New Jersey had an overriding interest in seeking to develop its own policy where there had been no adjudication by the state courts as to the legal attributes of the fund or what status the inmates had in relation to it)-which seems more likely-is unclear at this stage in the proceedings. Given the uncertainty concerning both the status of the fund under state law and the status of plaintiffs in relation to the fund, it would be premature to dismiss plaintiffs' misappropriation claim at this time.

*IV. Sovereign Immunity*

**\*16** The Commonwealth argues that plaintiffs' claims against the DOC, SCIG, the SCIG Medical Department, the SCIG Mental Health Department, and the SCIG CERT Team are barred by the Eleventh Amendment. Moreover, the Commonwealth asserts, these entities cannot be sued under § 1983 because they are not "persons" within the meaning of the statute.

The United States Supreme Court has held that suit against a state and its Board of Corrections is barred by the Eleventh Amendment, unless the state has consented to the filing of such a suit. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). This immunity extends to all departments or agencies "having no existence apart from the state." *Laskaris v. Thornburgh,* 661 F.2d 23, 25 (3d Cir.1981) (citing *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). The Commonwealth of Pennsylvania has not consented to suit. On the contrary, Pennsylvania, by statute, has expressly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

withheld its consent to be sued. *Id.* (citing 42 Pa.C.S.A. § 8521(b) FN16). Because the DOC, SCIG, the SCIG Medical Department, the SCIG Mental Health Department, and the SCIG CERT Team are entities that have no existence apart from the state, and because the Commonwealth has not waived its sovereign immunity, the Eleventh Amendment requires that these entities be dismissed as parties to this suit.

> FN16. § 8521(b) provides the following: "Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States." *Laskaris,* 661 F.2d at 25.

The Commonwealth is also correct in its argument that these entities must be dismissed from the suit because state agencies are not "persons" within the meaning of § 1983. *See Will v. Michigan Department of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that states and governmental entities that are considered "arms of the State" for Eleventh Amendment purposes are not "persons" under § 1983). Because the DOC, SCIG, the SCIG Medical Department, the SCIG Mental Health Department, and the SCIG CERT Team fall logically under the rubric of governmental entities that are "arms of the state," they may not be sued under § 1983. The Commonwealth's motion to dismiss the DOC, SCIG, the SCIG Medical Department, the SCIG Mental Health Department, and the SCIG CERT Team as defendants in this suit is therefore granted.

*V. Personal Involvement Requirement of § 1983*

The Commonwealth argues that plaintiffs' § 1983 claims against defendants Arroyo, Beard, Burke, Canino, Conrad, Croll, DiGuglielmo, Feilds, Geist, Grassmeyer, Hardnett, Hatcher, Horn, Hosband, James, Jones, Klem,

Knauer, Kyler, Martin, Maue, McVey, Mooney, Moyer, Murray, O'Hara, Rosso, Smith, Spencer, Stachelek, Ulisney, Vaughn, and Wolfe must be dismissed because plaintiffs do not allege personal wrongdoing on the part of any of these defendants, as required by § 1983. To state a claim under § 1983, a plaintiff must show that the defendant state official(s) participated in constitutional wrongdoing or had personal knowledge of and acquiesced in the alleged wrongdoing. *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988).

**\*17** A thorough review of the Second Amended Complaint-and a very liberal construction thereof-reveals that allegations of either direct constitutional wrongdoing or knowledge of and acquiescence in such wrongdoing are made against all of the above-named defendants, excepting Conrad, Hardnett, and Rosso. Allegations against some defendants are more factually specific than those against others, and many of the allegations appear to be rather tenuous, but it is not for the court at this point to make judgments about the credibility of plaintiffs' allegations.

With respect to Conrad, Wheeler alleges only that Conrad recommended that he (Wheeler) be compensated for damage to his personal belongings that allegedly occurred during an improper cell search. SAC at 15. Pavlichko alleges that Conrad authorized him to visit Housing Unit D so that Pavlichko could meet with his co-plaintiffs. *Id.* at 74. Fontroy alleges that Conrad telephoned an outside vendor on Fontroy's behalf to check the status of his eyeglass repair. *Id.* at 82. These are not allegations of wrongdoing; on the contrary, they are uniformly allegations of helpfulness. As there are no allegations of wrongdoing against Conrad in the Second Amended Complaint, he is not a proper defendant in this suit.

With respect to Hardnett, Wheeler alleges that Hardnett participated in the cell search that resulted in the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

confiscation of his (Wheeler's) cigarettes. SAC at 12. Wheeler acknowledges, however, that the search and confiscation occurred before he filed the lawsuit that is the purported basis for the retaliatory conduct alleged this case. *Id.* It is logically impossible for conduct occurring before an action that allegedly triggered a retaliatory response to be conduct in retaliation for that action. Furthermore, because Wheeler's due process claim relating to the taking of his cigarettes is insufficient as a matter of law, *see supra,* and because the cigarette confiscation is the only allegedly illegal act of which Hardnett is accused in the Second Amended Complaint, plaintiffs' § 1983 claim against Hardnett must fail.

With respect to Rosso, the Second Amended Complaint contains no allegations of constitutional wrongdoing against him. He is named only in connection with plaintiffs' antitrust and common law fraud claims, which have been dismissed with prejudice as to all DOC Defendants in a separate opinion. In light of these facts, Rosso must be dismissed as a party to this suit.

Because the Second Amended Complaint fails to allege personal involvement in constitutional wrongdoing on the part Conrad, Hardnett, or Rosso, and because such personal involvement is a necessary element of a § 1983 claim, plaintiffs fail to state any valid claims against Conrad, Hardnett, or Rosso. Accordingly, the Commonwealth's motion to dismiss defendants as parties for lack of personal involvement in constitutional wrongdoing is granted as to those three parties but denied as to the remaining individual DOC defendants.

Order

**\*18** AND NOW, this _____ day of August, 2005, upon careful consideration of the Commonwealth defendants' motions to dismiss the Second Amended Complaint (Doc. # 185, # 204, and # 218) and plaintiffs' briefs in opposition to the motions (Doc. # 190, # 199), it

is hereby ORDERED that the motions are

(1) DENIED with respect to plaintiffs' First Amendment retaliation claims;

(2) DENIED with respect to plaintiffs' First Amendment challenge to prison mail regulation DC-ADM 803;

(3) GRANTED with respect to plaintiffs' First Amendment access to courts claims, EXCEPT with respect to Wheeler's claim relating to alleged delays in mailing legal materials to the U.S. Court of Appeals for the Third Circuit and the Prothonotary of Schuylkill County;

(4) DENIED as to plaintiffs' Eighth Amendment claims relating to general environmental conditions and excessive heat in the dining halls at SCIG;

(5) GRANTED as to plaintiffs' Eighth Amendment claims relating to the provision of medical services at SCIG, EXCEPT with respect to Wheeler's claim relating to the alleged denial of surgery to remove a lump on his arm;

(6) GRANTED as to plaintiffs' Eighth Amendment claim relating to the denial of an electric shaver to Wheeler;

(7) GRANTED as to plaintiffs' Fourteenth Amendment procedural due process claims relating to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

(Cite as: 2005 WL 1840159 (E.D.Pa.))

adequacy of prison grievance procedures to address alleged deprivations of their personal property;

END OF DOCUMENT

(8) DENIED as to plaintiffs' Fourteenth Amendment due process claim relating to the alleged misappropriation of monies from the Inmate General Welfare Fund;

(9) GRANTED as to all claims against institutional defendants the DOC, SCIG, the SCIG Medical Department, the SCIG Mental Health Department, and the SCIG CERT Team, which are hereby DISMISSED as defendants to this action; and

(10) GRANTED as to all claims against individual defendants Conrad, Hardnett, and Rosso, who are hereby DISMISSED as defendants to this action.

It is further ORDERED that

(1) defendants shall file an answer within twenty (20) days; and

(2) any motion to sever individual claims or parties shall be filed within thirty (30) days.

E.D.Pa.,2005.

Wheeler v. Beard

Not Reported in F.Supp.2d, 2005 WL 1840159 (E.D.Pa.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,

E.D. New York.

Lester BATTICE, Plaintiff,

v.

R. PHILLIP, Correction Officer at Arthur Kill
Correctional Facility assigned to the 3:00 p.m. to 11
p.m. tour and Dennis Breslin, Superintendent at Arthur
Kill Correctional Facility, Defendants.

No. CV-04-669 (FB)(LB).

Aug. 2, 2006.

Lester Battice, Auburn, NY, pro se.

Eliot Spitzer, Attorney General of the State of New York,
by Julia Lee, Assistant Attorney General, New York, NY,
for Defendants.

*MEMORANDUM AND ORDER*

BLOCK, Senior District Judge.

**\*1** Plaintiff Lester Battice ("Battice"), proceeding *pro
se,* filed suit against defendants R. Phillip ("Phillip"), a
corrections officer at Arthur Kill Correctional Facility
("Arthur Kill"), and Dennis Breslin ("Breslin"), the
Superintendent of Arthur Kill (collectively "defendants"),
in their individual and official capacities pursuant to 42
U.S.C. §§ 1983 and 1985. Battice's complaint alleges that
while he was incarcerated at Arthur Kill, Phillip violated
his First Amendment rights by opening and reading
Battice's legal mail, and by taking various actions in
retaliation for grievances filed by Battice against Phillip.
In particular, Battice alleges that Phillip retaliated against
him by (1) making fun of his disability "in violation of
Title II of the Americans with Disabilities Act" ("ADA"),
Compl. ¶ 16; (2) endangering his life by informing other
prisoners that he had filed grievances against Phillip; (3)
searching Battice's cell and filing a misbehavior report
against him; (4) withholding Battice's mail; and (5)
altering Battice's work assignment. Battice's complaint
also alleges that Breslin was deliberately indifferent to
Phillip's violation of Battice's constitutional rights, and
violated state law and Department of Correctional
Services ("DOCS") regulations by making fun of Battice's
hearing disability. Battice seeks compensatory and
punitive damages and an injunction preventing defendants
from taking further retaliatory actions against him.

On July 26, 2005, following completion of discovery,
Magistrate Judge Bloom held a telephone conference in
which Battice refused to participate. Defendants
subsequently moved for summary judgment and served
Battice with the notice to *pro se* litigants required by
Local Rule 56.2. Following Battice's failure to submit a
response to defendants' summary judgment motion, the
Court issued an order on January 4, 2006, affording him
an opportunity to serve his responsive papers by January
13, 2006. After Battice failed to do so, Magistrate Judge
Bloom issued a second order, on June 30, 2006, stating
that Battice would be given a final opportunity to file his
response by July 31, 2006, and that failure to comply
would result in the motion being considered unopposed;
no response from Battice was received.[FN1] For the reasons

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

set forth below, defendants' motion for summary judgment is granted in its entirety.

> FN1. Although Battice has failed to respond to defendants' motion, he has continued to submit letters to the Court complaining of continuing harassment at Auburn Correctional Facility, where Battice is currently incarcerated. Despite Magistrate Judge Bloom's issuance of an order on August 30, 2005, directing Battice that he should not be submitting such documents to the Court, and that discipline imposed upon him at the Auburn Correctional Facility is irrelevant to the present case, the Court received another such letter from Battice on April 13, 2006.

## I.

The following background is taken from Battice's complaint and documents attached thereto; defendants' Statement of Undisputed Material Facts, *see* Local Rule 56.1(a); sworn deposition testimony; defendants' affidavits; and other supporting documents. In all material respects they are undisputed.

Battice was an inmate at Arthur Kill Correctional Facility at all relevant times. While incarcerated at Arthur Kill, Battice, who suffers from a hearing impairment, was housed for a period of time in unit F-2, where he was assigned work as a porter. During this period, Battice filed a number of administrative grievances against Phillip, the corrections officer ("CO") assigned to the 3 to 11 p.m. shift in Battice's unit, which Battice's complaint alleges precipitated various retaliatory actions by Phillip.

**\*2** Battice filed his initial grievance against Phillip on August 15, 2002, alleging that Phillip, without authorization, read certain court documents mailed to

Battice that were marked "confidential." On October 18, 2002, following an investigation, this grievance was accepted and the prison's Deputy Superintent of Security, Robert Morton ("Morton"), instructed Phillip regarding proper search procedures for inmate mail. On September 17, 2002, Battice filed a second grievance against Phillip, alleging that as a result of his initial grievance, Phillip had informed Battice and two other inmates that he was placing the F-2 housing unit on the "burn"; [FN2] during this conversation Phillip also allegedly mocked Battice's disability and stated that he intended to inform the unit's other inmates that he was placing the unit on the "burn" in retaliation for grievances filed by the three inmates. A September 16, 2002 memo from the Inmate Liaison Committee Executive Board to Morton contains similar allegations. Battice's second grievance was denied on October 25, 2002, on the ground that the allegations of alleged misconduct could not be substantiated.

> FN2. According to Battice's deposition, this meant that "there [wouldn't] be [any] rec[reation] or things of that nature." Aff. of Julia H. Lee, Ex. B at 45-6. However, Battice also testified that he was not aware that any of the inmates' privileges were ever suspended by Phillip.

On the same day that Battice filed his second grievance, Battice's cell was one of three in his unit selected for a search.[FN3] According to Breslin's affidavit and supporting documents, Arthur Kill conducts a daily search of the living quarters of a certain number of inmates in each housing unit in order to confiscate contraband. The list of cells to be searched each day is randomly generated by computer, and the searches are generally conducted by the unit's corrections officer during the 3 to 11 p.m. shift. According to the affidavits of Phillip and Morton, on September 17, 2002, pursuant to this procedure, Phillip received an order from Lieutenant Sweetman to search three cubicles, one of which belonged to Battice. Battice testified during his deposition that another inmate's cell had been selected for the search but that Phillip searched his cell instead; however, Battice did

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

not explain how he knew which cells had been selected for search or how he would have become aware of which inmates' cells had been selected prior to the search.

> FN3. Although Phillip's affidavit states that the search occurred on September 19, 2002, this appears to be erroneous; the administrative form completed by Phillip in connection with the search is dated September 17, 2002.

During the search of Battice's cell, Phillip discovered several items of contraband, including a bottle of glass cleaner, which prison regulations classified as a flammable substance.[FN4] Phillip issued a misbehavior report alleging that in addition to possessing contraband, Battice had been uncooperative during the search. A disciplinary hearing was held on September 25, 2002, during which Battice admitted to possession of the contraband, but explained that they had been given to him by other inmates. Battice was found guilty of possession of the contraband but not guilty of the allegations of uncooperative conduct during the search; although Battice appealed the hearing officer's decision on the ground that glass cleaner did not qualify as a flammable substance, his appeal was denied. Battice was not punished nor did he suffer a loss of any privileges as a result of the infraction; however, the hearing officer counseled him against keeping flammable materials in his cell.

> FN4. In addition to the glass cleaner, the following items of contraband were discovered in Battice's cell: excess paper towels, excess toilet paper, excess toothpaste, and excess shirts and gloves.

**\*3** On March 5, 2003, Battice filed a third grievance against Phillip, alleging that Phillip had failed to distribute a piece of incoming mail addressed to Battice. According to Phillip's grievance, a second CO discovered the mail in a desk drawer on February 28, 2003, two days after it had been delivered to Battice's unit, and turned it over to Battice. Battice's grievance was accepted in part after investigation revealed that the mail was found in the desk at the beginning of the following shift, but Phillip's actions in failing to deliver the mail were determined to be unintentional.

Approximately five months after filing this last grievance, Battice, along with a number of other inmates, who are not identified by Battice, were transferred from the F-2 unit to a different housing unit of the same level of security. Battice was given a different assignment as a porter in his new unit and allegedly received less pay in this new assignment. Following this transfer, Battice filed a fourth grievance against Phillip, alleging that Phillip had secured the transfer and associated change in work assignment and pay in retaliation for the grievances he had filed against Phillip. In support of this allegation, Battice's administrative complaint states that on July 30, 2003, Phillip

had a[l]list of [n]ames that I had observed. This [l]ist ... contained [a]ll [t]he [n]ames [o]f [t]he [i]nmates [i]n [t]he [d]orm [t]hat [h]ad [f]iled [g]rievances [a]gainst [h]im. I then observed that ... Phillip[ ] had a [s]econd [l]list of [i]nmates[']['][n]ames that were [b]eing [m]oved [o]ff [o]f Housing Unit F-2, I was one of those inmates included in this [m]ove [o]ff [o]f [unit] F-2.

Aff. of Dennis Breslin, Ex. D at 2. Battice's grievance also alleged that other inmates who had filed grievances against Phillip had been the target of assaults and the subjects of misbehavior reports, but did not allege that any other inmates were transferred out of the housing unit as a result of having filed grievances against Phillip.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

Battice's fourth grievance was denied on the ground that the allegations of misconduct could not be substantiated; it was "also noted that it was an administrative decision to move grievant off unit." Aff. of Dennis Breslin, Ex. D at 6. Defendants do not dispute that Battice was transferred and given a new work assignment that resulted in a reduction in pay, but provide no particular explanation for why these actions were taken. However, according to Breslin's affidavit and supporting documentation, corrections officers such as Phillip have "no discretion in the removal or transfer of inmates from their assigned programs," and the prison's Program Committee Chairperson, under the direction of the Deputy Superintendent of Programs, is responsible for coordinating program placements, including "acting upon all program assignment and change requests submitted by staff members." Aff. of Dennis Breslin, ¶ 11.

Breslin's affidavit further explains that his office receives hundreds of letters every year from inmates; one of Breslin's secretaries, or sometimes Breslin himself, will read the letters and determine the appropriate official to whom they should be forwarded for proper resolution. *Id.* ¶ 4. Breslin's affidavit also states that he has been advised by his staff that Battice had filed a number of grievances, but that those grievances were forwarded to other officials for proper resolution, and that Breslin did not personally respond to or investigate any grievances from Battice. *Id.* ¶ 6.

**\*4** Although Battice's complaint alleges that Breslin violated the ADA by making fun of his hearing disability, Battice does not explain when or where this event allegedly occurred, or provide any detail regarding this allegation.

## II.

**A. Summary Judgment Standard**

A Court may grant a motion for summary judgment

when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Andersen v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Where, as here, the non-moving party bears the burden of proof at trial, the moving party need only "show[ ]-that is, point[ ] out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986) (citation omitted). Upon such a showing, "the non-moving party must respond with 'specific facts showing that there is a genuine issue for trial,' " *Golden Pac Bancorp v. FDIC,* 375 F.3d 196, 200 (2d Cir.2004) (quoting Fed.R.Civ.P. 56(e)); conclusory statements, conjecture and other types of unsupported assertions are not sufficient. *See Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).

On a motion for summary judgment, the Court draws all justifiable inferences in the nonmoving party's favor. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing *Andersen,* 477 U.S. at 255). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not sufficiently probative ... summary judgment may be granted." *Andersen,* 477 U.S. at 249-50 (citations omitted). Finally, because Battice did not file any response to defendants' motion, the assertions contained in defendants' Statement of Material Facts and buttressed by defendants' sworn affidavits will be accepted as true, *see* Local Rule 56.1 [FN5]; however, where a motion for summary judgment is unopposed, the Court "may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citation and quotation marks omitted).

FN5. Although a verified complaint may be treated as an affidavit if it meets the requirements of Fed.R.Civ.P. 56(e) and is of sufficient factual

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

specificity, *see Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995), Battice's complaint is not verified and the Court will not give any evidentiary weight to its allegations.

**B. Section 1983 Claims**

**1. Interference with Mail**

Defendants are entitled to summary judgment on Battice's claim that Phillip interfered with Battice's right to receive mail when on one occasion he opened legal documents marked "confidential." Interference with legal mail implicates a prisoner's right of access to the courts and right of free speech under the First and Fourteenth Amendments. *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "To state a claim for denial of access to the courts [through interference with legal mail] a plaintiff must allege that the defendant 'took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim' "; the plaintiff must demonstrate that the actions resulted in actual injury. *Id.* In order to state a claim for violation of a prisoner's First Amendment right to send and receive mail, "the inmate must show that prison officials 'regularly and unjustifiably interfered with ... [a prisoner's] mail.' " *Id.*

**\*5** Battice has failed to state a claim under either theory. With respect to Battice's first theory, that Phillip's opening of his legal correspondence denied his access to the courts, Battice has not alleged, must less presented evidence to demonstrate, that he suffered any actual injury as a result of Phillip opening his legal correspondence. "Mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Id.* (citations and quotation marks omitted). Battice also fails to state a claim under his second theory, that defendants violated his rights to send and receive legal mail, because he cites to only one

instance of mail tampering, which did not result in any actual harm, and does not allege-nor present any evidence in support of such an allegation-that Arthur Kill officials established an ongoing practice of interfering with his mail.

**2. First Amendment Retaliation**

Phillip is also entitled to summary judgment on Battice's First Amendment retaliation claims. In order to sustain such claim, a prisoner must demonstrate " '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). "The causal connection must be sufficient to support the inference 'that the speech played a substantial part' " in the adverse action. *Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000) (quoting *Ezekwo v. NYC Health & Hosps. Corps.,* 940 F.2d 775, 780-81 (2d Cir.1991). Evidence that can lead to an inference of a causal connection includes (1) the temporal proximity between the protected conduct and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motives. *See Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995). The Second Circuit has been willing to draw an inference of causation where circumstantial evidence, such as temporal proximity, is combined with allegations that a defendant expressed an intent to retaliate. *See, e.g., Colon,* 58 F.3d at 872-73 (noting that if circumstantial evidence of temporal proximity between an inmate's lawsuit and disciplinary action and evidence of plaintiff's past good behavior "represented the sum total of [plaintiff's] proof, we might be inclined to affirm the grant of summary judgment based on the weakness of [plaintiff's] case," but concluding that this circumstantial evidence, in combination with direct evidence in the form of allegations regarding defendant's admission of a retaliatory scheme, would be sufficient to defeat a motion for summary judgment).

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

Nonetheless, prisoner retaliation claims are generally viewed "with skepticism and particular care" because "virtually any adverse action taken against a prisoner by a prison official-even those not otherwise rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes,* 239 F.3d at 492. The Second Circuit has established a "presumption that a prison official's acts to maintain order are done for a proper purpose," explaining that "the conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998). A "[p]laintiff has the initial burden of showing that an improper motive played a substantial part in the defendant's action. The burden then shifts to the defendant to show it would have taken exactly the same action absent the improper motive." *Scott v. Coughlin,* 344 F.3d 282, 288 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)). If the defendant meets this burden, summary judgment is appropriate. *See Davidson v. Chestnut,* 193 F.3d 144, 149 (2d Cir.1999). *See also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("[I]f the production of all relevant documents fails to add substance to the allegations and if the relevant officials submit affidavits explaining their reasons for the challenged actions, summary judgment dismissing the complaint may be granted ....").

**a. Withholding Mail, Making Fun of Battice's Hearing Disability, and Informing Other Inmates of Battice's Grievance**

*6 Defendants do not dispute that Battice's filing of a grievance qualifies as a constitutionally protected activity, and Battice has therefore satisfied the first element of a First Amendment retaliation claim. *See Graham,* 89 F.3d at 80 ("a retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments"). However, Battice's allegations that Phillip withheld his mail, made fun of his disability,

and informed other inmates that he was placing the housing unit on "the burn" because of Battice's grievance, even if true, do not constitute adverse actions. "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes,* 239 F.3d at 493). Furthermore, "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before [retaliatory] action taken against them is considered adverse." *Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (2d Cir.1999).

Phillip's failure to deliver Battice's mail on one occasion does not constitute the type of conduct that would deter an ordinary individual from exercising his constitutional rights. Phillip does not allege, much less present any evidence to show, that he suffered any injury as a result of the minor delay in receiving one piece of mail. Even if intentional, this isolated incident is "simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 493. As the present suit demonstrates, the incident did not deter Battice from continuing to use the mails to correspond with the Court, nor did it deter him from filing additional grievances against Phillip. Not only was this action not sufficiently serious enough to deter an individual of ordinary firmness from exercising his constitutional rights, but it clearly did not deter Battice from doing so.

Phillip's statement to Battice that he intended to inform other prisoners that he had filed a grievance also does not constitute an adverse action. The Second Circuit has held that a prisoner alleging that a prison official's comments incited other inmates must make some "factual showing that the comments ... actually risked inciting other inmates against" the prisoner, and has been "unwilling simply to assume that prison inmates would be incited, without more, to attack 'one of their own' who was labeled an 'informant' and a 'rat.' " *Dawes,* 239 F.3d at 493 (holding that prisoner's allegation that prison official

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

referred to prisoner as an "informant" and a "rat" in discussions with other inmates, and that this opened him up to assault by fellow inmates, did not amount to an adverse action). *See also Morales v. Mackalm,* 278 F .3d 126, 131 (2d Cir.2002) (holding that plaintiff's allegation that defendant called him a "stoolie" in front of other inmates did not sufficiently plead an adverse action). Even if the Court could take the allegations of Battice's unverified complaint as true for purposes of the present motion, the complaint alleges only that Phillip threatened to tell other inmates about the grievance, and then conclusorily states that this created resentment against Battice and "endanger[ed][his] life." Compl. ¶ 11. However, Battice does not allege that he ever suffered any adverse reactions from other inmates, and he admitted at his deposition that he was not aware that his unit ever suffered any loss of privileges. Because Battice has failed to make any factual showing that Phillip actually made any inflammatory comments to other inmates, or that those comments actually risked inciting other inmates against him, Phillip is entitled to summary judgment on this claim.

**\*7** Finally, the allegation that Phillip retaliated against Battice by making fun of his disability on one occasion, even if true, also does not amount to an adverse action. The Second Circuit has held that "[i]nsulting or disrespectful comments directed at an inmate" generally do not rise to the level of conduct that would deter an individual from exercising his or her constitutional rights. *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). *See also Dawes,* 239 F.3d 489 (" 'Certain means of 'retaliation' may be so de minimis as not to inhibit or punish an inmate's right of free speech. Many verbal responses by officials of resentment or even ridicule would fall into this safe harbor of permitted responses.' " (citing *Riley v. Coutu,* 172 F.R.D. 228, 235 (E.D.Mich.1997)); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam) (affirming dismissal of retaliation claim based on allegations that prison guard called inmate names). Phillip is therefore entitled to summary judgment on this claim.[FN6]

FN6. In addition to alleging that Phillip retaliated against him by making fun of his hearing disability "in violation of the Americans with Disabilities Act," Compl. ¶ 19, Battice's complaint also appears to assert a separate claim for violation of Title II of the ADA based upon the same alleged incident. *See* Compl. ¶ 16 (alleging that Phillip "mocked the plaintiff's disability in violation of Title II of the Americans with Disabilities Act"). To the extent that Battice is suing defendants in their personal capacities for violations of the ADA, this claim is not cognizable. *See Gill v. Calescibetta,* 157 Fed. Appx. 395, 396 n. 2 (2d Cir.2005) (unpublished) (citing *S.U.N.Y. Health Sci. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (affirming grant of summary judgment in suit filed by prisoner against prison official alleging violations of the ADA because "while state prisons fall squarely within the definition of a public entity for ADA purposes, ... the ADA does not protect [plaintiffs] from the actions of state officials undertaken in their individual capacities"). Furthermore, although suits against state officials in their official capacity are deemed to be suits against the state, *see Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993), there is no liability against the state for this particular claim because Battice does not allege that he was denied the benefit of any public services, programs, or activities by reason of his disability, *see* 42 U.S.C. § 12132, but alleges only that state officials made fun of his disability.

**b. Cell Search and Misbehavior Report**

Defendants are also entitled to summary judgment on Battice's allegation that Phillip searched his cell and filed a false misbehavior report against Battice in retaliation for filing grievances against him. The Second Circuit has not addressed whether a cell search can constitute an adverse action for purposes of a First Amendment retaliation claim;[FN7] however, many district courts in this circuit have concluded that it does not. *See, e.g., Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239 (S.D.N.Y.2005);

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

*Freeman v. Goord,* 2005 WL 3333465 at *5 (S.D.N.Y. Dec. 7, 2005); *Salahuddin v. Mead,* 2002 WL 1968329 at * 5 (S.D.N.Y. Aug. 26, 2002); *Walker v. Keyser,* 2001 WL 1160588, at *9 (S.D.N.Y. Oct. 2, 2001); *Walker v. Goord,* 2000 WL 297249 at *4 (S.D.N.Y. Mar. 22, 2000); *Bev v. Eggleton,* 1998 WL 118158 at *4 (S.D.N.Y. Mar. 17, 1998); *Gadson v. Goord,* 1997 WL 714878 at *7 (S.D.N.Y. Nov. 17, 1997). They have reasoned that under *Hudson v. Palmer,* 468 U.S. 517 (1984), a prisoner has no reasonable expectation of privacy in his or her prison cell; therefore, a search of an inmate's cell, even for retaliatory reasons, therefore does not implicate a constitutional right.

FN7. In *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996), the Second Circuit upheld the dismissal of a retaliatory cell search claim on the ground that the defendant was not personally involved in the search; however, the court did not address whether a cell search can constitute a retaliatory action.

Even assuming that a retaliatory cell search may form the basis for a retaliation claim, Battice does not provide any evidentiary support for his conclusory allegation that his cell was searched in place of a third cell selected at random by prison administrators. Moreover, although the search occurred on the same day or soon after Battice filed his second grievance against Phillip, and such close temporal proximity between a prisoner's exercise of a constitutional right and an adverse action may present circumstantial evidence of a causal connection between the two, *see, e.g., Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (finding circumstantial evidence of retaliation where adverse actions occurred within days of protected activity), defendants have submitted undisputed affidavits explaining that pursuant to established prison practice, Battice's cell was selected at random. Because defendants have carried their burden of demonstrating that the search would have been conducted in the absence of any retaliatory motive, and Battice has failed to put forth any evidence to dispute those assertions, summary judgment with respect to this claim is proper. *See Flaherty* 713 F.2d at 13 ("[I]f the production of all relevant documents fails to add substance to the allegations and if the relevant officials submit affidavits explaining their reasons for the challenged actions, summary judgment dismissing the complaint may be granted....").

**\*8** As for the misbehavior report, although the filing of a false misbehavior report can constitute an adverse action, *see Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988), and while the close temporal proximity between Battice's grievance and the filing of the misbehavior report might be sufficient, standing alone, to justify an inference of causal connection, defendants have put forth uncontradicted evidence that the misbehavior report would have been filed in the absence of any alleged retaliatory motive because Battice admittedly violated prison policy by storing contraband in his cell. *See Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (holding that defendants had met their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct because "it was undisputed that [plaintiff] had in fact committed the prohibited conduct" which led to issuance of a misbehavior report); *Hynes,* 143 F.3d at 657 (holding that defendants met their burden of proof that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct").

**c. Transfer and Change in Work Assignment**

Prisoners in New York have no liberty interest in being housed at a particular facility or maintaining a particular work assignment. *See Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) ("New York law does not give a prisoner 'any statutory, regulatory or precedential right to his prison job.'"); however, they do have a right not to be subject to retaliatory job transfers intended to "punish and harass." *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987).

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

Although Battice was transferred to a unit of the same level of security, and his conditions of confinement do not appear to have been altered by the transfer, if he earned less in his new assignment this would constitute an adverse action. *See Walker v. Pataro,* 2002 WL 664040 at *8 (S.D.N.Y. Apr. 23, 2002) (finding adverse action where, "[a]s a result of his transfer out of [one building, prisoner] lost a job that paid twenty-five cents an hour and was given a job that paid ten cents an hour"); *Van Pelt v. Finn,* 1993 WL 265297 at *4-5 (S.D.N.Y. Nov. 12, 1993) (denying summary judgment where prisoner was "transfer[red] from porter to clerk to recreational supervisor, and [suffered] ... corresponding decreases in pay"); *cf. Baker v. Zlochowon,* 741 F.Supp. 436, 439-40 (S.D.N.Y.1990) (denying summary judgment where plaintiff alleged that he was transferred to a lower-paying job after filing an Article 78 proceeding challenging prison officials' actions).

However, Battice's transfer and claimed loss of salary took place nearly five months after Battice had filed his most recent grievance against Phillip. Courts have held that "a time lapse of over four months ... standing alone, is insufficient to justify an inference of causal connection." *See, e.g., Freeman v. Goord,* 2005 WL 3333465 at *7 (S.D.N.Y. Dec. 7, 2005) (citing *Cobian v. New York City,* 2000 WL 1782744 at *18 (S.D.N.Y. Dec. 6, 2000) (collecting cases). *See also Conner v. Schnuck Mkts., Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997) ("the four month time lag between [plaintiff's] participation in protected activity and his termination by itself would not be sufficient to justify an inference of causation") (cited with approval in *Morris v. Lindau,* 196 F.3d 102, 113 (2d Cir.1999)).

**\*9** Notwithstanding this lapse of time, Battice's last administrative grievance contains other allegations that Battice claims supports an inference of retaliation; he alleges that on July 30, 2003, he observed Phillip with a list of inmates, including Battice, who were being transferred from his unit and that he then observed "that ... Phillip[ ] had a[s]econd [l]ist of [i]nmates['][n]ames that

were [b]eing [m]oved [o]ff [o]f Housing Unit F-2...." Aff. of Dennis Breslin, Ex. D at 2. These circumstances would not be sufficient to establish the requisite causal connection for a claimed retaliation occurring almost five months thereafter.

First, as the corrections officer assigned to the unit, it is logical that Phillip would have possessed a list of the names of inmates who were scheduled to be transferred from his unit. Even if, as Battice alleges, it was improper under prison regulations for Phillip to possess a list of the names of those inmates who had filed grievances against him, there is nothing in Battice's allegations regarding the lists to suggest that the two were related; Battice does not allege that Phillip was looking at the lists together, or comparing them in any manner that would suggest a connection between the names on one list and those on the other. Secondly, Battice does not allege that other inmates whose names appeared on the list of prisoners who had filed grievances were among those transferred to another housing unit; instead, Battice alleges that some inmates who had filed grievances against Phillip in the past had been subjected to other retaliatory acts, such as assaults and misbehavior reports. Finally, Phillip was allegedly seen with the two lists *after* the decision to transfer the inmates had been made; evidence that Phillip at some point possessed lists both of those inmates scheduled to be transferred and those who had filed grievances against him, even if true, at most allows only speculation that the transfer was ordered, or that Phillip had some role in securing that transfer, in retaliation for past grievances filed by Battice.

Because the Court concludes that the evidence put forth by Battice would be insufficient to allow a reasonable jury to return a verdict for Battice on this claim, there is no genuine issue for trial and summary judgment is appropriate. *See Andersen,* 477 U.S. at 249-50 (citations omitted) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not sufficiently

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

probative ... summary judgment may be granted.").

### 3. Liability of Breslin

Because Battice failed to present evidence sufficient to allow a reasonable jury to find that his constitutional rights were violated, the Court need not address Battice's claim that Breslin is liable for failing to prevent the alleged violations. In any event, Breslin would be entitled to summary judgment because Battice has failed to put forth any evidence to suggest that Breslin was personally involved in any deprivation of Battice's constitutional rights. Because there is no respondeat superior liability under § 1983, see *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003), "when a supervisor such as a prison superintendent is named as a defendant, that supervisor's involvement must be greater than 'mere linkage in the prison chain of command' to give rise to § 1983 liability." *Lipton v. County of Orange, New York,* 315 F.Supp.2d 434, 459 (S.D.N.Y.2004) (quoting *Richardson,* 347 F.3d at 435). The Second Circuit has held that a supervisor who merely receives and forwards an inmate's complaints to other officials for resolution is not sufficiently personally involved to be held liable for alleged constitutional violations. *See Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997). *See also Rivera v. Goord,* 119 F.Supp.2d 327, 344 (S.D.N.Y.2000) (plaintiff "merely asserts that he wrote to these [supervisory] defendants complaining about the conduct of various Medical and Correctional [d]efendants and that his complaints were ignored. These allegations are insufficient to hold these Official/Supervisory [d]efendants liable under § 1983").

**\*10** Breslin has submitted an affidavit stating that, consistent with his general practice, he was not personally involved in investigating or responding to any grievances or letters from Battice, which he instead forwarded to the necessary officials for response or investigation. Because the evidence shows that Breslin handled his office's receipt of the complaints in an appropriate manner by forwarding them for investigation and resolution through the prison's administrative grievance system, and Battice has not

submitted any evidence to contradict Breslin's affidavit, summary judgment dismissing the claims would be proper. *See Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir.1998) (stating that after "discovery, undisputed allegations that [a] supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case").

### C. **Section 1985** Claims

Although Battice's complaint also alleges that defendants' actions violated 42 U.S.C. § 1985, it does not contain any allegations of a conspiracy motivated "by some racial or perhaps otherwise class-based[ ] invidious discriminatory action," *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993), and Battice has not adduced any evidence that would support such allegations. Defendants are therefore also entitled to summary judgment on Battice's conspiracy claims under § 1985.

### III.

Defendant's motion for summary judgment dismissing plaintiff's federal claims is granted; the Court declines to exercise pendent jurisdiction over plaintiff's state law claims, which are dismissed without prejudice.

**SO ORDERED.**

E.D.N.Y.,2006.

Battice v. Phillip

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,

E.D. New York.

Lester BATTICE, Plaintiff,

v.

R. PHILLIP, Correction Officer at Arthur Kill
Correctional Facility assigned to the 3:00 p.m. to 11
p.m. tour and Dennis Breslin, Superintendent at Arthur
Kill Correctional Facility, Defendants.

No. CV-04-669 (FB)(LB).

Aug. 2, 2006.

Lester Battice, Auburn, NY, pro se.

Eliot Spitzer, Attorney General of the State of New York,
by Julia Lee, Assistant Attorney General, New York, NY,
for Defendants.

**MEMORANDUM AND ORDER**

BLOCK, Senior District Judge.

**\*1** Plaintiff Lester Battice ("Battice"), proceeding *pro
se,* filed suit against defendants R. Phillip ("Phillip"), a
corrections officer at Arthur Kill Correctional Facility
("Arthur Kill"), and Dennis Breslin ("Breslin"), the
Superintendent of Arthur Kill (collectively "defendants"),
in their individual and official capacities pursuant to 42
U.S.C. §§ 1983 and 1985. Battice's complaint alleges that
while he was incarcerated at Arthur Kill, Phillip violated
his First Amendment rights by opening and reading
Battice's legal mail, and by taking various actions in
retaliation for grievances filed by Battice against Phillip.
In particular, Battice alleges that Phillip retaliated against
him by (1) making fun of his disability "in violation of
Title II of the Americans with Disabilities Act" ("ADA"),
Compl. ¶ 16; (2) endangering his life by informing other
prisoners that he had filed grievances against Phillip; (3)
searching Battice's cell and filing a misbehavior report
against him; (4) withholding Battice's mail; and (5)
altering Battice's work assignment. Battice's complaint
also alleges that Breslin was deliberately indifferent to
Phillip's violation of Battice's constitutional rights, and
violated state law and Department of Correctional
Services ("DOCS") regulations by making fun of Battice's
hearing disability. Battice seeks compensatory and
punitive damages and an injunction preventing defendants
from taking further retaliatory actions against him.

On July 26, 2005, following completion of discovery,
Magistrate Judge Bloom held a telephone conference in
which Battice refused to participate. Defendants
subsequently moved for summary judgment and served
Battice with the notice to *pro se* litigants required by
Local Rule 56.2. Following Battice's failure to submit a
response to defendants' summary judgment motion, the
Court issued an order on January 4, 2006, affording him
an opportunity to serve his responsive papers by January
13, 2006. After Battice failed to do so, Magistrate Judge
Bloom issued a second order, on June 30, 2006, stating
that Battice would be given a final opportunity to file his
response by July 31, 2006, and that failure to comply
would result in the motion being considered unopposed;
no response from Battice was received.[FN1] For the reasons

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

set forth below, defendants' motion for summary judgment is granted in its entirety.

FN1. Although Battice has failed to respond to defendants' motion, he has continued to submit letters to the Court complaining of continuing harassment at Auburn Correctional Facility, where Battice is currently incarcerated. Despite Magistrate Judge Bloom's issuance of an order on August 30, 2005, directing Battice that he should not be submitting such documents to the Court, and that discipline imposed upon him at the Auburn Correctional Facility is irrelevant to the present case, the Court received another such letter from Battice on April 13, 2006.

## I.

The following background is taken from Battice's complaint and documents attached thereto; defendants' Statement of Undisputed Material Facts, *see* Local Rule 56.1(a); sworn deposition testimony; defendants' affidavits; and other supporting documents. In all material respects they are undisputed.

Battice was an inmate at Arthur Kill Correctional Facility at all relevant times. While incarcerated at Arthur Kill, Battice, who suffers from a hearing impairment, was housed for a period of time in unit F-2, where he was assigned work as a porter. During this period, Battice filed a number of administrative grievances against Phillip, the corrections officer ("CO") assigned to the 3 to 11 p.m. shift in Battice's unit, which Battice's complaint alleges precipitated various retaliatory actions by Phillip.

**\*2** Battice filed his initial grievance against Phillip on August 15, 2002, alleging that Phillip, without authorization, read certain court documents mailed to

Battice that were marked "confidential." On October 18, 2002, following an investigation, this grievance was accepted and the prison's Deputy Superintent of Security, Robert Morton ("Morton"), instructed Phillip regarding proper search procedures for inmate mail. On September 17, 2002, Battice filed a second grievance against Phillip, alleging that as a result of his initial grievance, Phillip had informed Battice and two other inmates that he was placing the F-2 housing unit on the "burn"; FN2 during this conversation Phillip also allegedly mocked Battice's disability and stated that he intended to inform the unit's other inmates that he was placing the unit on the "burn" in retaliation for grievances filed by the three inmates. A September 16, 2002 memo from the Inmate Liaison Committee Executive Board to Morton contains similar allegations. Battice's second grievance was denied on October 25, 2002, on the ground that the allegations of alleged misconduct could not be substantiated.

FN2. According to Battice's deposition, this meant that "there [wouldn't] be [any] rec[reation] or things of that nature." Aff. of Julia H. Lee, Ex. B at 45-6. However, Battice also testified that he was not aware that any of the inmates' privileges were ever suspended by Phillip.

On the same day that Battice filed his second grievance, Battice's cell was one of three in his unit selected for a search. FN3 According to Breslin's affidavit and supporting documents, Arthur Kill conducts a daily search of the living quarters of a certain number of inmates in each housing unit in order to confiscate contraband. The list of cells to be searched each day is randomly generated by computer, and the searches are generally conducted by the unit's corrections officer during the 3 to 11 p.m. shift. According to the affidavits of Phillip and Morton, on September 17, 2002, pursuant to this procedure, Phillip received an order from Lieutenant Sweetman to search three cubicles, one of which belonged to Battice. Battice testified during his deposition that another inmate's cell had been selected for the search but that Phillip searched his cell instead; however, Battice did

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

not explain how he knew which cells had been selected for search or how he would have become aware of which inmates' cells had been selected prior to the search.

> FN3. Although Phillip's affidavit states that the search occurred on September 19, 2002, this appears to be erroneous; the administrative form completed by Phillip in connection with the search is dated September 17, 2002.

During the search of Battice's cell, Phillip discovered several items of contraband, including a bottle of glass cleaner, which prison regulations classified as a flammable substance.[FN4] Phillip issued a misbehavior report alleging that in addition to possessing contraband, Battice had been uncooperative during the search. A disciplinary hearing was held on September 25, 2002, during which Battice admitted to possession of the contraband, but explained that they had been given to him by other inmates. Battice was found guilty of possession of the contraband but not guilty of the allegations of uncooperative conduct during the search; although Battice appealed the hearing officer's decision on the ground that glass cleaner did not qualify as a flammable substance, his appeal was denied. Battice was not punished nor did he suffer a loss of any privileges as a result of the infraction; however, the hearing officer counseled him against keeping flammable materials in his cell.

> FN4. In addition to the glass cleaner, the following items of contraband were discovered in Battice's cell: excess paper towels, excess toilet paper, excess toothpaste, and excess shirts and gloves.

**\*3** On March 5, 2003, Battice filed a third grievance against Phillip, alleging that Phillip had failed to distribute a piece of incoming mail addressed to Battice. According

to Phillip's grievance, a second CO discovered the mail in a desk drawer on February 28, 2003, two days after it had been delivered to Battice's unit, and turned it over to Battice. Battice's grievance was accepted in part after investigation revealed that the mail was found in the desk at the beginning of the following shift, but Phillip's actions in failing to deliver the mail were determined to be unintentional.

Approximately five months after filing this last grievance, Battice, along with a number of other inmates, who are not identified by Battice, were transferred from the F-2 unit to a different housing unit of the same level of security. Battice was given a different assignment as a porter in his new unit and allegedly received less pay in this new assignment. Following this transfer, Battice filed a fourth grievance against Phillip, alleging that Phillip had secured the transfer and associated change in work assignment and pay in retaliation for the grievances he had filed against Phillip. In support of this allegation, Battice's administrative complaint states that on July 30, 2003, Phillip

had a[l]l of [n]ames that I had observed. This [l]ist ... contained [a]ll [t]he [n]ames [o]f [t]he [i]nmates [i]n [t]he [d]orm [t]hat [h]ad [f]iled [g]rievances [a]gainst [h]im. I then observed that ... Phillip[ ] had a [s]econd [l]ist of [i]nmates[']nmates that were [b]eing [m]oved [o]ff [o]f Housing Unit F-2, I was one of those inmates included in this [m]ove [o]ff [o]f [unit] F-2.

Aff. of Dennis Breslin, Ex. D at 2. Battice's grievance also alleged that other inmates who had filed grievances against Phillip had been the target of assaults and the subjects of misbehavior reports, but did not allege that any other inmates were transferred out of the housing unit as a result of having filed grievances against Phillip.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

Battice's fourth grievance was denied on the ground that the allegations of misconduct could not be substantiated; it was "also noted that it was an administrative decision to move grievant off unit." Aff. of Dennis Breslin, Ex. D at 6. Defendants do not dispute that Battice was transferred and given a new work assignment that resulted in a reduction in pay, but provide no particular explanation for why these actions were taken. However, according to Breslin's affidavit and supporting documentation, corrections officers such as Phillip have "no discretion in the removal or transfer of inmates from their assigned programs," and the prison's Program Committee Chairperson, under the direction of the Deputy Superintendent of Programs, is responsible for coordinating program placements, including "acting upon all program assignment and change requests submitted by staff members." Aff. of Dennis Breslin, ¶ 11.

Breslin's affidavit further explains that his office receives hundreds of letters every year from inmates; one of Breslin's secretaries, or sometimes Breslin himself, will read the letters and determine the appropriate official to whom they should be forwarded for proper resolution. *Id.* ¶ 4. Breslin's affidavit also states that he has been advised by his staff that Battice had filed a number of grievances, but that those grievances were forwarded to other officials for proper resolution, and that Breslin did not personally respond to or investigate any grievances from Battice. *Id.* ¶ 6.

**\*4** Although Battice's complaint alleges that Breslin violated the ADA by making fun of his hearing disability, Battice does not explain when or where this event allegedly occurred, or provide any detail regarding this allegation.

## II.

### A. Summary Judgment Standard

A Court may grant a motion for summary judgment

when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Andersen v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Where, as here, the non-moving party bears the burden of proof at trial, the moving party need only "show[ ]-that is, point[ ] out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986) (citation omitted). Upon such a showing, "the non-moving party must respond with 'specific facts showing that there is a genuine issue for trial,' " *Golden Pac Bancorp v. FDIC,* 375 F.3d 196, 200 (2d Cir.2004) (quoting Fed.R.Civ.P. 56(e)); conclusory statements, conjecture and other types of unsupported assertions are not sufficient. *See Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).

On a motion for summary judgment, the Court draws all justifiable inferences in the nonmoving party's favor. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing *Andersen,* 477 U.S. at 255). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not sufficiently probative ... summary judgment may be granted." *Andersen,* 477 U.S. at 249-50 (citations omitted). Finally, because Battice did not file any response to defendants' motion, the assertions contained in defendants' Statement of Material Facts and buttressed by defendants' sworn affidavits will be accepted as true, *see* Local Rule 56.1 [FN5]; however, where a motion for summary judgment is unopposed, the Court "may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citation and quotation marks omitted).

FN5. Although a verified complaint may be treated as an affidavit if it meets the requirements of Fed.R.Civ.P. 56(e) and is of sufficient factual

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

specificity, see *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995), Battice's complaint is not verified and the Court will not give any evidentiary weight to its allegations.

**B. Section 1983 Claims**

**1. Interference with Mail**

Defendants are entitled to summary judgment on Battice's claim that Phillip interfered with Battice's right to receive mail when on one occasion he opened legal documents marked "confidential." Interference with legal mail implicates a prisoner's right of access to the courts and right of free speech under the First and Fourteenth Amendments. *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "To state a claim for denial of access to the courts [through interference with legal mail] a plaintiff must allege that the defendant 'took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim' "; the plaintiff must demonstrate that the actions resulted in actual injury. *Id.* In order to state a claim for violation of a prisoner's First Amendment right to send and receive mail, "the inmate must show that prison officials 'regularly and unjustifiably interfered with ... [a prisoner's] mail.' " *Id.*

**\*5** Battice has failed to state a claim under either theory. With respect to Battice's first theory, that Phillip's opening of his legal correspondence denied his access to the courts, Battice has not alleged, must less presented evidence to demonstrate, that he suffered any actual injury as a result of Phillip opening his legal correspondence. "Mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Id.* (citations and quotation marks omitted). Battice also fails to state a claim under his second theory, that defendants violated his rights to send and receive legal mail, because he cites to only one

instance of mail tampering, which did not result in any actual harm, and does not allege-nor present any evidence in support of such an allegation-that Arthur Kill officials established an ongoing practice of interfering with his mail.

**2. First Amendment Retaliation**

Phillip is also entitled to summary judgment on Battice's First Amendment retaliation claims. In order to sustain such claim, a prisoner must demonstrate " '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). "The causal connection must be sufficient to support the inference 'that the speech played a substantial part' " in the adverse action. *Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000) (quoting *Ezekwo v. NYC Health & Hosps. Corps.,* 940 F.2d 775, 780-81 (2d Cir.1991). Evidence that can lead to an inference of a causal connection includes (1) the temporal proximity between the protected conduct and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motives. *See Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995). The Second Circuit has been willing to draw an inference of causation where circumstantial evidence, such as temporal proximity, is combined with allegations that a defendant expressed an intent to retaliate. *See, e.g., Colon,* 58 F.3d at 872-73 (noting that if circumstantial evidence of temporal proximity between an inmate's lawsuit and disciplinary action and evidence of plaintiff's past good behavior "represented the sum total of [plaintiff's] proof, we might be inclined to affirm the grant of summary judgment based on the weakness of [plaintiff's] case," but concluding that this circumstantial evidence, in combination with direct evidence in the form of allegations regarding defendant's admission of a retaliatory scheme, would be sufficient to defeat a motion for summary judgment).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

Nonetheless, prisoner retaliation claims are generally viewed "with skepticism and particular care" because "virtually any adverse action taken against a prisoner by a prison official-even those not otherwise rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes,* 239 F.3d at 492. The Second Circuit has established a "presumption that a prison official's acts to maintain order are done for a proper purpose," explaining that "the conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998). A "[p]laintiff has the initial burden of showing that an improper motive played a substantial part in the defendant's action. The burden then shifts to the defendant to show it would have taken exactly the same action absent the improper motive." *Scott v. Coughlin,* 344 F.3d 282, 288 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)). If the defendant meets this burden, summary judgment is appropriate. *See Davidson v. Chestnut,* 193 F.3d 144, 149 (2d Cir.1999). *See also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("[I]f the production of all relevant documents fails to add substance to the allegations and if the relevant officials submit affidavits explaining their reasons for the challenged actions, summary judgment dismissing the complaint may be granted ....").

**a. Withholding Mail, Making Fun of Battice's Hearing Disability, and Informing Other Inmates of Battice's Grievance**

**\*6** Defendants do not dispute that Battice's filing of a grievance qualifies as a constitutionally protected activity, and Battice has therefore satisfied the first element of a First Amendment retaliation claim. *See Graham,* 89 F.3d at 80 ("a retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments"). However, Battice's allegations that Phillip withheld his mail, made fun of his disability, and informed other inmates that he was placing the housing unit on "the burn" because of Battice's grievance, even if true, do not constitute adverse actions. "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes,* 239 F.3d at 493). Furthermore, "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before [retaliatory] action taken against them is considered adverse." *Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (2d Cir.1999).

Phillip's failure to deliver Battice's mail on one occasion does not constitute the type of conduct that would deter an ordinary individual from exercising his constitutional rights. Phillip does not allege, much less present any evidence to show, that he suffered any injury as a result of the minor delay in receiving one piece of mail. Even if intentional, this isolated incident is "simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 493. As the present suit demonstrates, the incident did not deter Battice from continuing to use the mails to correspond with the Court, nor did it deter him from filing additional grievances against Phillip. Not only was this action not sufficiently serious enough to deter an individual of ordinary firmness from exercising his constitutional rights, but it clearly did not deter Battice from doing so.

Phillip's statement to Battice that he intended to inform other prisoners that he had filed a grievance also does not constitute an adverse action. The Second Circuit has held that a prisoner alleging that a prison official's comments incited other inmates must make some "factual showing that the comments ... actually risked inciting other inmates against" the prisoner, and has been "unwilling simply to assume that prison inmates would be incited, without more, to attack 'one of their own' who was labeled an 'informant' and a 'rat.' " *Dawes,* 239 F.3d at 493 (holding that prisoner's allegation that prison official

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

referred to prisoner as an "informant" and a "rat" in discussions with other inmates, and that this opened him up to assault by fellow inmates, did not amount to an adverse action). *See also Morales v. Mackalm,* 278 F .3d 126, 131 (2d Cir.2002) (holding that plaintiff's allegation that defendant called him a "stoolie" in front of other inmates did not sufficiently plead an adverse action). Even if the Court could take the allegations of Battice's unverified complaint as true for purposes of the present motion, the complaint alleges only that Phillip threatened to tell other inmates about the grievance, and then conclusorily states that this created resentment against Battice and "endanger[ed][his] life." Compl. ¶ 11. However, Battice does not allege that he ever suffered any adverse reactions from other inmates, and he admitted at his deposition that he was not aware that his unit ever suffered any loss of privileges. Because Battice has failed to make any factual showing that Phillip actually made any inflammatory comments to other inmates, or that those comments actually risked inciting other inmates against him, Phillip is entitled to summary judgment on this claim.

**\*7** Finally, the allegation that Phillip retaliated against Battice by making fun of his disability on one occasion, even if true, also does not amount to an adverse action. The Second Circuit has held that "[i]nsulting or disrespectful comments directed at an inmate" generally do not rise to the level of conduct that would deter an individual from exercising his or her constitutional rights. *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). *See also Dawes,* 239 F.3d 489 (" 'Certain means of 'retaliation' may be so de minimis as not to inhibit or punish an inmate's right of free speech. Many verbal responses by officials of resentment or even ridicule would fall into this safe harbor of permitted responses.' " (citing *Riley v. Coutu,* 172 F.R.D. 228, 235 (E.D.Mich.1997)); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam) (affirming dismissal of retaliation claim based on allegations that prison guard called inmate names). Phillip is therefore entitled to summary judgment on this claim.[FN6]

FN6. In addition to alleging that Phillip retaliated against him by making fun of his hearing disability "in violation of the Americans with Disabilities Act," Compl. ¶ 19, Battice's complaint also appears to assert a separate claim for violation of Title II of the ADA based upon the same alleged incident. *See* Compl. ¶ 16 (alleging that Phillip "mocked the plaintiff's disability in violation of Title II of the Americans with Disabilities Act"). To the extent that Battice is suing defendants in their personal capacities for violations of the ADA, this claim is not cognizable. *See Gill v. Calescibetta,* 157 Fed. Appx. 395, 396 n. 2 (2d Cir.2005) (unpublished) (citing *S.U.N.Y. Health Sci. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (affirming grant of summary judgment in suit filed by prisoner against prison official alleging violations of the ADA because "while state prisons fall squarely within the definition of a public entity for ADA purposes, ... the ADA does not protect [plaintiffs] from the actions of state officials undertaken in their individual capacities"). Furthermore, although suits against state officials in their official capacity are deemed to be suits against the state, *see Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993), there is no liability against the state for this particular claim because Battice does not allege that he was denied the benefit of any public services, programs, or activities by reason of his disability, *see* 42 U.S.C. § 12132, but alleges only that state officials made fun of his disability.

**b. Cell Search and Misbehavior Report**

Defendants are also entitled to summary judgment on Battice's allegation that Phillip searched his cell and filed a false misbehavior report against Battice in retaliation for filing grievances against him. The Second Circuit has not addressed whether a cell search can constitute an adverse action for purposes of a First Amendment retaliation claim;[FN7] however, many district courts in this circuit have concluded that it does not. *See, e.g., Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239 (S.D.N.Y.2005);

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

*Freeman v. Goord,* 2005 WL 3333465 at *5 (S.D.N.Y. Dec. 7, 2005); *Salahuddin v. Mead,* 2002 WL 1968329 at * 5 (S.D.N.Y. Aug. 26, 2002); *Walker v. Keyser,* 2001 WL 1160588, at *9 (S.D.N.Y. Oct. 2, 2001); *Walker v. Goord,* 2000 WL 297249 at *4 (S.D.N.Y. Mar. 22, 2000); *Bey v. Eggleton,* 1998 WL 118158 at *4 (S.D.N.Y. Mar. 17, 1998); *Gadson v. Goord,* 1997 WL 714878 at *7 (S.D.N.Y. Nov. 17, 1997). They have reasoned that under *Hudson v. Palmer,* 468 U.S. 517 (1984), a prisoner has no reasonable expectation of privacy in his or her prison cell; therefore, a search of an inmate's cell, even for retaliatory reasons, therefore does not implicate a constitutional right.

> FN7. In *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996), the Second Circuit upheld the dismissal of a retaliatory cell search claim on the ground that the defendant was not personally involved in the search; however, the court did not address whether a cell search can constitute a retaliatory action.

Even assuming that a retaliatory cell search may form the basis for a retaliation claim, Battice does not provide any evidentiary support for his conclusory allegation that his cell was searched in place of a third cell selected at random by prison administrators. Moreover, although the search occurred on the same day or soon after Battice filed his second grievance against Phillip, and such close temporal proximity between a prisoner's exercise of a constitutional right and an adverse action may present circumstantial evidence of a causal connection between the two, *see, e.g., Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (finding circumstantial evidence of retaliation where adverse actions occurred within days of protected activity), defendants have submitted undisputed affidavits explaining that pursuant to established prison practice, Battice's cell was selected at random. Because defendants have carried their burden of demonstrating that the search would have been conducted in the absence of any retaliatory motive, and Battice has failed to put forth any evidence to dispute those assertions, summary judgment with respect to this claim is proper. *See Flaherty* 713 F.2d at 13 ("[I]f the production of all relevant documents fails to add substance to the allegations and if the relevant officials submit affidavits explaining their reasons for the challenged actions, summary judgment dismissing the complaint may be granted....").

*8 As for the misbehavior report, although the filing of a false misbehavior report can constitute an adverse action, *see Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988), and while the close temporal proximity between Battice's grievance and the filing of the misbehavior report might be sufficient, standing alone, to justify an inference of causal connection, defendants have put forth uncontradicted evidence that the misbehavior report would have been filed in the absence of any alleged retaliatory motive because Battice admittedly violated prison policy by storing contraband in his cell. *See Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (holding that defendants had met their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct because "it was undisputed that [plaintiff] had in fact committed the prohibited conduct" which led to issuance of a misbehavior report); *Hynes,* 143 F.3d at 657 (holding that defendants met their burden of proof that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct").

**c. Transfer and Change in Work Assignment**

Prisoners in New York have no liberty interest in being housed at a particular facility or maintaining a particular work assignment. *See Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) ("New York law does not give a prisoner 'any statutory, regulatory or precedential right to his prison job.'"); however, they do have a right not to be subject to retaliatory job transfers intended to "punish and harass." *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

Although Battice was transferred to a unit of the same level of security, and his conditions of confinement do not appear to have been altered by the transfer, if he earned less in his new assignment this would constitute an adverse action. *See* *Walker v. Pataro,* 2002 WL 664040 at *8 (S.D.N.Y. Apr. 23, 2002) (finding adverse action where, "[a]s a result of his transfer out of [one building, prisoner] lost a job that paid twenty-five cents an hour and was given a job that paid ten cents an hour"); *Van Pelt v. Finn,* 1993 WL 265297 at *4-5 (S.D.N.Y. Nov. 12, 1993) (denying summary judgment where prisoner was "transfer[red] from porter to clerk to recreational supervisor, and [suffered] ... corresponding decreases in pay"); *cf. Baker v. Zlochowon,* 741 F.Supp. 436, 439-40 (S.D.N.Y.1990) (denying summary judgment where plaintiff alleged that he was transferred to a lower-paying job after filing an Article 78 proceeding challenging prison officials' actions).

However, Battice's transfer and claimed loss of salary took place nearly five months after Battice had filed his most recent grievance against Phillip. Courts have held that "a time lapse of over four months ... standing alone, is insufficient to justify an inference of causal connection." *See, e.g., Freeman v. Goord,* 2005 WL 3333465 at *7 (S.D.N.Y. Dec. 7, 2005) (citing *Cobian v. New York City,* 2000 WL 1782744 at *18 (S.D.N.Y. Dec. 6, 2000) (collecting cases). *See also Conner v. Schnuck Mkts., Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997) ("the four month time lag between [plaintiff's] participation in protected activity and his termination by itself would not be sufficient to justify an inference of causation") (cited with approval in *Morris v. Lindau,* 196 F.3d 102, 113 (2d Cir.1999)).

**\*9** Notwithstanding this lapse of time, Battice's last administrative grievance contains other allegations that Battice claims supports an inference of retaliation; he alleges that on July 30, 2003, he observed Phillip with a list of inmates, including Battice, who were being transferred from his unit and that he then observed "that ... Phillip[ ] had a[s]econd [l]ist of [i]nmates['][n]ames that

were [b]eing [m]oved [o]ff [o]f Housing Unit F-2...." Aff. of Dennis Breslin, Ex. D at 2. These circumstances would not be sufficient to establish the requisite causal connection for a claimed retaliation occurring almost five months thereafter.

First, as the corrections officer assigned to the unit, it is logical that Phillip would have possessed a list of the names of inmates who were scheduled to be transferred from his unit. Even if, as Battice alleges, it was improper under prison regulations for Phillip to possess a list of the names of those inmates who had filed grievances against him, there is nothing in Battice's allegations regarding the lists to suggest that the two were related; Battice does not allege that Phillip was looking at the lists together, or comparing them in any manner that would suggest a connection between the names on one list and those on the other. Secondly, Battice does not allege that other inmates whose names appeared on the list of prisoners who had filed grievances were among those transferred to another housing unit; instead, Battice alleges that some inmates who had filed grievances against Phillip in the past had been subjected to other retaliatory acts, such as assaults and misbehavior reports. Finally, Phillip was allegedly seen with the two lists *after* the decision to transfer the inmates had been made; evidence that Phillip at some point possessed lists both of those inmates scheduled to be transferred and those who had filed grievances against him, even if true, at most allows only speculation that the transfer was ordered, or that Phillip had some role in securing that transfer, in retaliation for past grievances filed by Battice.

Because the Court concludes that the evidence put forth by Battice would be insufficient to allow a reasonable jury to return a verdict for Battice on this claim, there is no genuine issue for trial and summary judgment is appropriate. *See Andersen,* 477 U.S. at 249-50 (citations omitted) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not sufficiently

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

probative ... summary judgment may be granted.").

### 3. Liability of Breslin

Because Battice failed to present evidence sufficient to allow a reasonable jury to find that his constitutional rights were violated, the Court need not address Battice's claim that Breslin is liable for failing to prevent the alleged violations. In any event, Breslin would be entitled to summary judgment because Battice has failed to put forth any evidence to suggest that Breslin was personally involved in any deprivation of Battice's constitutional rights. Because there is no respondeat superior liability under § 1983, see *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003), "when a supervisor such as a prison superintendent is named as a defendant, that supervisor's involvement must be greater than 'mere linkage in the prison chain of command' to give rise to § 1983 liability." *Lipton v. County of Orange, New York,* 315 F.Supp.2d 434, 459 (S.D.N.Y.2004) (quoting *Richardson,* 347 F.3d at 435.) The Second Circuit has held that a supervisor who merely receives and forwards an inmate's complaints to other officials for resolution is not sufficiently personally involved to be held liable for alleged constitutional violations. See *Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997). See also *Rivera v. Goord,* 119 F.Supp.2d 327, 344 (S.D.N.Y.2000) (plaintiff "merely asserts that he wrote to these [supervisory] defendants complaining about the conduct of various Medical and Correctional [d]efendants and that his complaints were ignored. These allegations are insufficient to hold these Official/Supervisory [d]efendants liable under § 1983").

*10 Breslin has submitted an affidavit stating that, consistent with his general practice, he was not personally involved in investigating or responding to any grievances or letters from Battice, which he instead forwarded to the necessary officials for response or investigation. Because the evidence shows that Breslin handled his office's receipt of the complaints in an appropriate manner by forwarding them for investigation and resolution through the prison's administrative grievance system, and Battice has not

submitted any evidence to contradict Breslin's affidavit, summary judgment dismissing the claims would be proper. See *Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir.1998) (stating that after "discovery, undisputed allegations that [a] supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case").

### C. Section 1985 Claims

Although Battice's complaint also alleges that defendants' actions violated 42 U.S.C. § 1985, it does not contain any allegations of a conspiracy motivated "by some racial or perhaps otherwise class-based[ ] invidious discriminatory action," *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993), and Battice has not adduced any evidence that would support such allegations. Defendants are therefore also entitled to summary judgment on Battice's conspiracy claims under § 1985.

### III.

Defendant's motion for summary judgment dismissing plaintiff's federal claims is granted; the Court declines to exercise pendent jurisdiction over plaintiff's state law claims, which are dismissed without prejudice.

**SO ORDERED.**

E.D.N.Y.,2006.

Battice v. Phillip

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Feliberto RIVERA, Jr. Plaintiff,

v.

George E. PATAKI, Governor-Chief Officer of the New York State Department of Correctional Services, et al., Defendants.

No. 04 Civ. 1286(MBM).

Feb. 7, 2005.

Feliberto Rivera, Jr., Marcy Correctional Facility, Marcy, NY, Plaintiff pro se.

OPINION & ORDER

MUKASEY, J.

**\*1** Plaintiff Feliberto Rivera, Jr., an inmate at Marcy Correctional Facility, sues 46 individual named and 10 unnamed defendants associated with the New York Department of Correctional Services (DOCS),[FN1] alleging numerous instances of retaliation, mistreatment, and abuse, amounting to violations of his constitutional rights. He also alleges that he was denied access to the courts by various DOCS employees. Rivera sues under 42 U.S.C. §§ 1983, 1985, 1986, and 1988 (2000) for $1 million in compensatory and punitive damages. He also requests a preliminary injunction pursuant to Fed.R.Civ.P. 65 prohibiting DOCS from enforcing several of its correctional regulations. Defendants move to dismiss the complaint.[FN2] Both sides have submitted exhibits to supplement their pleadings, which allows the court to consider defendants' motion to dismiss as one for summary judgment. The court does so, and for the reasons stated below, defendants' motion is denied in part and granted in part.

FN1. Throughout this opinion, the court will attempt to use the correct spelling of defendants' names, taking guidance from court records, exhibits filed by both parties, and defendants' filings. The court has also attempted to supply the first names of defendants where they were not listed in the complaint. The defendants listed in the complaint, with name spellings corrected to the best of the court's ability, in the order of the caption, and including the caption's descriptions, are as follows: George E. Pataki, Governor-Chief Officer of the New York State Department of Correctional Services; Glenn Goord, Commissioner of the New York State Department of Correctional Services; Donald Selsky, Director of Special Housing Unit for the New York State Department of Correctional Services; Brian Malone, Inspector General of the New York State Department of Correctional Services; Christopher P. Artuz, Superintendent of Green Haven Correctional Facility; Dennis Bliden, First Deputy Superintendent of Green Haven Correctional Facility; George S. Schneider, Deputy Superintendent of Security at Green Haven Correctional Facility; Gayle Haponik, Deputy Superintendent of Administrative Services at Green Haven Correctional Facility; J. McKoy, Deputy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

Superintendent of Programs at Green Haven Correctional Facility; Frank Meeuwisse, Hearing Officer at Green Haven Correctional Facility; Correctional Lieutenants: Gwen S. Schneider; Thomas K. Quackenbush; Michael N. Nagy; T. Gotsch; Correctional Sergeants: William F. Keyser; Alexander C. Miller; Kenneth G. Hafford; Coleman S. Wilson; Ward; Thomas P. McCabe; Correctional Officers: Jerry W. Surber, Jr.; Daniel F. Martuscello; Chris M. Martuscello; Christopher W. Carlton; T. Schihl; Erns; Marc Speed; R. Graziano; Miller; W. Eaton; Tammy Haights, Investigator of the New York State Department of Correctional Services Inspector General's Office; David Miller, Superintendent of Eastern Correctional Facility; Jordan A. Ryan, Superintendent of Cayuga Correctional Facility SHU-200 Box; George B. Duncan, Superintendent at Great Meadow Correctional Facility; William E. Phillips, Deputy Superintendent of Security at Great Meadow Correctional Facility; Dr. Albert Paolano, Medical Director at Great Meadow Correctional Facility; Ted Nesmith, Physician Assistant at Great Meadow Correctional Facility; Harris, Nurse at Great Meadow Correctional Facility; Harold McKinney, Superintendent of Mt. McGregor Correctional Facility; Edward J. McSweeney, Assistant Commissioner/Executive Assistant of the New York State Department of Correctional Services; Gwen Duncan, Inmate Grievance Program Supervisor at Mt. McGregor Correctional Facility; Peter Berezny, Inmate Grievance Program Coordinator for the New York State Department of Correctional Services; Richard Roy, Assistant Commissioner of the New York State Department of Correctional Facilities; Lucien Leclaire, Jr., Deputy Commissioner of the New York State Department of Correctional Facilities; Kenny Marks, Nurse at Great Meadow Correctional Facility; John W. Burge, Auburn Correctional Facility Superintendent; and John/Jane Doe 1-10, in their personal and individual capacity.

FN2. Defendants note that according to their records, defendants Artuz, McCabe, C. Martuscello, and Burge have not requested representation by the State in regard to this action. (Def. Mem. at 2 n.1) However, according to 42 U.S.C. § 1997(e)(c)(1), the court may dismiss an action concerning prison conditions brought pursuant to federal law upon motion of any party. Therefore, the State moves to file its papers on behalf of all named defendants, and that motion is granted.

I.

This is the second time this court has considered Rivera's allegations against DOCS officials. Rivera sued 35 named and seven unnamed DOCS defendants in May 2001 alleging many of the same claims involved in this case. I dismissed that action without prejudice because Rivera had failed to exhaust administrative remedies for several of his claims; I advised Rivera that he could file a new complaint containing only exhausted claims. *See Rivera v. Pataki,* No. 01 Civ. 5179, 2003 U.S. Dist. LEXIS 11266, at *31 (S.D.N.Y. June 25, 2003). Rivera then initiated this action, in which he reasserts his previous allegations of retaliation, assault, and mistreatment, and also claims that DOCS officials prevented him from exhausting his unexhausted claims from the previous lawsuit.

Many of Rivera's allegations are set forth in the court's previous opinion, *see Rivera,* 2003 U.S. Dist. LEXIS 11266, at *3-*7. I have repeated them here when necessary to provide context for my decision. Rivera's complaint was received by the Pro Se Office on December 10, 2003, and filed in the Clerk's Office on February 17, 2004. The claims rest on alleged events at Green Haven Correctional Facility from November 1999 through January 2000, at Eastern, Cayuga and Auburn Correctional Facilities in January and February 2000, at Great Meadow Correctional Facility in April and May 2001, and at Mt. McGregor Correctional Facility from

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

July through October 2003.

A. Green Haven Claims

In March 1999, Rivera filed a lawsuit in this District against 38 DOCS officials alleging mistreatment in connection with a dental procedure he underwent at Green Haven in 1997. That lawsuit was eventually dismissed when Judge Chin granted the defendants' motion for summary judgment. *See Rivera v. Goord, 253 F.Supp.2d 735 (S.D.N.Y.2003); see also Rivera v. Goord, 119 F.Supp.2d 327 (S.D.N.Y.2000)* (granting defendants' motion to dismiss Rivera's claims in part and denying it in part). In the instant lawsuit, Rivera claims that various officials within DOCS and at Green Haven retaliated against him for filing that lawsuit.

**\*2** Specifically, Rivera alleges that in November 1999, he was prevented from mailing legal documents by several Green Haven employees, among them defendants Sergeant William Keyser (Compl.¶ 13), and Officer Thomas P. McCabe (*Id.* ¶ 14). When Rivera complained about these incidents to Lieutenant Thomas Quackenbush, also a defendant in this case, Quackenbush "refused to act." (*Id .* ¶ 14) Plaintiff alleges that he wrote to complain about these incidents also to defendants DOCS Commissioner Glenn Goord, Green Haven Superintendent Christopher Artuz, Green Haven Deputy Superintendent Dennis Bliden, and Tammy Haights, an employee at the DOCS Inspector General's Office. Plaintiff alleges that Haights visited him at Green Haven in response to his complaints, but that she and defendant Inspector General Brian Malone ultimately "refused to take action and assisted in the conspiracy to cover up the wrong doings." (*Id.* ¶ 15)

Rivera alleges also that officials at Green Haven refused to provide him with a package containing $383.00 worth of clothing, towels, and bedding that he ordered from an outside vendor. Defendant Artuz allegedly refused

to provide plaintiff with a tracking slip for the package, and "instead acted in a retaliatory conspiracy to cover up plaintiff['s] stolen property." (*Id.* ¶ 16)

Plaintiff next claims that on November 15, 1999, defendants Artuz, George Schneider, Haponik, McKoy, Gwen Schneider, Martuscello,[FN3] Malone, Haights, and John and Jane Does acting together filed two falsified misbehavior reports against him, and then "deliberately ordered plaintiff into a life-threatening situation, in retaliation, to cause him harm." (*Id.* ¶ 17) It is unclear from plaintiff's complaint exactly what this "life-threatening situation" was, but it appears that during a facility lockdown, Rivera was ordered to clean an area where inmates were throwing objects from their cells. Rivera refused, and was cited for refusing a direct order. *See* Pl. Resp. Ex. Q.[FN4] Rivera was called for his hearing on the misbehavior reports 18 days after they were issued. When Rivera objected to the late date of his hearing, which was supposed to occur within seven days of the issuance of the misbehavior report, defendant Michael Nagy, the hearing officer, informed Rivera that defendant Donald Selsky had granted a "blanket extension" of the hearing date, and then found him guilty of the charged offense. Rivera had not been notified of this extension, and claims that because Nagy was one of the defendants in his prior lawsuit against Green Haven officials, Nagy was "using the disciplinary system as a source of retaliation against plaintiff." Rivera complained about Nagy's actions to defendants Artuz, Goord, Bliden, and Haights to no avail; he alleges that they "instead assisted in the retaliatory conspiracy to violate plaintiff's rights." (*Id.* ¶¶ 18-20)

FN3. Plaintiff is suing two defendants with the last name Martuscello. In describing this incident, plaintiff does not specify whether he is accusing Daniel or Chris Martuscello.

FN4. Rivera has submitted two sets of exhibits in

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

this case: The first was attached to his Complaint, filed on February 17, 2004, and the second was attached to his Response, filed on September 22, 2004. Where the Complaint exhibits are cited, the court will refer to "Pl.Ex. [letter]." Where the Response exhibits are cited, the court will refer to "Pl. Resp. Ex. [letter]."

Plaintiff's complaint also details an episode on November 16, 1999, in which his cell was ransacked, his property destroyed, and he was physically assaulted. Plaintiff claims that defendant Correction Officer Jerry Surber, Jr., when standing in front of Rivera's cell, told several other officers, "He's an ass hole, ransack his cell!" (*Id.* ¶ 21) At that point, Surber ran a hand-scanner over plaintiff's body, and ordered him strip searched in front of defendants Carlton, Martuscello,[FN5] and Hafford, as well as three other prisoners. During this time, defendants Miller,[FN6] Wilson, and Schihl "ransacked" plaintiff's cell, and when plaintiff complained to defendant Hafford, Hafford allegedly ordered Surber and Carlton to handcuff Rivera and lock him in the shower. (*Id.*) Rivera claims that while in the shower, he was "smacked, hit in both the lower and upper parts of his body while still handcuffed, and denied medical treatment." (*Id.*) When Rivera was taken back to his cell, it was "turned up side down,"-he claims that his legal documents were "thrown everywhere," his "priceless family photographs" were destroyed, and "body oil and cooking oil was thrown over all of [his] belongings." (*Id.*) Defendants Surber, Martuscello, Carlton, Miller, and Wilson then allegedly asked plaintiff, "How do you like what we did to your cell?" When he told them that he would inform the judge in his pending civil case of their conduct, defendant Surber made several profane comments about plaintiff's judge, and told him, "I don't care who you are suing; we can still do as we please." (*Id.*)

When describing this incident in his complaint, Plaintiff does not specify which Martuscello defendant was involved. See *supra,* note 3. However, later in his complaint, plaintiff

indicates that Daniel Martuscello was the individual involved. *See* Compl. ¶ 28(a) n.*.

FN6. Plaintiff is suing three defendants with the last name "Miller ." The first is David Miller, Superintendent of Eastern Correctional Facility. The second is Green Haven Correctional Sergeant Alexander C. Miller. The third is Green Haven Correctional Officer "Miller," with no first name specified. Plaintiff does not specify which "Miller" was involved in this incident.

**\*3** Rivera claims that in the aftermath of the November 16 incident, defendants Surber, Carlton, Schihl, Hafford, Miller, Martuscello, and Wilson wrote a falsified inmate misbehavior report against him which made no reference to the assault that had occurred, but accused him of possession of contraband. (*Id.* ¶ 22; *see also* Rivera Ex. B) Defendant Frank Meeuwisse, the hearing officer who considered the misbehavior report, found plaintiff not guilty of possession of contraband, but did cite him for possession of extra bedding, which had been found during the officers' search of his cell. *See* Rivera Ex. B. According to Rivera, at this hearing, Meeuwisse informed Rivera that the officers who had searched his cell had illegally taken and destroyed other of his possessions, and warned him to stop complaining about his treatment because "defendants Pataki, Goord, Selsky, Artuz, Malone, Bliden, G. Schneider, Haponik, McCoy, Quackenbush, Nagy, and Gotsch are acting together to harass him" in retaliation for his previous lawsuit against Green Haven officials. (*Id.* ¶ 22) Rivera alleges that, as part of the same retaliatory conspiracy, defendant Haponik falsified Rivera's facility claim for the destroyed property, incorrectly stating that the only items taken from Rivera's cell were a broken hot pot and a list of names of DOCS employees. (*Id.* ¶ 23)

Plaintiff claims as well that twice in December, 1999, he was forced to endure extreme cold during strip searches

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

in unheated hallways. Defendants Miller, [FN7] Erns, and Ward allegedly were involved in these incidents. (*Id.* at ¶¶ 24-25)

> FN7. Plaintiff does not specify which "Miller" was involved in these incidents. *See supra* note 6.

Finally, Rivera describes events leading up to his transfer from Green Haven at 11 p.m. on the night of January 5, 2000, as set forth below.

On January 1, 2000, Correction Officer R. Graziano issued Rivera an Inmate Misbehavior Report, because Rivera had refused a direct order to report to his assigned work program, and the Officer deemed Rivera to be taking part in an inmate work stoppage planned for that day. (Rivera Ex. D) Rivera claims that this report was "part of the retaliatory conspiracy" against him, and points out that the report later "disappeared," and he was never called for a hearing regarding the allegations it contained. (Compl.¶ 26) That day, when defendant Miller [FN8] was escorting Rivera to collect his medication, Miller allegedly harassed Rivera about filing complaints, and said to him, "I don't care about the constitution, nor any inmate rights, because you all have no rights!" (*Id.* ¶ 27)

> FN8. Plaintiff does not specify which "Miller" was involved in this incident. *See supra* note 6.

Then, on the morning of January 4, 2000, Rivera claims that he was assaulted by defendants Chris Martuscello, Eaton, Erns, and Speed during a strip frisk. Rivera claims that he was ordered to strip to his undershorts and place his hands on the wall. Martuscello then allegedly ordered Eaton to "commence the sexual

assault." Eaton "slammed [Rivera] violently against the wall," and then "began fondling plaintiff's genitalia from behind, by way, of in between his legs." (*Id.* ¶ 28(b)) Eaton and Martuscello [FN9] then allegedly grabbed plaintiff's legs and twisted them, causing plaintiff "severe pain." (*Id.*)

> FN9. After referring to C. Martuscello in describing the sexual assault, plaintiff then twice names D. Martuscello as involved in the physical assault. The court is unsure whether this is a typographical error (of which there are many in plaintiff's complaint), or whether plaintiff is alleging that both Martuscello defendants were involved in the assault.

**\*4** Rivera claims that he immediately reported the assault to "the first sergeant he saw," who ordered plaintiff to the clinic, where he was examined and photographed. Plaintiff alleges that on his way to the clinic, he was threatened and mocked by Correction Officer Conforti, who told Rivera, "Crybaby, you're lucky we haven't really kicked your ass yet!" (*Id.* at 28(c))

Later on the day of the alleged assault, Correction Officer Eaton filed an Inmate Misbehavior Report against Rivera for "Lying," which stated that, contrary to Rivera's assertions, he had not used any force during the morning strip search. (Rivera Ex. E) Rivera alleges that this Report was filed to cover up the assault that had occurred. (Compl.¶ 28(d)) The Report later "disappeared," [FN10] and Rivera was never called to a hearing concerning the allegation that he had lied about the assault. (*Id.*)

> FN10. Indeed, Rivera appears to be the only party in possession of a copy of the Misbehavior Report. Lieutenant T. Gotsch, in a January 24, 2000 letter responding to plaintiff's complaint

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

about the January 4 assault, mentions that he was unable locate the Misbehavior Report or any other evidence that an assault had occurred. (Rivera Ex. F)

The following day, January 5, 2000, Officer Eaton filed another Inmate Misbehavior Report against Rivera which was identical (in words and punctuation) to the January 1 Report accusing Rivera of participating in a planned inmate work stoppage. (Rivera Ex. G; Compl. ¶ 29(b))

Later on January 5, Officer Eaton informed Rivera that he was being transferred out of Green Haven Correctional Facility due to his complaints about the January 4 assault. (Compl.¶ 29(a)) Rivera was transferred to Eastern Correctional Facility Special Housing Unit at 11 p.m. that evening "with only the clothes on his back." (*Id.* ¶ 30)

Rivera later appealed his transfer from Green Haven, claiming that he had been improperly transferred for retaliatory reasons. DOCS Assistant Commissioner Richard Roy informed plaintiff that he had been removed from Green Haven not "due to disciplinary reasons, but due to separation issues." (Rivera Resp. Ex. J-2) In a May 8, 2001 letter to Rivera, Deputy DOCS Commissioner Lucien Leclaire further explained that all Green Haven inmates involved in the January 2000 work stoppage had been transferred from the facility; Leclaire acknowledged that Rivera had been found not guilty after his transfer of involvement in the work stoppage,[FN11] and advised him to discuss further transfer options with his assigned counselor. (Rivera Ex. J-2)

FN11. At his administrative hearing on January 18, 2000, Rivera was found not guilty of work stoppage charges because he was under medical

restrictions at the time, and had not been "fully cleared to return to work." (Rivera Ex. G)

B. Eastern, Cayuga, and Auburn Claims

Rivera spent two nights at Eastern Correctional Facility and was transferred to Cayuga Correctional Facility on January 7, 2000. Plaintiff was at Cayuga until February 9, 2000, when he was transferred to Auburn Correctional Facility, where he remained until April 30, 2001.

Rivera claims that throughout his time at Eastern and Cayuga he was denied medical treatment, and unable to eat or sleep because of the pain he was suffering. According to Rivera, he was denied his prescribed medication and his dental mouth guard, and Green Haven officials had failed to send these items when he was transferred. (Compl.¶ 29(a)) Plaintiff also alleges that defendants Pataki, Goord, Selsky, Malone, Artuz, Bliden, George Schneider, Haponik, McKoy, Gwen Schneider, and Gotsch together "stole, destroyed, and/or deliberately lost" plaintiff's 13 bags of personal property "in the course of retaliating against plaintiff [due] to his pending civil action." (*Id.* ¶ 30) Rivera claims that these defendants falsified an inmate property I-64 form, misrepresenting the amount of property he had and failing to send most of it to Cayuga after Rivera's late-night transfer from Green Haven. (*Id.*)

**\*5** Rivera also claims that defendants Pataki, Goord, Selsky, Malone, Artuz, Bliden, McKoy, George Schneider, Gotsch, Ryan, Burge, and Gwen Schneider improperly "red tagged" his institutional records upon his arrival at Auburn, ordering that he be generally separated from all inmates. As a result of his "red-tagging," plaintiff was denied jobs, visits with his young son, and the opportunity to transfer out of a disciplinary facility and to a facility closer to home. (*Id.* ¶ 31)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

C. Great Meadow Claims

Rivera was transferred from Auburn Correctional Facility to Great Meadow Correctional Facility on April 25, 2001. (*Id.* ¶ 32(a)) Upon his arrival at Great Meadow on April 30, 2001, Rivera was taken to the facility clinic, where defendant Nesmith, a Physician's Assistant at Great Meadow, inquired about the medication Rivera was taking. Rivera informed Nesmith that Prozac, Imitrex, Neurontin, and Motrin, and a daily mouth guard had been prescribed for him to treat his migraine headaches and chronic jaw condition (Temporomandibular Joint Disease, or TMJ). Nesmith took away all of Rivera's medication except the Neurontin, and told Rivera that the clinic would give him his other medication at a later date. (*Id.*)

For the next three weeks, until approximately late May, 2001, Rivera was denied his prescribed medications. He alleges that during this time, he suffered severe pain and migraine headaches, and was unable to eat or sleep because of the pain in his mouth. During this period, Rivera visited the Great Meadow clinic at least seven times complaining of extreme pain, and once was admitted to the hospital ward overnight. (*Id.* ¶ 32)

After filing an initial complaint on May 2, 2001, plaintiff was informed that he could not receive his other medications until Dr. Albert Paolano, the Great Meadow physician, had approved them. (*Id .* ¶¶ 32(d)-(e)) Despite repeated visits to the clinic and complaints of severe pain, defendants Nesmith and William Phillips, Deputy Superintendent of Security at Great Meadow, allegedly refused to take action to alleviate Rivera's condition. (*Id.* ¶¶ 32(i)-(j))

On May 13, 2001, Rivera reported to emergency sick call and was admitted to the facility hospital overnight by the nurse on duty and given Tylenol. The following

morning, Dr. Paolano saw Rivera in the facility hospital, and ordered him back to his cell without medication, telling him: "You don't suffer from a severe condition of TMJ or headaches! You do not belong up here! I do not care about the course of treatment prescribed to you by all the specialists and I am not going to give you back your prescribed medications, which the specialists, have found to work for you! In fact, I am discharging you from the hospital right now!" (*Id.* ¶ 34)

Plaintiff returned to his cell and continued to endure severe pain.[FN12] On May 18, 2001, the correctional officers on Rivera's block noticed that he was in severe pain and contacted the clinic, but defendant Harris, a Nurse at the Great Meadow clinic, told the officers that Dr. Paolano had instructed her that he was the only person allowed to treat Rivera, and that Rivera would have to wait until the following week. (*Id.* ¶ 35) Rivera's condition continued to deteriorate, and the sergeant on duty saw then called the clinic himself, demanding that Nurse Harris treat Rivera. Upon Rivera's arrival at the clinic, however, Harris refused to treat him, stating, "I can not do anything for you. Don't you understand Dr. Paolano is my boss, and he clearly stated you aren't to be seen by anyone but him sometime next week." (*Id.*)

FN12. Plaintiff notes in passing that defendant Kenny Marks, one of the nurses at Great Meadow, promised to "take care of" getting Rivera his prescribed medications, but failed to do so. (Compl.¶ 35)

**\*6** Plaintiff's allegations concerning his treatment at Great Meadow conclude after the events of May 18, 2001; Rivera apparently did receive treatment for his condition sometime shortly after that date.

D. Mt. McGregor Claims

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

At some point before June 2003, Rivera was transferred from Great Meadow Correctional Facility to Mt. McGregor Correctional Facility. In early July 2003, Rivera received this court's opinion dismissing all of his claims without prejudice because he had failed to exhaust his administrative remedies as to the Green Haven allegations. I informed Rivera that he was free to file another complaint containing only exhausted claims, and that even though the statute of limitations had expired for his Green Haven, Eastern, and Auburn claims, New York CPLR § 205(a) provided a grace period of six months from the date of decision during which he would be permitted to file and serve a complaint containing his otherwise time-barred claims. *Rivera,* 2003 U.S. Dist. LEXIS 11266, at *31-32.

On or about July 5, 2003, after receiving the court's opinion, Rivera alleges that he filed 15 grievances at Mt. McGregor Correctional Facility in order to exhaust his unexhausted claims. (Compl.¶ 36(b)) On approximately July 7, 2003, Defendant Gwen Duncan, the Inmate Grievance Program (IGP) Supervisor at Mt. McGregor, refused to accept these grievances because they were untimely. FN13 (*Id.; see also* Plaintiff's Response Memorandum at 2; FN14 Rivera Ex. M-A) Duncan asked Rivera to present mitigating circumstances to justify the late submission of these grievances. FN15 Rivera explained that this court had referred him to the IGP, directed him to exhaust his administrative remedies, and said that "referral to the IGP by the courts" was one of the stated examples for mitigating circumstances in DOCS regulations. *See* Rivera Ex. M-A; 7 N.Y.C.R.R. § 701.7(a)(1). FN16 Although there is no administrative record of her decision, according to Rivera, Duncan later denied Rivera's request to file untimely grievances. (Compl.¶ 36(b); Rivera Ex. M-A)

FN13. This was the second time Rivera had attempted to file untimely grievances after being directed to do so by a court. On May 20, 2003, Duncan denied Rivera's request to submit

grievances stemming from his treatment at Green Haven in 1997 and 1999-claims that were part of plaintiff's previous federal lawsuit against 38 Green Haven officials-because those claims were untimely. *See* Eagen Affidavit, Def. Ex. E, at 5. Judge Chin had dismissed these unexhausted claims "on the condition that defendants provide Rivera with an opportunity to exhaust his administrative remedies in light of the Supreme Court's decision in *Porter v. Nussle,* 534 U.S. 516 (2002) [which mandated administrative exhaustion in all inmate § 1983 suits]." *Rivera,* 253 F.Supp. at 749. Duncan acknowledged that the Court had directed Rivera to exhaust his administrative remedies, but explained that Rivera had waited too long to file his grievances, because the *Porter* decision had been released "over one year ago," and Rivera had provided no explanation for his failure to file the grievances closer to the date of the *Porter* decision. Because *Porter* was no longer new law, it failed to qualify as a "mitigating circumstance" justifying the late filing of grievances concerning retaliation. *See* Eagen Aff., Def. Ex. E, at 5. Judge Chin's dismissal of Rivera's unexhausted claims was conditioned on Rivera having the opportunity to exhaust those claims. Therefore, Duncan's refusal to allow Rivera to file his 1997 and 1999 Green Haven grievances ostensibly gave Rivera the right to refile a federal action based upon those claims. So far as the court knows, Rivera did not do so.

FN14. The court may consider the factual allegations in plaintiff's Response to supplement those in his complaint because of the liberal standard afforded to the pleadings of *pro se* litigants. *See Verley v. Goord,* No. 02 Civ. 1182, 2004 U.S. Dist. LEXIS 857, at *15-*17 (S.D.N.Y. Jan. 22, 2004) (collecting cases from the District applying this rule).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

FN15. DOCS regulations require that an inmate grievance must be submitted within 14 days of the alleged occurrence unless the inmate can provide mitigating circumstances to excuse the delay. 7 N.Y.C.R.R. 701.7(a)(1).

FN16. In April 2004, DOCS amended its grievance mechanisms, and eliminated "referral from the courts ..." as an example of mitigating circumstances justifying an untimely grievance. *See* Eagen Aff., Def. Ex. A.

On July 23, 2003, Rivera filed an administrative appeal of Duncan's decision with Mt. McGregor Superintendent Harold McKinney. (Compl.¶ 36(c); *see also* Rivera Ex. M-A) When he did not receive a timely response from McKinney, on August 6, 2003, Rivera directed his complaint to DOCS Commissioner Goord. Defendant McKinney responded on August 19, 2003 that he had completed an investigation of the matter, and that IGP Supervisor Duncan had acted appropriately. (Pl. Resp. at 3; Eagen Aff., Def. Ex. D, at 11) Commissioner Goord responded to plaintiff on August 26, 2003, through Assistant Commissioner Edward McSweeney, that the proper procedure to appeal IGP Supervisor Duncan's decision was by filing a grievance, not by writing letters to DOCS officials. (Pl. Resp. at 3; Eagen Aff., Def. Ex. D, at 10) FN17

FN17. Before he was aware that the only way to protest Duncan's decision was through the grievance process, Rivera also filed complaints with Inmate Grievance Program Regional Coordinator Peter Berezny and Governor George Pataki. Both individuals subsequently informed him that the inmate grievance process was the appropriate forum for his complaints. *See* Pl. Resp. at 4; Pl. Resp. Ex. D (containing this correspondence).

Following the directions in McSweeney's letter, Rivera then filed a grievance on September 3, 2003, complaining that he was being denied access to the courts and that IGP Supervisor Duncan had violated DOCS regulations. (Eagen Aff., Def. Ex. E, at 3) On September 9, 2003, the Inmate Grievance Resolution Committee (IGRC) found that DOCS regulations were being followed, and on September 11, 2003, Superintendent McKinney affirmed the ICRC decision. (*Id.* at 9, 2) On October 23, 2003, the IGP Central Office Review Committee (CORC) upheld the Superintendent's decision and held that IGP Supervisor Duncan's decision was in compliance with DOCS regulations.FN18 (*Id.* at 1) On December 10, 2003, Rivera filed the instant action, reasserting his claims from his previous lawsuit before this court, and also claiming that DOCS had improperly denied him the opportunity to exhaust his administrative remedies.

FN18. To justify its decision, the CORC quoted Duncan's May 20, 2003 letter to Rivera explaining why she was preventing him from filing his untimely grievances related to his suit before Judge Chin. (Eagen Aff., Def. Ex. E, at 1) The record contains no documentary evidence of Duncan's denial of Rivera's claims in the action pending before this court. The CORC's citation of Duncan's letter was perhaps relevant because the reasoning behind Duncan's refusal to permit Rivera to file his untimely grievances in both cases was ostensibly the same: The *Porter* decision, now more than a year old, was no longer a sufficient justification for late filing of claims. No DOCS official ever explained to Rivera why "referral to the IGP by the courts"-a stated mitigating circumstance for untimely grievance submission-was not deemed a sufficient mitigating circumstance to justify late filing in both cases.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

II.

**\*7** "The settled rule is that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004) (internal quotation marks omitted). When considering the claims of a *pro se* plaintiff, the court is obligated to construe the pleadings liberally in plaintiff's favor, and interpret them to raise the strongest arguments they suggest. *See, e.g., Sharpe v. Conole,* 386 F.3d 482, 484 (2d Cir.2004); *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001).

In deciding a motion to dismiss, the court may consider only the facts alleged in the complaint, and any exhibits attached to the complaint or incorporated therein by reference. *Int'l Audiotext Network, Inc. v. AT & T Co.,* 62 F.3d 69, 71-72 (2d Cir.1995). Both parties in this case have submitted evidence outside the pleadings for the court's consideration. If the court is satisfied that both parties have had a reasonable opportunity to contest any facts averred outside the pleadings, and that neither party has been taken by surprise, the court may consider facts outside the pleadings and convert a motion to dismiss to a motion for summary judgment. *Krijn v. Pogue Simone Real Estate Co.,* 896 F.2d 687, 689 (2d Cir.1990); *see also Arnold v. Goetz,* 245 F.Supp.2d 527, 540 (S.D.N.Y.2003). In papers submitted on August 17, 2004, defendants notified plaintiff that their submission of additional materials could allow the court to treat their motion to dismiss as one for summary judgment, and, accordingly, along with his Response plaintiff submitted exhibits in addition to those he had already attached to his Complaint. Because the additional materials submitted by both parties are helpful in parsing the complex facts in this case, and because both parties were on notice of the potential consequences of the submission of such materials, I will convert defendants' motion to dismiss into one for summary judgment. To prevail, defendants must prove that this case contains " 'no genuine issue as to any material fact' " and that they " 'are entitled to judgment as a matter of law.' " *Allen v. Coughlin,* 64 F.3d 77, 79 (2d

Cir.1995) (quoting Fed.R.Civ.P. 56(c)).

Defendants have not contested any of the facts in plaintiff's complaint, instead arguing their case solely on legal grounds. However, as explained below, defendants do not prevail on all of their legal claims. Defendants' converted motion for summary judgment is therefore denied in part and granted in part.

III.

A. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 states: "No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C.1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). As the Supreme Court held in *Porter v. Nussle,* 534 U.S. 516, 532 (2002), the administrative exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." The exhaustion requirement is a prerequisite to all prisoner claims, even if the remedy requested is not available in an administrative grievance proceeding. *Id.* at 524 (citing *Booth v. Churner,* 532 U.S. 731, 740-41 (2001)). This requirement exists in order "to reduce the quantity and improve the quality of prisoner suits ... [and to afford] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Id.* at 524-25.

**\*8** Exhaustion of administrative remedies is not a jurisdictional prerequisite. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). The failure to exhaust administrative remedies is an affirmative defense that may be waived, *Johnson v. Testman,* 380 F.3d 691, 695 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

Cir.2004), and is subject to estoppel, *Ziemba v.. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). Where, as here, defendants have raised the issue of administrative exhaustion as an affirmative defense and plaintiff has plausibly countered that assertion, the court must conduct a three-step inquiry, as our Circuit recently held in five cases decided on August 18, 2004. First, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (citing *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004)). Second, the court must determine whether defendants forfeited the defense of administrative exhaustion by failing to raise or preserve it, *id.* (citing *Johnson,* 380 F.3d 691), or whether defendants are estopped to raise the defense by their own actions inhibiting the inmate's exhaustion of remedies, *id.* (citing *Ziemba,* 366 F.3d at 163). Third, the court must inquire whether the prisoner has alleged "special circumstances" that justify his failure to exhaust administrative remedies. *Id.* (citing *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004)).

1. *The Grievance Process*

    In order to exhaust a claim, DOCS regulations provide that an inmate must file a grievance and appeal it through three tiers of review:

    First, the inmate files a level 1 grievance (either on an Inmate Grievance Complaint Form, or on plain paper if the form is not readily available) with the Inmate Grievance Resolution Committee ("IGRC"), which is composed of fellow inmates and prison officials.[FN19] The IGRC must convene a hearing, if necessary, within seven working days, and issue a written decision within two days of the hearing. Next, the inmate has four days to appeal the IGRC decision to the superintendent of the facility, who must respond within ten days and must provide 'simple directions' on how to appeal to the next level, the Central Office Review Committee ("CORC"). The inmate's final opportunity for resolution of his grievance is to appeal to the CORC within four working days of the superintendent's decision. The CORC then has 20 working

days to render a decision. 7 N.Y.C.R.R. 701.7(c)(4).

    FN19. The inmate has 14 days from the date of the incident complained of to file a complaint, but "mitigating circumstances" may toll the deadline. (a)(1) [note 3 in original].

    *Hemphill,* 380 F.3d at 682 (footnote omitted). Defendants concede that plaintiff has followed the above procedures and administratively exhausted his claims regarding his medical treatment at Cayuga and Great Meadow Correctional Facilities and his claim of denial of access to the courts at Mt. McGregor Correctional Facility. *See* Defendants' Memorandum in Support of Motion to Dismiss at 15-16; Eagen Aff., Def. Ex. C. Defendants allege, however, that plaintiff's case must be dismissed because he did not exhaust his claims regarding his treatment at Green Haven, Eastern, and Auburn Correctional Facilities.

2. *Green Haven, Eastern, and Auburn Claims*

    **\*9** At the time of the alleged incidents at Green Haven, Eastern, and Auburn in 1999 and 2000, inmates under this Circuit's jurisdiction were not required to administratively exhaust claims of excessive force or retaliation before filing actions in federal court.[FN20] But on February 26, 2002, as explained above, the Supreme Court overruled the Second Circuit's holding and mandated exhaustion in all cases containing claims relating to prison life, including § 1983 cases. *Porter v. Nussle,* 534 U.S. 516.

    FN20. *See Lawrence v. Goord,* 238 F.3d 182, 186 (2d Cir.2001) (holding that no exhaustion was required in cases alleging retaliation); *Nussle v. Willette,* 224 F.3d 95, 106 (2d Cir.2000) (holding that no exhaustion was required in cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

alleging excessive force and assault).

Rivera knew that the *Porter* decision might affect his own rights. Plaintiff had filed his original complaint with this court containing his Green Haven, Eastern, and Auburn claims on May 18, 2001, but he had never filed grievances based on those claims, because until the *Porter* decision, grievances were not prerequisites to § 1983 suits based upon excessive force and retaliation. On April 10, 2002, not long after the Court's decision in *Porter,* Rivera filed an inmate grievance complaint expressing his concern that *Porter* was in conflict with DOCS regulations, which provided that all grievances must be brought within 14 days unless an inmate could present mitigating circumstances. (Pl.Resp.Ex. J) Rivera was concerned that DOCS would not consider pending § 1983 suits to be mitigating circumstances, which would result in the dismissal of his (and other inmates') unexhausted claims as untimely. (*Id.*) Rivera feared that under the current rules, his suit pending before this court would be dismissed for nonexhaustion under *Porter,* and that he would be then denied the opportunity to exhaust his claims for lack of mitigating circumstances. This is in fact what occurred, both in Rivera's case before Judge Chin and in his case before me. *See supra* Part I.D & n.13.

Rivera's grievance concerning *Porter* ultimately was denied because officials at Great Meadow, where plaintiff was then housed, informed plaintiff that they lacked the authority to revise or amend DOCS regulations. (Pl.Resp.Ex. J) On March 25, 2002, DOCS did notify all Inmate Grievance Supervisors that they should "exercise [their] discretion" to allow mitigating circumstances for late grievances that were filed because of the *Porter* decision. (Eagen Aff., Def. Ex. B) This policy lasted until April 8, 2003, when DOCS informed its Grievance Supervisors that such considerations were no longer "appropriate," because *Porter* had been in effect for more than a year. (*Id.*) Rivera never got the benefit of this short-lived DOCS policy. Rivera did not try to file grievances containing the unexhausted claims until early July 2003, when he received this court's decision

informing him that he must exhaust his unexhausted claims. When Rivera did try to file grievances containing his unexhausted claims, he was informed that they were untimely, and that he had not specified sufficient mitigating circumstances to excuse his delay.

The CORC, in approving IGP Supervisor Gwen Duncan's denial of Rivera's right to file untimely grievances, explained that because Rivera had waited more than a year after the *Porter* decision to file his grievances, he could no longer rely on that decision as a mitigating circumstance. (Eagen Aff., Def. Ex. E, at 1) The CORC noted that the court had referred Rivera to the IGP, but did not explain why this was not a sufficient mitigating circumstance to justify late filing.[FN21]

FN21. Notably, in April 2004, DOCS amended its grievance mechanisms, and eliminated "referral from the courts ..." as an example of mitigating circumstances justifying an untimely grievance. *See supra* note 16; Eagen Aff., Def. Ex. A.

**\*10** Given the above facts, the court must assess whether plaintiff's case should be dismissed on nonexhaustion grounds.

a. *Availability of Remedies*

The court's first inquiry is whether administrative remedies were "in fact available" to Rivera. *Abney,* 380 F.3d at 667. Our Circuit has not fully explained exactly what it means by "available ." However, in *Abney,* the Court determined that no further remedies were available to the plaintiff where grievances were resolved in his favor, but the promised relief was never delivered, and there was no appeal mechanism for implementation failure. *Id.* at 669 ("A prisoner who has not received

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

promised relief is not required to file a new grievance where doing so may result in a never-ending cycle of exhaustion."). The *Abney* Court also noted that remedies were unavailable in cases where officials failed to respond to grievances within the time period prescribed by the regulations, and where officials prevented plaintiffs from employing their administrative remedies. *Id.; see also Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (holding that remedies are unavailable if there is no grievance mechanism, or if they are "impeded by a correctional officer.") There is an objective standard for determining the availability of remedies: The court must ask whether "a similarly situated individual of ordinary firmness" would have deemed them available. *Hemphill,* 380 F.3d at 688 (internal quotation marks omitted).

In this case, a grievance mechanism was in place, but DOCS officials prevented Rivera from using it because his claims were untimely. DOCS was not obligated to allow Rivera to file his untimely grievances: The note to 7 N.Y.C.R.R. § 701.7(a)(1) before its April 2004 amendment [FN22] stated that "[e]xceptions to [the 14-day time limit for filing grievances] *may* be approved by the IGP supervisor based on mitigating circumstances (e.g. attempts to resolve informally by the inmate, referrals back to the IGP by the courts, etc.)" (emphasis added). Remedies were available to Rivera, but the regulations governing those remedies gave IGP Supervisor Duncan the discretion to prevent him from using the grievance system to file untimely claims. DOCS officials did impede Rivera's administrative remedies, but their actions were objectively permissible under department regulations. Therefore administrative remedies were technically "available" to plaintiff.

FN22. *See supra* note 16.

b. *Estoppel*

The court must assess whether defendants are estopped to assert the affirmative defense of nonexhaustion by their own actions. In *Ziemba,* the plaintiff claimed that correction officers prevented him from exhausting his administrative remedies by "beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another prison." 366 F.3d at 162. The Court held that all affirmative defenses, including nonexhaustion, are subject to equitable estoppel, and remanded to the district court to determine whether estoppel should apply in that case. *Id.* at 163-64; *see also Hemphill,* 380 F.3d at 688-89 (same); *Taylor v. N.Y. State Dep't of Corr.,* No. 03-1929, 2004 U.S. Dist. LEXIS 25795, at *22 (S.D.N.Y. Dec. 22, 2004) (holding that estoppel applies where prison officials "inhibit an inmate's ability to utilize grievance processes," or where officials fail to "timely advance inmate's grievance or otherwise prevent him from seeking his administrative remedies.") (internal quotation marks omitted).

**\*11** In this case, defendants are estopped to assert the defense of nonexhaustion because DOCS itself prevented plaintiff from following this court's direction to exhaust his remedies. In Rivera's previous action before Judge Chin, the Court dismissed Rivera's unexhausted claims on the condition that DOCS subsequently allow Rivera to exhaust the claims. *Rivera,* 253 F.Supp.2d at 753. Judge Chin explained:

On the one hand, DOCS may rely on *Porter v. Nussle* retroactively [to require plaintiff to exhaust his claims].... On the other hand, Rivera is being held to the exhaustion requirement, even though he filed suit several years before *Porter v. Nussle.* It would be highly unfair to permit DOCS to now reject Rivera's grievances as untimely, when he was not required to exhaust when he filed suit, at the same time that DOCS can assert nonexhaustion as a defense. In other words, DOCS cannot have it both ways.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

*Id.* Similarly, when I dismissed Rivera's claims without prejudice in the first iteration of this lawsuit, I told him that he could refile a new complaint containing only exhausted claims, which could include "claims that were exhausted at the time Rivera filed his 2001 complaint, claims that he has since exhausted, and claims he exhausts between now and the filing of the new complaint." *Rivera,* 2003 U.S. Dist. LEXIS 11266, at *31.

Despite the directions of two courts in this district, despite the express provision in DOCS regulations that "referrals back to the IGP by the courts" could be a mitigating circumstance for untimely filing, and even though Rivera's lawsuits before this court and Judge Chin had both been filed before *Porter v. Nussle* was decided and before Rivera knew exhaustion was required, DOCS denied Rivera the right to file his grievances, both in this case and in his case before Judge Chin. *See supra* Part I.D & n.13. After denying Rivera the right to exhaust his claims, defendants assert nonexhaustion as their primary ground for dismissal. As Judge Chin held, defendants cannot have it both ways. Defendants' actions in denying Rivera the right to exhaust his claims estop them to assert nonexhaustion as an affirmative defense.[FN23]

FN23. There is also a possibility that Rivera did attempt to exhaust his claim relating to the alleged sexual assault at Green Haven in January, 2000, because he reported the assault to "the first sergeant he saw," Sergeant Hann (Compl.¶ 28(c)). If the Sergeant he consulted is the immediate supervisor of any of the officers allegedly involved in the assault, his report of the assault to her would have been the first step in the DOCS expedited grievance procedure for allegations of employee harassment against inmates. *See* 7 N.Y.C.R.R. § 701.11(b). The supervisor then records the grievance and gives it a calendar number, at which point the superintendent considers it. *Id. §* 701.11(b)(2)-(3). However, Rivera does not allege that he was given a grievance calendar number for this complaint, and therefore the matter was never referred to the superintendent or considered by the IGRC. Plaintiff was transferred from Green Haven the following day. If Sergeant Hann refused to instigate an expedited grievance process after Rivera's complaint of sexual assault, defendants are estopped to argue nonexhaustion on the sexual assault claim under *Ziemba,* 366 F.3d 161. However, this issue is moot because the court holds that defendants are estopped to argue nonexhaustion as to all of Rivera's claims.

c. *Special Circumstances*

The Circuit has held also that "special circumstances," such as when an inmate has "reasonably interpreted" DOCS regulations, may justify his failure to exhaust remedies. *Giano,* 380 F.3d at 675-76. In *Giano,* the petitioner believed that several defendants had presented false evidence at two of his disciplinary hearings. Giano interpreted DOCS grievance regulations to mean that his only administrative recourse to protest the hearings was to appeal his disciplinary conviction; in fact, he should have filed a formal grievance. *Id.* at 676. The *Giano* Court held that "special circumstances" justifying nonexhaustion "must be determined by looking at the circumstances which might understandably lead usually uncounseled prisoners to fail to grieve in the normally required way." *Id.* at 678. In *Giano,* the Court found that DOCS regulations on the subject of the appeal of disciplinary hearings were unclear to the extent that petitioner's reading of the regulations was "hardly unreasonable." *Id.* at 679.

*12 The same is true in this case: Rivera did the best he could to follow DOCS regulations while responding to an evolving legal framework. Rivera was aware of the effect that *Porter* might have on his claims. He contacted prison officials about his concerns, but was informed that nothing could be done on the facility level. (Pl.Resp.Ex. J) DOCS ultimately did instruct its IGP Supervisors that they

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

might consider *Porter* as a mitigating circumstance for untimely claims, (Eagen Aff., Def. Ex. E, at 1), but defendants have presented no evidence showing that either this policy change, or its cancellation a year later (*Id.* at 2), were communicated to plaintiff or any other inmate. Plaintiff certainly did not know that he would not be able to rely on *Porter* as a mitigating circumstance once the decision was no longer new law, even though it had been decided after his federal cases were filed. *See* Def. Mem. at 14; Eagen Aff., Def. Ex. E, at 1. So far as Rivera knew when he filed his federal claims, there was no use in filing his grievances, because they would be rejected as untimely: His hope was that this court would not apply *Porter* retroactively to his claims but would consider them exempt from the exhaustion requirement, or that it would direct the IGP to accept his untimely grievances.

This court dismissed Rivera's action without prejudice on June 25, 2003, applying *Porter* retroactively and requiring plaintiff to exhaust his claims. Based on the court's opinion, Rivera immediately filed 15 grievances comprising his unexhausted claims. Because Rivera knew that "referral back to the IGP from the courts" was a stated mitigating circumstance for late filing of grievances, he expected that these untimely grievances would be accepted. However, they were not, and plaintiff was prevented from exhausting any of his claims.

Defendants argue that Rivera should have filed his grievances soon after June 12, 2002, when he received defendants' brief supporting their motion to dismiss in the first action in this case, which mentioned the *Porter* holding. (Def. Mem. at 14) Indeed, plaintiff knew about *Porter* even earlier than June, 2002, as evidenced by his April, 2002, grievance about the effect the decision might have on pending § 1983 suits. (Pl.Resp.Ex. J) However, Rivera did not know that DOCS had decided to treat *Porter* as a mitigating circumstance, he did not know that this policy would last for only a year, and he did not know that the holding in *Porter* would be applied retroactively in his case until he received this court's opinion in June 2003.[FN24] Therefore, plaintiff had no way of knowing until

he received this court's opinion in July, 2003 that he could and should have filed grievances for his unexhausted claims.

FN24. *Porter* was later found retroactive by the Second Circuit, *see* Webb v. Goord, 340 F.3d 105, 112 (2d Cir.2003), although the Circuit itself has not uniformly applied this rule, *see* Rodriguez v. Westchester County Jail, 372 F.3d 485, 487 (2d Cir.2004) (holding that a prisoner was excused from exhausting his remedies when he filed his case before the Supreme Court's decision in *Porter* ).

Defendants cite Berry v. Kerik, 366 F.3d 85, 88 (2d Cir.2003), for the principle that so long as an inmate is in custody, failure to exhaust administrative remedies within the time they are available precludes a federal lawsuit. However, as our Circuit noted in Rodriguez v. Westchester County Jail, 372 F.3d 485, 487 (2d Cir.2004) (quoting Berry, 366 F.3d at 88), the *Berry* Court simply required exhaustion "in the absence of any justification" for an inmate's failure to do so. The *Rodriguez* Court held than an inmate's interpretation of § 1997(e), later determined to be erroneous in *Porter,* was a justification for his failure to exhaust. *Id.*

**\*13** Rivera did his best to preserve his claims in this case. His reasonable interpretations of DOCS regulations, applicable law, and this court's previous opinion, justify his untimely grievance filings. As his filings indicate, Rivera was much more sophisticated than an ordinary "uncounseled prisoner," Giano, 380 F.3d at 678, and still he was unable to find a way to pursue his unexhausted claims. Had Rivera known that all he had to do to preserve his claims of assault at Green Haven was to file grievances about those claims at some point in 2002, it is obvious that he would have done so. However, the evolving legal framework was so complex that Rivera was unaware that such a filing would be helpful to him. Rivera's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

interpretation of the regulations and statutes at issue was "hardly unreasonable." *Giano,* 380 F.3d at 679.

Rivera's failure to exhaust is excused both because defendants are estopped to assert that defense, and because Rivera's interpretation of the applicable regulations and laws was reasonable.

e. *Subject of the Grievances*

Neither Rivera nor defendants allege with precision which claims were contained in the 15 grievances Rivera attempted to file in July 2003. All agree that the Cayuga, Great Meadow, and Mt. McGregor claims were exhausted before Rivera commenced this action. Rivera's DOCS record indicates that he filed no grievances relating to his alleged mistreatment at Green Haven from November 1999 through January 2000, his denial of medical treatment at Eastern in January 2000, or his "red-tagging" at Auburn in 2000 and 2001. *See* Eagen Aff., Def. Ex. C. The court will assume that the 15 grievances Rivera attempted to file in July 2003 contained those claims, because they are the unexhausted claims contained in plaintiff's complaint. Defendants have not argued to the contrary in this motion, but if they can show in a subsequent filing that plaintiff is bringing in this lawsuit new claims that he did not attempt to exhaust in July 2003, those new claims will be dismissed for failure to exhaust.

3. *Total Exhaustion*

Defendants argue that even though some of plaintiff's claims have been exhausted, his entire complaint must be dismissed because a complaint containing a mixture of exhausted and unexhausted claims must be dismissed. (Defendants' Reply Memorandum, at 6-8) Indeed, this court dismissed plaintiff's previous action in this case on that basis, because his Great Meadow claims had not been exhausted at the time he had filed his complaint. *Rivera,* 2003 U.S. Dist. LEXIS 11266, at *29.

However, in the period between the court's first decision in this case and the current opinion, our Circuit decided *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004), which held that dismissal of an action containing both unexhausted and exhausted claims is not required. *Id.* at 663. Courts in this District subsequently have declined to dismiss such actions in their entirety, and have considered only the exhausted claims in complaints containing both exhausted and unexhausted claims. *See, e.g., Madison v. Mazzuca,* No. 02 Civ. 10299, 2004 U.S. Dist. LEXIS 26137, at *3-*4 (S.D.N.Y. Dec. 30, 2004); *Degrafinreid v. Ricks,* No. 03 Civ. 6645, 2004 U.S. Dist. LEXIS 24448, at *46 (S.D.N.Y. Dec. 6, 2004); *Scott v. Goord,* No. 01 Civ. 847, 2004 U.S. Dist. LEXIS 21663, at *26-*27 (S.D.N.Y. Oct. 25, 2004).

**\*14** Defendants argue that following the Second Circuit holding in *Ortiz* will encourage inmates to bring unrelated claims in single lawsuits, as they allege Rivera has done in this case, joining frivolous with nonfrivolous claims, evading multiple filing fees, and creating more work for the courts. Defendants may have a point, but they cite no case law to support their assertions. Additionally, as the *Ortiz* court noted (and as defendants acknowledge), a rule of total exhaustion would not necessarily ease the burden on district courts; rather, it likely would cause inmates to bring a greater number of lawsuits. *Ortiz,* 380 F.3d at 658; Def. Reply Mem., at 7-8.

Moreover, because the court has found plaintiff to be excused from the exhaustion requirement for all of his unexhausted claims, the total exhaustion question is moot, and the court need not decide whether that doctrine should be applied here.

B. Statute of Limitations

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

1. *Delayed Service*

Defendants move to dismiss plaintiff's Green Haven, Eastern, and Auburn claims also because they are barred by the statute of limitations. When Rivera's initial complaint was dismissed without prejudice in June, 2003, I noted that the three-year statute of limitations had run on his § 1983 claims arising from events occurring between November 1999 and January 2000. *Rivera,* 2003 U .S. Dist. LEXIS 11266, at *31 (citing *Owens v. Okure,* 488 U.S. 235, 251 (1989)). I also explained, however, that Rivera had the benefit of section 205(a) of New York's Civil Practice Law and Rules (CPLR), which gave him a six-month grace period in which to file and serve a new complaint containing claims asserted and dismissed in his previous action, provided those claims were exhausted when the new complaint was filed. *Id.* at *32. In that opinion, I quoted section 205(a), which reads:

If an action is timely commenced and is terminated in any other manner than by a voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits, the plaintiff, or, if the plaintiff dies, and the cause of action survives, his or her executor or administrator, may commence a new action upon the same transaction or occurrence or series of transactions or occurrences within six months after the termination provided that the new action would have been timely commenced at the time of commencement of the prior action and that service upon defendant is effected within such six-month period.

N.Y.C.P.L.R. § 205(a); *see also Bd. of Regents v. Tomanio,* 446 U.S. 478, 484 (1980) (holding that federal courts should borrow analogous state law statues of limitation for § 1983 actions).

Plaintiff's § 205(a) six-month grace period was to expire on January 3, 2004-six months after judgment was entered on the court's previous opinion. [FN25] Plaintiff unsuccessfully attempted to exhaust his unexhausted claims within the grace period before he filed his second complaint, but the CORC on October 23, 2003 denied plaintiff's final appeal to enforce his right to file grievances. *See supra,* Part III.A.2. On December 8, 2003, Rivera filed a new complaint with this court containing his exhausted claims, the claims he had tried to exhaust, and his new claim that he had been denied access to the courts. Plaintiff's complaint was received by the Pro Se office on December 10, 2003, and filed in the clerk's office on February 17, 2004. The first defendants in the case were served on March 18, 2004 (Dkt.Nos.5-6), and the last defendant was served on May 3, 2004 (Dkt. No. 48). Defendants argue that because plaintiff did not serve any of the defendants in this action before the § 205(a) grace period concluded, all of his 1999 and 2000 claims are now barred by the statute of limitations.

FN25. *See Yates v. Genesee County Hospice Found.,* 299 A.D.2d 900, 901, 750 N.Y.S.2d 727, 728 (4th Dep't 2002) (holding that the § 205(a) six-month grace period begins to run on the day the order dismissing plaintiff's claims is entered); Shulman Decl., Ex. A (showing entry of judgment in Rivera's earlier case on July 3, 2003).

**\*15** Because § 1983 does not provide a statute of limitations, federal courts borrow state statutes of limitation and tolling rules in § 1983 actions. *Hardin v. Straub,* 490 U.S. 536, 538-39 (1989); *see also Wilson v. Garcia,* 471 U.S. 261, 269 (1985) (federal courts are obliged to follow state law on "closely related questions of tolling and application" in § 1983 actions). However, where "the underlying cause of action is based on federal law and the absence of an express federal statute of limitations makes it necessary to borrow a limitations

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

period from another statute, the action is not barred if it has been 'commenced' in compliance with [Fed.R.Civ.P.] 3 within the borrowed period." *West v. Conrail,* 481 U.S. 35, 39 (1987); *see also LaBounty v. Coombe,* No. 95 Civ. 2617, 2004 U.S. Dist. LEXIS 6593, at \*9 (S.D.N .Y. Apr. 13, 2004).[FN26] According to Fed.R.Civ.P. 3, a civil action is commenced when a complaint is filed with the court, and a *pro se* prisoner's complaint "is deemed filed, for statute of limitations purposes, when it is delivered to prison officials." *Tapia-Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999); *see also* Shulman Decl., Ex. C (showing that Rivera delivered his complaint to officials at Mt. McGregor Correctional Facility on December 8, 2003).

> FN26. Defendants argue that the requirement in § 205(a) that service be effected within six months is a "condition" for the six-month toll to operate, not a signal that the action has been commenced. (Def. Reply Mem. at 10) However, *West* explicitly held where the underlying cause of action is based on federal law, Fed.R.Civ.P. 3 determines when service must be effected. Only when an action is solely based on diversity do state service rules apply. *West,* 481 U.S. at 39 n.4; *see also id.* at 39-40 (holding that because state law is borrowed in federal actions only to "close interstices in federal law[,] ... when it is necessary for us to borrow a statute of limitations for a federal cause of action, we borrow no more than necessary. Here, because of the availability of Rule 3, there is no lacuna as to whether the action was brought within the borrowed limitations period.") (footnotes omitted).

Rivera delivered his complaint to prison officials on December 8, 2003, almost a month before the § 205(a) tolled period was to expire. Therefore, his action is timely under Fed.R.Civ.P. 3, and is not barred by the statute of limitations.

*2. Unserved Defendants and Deceased Defendant*

According to the docket sheet in this case, the Marshals Service attempted but was unable to serve plaintiff's complaint on Green Haven supervisory defendants Dennis Bliden and George Schneider, and Correction Officers Schihl, Graziano, Hafford, and Miller (Dkt.Nos.14, 15, 32, 35, 36, 38). Additionally, according to the docket sheet, it appears that no attempt was made to serve defendants Tammy Haights and Alexander C. Miller.[FN27] Defendant and former DOCS Inspector General Brian Malone was served in this case, but is now deceased. *See* Schulman Decl. ¶ 4; Dkt. No. 8. Defendants argue that plaintiff's claims should be dismissed as to the unserved defendants, the deceased defendant, and as to John and Jane Does 1-10, who are not identified in plaintiff's papers. (Def. Mem. at 1 n.1)

> FN27. Defendants state that to their knowledge, only defendants Bliden, Schihl, and Graziano have not yet been served. (Def. Mem. at 1 n.1) The court has no documentary evidence that defendants Schneider, Hafford, Miller, Haights, and Alexander C. Miller were served. However, because plaintiff is not held responsible for the Marshals' inability to serve these defendants, the discrepancy between the court's and defendants' records is immaterial.

As to the named unserved defendants, as discussed above, *see supra* Part III.B.2, Rivera's action was commenced upon the filing of his complaint on December 8, 2003. Rivera was entitled to rely on the Marshals for service, and bears no blame that several defendants may not yet have been served. As our Circuit has held, "[T]he interests of justice, informed by a liberal interpretation of Rule 4, are best served by allowing [incarcerated litigants] to rely on the personal service, albeit untimely, ultimately effected by the Marshal's Service." *Romandette v. Weetabix Co.,* 807 F.2d 309, 311 (2d Cir.1986); *see also McCoy v. Goord,* 255 F.Supp.2d 233, 263 (S.D.N.Y.2003) (citing *Romandette,* 807 F.2d at 311);

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

*Ellis v. Guarino,* No. 03 Civ. 6562, 2004 U.S. Dist. LEXIS 16748, at *43 (S.D.N.Y. Aug. 24, 2004) (extending *pro se* inmate's time for service because he "entitled to assistance from the district court" in effecting service). Once plaintiff provided the Marshal's Service with the information required to serve his complaint, he was absolved of further responsibility for service.[FN28] The Marshal's Service is directed to effect service on whichever defendants have yet to be served, and defendants' motion to dismiss the complaint against those defendants is denied.

FN28. Numerous Circuit Courts have held that as long as the inmate provides the information necessary to identify the defendant, the Marshals' failure to effect service on behalf of the inmate constitutes good cause to extend the time for service under Fed.R.Civ.P. 4(m). *See Moore v. Ernest-Jackson,* 123 F.3d 1082, 1085-86 (8th Cir.1997); *Puett v. Blandford,* 912 F.2d 270, 276 (9th Cir.1990); *Sellers v. United States,* 902 F.2d 598, 602 (7th Cir.1990). Our Circuit noted its support for this principle in an unpublished and nonprecedential opinion. *See Ruddock v. Reno,* No. 00 Civ. 179, 104 Fed. Appx. 204, 206-07 (2d Cir.2004).

**\*16** The complaint is dismissed, however, as to John and Jane Doe defendants 1-10, because plaintiff has made no effort to identify those parties, and the Marshal's Service had no way to serve them.

As to deceased defendant Brian Malone, pursuant to Fed.R.Civ.P. 25(a)(1), "[i]f a party dies and the claim is not thereby extinguished," then a motion for substitution must be made within 90 days after "the death is suggested upon the record by service of a statement of the fact of the death ..." Defendants noted in their motion to dismiss filed on August 17, 2004 that defendant Malone was deceased. (Def. Mem. at 1, n.1) More than 90 days have elapsed

since plaintiff received defendants' motion, and no motion for substitution has been made. All of plaintiff's claims against defendant Brian Malone are dismissed.[FN29]

FN29. Plaintiff sues all defendants in their "personal and individual capacities," (Compl.¶ 10), therefore Fed.R.Civ.P. 25(d), which automatically substitutes the successor to a party holding public office as a party when the named defendant ceases to hold office, does not apply.

3. *Additional Defendants*

Plaintiff adds several new defendants to his complaint in this case, none of whom were defendants in plaintiff's previous action before this court.[FN30] The new defendants are: Correctional Officers Erns and Graziano, Auburn Correctional Facility Superintendent John W. Burge, Kenny Marks and Harris, both nurses at Great Meadow Correctional Facility, Mt. McGregor Correctional Facility Superintendent Harold McKinney, DOCS Assistant Commissioners Edward McSweeney and Richard Roy, Deputy DOCS Commissioner Lucien Leclaire, Mt. McGregor IGP Supervisor Gwen Duncan, and DOCS IGP Coordinator Peter Berezny.

FN30. Defendants erroneously claim that defendant Speed was also not named in plaintiff's previous action (Def. Mem. at 17). However, defendants' own exhibits, the docket sheet in case no. 01 Civ. 5179, and the court's opinion in that case show that Officer Speed was indeed a named defendant in the previous action. *See* Schulman Decl., Def. Ex. A; *Rivera,* 2003 U.S. Dist. LEXIS, at *1 n.1. Additionally, according to defendants, Erns and Speed were the only two new defendants as to whom the statute of limitations has expired. The Court finds that this holding applies also to new defendants Graziano, Burge, and Roy, *see supra,* and that it does not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

apply to Speed.

Plaintiff filed his complaint on December 8, 2003. All claims against new defendants that accrued after December 8, 2000 are within the three-year statute of limitations of § 1983 actions. Plaintiff's claims against the Mt. McGregor defendants concern events in 2003, and his claims against the Great Meadow defendants and against DOCS Deputy Commissioner Leclaire concern events in 2001. Therefore plaintiff's actions against Harris, McKinney, McSweeney, Gwen Duncan, Berezny, and Leclaire are not time-barred.

However, plaintiff's claims against new defendants Erns, Graziano, Burge, and Roy concern conduct before December 8, 2000, and therefore are dismissed. Defendants correctly argue that CPLR § 205(a) does not apply to defendants over whom plaintiff did not have jurisdiction in his previous case. (Def. Mem. at 17)

New York CPLR § 205(a) provides that after a plaintiff's previous action has been dismissed, he may file within six months "a new action upon the same transaction or occurrence or series of transactions or occurrences ...", but not if the prior action is terminated by a "failure to obtain personal jurisdiction over the defendant." Federal and New York State courts have interpreted § 205(a) to mean that a time-barred claim may be filed within six months of dismissal "only if the original court had personal jurisdiction over the same defendant as in the second case." *Rayo v. State of N.Y.,* 882 F.Supp. 37, 39 (N.D.N.Y.1995); *see also Parker v. Mack,* 61 N.Y.2d 114, 118-19, 472 N.Y.S.2d 882, 884 (1984) (noting the "fatal consequence" of lack of personal jurisdiction to the applicability of § 205(a), and holding that personal jurisdiction over the original defendant is required even if the defendant had actual notice of the previous action); *Cazsador by Cazsador v. Greene Cent. Sch.,* 243 A.D.2d 867, 868-69, 663 N.Y.S.2d 310, 311 (3d Dep't 1997) ("[B]ecause plaintiff never obtained jurisdiction over

[defendant] in the prior action (and in fact made no attempt to interpose a claim against that party), CPLR 205(a) has no application in this case."); *cf. George v. Mt. Sinai Hosp.,* 47 N.Y.2d 170, 180, 417 N.Y.S.2d 231, 237 (1979) (noting that § 205(a) was "created to serve in those cases in which the prior action was defective and so had to be dismissed.").

**\*17** Because defendants Erns, Graziano, Burge, and Roy were not named in plaintiff's initial action before this court, the court did not have personal jurisdiction over them. Therefore plaintiff may not receive the benefit of § 205(a) as to these defendants. The claims against them are time-barred, and are dismissed.

4. *Previously Unserved Defendants*

In his complaint in the instant lawsuit, plaintiff names six defendants who were named as defendants in his previous action before this court, but never served in that action: Inspector General Malone, Lieutenant Michael Nagy, Tammy Haights, Deputy Superintendent Phillips, and Correctional Officers Schihl and Miller. (Schulman Decl., Def. Ex. A) Defendants claim that § 205(a) does not apply to these defendants, because they were never served in the initial action. (Def. Mem. at 17)

Indeed, the New York Court of Appeals has held that § 205(a) is not applicable where service was defective in the prior action. *George,* 47 N.Y.2d at 179, 417 N.Y.S.2d at 237 (1979); *see also Mohammed v. Elassal,* 226 A.D.2d 509, 510, 640 N.Y.S.2d 608, 609 (2d Dep't 1996); *Hertz v. Schiller,* 239 A.D.2d 240, 241, 657 N.Y.S.2d 652, 653-54 (1st Dep't 1997). However, as explained above, this court must apply Fed.R.Civ.P. 3 when assessing the adequacy of service in this case, *see supra* Part III.B.2, and according to federal law, plaintiff was entitled to rely on the Marshals for service of his complaint. *Romandette,* 807 F.2d at 311 (2d Cir.1986); *cf. Meneely v. Hitachi Seiki USA,* 175 A.D.2d 111, 112-13, 571 N.Y.S.2d 809,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

810-11 (2d Dep't 1991) (applying the federal service of process rules to a CPLR § 205(a) tolling question where the underlying claim was based upon federal law). Any defect in service in plaintiff's prior action would not have been grounds for dismissal of that action, therefore any such defect is not grounds for dismissal in the instant action. Plaintiff's claims against previously unserved defendants are not dismissed.

**C. Denial of Access to the Courts**

Defendants move to dismiss plaintiff's claim that he was denied access to the courts when officials at Mt. McGregor Correctional Facility prevented him from exhausting his unexhausted claims. (Def. Mem. at 19-21)

The First and Fourteenth Amendments guarantee all prisoners " 'the fundamental constitutional right of access to the courts.' " *Lewis v. Casey,* 518 U.S. 343, 346 (1996) (quoting *Bounds v. Smith,* 430 U.S. 817, 828 (1977)); *see also Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). To state a claim for denial of access to the courts, plaintiff must allege that defendants "took or [were] responsible for actions that hindered [plaintiff's] efforts to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted). More specifically, plaintiff must allege " 'not only that the defendant[s'] alleged conduct was deliberate and malicious, but also that the defendant[s'] actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim.' " *Id.* (quoting *Cancel v.. Goord,* No. 00 Civ.2042, 2001 U.S. Dist. LEXIS 3440, at *12 (S.D.N.Y. Mar. 21, 2001)).

**\*18** Defendants have been found estopped to argue that plaintiff has not exhausted his administrative remedies, and special circumstances have been held to excuse plaintiff from having to do so. *See supra,* Part III.A.2.b-c. Plaintiff has thereby been granted access to the courts. His underlying allegations of mistreatment will be considered in a judicial forum, and he suffered no actual

injury when the Mt. McGregor defendants refused to let him file untimely grievances. Therefore, plaintiff's claims against defendants McKinney, McSweeney, Gwen Duncan, and Berezny are dismissed for failure to state a claim. Plaintiff's claims against defendants Goord and Pataki, insofar as they relate to his access to courts claim, are dismissed as well.

**D. Allegedly Frivolous Claims**

Defendants move to dismiss several of plaintiff's claims on the grounds that they are frivolous, and invalid on their face under governing law.

**1. Legal Mail**

First, defendants argue that plaintiff's claim that he was prevented from mailing legal documents to the court should be dismissed because plaintiff does not allege any actual injury. Def. Mem. at 21. Indeed, plaintiff does not specify any injury, and his lawsuit before Judge Chin did eventually progress to the summary judgment stage. *See Rivera,* 253 F.Supp.2d at 757. Therefore plaintiff's claims against defendants Keyser, McCabe, Malone,[FN31] Goord, Artuz, Bliden, and Haights based upon denial of access to the courts are dismissed.

FN31. All of plaintiff's claims against defendant Malone, including any claims relating to plaintiff's legal mailings, are dismissed also because Malone is deceased and no motion was made to substitute another defendant in his place. *See supra* Part III.B.2.

Plaintiff alleges also that defendants' actions in the legal mail incidents were committed in retaliation for plaintiff's pending federal lawsuit against 38 Green Haven employees (Compl.¶ 15). No actual injury is required in

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

order to state a First Amendment claim for retaliation. In order to state a First Amendment claim for retaliation, plaintiff must "advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001). Prisoner retaliation claims are viewed "with skepticism and particular care," because "virtually any adverse action taken against a prisoner by a prison official-even those not otherwise rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Id.* at 491.

As explained above, *see supra,* Part III.C, access to the courts is constitutionally protected. Adverse action is described as conduct "that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights ...," *Dawes,* 239 F.3d at 493, and the adverse action must be "motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (2d Cir.1999). Additionally, "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before [retaliatory] action taken against them is considered adverse." *Id.* at 398.

**\*19** Plaintiff's legal mail retaliatory claims against defendants Keyser, McCabe, Quackenbush, Malone, Goord, Artuz, Bliden, and Haights are dismissed. Defendants Quackenbush, Malone, Goord, Artuz, Bliden, and Haights never took adverse action against plaintiff; rather, they "refused" to respond to his complaints about his inability to mail his documents. (Compl.¶¶ 14-15). A retaliatory adverse action must be serious enough to deter an individual of ordinary firmness from exercising his constitutional rights, and refusal to take action in response to Rivera's complaints does not meet this standard.

Defendants Keyser and McCabe allegedly actively prevented Rivera from mailing his documents, and Rivera claims that Keyser ordered nine other correction officers to deny Rivera access to the mail. However, Rivera has not demonstrated that this conduct is sufficiently serious to constitute adverse retaliatory action. Rivera himself states that in the weeks following the legal mail incidents, he filed six separate complaints concerning this "harassment," including one such letter addressed to Judge Chin (*id.* ¶ 15), not to mention the instant lawsuit and its predecessor. The legal mail incidents thus do not appear to have deterred Rivera from using the mails, or from exercising his constitutional rights to file grievances or lawsuits. The actions allegedly taken by defendants Keyser and Malone did not constitute adverse action serious enough to deter an individual of ordinary firmness-or Rivera himself-from exercising his constitutional rights, therefore Rivera has no claim for retaliation against either of these individuals.[FN32]

FN32. Additionally, plaintiff's conspiracy claims against all defendants based on 42 U.S.C. §§ 1985 and 1986 are dismissed. Plaintiff has not alleged any conspiracy that is motivated "by some racial or perhaps otherwise class-based [ ] invidious discriminatory action," therefore his claims under those statutes are not cognizable. *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F .3d 1085, 1087 (2d Cir.1993); *Wahad v. FBI,* 813 F.Supp. 224, 231 (S.D.N.Y.1993).

All of Rivera's legal mail claims are dismissed.

**2.** *Lost, Stolen, or Destroyed Property*

Defendants move to dismiss plaintiff's claims regarding his lost, stolen or destroyed property. *See* Def. Mem. at 21; Compl. ¶¶ 16, 23, 29(a)*, 30.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

A claim for deprivation of personal property cannot lie in federal court if state courts can provide plaintiff with an adequate remedy for his loss. *Parratt v. Taylor,* 451 U.S. 527, 542-43 (1981), overruled in part on other grounds by *Daniels v. Williams,* 474 U.S. 327, 330-31 (1986); *see also Hudson v. Palmer,* 468 U.S. 517, 533 (1984) (noting that the same standard applies even where plaintiff alleges intentional destruction of property). New York provides such an alternative remedy: Inmates may pursue their property claims against the State of New York in the New York Court of Claims, as provided by § 9 of the New York Court of Claims Act. N.Y. Ct. Cl. Act. § 9 (McKinney 2004); *see also Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995). Additionally, plaintiff was not deprived of his property without due process of law, because an adequate remedy for the vindication of his constitutional rights was available to him in the New York Court of Claims. "[S]ection 1983[can]not be made a vehicle for transforming mere civil tort claims into constitutional injuries." *Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987).

**\*20** Therefore no remedy in federal court is available to Rivera as to the property claims he makes against defendants Haponik, Pataki, Goord, Selsky, Malone,[FN33] Artuz, Bliden, George Schneider, McKoy, Gwen Schneider, and Gotsch. Any retaliation claim plaintiff has against these defendants regarding his property also fails because he has not alleged that any of the defendants have committed actions "that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights...." *Dawes,* 239 F.3d at 493.

FN33. All of plaintiff's claims against defendant Malone, including any claims relating to plaintiff's personal property, are also dismissed because Malone is deceased and no motion was made to substitute another defendant in his place. *See supra* Part III.B.2.

3. *Exposure to Cold*

Defendants move to dismiss plaintiff's claims that he was exposed to extreme cold, arguing that plaintiff's alleged injuries are de minimis. *See* Def. Mem. at 21, Compl. ¶¶ 24-25.

Our Circuit has held that prolonged exposure to "bitter cold" can constitute an Eighth Amendment violation. *See Gaston v. Coughlin,* 249 F.3d 156, 164-65 (2d Cir.2001) (broken windows in inmate's cell block all winter); *Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (freezing temperatures in prisoner's cell for three months). However, Rivera's allegations are not nearly serious enough to constitute Eighth Amendment violations. He claims that he was strip frisked on two occasions in unheated areas. These allegations do not constitute prolonged exposure to cold. *See Trammell v. Keane,* 338 F.3d 155, 164-65 (2d Cir.2003) (denying prisoner's Eighth Amendment claim because the cold conditions in plaintiff's cell did not present a threat to the prisoner's "health or safety"). Restrictive and harsh conditions in prison are "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). Additionally, plaintiff has no retaliation claim against these defendants, because such brief and limited exposure to cold would not be sufficient "to deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights...." *Dawes,* 239 F.3d at 493.

Plaintiff's claims of exposure to cold against Correction Officers Miller,[FN34] Erns,[FN35] Ward, and against supervisory defendants Artuz, Goord, and Pataki therefore are dismissed.

FN34. *See supra* note 6.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

FN35. Plaintiff's claims against defendant Erns are dismissed also because they are time-barred. *See supra* Part III.B.3.

### 4. *"Disappearing" Misbehavior Reports*

Defendants move to dismiss Rivera's claims that two false misbehavior reports were filed against him and later "disappeared" "as part of the retaliatory conspiracy" against him. *See* Def. Mem. at 21-22; Compl. ¶¶ 26, 28(d). One of these reports allegedly was filed on January 1, 2000, the other on January 4, 2000. (*Compl.* ¶¶ 26, 28(d))

"An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citing *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d Cir.1988)). In order to properly support such an allegation, a plaintiff " 'bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." ' *Id.* (quoting *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)). If the plaintiff can make this showing, the burden shifts to the defendant to show that the plaintiff would have received the same punishment absent the retaliatory motivation. *Id.*

**\*21** The January 1, 2000 misbehavior report alleged that plaintiff had participated in a planned work stoppage, (Pl.Ex. D), and plaintiff claims Officer Graziano issued this report as part of the conspiracy among Green Haven employees to retaliate against him for having filed a lawsuit in this District against 38 Green Haven employees. (Compl.¶ 26) However, plaintiff's claim against defendant Graziano is time-barred, because Graziano was not a defendant in plaintiff's previous action before this court, and the six-month statute of limitations grace period provided by N.Y. C.P.L.R. § 205(a) does not apply to

defendants who were not included in the previous action. *See supra* Part III.B.3. Plaintiff's claim against Graziano is dismissed.

Defendant Correctional Officer Eaton filed the January 4, 2000 misbehavior report, which alleged that plaintiff had lied when he reported to a sergeant that Eaton had assaulted him that morning. *See* Pl.Ex. E; Compl. ¶ 28(d). Plaintiff alleges that this report was made "in order to cover-up the assault." When Rivera reported the assault to Sergeant Hann immediately after it occurred on the morning of January 4, this act constituted the first step in the expedited grievance process. *See supra* note 23. That process was not set into motion, and Rivera was transferred from Green Haven later that evening. But so far as Officer Eaton knew, Rivera had begun the process of filing an expedited grievance against him. *See* Compl. ¶ 29(a) (alleging that Eaton informed Rivera that due to his complaint to Sergeant Hann about the assault, he was being transferred out of Green Haven). The filing of an inmate grievance complaint is a constitutionally protected right, *Franco, 854 F.2d at 589-90,* and "the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation." *Gayle, 313 F.3d at 683* (citing *Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995)*). Because Eaton allegedly was involved in the assault the morning the report was filed, (Compl.¶¶ 28(a)-(b)), plaintiff has set forth sufficient facts to make out a claim that the grievance report was a retaliatory action.

Defendants argue (Def. Mem. at 22), that because the "disappearing" inmate misbehavior reports were never acted upon, they never caused Rivera any harm, and therefore would have been insufficient to "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Dawes,* 239 F.3d at 493. This inquiry is moot as to the claim against defendant Graziano for the January 1, 2000 report, which has been dismissed. As to the January 4, 2000 report, defendants' argument is unpersuasive. Our Circuit has held that the filing of a false disciplinary report is a serious enough

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

action that temporal proximity between an inmate grievance and the filing of a report is enough to state a retaliation claim. *Gayle,* 313 F.3d at 683. No proof of the deterrent effect of such a report or its consequences is required.

**\*22** Rivera has stated a retaliation claim against Officer Eaton, and the motion to dismiss that claim is denied.

E. Supervisory Defendants

1. *Supervisory Immunity*

Defendants move to dismiss plaintiff's complaint against supervisory defendants Governor George Pataki, DOCS Commissioner Glenn Goord, Disciplinary Director Donald Selsky, Inspector General Brian Malone,[FN36] Green Haven Superintendent Christopher Artuz, Green Haven Deputy Superintendents Dennis Bliden, George Schneider, Gayle Haponik, and J. McKoy, Green Haven Lieutenants Gwen Schneider and Michael Nagy, Inspector Tammy Haights, Eastern Superintendent David Miller, Cayuga Superintendent Jordan Ryan, and Auburn Superintendent John Burge.[FN37] (Def. Mem. at 22-23) Defendants claim that these defendants for the most part lacked personal involvement in any of plaintiff's alleged claims, and where personal involvement existed, it did not meet the *Dawes* standard for a retaliation claim.

FN36. All of plaintiff's claims against defendant Malone, including any claims relating to his status as a supervisory defendant, are dismissed because Malone is deceased and no motion was made to substitute another defendant in his place. *See supra* Part III.B.2.

FN37. The court has only considered dismissal as to the supervisory defendants named in defendants' memorandum to dismiss. Plaintiff's complaint lists several other supervisory defendants whom defendants apparently concede did have personal involvement in his case and are not entitled to dismissal solely on the basis of supervisory immunity, namely Lieutenant T. Gotsch, Great Meadow Superintendent George Duncan, Great Meadow Deputy Superintendent Phillips, Assistant DOCS Commissioner Richard Roy, and Deputy DOCS Commissioner Lucien Leclaire.

Damages may not be awarded under § 1983 unless plaintiff can prove the personal involvement of defendants in the alleged constitutional deprivations. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Personal involvement of a supervisory defendant may be shown by evidence that:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873. Plaintiff's claim for monetary damages against supervisory defendants therefore "requires a showing of more than the linkage in the prison chain of command; the doctrine of respondeat superior

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

does not apply." *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

In plaintiff's response, he argues that he repeatedly wrote to the above-named supervisory defendants, notifying them about the unconstitutional acts that were occurring. (Pl. Resp. at 13-15) Simply because Rivera wrote to these supervisory officials complaining of mistreatment does not justify holding them liable under § 1983. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (two letters of appeal sent to prison official followed by a referral and a brief response that a decision had been rendered were not sufficient to constitute the official's personal involvement). More proof of personal involvement is required: "[T]o allow a mere letter to an official to impose supervisory liability would permit an inmate to place liability on individuals who had no authority over the situation complained of merely by sending letters." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002); *see also id.* (collecting cases from this District holding that an official may not be held liable for ignoring an inmate's letter of complaint); *Rivera,* 119 F.Supp.2d at 344 (same).

**\*23** However, "personal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Johnson,* 234 F.Supp.2d at 363-64; *see also Ramos v. Artuz,* No. 00 Civ. 149, 2001 U.S. Dist. LEXIS 10327, at \*24-\*28 (S .D.N.Y. July 19, 2001) (finding personal involvement where supervisory official's involvement "went beyond merely the receipt of complaint letters" and where letters contained detailed information that should have been acted upon); *James v. Artuz,* No. 93 Civ.2056, 1994 U.S. Dist. LEXIS 5708, at \*25-\*26 (S.D.N.Y. May 2, 1994) (finding personal involvement where supervisory official conducted de novo review of inmate's disciplinary hearing); *cf. Colon,* 58 F.3d at 873 (noting that personal involvement might be found if the letter of complaint contained information that "reasonably should have prompted [the supervisory defendant] to investigate.").

Given these considerations, the court will evaluate the personal involvement of each supervisory defendant in turn.

Rivera wrote defendant Pataki on at least two separate occasions, once to complain about his treatment at Great Meadow (Pl. Resp. Ex. T, at 188-92), and once to complain about the denial of his right to file grievances at Mt. McGregor (Pl.Ex. M). Rivera's sister also wrote Pataki about Rivera's treatment at Great Meadow. Pl. Resp. Ex. R, at 148-50. Defendant Pataki referred both issues to subordinates, both of whom responded to Rivera. Assistant DOCS Commissioner Edward McSweeney responded to Rivera regarding his Mt. McGregor claims, (Eagen Aff., Def. Ex. D, at 10), and DOCS Chief Medical Officer Dr. Lester N. Wright responded regarding Rivera's medical claims at Great Meadow (Pl. Resp. Ex. T, at 182). Under *Sealey,* 116 F.3d at 51, Pataki's referral of these matters to DOCS employees is insufficient to constitute personal involvement. Therefore, defendant Pataki has supervisory immunity from Rivera's claims, and all claims against him are dismissed.[FN38]

FN38. In his Response, plaintiff cites several exhibits containing letters written to Pataki and other defendants in the spring and summer of 1999. (Pl. Resp. at 13-14, citing Pl. Resp. Exs. K, L, M, N, O, and P). This correspondence does not relate to any of the claims in this lawsuit and is therefore irrelevant.

Rivera wrote defendant Goord on several occasions, complaining about his treatment at Green Haven, Great Meadow, and Mt. McGregor Correctional Facilities. *See* Pl.Ex. F (Green Haven claims); Pl. Resp. Ex. T, at 183-87 (Great Meadow claims); Pl.Ex. M (Mt. McGregor claims). Rivera's sister wrote Goord regarding the Great Meadow

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

claims as well. (Pl. Resp. Ex. S, at 152-56) Goord never responded directly to any of plaintiff's claims; like Pataki, he referred them to DOCS subordinates. These subordinates responded in the letters described above from DOCS Chief Medical Officer Wright and Assistant Commissioner McSweeney. *See* Pl. Resp. Ex. T, at 182; Eagen Aff., Def. Exh. D, at 10. For the same reasons as applied to defendant Pataki, defendant Goord lacked personal involvement in Rivera's claims. All claims against Goord are dismissed.[FN39]

> FN39. The record shows also that Rivera contacted defendants Goord and Pataki in spring 2000, alleging that he had been transferred from Green Haven for retaliatory reasons. Goord and Pataki both referred this claim to defendants Richard Roy and Lucien Leclaire, Assistant and Deputy DOCS Commissioners, respectively, and Roy and Leclaire contacted Rivera in response to his claims. Pl. Exh. J-2. Following the above reasoning, these referrals are not sufficient to constitute supervisory liability for Goord or Pataki on plaintiff's retaliatory transfer claim.

Plaintiff never contacted defendant Selsky, but Selsky was tangentially involved in several of plaintiff's claims. First, Selsky denied Rivera's appeal of his November 19, 1999 disciplinary hearing before defendant Frank Meeuwisse, Pl.Ex. B, in which Meeuwisse allegedly informed Rivera of the ongoing conspiracy against him. (Compl.¶ 22) A review of an inmate's case does constitute personal involvement, *see James,* 1994 U.S. Dist. LEXIS 5708, at *25-*26. However, at the hearing before Meeuwisse, plaintiff was found guilty of possessing extra bedding; there is no reference in the record to a conspiracy against plaintiff. Pl.Ex. B. Selsky's review was ostensibly limited to the extra bedding issue, which is not being contested by plaintiff, and therefore his review did not involve any of plaintiff's claims in this lawsuit and does not constitute personal involvement. Selsky also extended the time limit for disciplinary hearings following a lockdown at Green Haven in 1999. (Pl. Resp. Ex. Q, at

140) However this extension was not specifically directed at Rivera, and brought about no deprivation of his constitutional rights. Rivera received a hearing within the time period provided by the extension. *Id.* at 135. Plaintiff's claims against Selsky related to loss of property have already been dismissed, *see supra* Part III.D.2. Plaintiff's remaining claims against Selsky for retaliatory transfer and red-tagging (Compl.¶¶ 29(a), 31), have no basis in the record and plaintiff has not alleged any specific personal involvement justifying Selsky's supervisory liability. All claims as to defendant Selsky therefore are dismissed.

**\*24** Plaintiff contacted defendant Artuz at least three times regarding his treatment at Green Haven. *See* Pl. Resp. Ex. Q, at 121-28 & 136-38; Pl.Ex. F. The record contains no evidence that Artuz ever responded to these claims. Additionally, Rivera presents no specific evidence of how Artuz was involved in the alleged retaliatory conspiracy against him. Therefore Artuz has supervisory immunity: He had no personal involvement in Rivera's case, and all claims against him are dismissed.

Plaintiff contacted defendant Bliden at least twice regarding his claims of mistreatment at Green Haven.[FN40] He protested the result of his December 2, 1999 disciplinary hearing in front of defendant Michael Nagy, and he complained of the abuse he allegedly suffered at Green Haven in November and December 1999. *See* Pl. Resp. Ex. Q; Pl.Ex. F. Bliden never responded to Rivera's allegations regarding assault and sexual abuse, destruction of property, and exposure to cold, and therefore lacked personal involvement on those claims. Additionally, plaintiff does not set forth any facts that show Bliden's personal involvement in his claim of red-tagging, (Compl.¶ 30), and his claims against Bliden relating to lost property and legal mail have already been dismissed, *see supra* Parts III.D.1-2. However, Bliden did review and respond to Rivera's appeal regarding his disciplinary hearing before defendant Michael Nagy (Pl. Resp. Ex. Q, at 143), therefore he was personally involved in Rivera's claim as to that event. All claims against defendant Bliden

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

are dismissed except those relating to his review of Rivera's December 2, 1999 disciplinary hearing.[FN41]

FN40. The record also indicates that Rivera contacted Bliden on July 5, 1999 in regards to claims unrelated to this lawsuit. This correspondence is irrelevant and will not be considered. (Pl. Resp. Ex. N, at 111)

FN41. *But see infra* Part III.E.3; the claim against Bliden regarding the December 2, 1999 hearing is dismissed on principles of qualified immunity.

There is no record that plaintiff ever contacted defendant George Schneider about any of his claims in this case,[FN42] or that Schneider ever communicated with plaintiff.[FN43] Plaintiff alleges that Schneider was involved in the retaliatory conspiracy against him at Green Haven (Compl.¶¶ 17, 29(a), 30, 31), but provides no evidence or details as to the extent or nature of Schneider's involvement. These allegations are insufficient to suggest Schneider's involvement in this case, and all claims against him are dismissed.

FN42. Lieutenant T. Gotsch did notify plaintiff that Schneider had ordered him to investigate the assault alleged in plaintiff's January 4, 2000 letter to various DOCS officials. (Pl.Ex. F) However, as explained above, such a referral is not sufficient to constitute personal involvement.

FN43. Plaintiff provides evidence that he contacted Schneider in spring 1999 regarding claims not related to this case. (Pl.Resp.Exs.K, L, M) This evidence is irrelevant and has no

bearing on any of the allegations in the complaint.

Plaintiff's property-related claims against defendant Gayle Haponik have already been dismissed. *See supra,* Part III.D.2. His remaining claim against her alleges that she was involved in the November 15, 1999 conspiracy to endanger plaintiff and then punish him for refusing to comply with a direct order. (Compl.¶ 17) Plaintiff makes no specific allegations as to how defendant Haponik was involved in this conspiracy, and the record contains no evidence that plaintiff ever contacted her in reference to his allegations against her. Because plaintiff has not set forth sufficient evidence of personal involvement, and because plaintiff's property claims have already been dismissed, all claims against defendant Haponik are dismissed.

The record contains no evidence that plaintiff contacted defendant McKoy regarding his claims in this lawsuit, and no evidence shows that McKoy had personal involvement in any of plaintiff's claims.[FN44] All claims against defendant McKoy therefore are dismissed.

FN44. The record shows that plaintiff contacted defendant McKoy on July 5, 1999 regarding claims unrelated to this lawsuit. (Pl. Resp. Ex. O, at 114-17)

**\*25** Plaintiff's claims against Correctional Lieutenant Gwen Schneider regarding her involvement the loss of his property have already been dismissed, *see supra* Part III.D.2. However, Rivera's claims relating to her involvement in his retaliatory transfer and red-tagging (Compl.¶¶ 29(a), 31), are not dismissed. The record contains evidence that Schneider signed as a witness on the allegedly false misbehavior report filed against plaintiff on January 5, 2000. (Pl.Ex. G) This report

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

accused Rivera of participating in a work stoppage, and was used to justify Rivera's transfer from Green Haven. *See* Pl.Ex. J. Rivera later was found not guilty of the charges contained in the report (Pl.Ex. G), and Rivera alleges that he was transferred out of retaliation for his complaints of assault by Green Haven employees. Because the record contains evidence that Lieutenant Gwen Schneider was directly involved in the alleged unconstitutional conduct, she does not receive supervisory immunity, and Rivera's retaliation claims against her are not dismissed.

Correctional Lieutenant Michael Nagy, who allegedly presided over plaintiff's December 2, 1999 disciplinary hearing, does not receive supervisory immunity. [FN45] Nagy's role as hearing officer constituted direct involvement in Rivera's case. Rivera claims that Nagy's disposition was influenced by his status as a defendant in Rivera's pending federal action (Compl.¶ 18). Though there may well be little merit to Rivera's claim because he pleaded guilty to the charge of which he was accused, (Pl. Resp. Ex. Q, at 153), he appears to contest both his sentence and the fact that the hearing was held late. Nagy's participation in Rivera's case is sufficient to constitute direct involvement; Nagy does not get the benefit of supervisory immunity in this case.

FN45. *But see infra* Part III.E.3; claims against Nagy regarding the December 2, 1999 hearing are dismissed on principles of qualified immunity.

Plaintiff accuses Inspector Tammy Haights of refusing to investigate and sanction those involved in the retaliatory conspiracy against him at Green Haven (Compl.¶¶ 15, 20), and of participating in that conspiracy (*Id.* ¶ 17). Plaintiff alleges that in response to one of his written complaints, Haights visited him at Green Haven at an unspecified date, at which point he informed her "of the harassment, and the assaults upon him by the other

defendants in retaliation of plaintiff seeking redress." (*Id.* ¶ 15) Plaintiff also wrote a letter to Haights describing these abuses on January 4, 2000 (Pl.Ex. F). Haights's alleged visit to Green Haven in response to plaintiff's written complaint constitutes sufficient personal involvement in his Green Haven claims to deprive her of supervisory immunity. [FN46] Plaintiff's allegation that Haights participated in the falsification of an inmate misbehavior report filed against him in November 1999, (Compl.¶ 17), however, is unsubstantiated by any evidence in the record, and is dismissed.

FN46. *But see infra* Part III.E.2. Despite Haights's personal involvement in Rivera's case, all claims against Haights are dismissed because they are frivolous in nature and unsupported by evidence of conspiracy.

Rivera's claims are dismissed as to Eastern Correctional Facility Superintendent David Miller and Cayuga Superintendent Jordan Ryan. [FN47] Rivera claims that Miller was involved in his retaliatory transfer from Green Haven to Eastern in January 2000, (Compl.¶ 29(a)), and that Ryan was involved in both Rivera's retaliatory transfer from Green Haven and Rivera's red-tagging (Compl.¶¶ 29(a), 31). However, Rivera makes no specific allegations as to how these defendants were involved in these events, and there is no record that Rivera ever notified Miller or Ryan of his complaints in this case. Rivera has not shown personal involvement in his claims against any of these defendants, and therefore Miller and Ryan have supervisory immunity.

FN47. The reasoning in this paragraph also applies to Rivera's claims against Auburn Correctional Facility Superintendent John Burge. However, Rivera's claims against Burge have already been dismissed because they are time barred. *See supra* Part III.B .3.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

2. *Baseless Allegations*

**\*26** Supervisory defendants Gotsch, Haights, and Leclaire all personally investigated plaintiff's claims upon receiving his complaints, and therefore do not get the benefit of supervisory immunity. However, plaintiff's allegations against these defendants have no rational basis. The PLRA mandates that a district court "shall dismiss" the action if the court determines it to be "frivolous or malicious." 28 U.S.C. § 1915(e)(2)(B)(i). Our Circuit has held that allegations of "wide-ranging conspiracies, clearly without foundation, to violate [plaintiff's] constitutional rights" are sufficiently frivolous to merit dismissal under § 1915. *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir.1998).

Defendant Gotsch reviewed Rivera's allegations of assault and retaliatory treatment at Green Haven. After examining Rivera's medical and disciplinary records, as well as receiving written reports from defendants Miller and Martuscello denying any harassment, Gotsch concluded that there was no evidence to support plaintiff's claim of assault. (Pl.Ex. F) Gotsch's consideration of Rivera's claims constituted personal involvement in his case, and would help provide the basis for a claim against Gotsch, were there other evidence that he acted improperly. However, plaintiff relies solely on a conclusory claim that Gotsch conspired with others, for which his only evidence is that Gotsch reviewed Rivera's file and ruled against him. That is simply not enough, absent any facts suggesting an agreement with other defendants to act in their behalf. If Rivera's bare allegations were sufficient to state a claim, he could just as easily accuse any court that ruled against him. Any retaliation claim plaintiff alleged against Gotsch is dismissed. Plaintiff also alleges that Gotsch participated in the deprivation of plaintiff's property and the red-tagging of plaintiff's records (Compl.¶¶ 30, 31). Plaintiff's property claims have already been dismissed, *see supra* Part III.D.2. Plaintiff presents no evidence that Gotsch was personally involved in the red-tagging; Gotsch has supervisory immunity as to that claim. All claims against

Gotsch therefore are dismissed.

Defendant Lucien Leclaire investigated plaintiff's retaliatory transfer claims on behalf of defendants Goord and Pataki. (Pl.Ex. J-2) Although Leclaire considered and responded to plaintiff's claims, thereby depriving him of supervisory immunity, Rivera presents no evidence that Leclaire was involved in a retaliatory conspiracy against him. Rivera's claim against Leclaire is baseless, and must be dismissed.[FN48]

> [FN48.] The reasoning in this section also applies to Rivera's claim against Assistant DOCS Commissioner Richard Roy. However, Rivera's claim against Roy has already been dismissed because it is time barred. *See supra* Part III.B.3.

The same is true for defendant Haights. Haights allegedly ignored Rivera's oral and written reports of abuse and assault in retaliation for Rivera's previous lawsuits against Green Haven officials (Compl.¶¶ 15, 20). Haights' personal involvement in Rivera's case denies her the benefit of supervisory immunity, but Rivera's retaliation claims against her are dismissed nonetheless, because he has failed to support his claims with any evidence.

**\*27** It should be noted that Rivera's retaliatory conspiracy claims against many of the supervisory defendants in this case could be dismissed on the grounds that they are frivolous and malicious; simply because the court has dismissed Rivera's case against most of the supervisory defendants on immunity grounds does not mean that his claims against them would have had merit had the defendants not been immune.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

3. *Qualified Immunity*

All claims against supervisory defendants have been dismissed except those against Correctional Lieutenants Gwen Schneider and Michael Nagy; Green Haven Deputy Superintendent Dennis Bliden (regarding the disciplinary hearing he reviewed); Great Meadow Superintendent George Duncan; and Great Meadow Deputy Superintendent William E. Phillips. Defendants argue that these defendants are entitled to qualified immunity from suit because their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

In evaluating a motion based on qualified immunity, the court must perform a two-part test:

We ask first whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation. If they do not, the plaintiff may not recover because he has suffered no wrong cognizable under § 1983. If the facts do establish a constitutional violation, however, we proceed to the second inquiry, asking 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' If a reasonable officer could have believed that the challenged conduct was lawful at the time of the violation, then qualified immunity bars the claim.

*Sira v. Morton,* 380 F.3d 57, 68-69 (2d Cir.2004) (quoting *Saucier v. Katz,* 533 U.S. 194, 202 (2001)) (citations omitted).

Plaintiff alleges that defendant Gwen Schneider was part of the retaliatory conspiracy to red-tag him and transfer him from Green Haven the day of the alleged assault against him. (Compl.¶¶ 29(a), 31) Schneider signed as a witness to the allegedly false January 5, 2000 misbehavior report that was the justification for Rivera's transfer from Green Haven. (Pl.Ex. G) "A prisoner has no liberty interest in remaining at a particular correctional facility, but prison officials may not transfer an inmate in retaliation for the exercise of constitutionally protected rights...." *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) (citations omitted). The right to file a grievance is constitutionally protected, *see Gayle,* 313 F.3d at 682, as is the right of access to the courts, *see Lewis,* 518 U.S. at 346. Rivera appears to allege that Schneider was acting in retaliation both for Rivera's previous lawsuit against her, and for Rivera's report of the January 4, 2000 assault to a supervisor, which should have initiated an expedited grievance process. Therefore he implicates Schneider in two potential constitutional violations, satisfying the first prong of the qualified immunity test. As to the second prong, any reasonable officer should have been aware that falsifying an inmate disciplinary report was illegal and improper. Schneider does not receive the benefit of qualified immunity.

**\*28** Defendants Nagy and Bliden were involved in plaintiff's December 2, 1999 disciplinary hearing, in which Rivera pleaded guilty to refusing a direct order and was sentenced to 30 days of penalties. Pl. Resp. Ex. Q, at 141-43. Rivera alleges that Nagy improperly delayed his hearing, that Bliden erred in affirming Nagy's decision, and that both defendants were acting in retaliation for Rivera's lawsuit against 38 Green Haven officials-a lawsuit in which both Nagy and Bliden were defendants.[FN49] (Compl.¶¶ 18-19) Nagy's and Bliden's alleged retaliatory actions in response to Rivera's lawsuit may have been unconstitutional, however reasonable officers would not have considered their conduct inappropriate. Rivera's hearing date was delayed pursuant to a general mandate by defendant Selsky, *see* Pl. Resp. Ex. Q, at 140; therefore, Nagy did not exercise any personal discretion in permitting the delay. Rivera pleaded guilty to the charged offense. Nagy's only discretionary authority related to Rivera's penalty, and Rivera does not allege any retaliation in that regard. Defendant Nagy acted in an objectively reasonable manner in presiding over Rivera's hearing, as did defendant Bliden in reviewing

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

Nagy's decision. Both Nagy and Bliden are entitled to qualified immunity, and all of plaintiff's claims against them are dismissed.

> FN49. Gwen Schneider, Nagy, and Bliden all were defendants in Rivera's action before Judge Chin-the action that Rivera claims gave rise to the retaliatory conspiracy against him. *See Rivera,* 119 F.Supp.2d at 333 n.2, 334 n.3.

Last, defendants argue that Great Meadow Superintendent Duncan and Deputy Superintendent Phillips are entitled to qualified immunity regarding their response to plaintiff's complaints that he was being deprived of medical treatment at their facility. (Def. Mem. at 26) To establish a qualified immunity defense where deprivation of medical treatment is alleged, defendants must show that it was " 'objectively reasonable' for them to believe that they had not acted with the requisite deliberate indifference [to a serious medical need]." *McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004) (citation omitted); *see also Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (establishing the standard of deliberate indifference for prisoners' Eighth Amendment denial of medical care claims). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). A serious medical need exists where there is "a condition of urgency that may result in degeneration or extreme pain." *Id.,* at 702 (internal quotation marks omitted). Medical conditions "vary in severity" and a "decision to leave a condition untreated will be constitutional or not depending on the facts of the particular case." *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000). Our Circuit has noted that several factors are relevant in assessing the seriousness of the medical condition at issue: " '[T]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." ' *Chance,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992)).

**\*29** In this case, plaintiff alleges that he filed a complaint against defendant Nesmith with defendant Duncan on May 2, 2001 (Compl.¶ 32(b)), and that Duncan referred the matter to a Mr. Ebert,[FN50] who later informed plaintiff of the results of his investigation (*id.* ¶ 32(e)). Although defendants do not so argue, Duncan is entitled to supervisory immunity in this case. As explained above, our Circuit has held that referral of a matter by a supervisory defendant to a subordinate is insufficient to constitute personal involvement. *Sealey,* 116 F.3d at 51. Superintendent Duncan has supervisory immunity, and plaintiff's claim against him is dismissed.

> FN50. Ebert is referred to as a defendant in plaintiff's complaint, but does not appear in the caption. The court will therefore not consider Ebert as a defendant.

Plaintiff's claim against Green Haven Deputy Superintendent William Phillips, however, is not dismissed. Plaintiff claims that on May 11, 2001, after defendant Nesmith had ordered plaintiff to leave the Great Meadow clinic despite his "severe pain," plaintiff spoke with Phillips outside the clinic. (Compl.¶ 32(i)-(j)) Plaintiff alleges that he told Phillips that since his transfer to Great Meadow at the end of April, he had been denied his prescribed medications, that he had not been examined by a doctor although he suffered from a "chronic medical condition" which caused him "severe pain," and that he had just been ordered out of the clinic without medication. (*Id.* ¶ 32(j)) Phillips then allegedly responded, "P.A. Ne[ ]smith is under the supervision of Dr. Paolano and there is nothing I can do." (*Id.*)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

As defendants point out, the Circuit has held that a non-medical defendant should not intercede in the medical treatment of an inmate. *See Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) ("One can imagine the repercussions if non-medical prison officials were to attempt to dictate the specific medical treatment to be given particular prisoners...."); Def. Mem. at 26. However, plaintiff's claim is that he was receiving no treatment at all, not that Phillips was being asked to interfere with a prescribed course of treatment. Our Circuit has held that deliberate indifference to a serious medical need exists where an inmate is denied medical treatment and thereby experiences "extreme pain." *Chance,* 143 F.3d at 702; *see also Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996) (sustaining Eight Amendment claims against two correction officers who denied inmate his prescription eyeglasses, which caused the inmate to suffer from double vision and loss of depth perception).

Rivera informed Phillips that he was suffering from severe pain due to a chronic medical condition,[FN51] and that he had been denied medical attention as well as his prescription medications. (Compl.¶ 32(j)) Upon these facts, Phillips cannot reasonably have believed that his refusal to help Rivera obtain medical treatment did not constitute deliberate indifference to a serious medical need. *See McKenna,* 386 F.3d at 437. Rivera informed Phillips of facts from which Phillips should have inferred a "substantial risk of serious harm" to plaintiff, *Chance,* 143 F.3d at 702 (quoting *Farmer,* 511 U.S. at 537), and Phillips allegedly disregarded this risk. Rivera has presented enough evidence to sustain his claim against Phillips at this stage; Phillips does not have qualified immunity. Plaintiff's claim against defendant Phillips is not dismissed.

FN51. Plaintiff had informed defendant Nesmith that his condition was the jaw disease known as TMJ (Compl.¶ 32(a)), but plaintiff does not

allege that he mentioned the name of his condition to Phillips.

IV.

**\*30** For the foregoing reasons, defendant's motion for summary judgment is denied, except as to plaintiff's claim alleging denial of access to the courts, his claims involving legal mail, property, and exposure to cold, his claims against supervisory defendants who have the benefit of supervisory or qualified immunity, and his unsubstantiated claims of retaliatory conspiracy. Plaintiff's action is dismissed as to those claims only. Summary judgment is denied as to the rest of plaintiff's claims.

Plaintiff's action is dismissed in its entirety against the following defendants, listed in order of their appearance in the caption: George Pataki, Glenn Goord, Donald Selsky, Brian Malone, Christopher P. Artuz, Dennis Bliden, George S. Schneider, Gayle Haponik, J. McKoy, Thomas K. Quackenbush, Michael N. Nagy, T. Gotsch, William F. Keyser, Ward, Thomas P. McCabe, Erns, R. Graziano, Tammy Haights, David Miller, Jordan Ryan, George B. Duncan, Harold McKinney, Edward McSweeney, Gwen Duncan, Peter Berezny, Richard Roy, Lucien Leclaire Jr., and John W. Burge.

The claims specified above survive against the following defendants, also listed in order of their appearance in the caption: Frank Meeuwisse, Gwen S. Schneider, Alexander C. Miller,[FN52] Kenneth G. Hafford, Coleman S. Wilson, Jerry W. Surber, Jr., Daniel F. Martuscello, Christopher M. Martuscello, Christopher W. Carlton, T. Schihl, Marc Speed, Miller,[FN53] W. Eaton, William E. Phillips, Dr. Albert Paolano, Ted Nesmith, Harris, and Kenny Marks.

FN52. As explained above, *see supra* note 6,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

(Cite as: 2005 WL 407710 (S.D.N.Y.))

plaintiff refers in his complaint to two Green Haven correctional defendants whose last name is Miller, one, a correctional officer, and the other, a correctional sergeant. An individual with the last name Miller allegedly was involved in the November 16, 1999 ransacking of plaintiff's cell and in the subsequent filing of an allegedly false misbehavior report. (Compl.¶¶ 21-22) "Miller" was also allegedly involved in two incidents where plaintiff was exposed to cold (Compl.¶ 24-25) Finally, "Miller" allegedly verbally abused plaintiff, informing him that he had no rights. (Compl.¶ 27) Plaintiff's exposure to cold claim was dismissed, *see supra* Part III.D.3, but the other claims still stand. The court does not know which Miller was involved in which claims. Both Millers remain defendants for now. If one of the Millers was involved solely in the exposure to cold claim, he can petition the court for dismissal in a subsequent filing.

FN53. *See supra* note 52.

SO ORDERED:

S.D.N.Y.,2005.

Rivera v. Pataki

Not Reported in F.Supp.2d, 2005 WL 407710 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Ronald G. BOOKMAN, Plaintiff,

v.

MERRILL LYNCH, Defendant.

No. 02 Civ. 1108(RJS).

May 14, 2009.

Michael Gerard O'Neill, New York, NY, for Plaintiff.

Debra S. Morway, Brennan Slater McDonough, and Christopher Alan Parlo, Morgan, Lewis and Bockius LLP, New York, NY, for Defendant.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge.

**\*1** Plaintiff Ronald G. Bookman brings this action against Defendant Merrill Lynch, alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Age Discrimination in Employment

Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Plaintiff contends that Defendant failed to accommodate his disability, terminated his employment in a discriminatory fashion on the basis of his age and race, created a hostile work environment, and retaliated against him for engaging in conduct that is otherwise protected by these laws.

Before the Court is Defendant's motion for summary judgment as to each of Plaintiff's claims. For the reasons set forth below, the motion is granted in part and denied in part.

I. BACKGROUND

The facts described below are taken from the parties' Local Rule 56.1 Statements, the affidavits and declarations submitted in connection with the motion, and the exhibits attached thereto. Where only one party's Rule 56.1 Statement is cited, the opposing party does not dispute that fact or has not presented admissible evidence to controvert it.

A. Facts

The Court describes the factual circumstances of this case in three parts. First, the Court provides background regarding the mechanics of Defendant's Professional Development Program (the "PDP") for Financial Consultants ("FCs"). Second, the Court discusses the undisputed facts regarding Plaintiff's employment as an FC Trainee in the PDP. Finally, the Court describes the evidence adduced by Plaintiff of discriminatory conduct by Defendant's employees.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

1. Overview of the Professional Development Program
   For Financial Consultants

At the time relevant to Plaintiff's claims, Defendant had a training program for FCs known as the PDP. This program was overseen by Hassan Tabbah, the Resident Vice-President of Defendant's office at the Fifth Avenue Financial Center, and Patrick Donohue, a Sales Manager supervised by Tabbah. (Donohue Aff. ¶¶ 1, 2; Tabbah Aff. ¶¶ 1, 3.)

Employees entering the PDP were known as "FC Trainees." FC Trainees were required to obtain the required state and federal licenses before they were permitted to sell securities and other products to Defendant's customers. (Def.'s 56.1 ¶ 7.) In 1998, FC Trainees were given approximately four months to obtain these licenses. (*Id.*)

Once they were properly licensed, FC Trainees participated in a twenty-four month program during which they were expected to begin to develop clients and generate "production credits." (*Id.* ¶ 8.) [FN1] Employees in this phase of the program were referred to as "PDP FCs," and the transition from the FC Trainee phase of the program to the PDP FC phase was known as "entering production." (*Id.* ¶¶ 8, 9.) To facilitate that transition, each new PDP FC was granted a "stub" period, during which they were not required to meet Defendant's specific goals for generating business. (*Id.* ¶ 10.) Generally, a PDP FC's stub period was during his or her first month of production, which was usually the fifth month after entering the program as an FC Trainee. (*Id.* ¶ 11.)

FN1. The term "production credit" is not defined in the record, and neither party has explained Defendant's method for calculating these credits. However, the Court deems this information immaterial to the resolution of Defendant's motion.

**\*2** Following the stub period, Defendant set production requirements for PDP FCs in three categories: (1) production credits generated, (2) number of financial plans completed, and cumulative assets under management. (*Id.* ¶ 12; *see also* Pl.'s 56.1 ¶ 12.) PDP FCs were assessed each month according to their production in these respective categories. (Def.'s 56.1 ¶ 13.) After eight months in production-including the stub period-PDP FCs were required to have generated 20,000 production credits, completed four financial plans, and accumulated $1.8 million in assets under management. (*Id.* ¶ 14.)

Donohue was responsible for monitoring PDP FCs' progress toward satisfying the requirements of the program. (*Id.* ¶ 17.) Based on their performance, PDP FCs received monthly ratings of "far exceeds requirements," "exceeds requirements," "meets requirements," or "does not meet requirements." (*Id.* ¶ 13.) In order to receive an overall "meets requirements" rating, PDP FCs were required to meet all three of the requirements. (*Id.*) If, after five months of being "in production," a PDP FC was not satisfying the requirements in each category, Donohue would meet with the person to provide a warning that the failure to meet the requirements in each of the three categories after eight months would result in his or her termination. (*Id.* ¶ 18.)

At the end of the twenty-four month PDP, FCs were required to have generated 150,000 production credits, completed 25 financial plans, and accumulated $10 million of client assets under management. (*Id.* ¶ 15.) PDP FCs who met those requirements by the end of the twenty-four month period became "full-fledged FCs," whose compensation was based, in large part, on the production credits that they produced each month. (*Id.* ¶ 16.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

2. Plaintiff's Employment at Merrill Lynch

In May 1997, Plaintiff responded to an advertisement in the Wall Street Journal regarding an FC position, and he was granted an interview for the job. (*See* Def.'s 56.1 ¶ 1.) During the interview process, Plaintiff met with both Tabbah and Donohue, and he was ultimately offered the position with a starting salary of $40,000 per year. (*Id.* ¶ 4; Pl.'s Decl. Ex. A, Pl.'s Interrog. Resp. ("Pl.'s Interrog. Resp.") at 1-2.)

i. Plaintiff's FC Trainee Period

Plaintiff is an African American male, and he was approximately fifty years old when he began work as an FC trainee on January 5, 1998. (*See* Compl. at 4; Def.'s 56.1 ¶ 5; Pl.'s Interrog. Resp. at 11.) On January 16, 1998, Plaintiff's mother became seriously ill at her home in Texas. (Pl.'s Interrog. Resp. at 6.) Plaintiff informed Donohue of the situation and traveled to Texas to be with his mother in the hospital. (Def.'s 56.1 ¶ 20.) From that time until approximately March 14, 1998, when his mother passed away, Plaintiff frequently traveled between New York and Texas. (*Id.* ¶ 21.)

**\*3** Plaintiff was paid during the time that he missed work while he was with his mother. (Morway Aff. Ex. A, Pl.'s Dec. 22, 2003 Dep. ("Pl.'s Dep.") at 219:8-11.) On February 2, 1998, Plaintiff requested an unpaid leave of absence, which his supervisors declined to grant him. (Pl.'s Interrog. Resp. at 6.) Plaintiff asserts that, during that February 2 conversation, and again on February 9 and 27, 1998, Donohue threatened to terminate him if he did not return to work. (*Id.* at 6-7.)

ii. Plaintiff's PDP FC Period

Although the parties dispute the length of Plaintiff's "stub" period, it is undisputed that Plaintiff's first month of "production" was September 1998. (Pl.'s Dep. at

246:7-10; Def.'s 56.1 ¶ 26.) Plaintiff consistently received "does not meet requirements" performance ratings from the time he entered production until his termination in May 1999. (*See* Def.'s 56.1 ¶ 29.)

Donohue met with Plaintiff to discuss his performance during each of Plaintiff's months in production as a PDP FC. (*Id.* ¶¶ 28-29.) Beginning in February 1999-Plaintiff's fifth month in production-Donohue began to warn Plaintiff that his failure to obtain "meets requirements" ratings by April 1999 would result in his termination. (*Id.* ¶ 29.)

At the end of Plaintiff's first eight months as a PDP FC, he had obtained the required amount of assets under management and completed the required number of financial plans. (*See id.* ¶ 31.) However, although the parties differ regarding the number of production credits that Plaintiff actually generated, it is undisputed that Plaintiff did not satisfy Defendant's eight-month requirement relating to the generation of production credits. (*Id.*; Pl.'s Decl. ¶ 12.)

Tabbah and Donohue subsequently made a joint decision to terminate Plaintiff's employment (Donohue Aff. ¶ 10; Tabbah Aff. ¶ 6), which occurred on May 5, 1999 (Def.'s 56.1 ¶ 32). A June 1, 1999 "Uniform Termination Notice For Securities Industry Registration," known as a "Form U-5," stated that the reason for Plaintiff's discharge was "Failure to Perform to PDP Standards." (Addendum to Compl.)

3. Plaintiff's Evidence of Discrimination

Primarily through his interrogatory responses and a declaration submitted with his opposition to Defendant's motion, Plaintiff has adduced evidence of a series of events and comments that he asserts support an inference of discrimination.[FN2] The Court discusses this evidence

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

below.

> FN2. Reliance on declarations and interrogatory responses is an entirely proper method of opposing a motion for summary judgment. *See* Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred."); *Danzer v. Norden Sys. Inc.,* 151 F.3d 50, 57 (2d Cir.1998).

### i. Segregated Seating in the Workplace

Plaintiff asserts that the work stations for "virtually all the African American financial consultants" were placed in a segregated area of the office. (Pl.'s Decl. ¶ 15; *see also* Pl.'s Interrog. Resp. at 5.) He alleges that the seating was referred to as the "crows nest" or the "segregated section," and it was "openly discussed within the office." (Pl.'s Interrog. Resp. at 5; *see also* Pl.'s Decl. ¶ 15.) When Plaintiff asked Donohue about the seating arrangements, Donohue allegedly stated that " 'it's better than sitting at the back of the bus.' " (Pl.'s Interrog. Resp. at 29; *see also id.* at 5.) FN3

> FN3. Throughout this decision, the Court uses internal quotation marks to indicate instances in which Plaintiff attributes an exact quote to the speaker in question.

### ii. The Exotic Dancer Incident

**\*4** In approximately May or June of 1998, Plaintiff asserts that "an exotic dancer began to quickly disrobe and perform a striptease in the near vicinity of [his] desk." (Pl.'s Interrog. Resp. at 31; *see also* Pl.'s Dep. at 324:23-24.) Plaintiff complained to Donohue and Tabbah about the incident, but he claims that he subsequently learned that they approved the event. (Pl.'s Interrog. Resp. at 9.) Plaintiff asserts that "Donohue made it quite clear that he was very unhappy with my complaint about the dancer." (*Id.*)

### iii. Plaintiff's January 1999 Business Meeting

In January 1999, Plaintiff conducted a meeting of African American business people and ministers in a conference room at Defendant's office. (Pl.'s Interrog. Resp. at 20.) The walls of the conference room in which the meeting was held were made of glass, and other employees were able to observe the meeting as they passed by the room. (*Id.*)

Plaintiff contends that, as the meeting began, all of the participants noted "that many of the same employees were repeatedly passing by gawking, gesturing, giggling and merely acting in a rude manner as if they were viewing animals in a zoo.... The employees were acting as if they'd never seen more than one African American in a single setting before." (*Id.*) After the meeting, Plaintiff reported the incident to Donohue, who replied " 'well, what's the problem?' " (*Id.; see also* Pl.'s Decl. ¶¶ 41-42 .)

### iv. Defendant's Denial of Plaintiff's Business Proposals

Plaintiff argues that he was unable to meet the requirements of the PDP FC program because Defendant's employees discriminated against him by failing to support, and sometimes affirmatively hindering, his efforts to generate production credits. (*See* Pl.'s Decl. ¶¶ 13, 49.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

a. The African Methodist Episcopal Church

First, between November 1998 and March 1999, Plaintiff developed a business relationship with the African Methodist Episcopal Church (the "AME"). (Pl.'s Interrog. Resp. at 18.) Plaintiff alleges that the AME was interested in pursuing several mortgage financing opportunities. (*Id.*)

In February 1999, on behalf of the AME, Plaintiff submitted an application for a $1.2 million mortgage to Defendant's real estate lending group. (*Id.* at 19.) Plaintiff was informed by a Merrill Lynch Mortgage and Credit Specialist "that the underwriters might not accept processing of church mortgage loans," but that "it would dramatically assist the process if ... Tabbah were to lobby the effort." (*Id.*)

On February 3, 1999, Plaintiff sent a letter to Tabbah regarding the pending application. (Pl.'s Decl. Ex. B.) The letter stated that

I recently submitted a commercial mortgage refinance application for about $1.2 million received from an African Methodist Church in Oakland, California. I was informed by Mr. David Gray of our Mortgage Services Division that [Merrill Lynch] does not finance "not for profit" or "non-profit" institutions regardless of their financial status or ability to service their debt.

**\*5** (*Id.*) The letter went on to request Tabbah's "input and assistance on this issue," and noted that "[t]he mortgage refinance business especially from my black church client potentials constitute an enormous source of production credits and revenues for me this year." (*Id.*) In response to Plaintiff's request, Tabbah told Plaintiff that he was "not interested" in helping him. (Pl.'s Decl. ¶ 22; *see also* Pl.'s Interrog. Resp. at 19.)

b. Prime Time Radio

Prime Time Radio is an "African American owned and managed firm located in Tallahassee, Florida," which "was an experienced holder and manager of urban radio station properties targeting African Americans." (Pl.'s Interrog. Resp. at 19.) In December 1998, Plaintiff submitted a $17 million loan application to Merrill Lynch's Business Financial Services Department on behalf of Prime Time Radio. (*Id.*) Plaintiff also indicated that he believed that Prime Time Radio would be "a good candidate to take public." (*Id.*)

When Plaintiff submitted the application, he was advised that he would need Tabbah's support. (*See id.* at 20; Pl.'s Decl. ¶ 24 .) However, "Tabbah again refused to give [Plaintiff] any assistance with this project." (Pl.'s Decl. ¶ 24; Pl.'s Interrog. Resp. at 20.)

c. Prince Alwaleed Bin Talal

On January 11, 1999, Plaintiff received a facsimile from Dr. Khalid Abdullah Tariq Al-Mansour, a legal adviser to Prince Alwaleed Bin Talal of Saudi Arabia. (Pl.'s Interrog. Resp. at 22.) In the transmission, Dr. Al-Mansour stated, on behalf of Prince Alwaleed Bin Talal, that he "would like to know Merrill Lynch's views on the topic of strategic alliances, especially in Africa." (Pl.'s Decl. Ex. D.) However, both Donohue and Tabbah stated that "there was no interest at Merrill Lynch in forming any alliance with the Prince." (Pl.'s Interrog. Resp. at 22.)

d. The Fifth African American Summit

In January 1999, Plaintiff was invited to attend the Fifth African American Summit, which was to be held in

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

Ghana from May 15 to May 22, 1999. (*Id.* at 21.) In an April 23, 1999 letter to Tom Rasmussen, an Administrative Manager at Merrill Lynch, Plaintiff stated that he was selected to speak at the Summit "principally due to [his] 10 year business background in international markets and having successfully conducted business in both Africa and Europe." (*See* Pl.'s Decl. Ex. C.)

When Plaintiff sought permission to attend the Summit, Tabbah called him to his office "in a highly hostile state, 'slammed his fist' to his desk and stated forcibly, 'I forbid you to attend this event.' " (Pl.'s Interrog. Resp. at 22.) Tabbah also "shouted" that Plaintiff " 'was a domestic retail Financial Consultant and there was no opportunity for [Plaintiff] or Merrill Lynch in attending such events,' " and that it would be " 'a colossal waste of time.' " (*Id.*)

### e. Shorter College

In February 1999, Shorter College opened an account with Plaintiff with an initial deposit of approximately $150,000. (Pl.'s Interrog. Resp. at 19.) Plaintiff contends that the client was "looking for a senior debt facility of $500,000...." (*Id.*)

**\*6** On March 8, 1999, Plaintiff requested assistance from the Commercial Mortgage Group of Merrill Lynch's Business Financial Services Department. (*Id.*) He was advised that he would need Tabbah to endorse the project. (*Id.*) However, Tabbah "refused" to do so and the loan application "lost traction." (Pl.'s Decl. ¶ 23; Pl.'s Interrog. Resp. at 19.)

### f. Account Distributions

Plaintiff challenges the manner in which Defendant redistributed the client accounts of departing FCs to PDP FCs. (Pl.'s Interrog. Resp. at 10.) According to Defendant's policy, PDP FCs were only eligible to receive these distributions if they had been in the program for four months or more, and if they had received ratings of "far exceeds requirements" or "exceeds requirements." (Morway Reply Aff. Ex. B, Tabbah's Mar. 23, 2004 Dep. at 175:17-21.)

Plaintiff argues that Tabbah exercised unfettered discretion over the account distributions, and that "lucrative and active client accounts were secretly and selectively distributed to young white PDP participants" between June 1998 and May 1999. (Pl.'s Interrog. Resp. at 10.) Plaintiff alleges that "[q]uite by chance," he "learned that the account of a family acquaintance had been distributed to Alexander Nephew, a young White FC who was not meeting his goals ...." (Pl.'s Decl. ¶ 48.) He contends that "the account was distributed to Nephew, and then re-assigned to [Plaintiff] at the customer's insistence." (*Id.*; *see also* Pl.'s Interrog. Resp. at 19.)

### v. Alleged Comments by Defendant's Employees

Lastly, Plaintiff asserts that a series of discriminatory comments were made by Tabbah, Donohue, and Plaintiff's co-workers during the course of his employment. Donohue and Tabbah deny making these comments. (*See* Def.'s Reply at 21 n. 7.) Although the Court does not-and, procedurally speaking, could not-make findings of fact at this stage of the litigation, Plaintiff's allegations and evidence of these remarks are relevant to the Court's analysis of Defendant's motion for summary judgment.

### a. Alleged Comments by Tabbah

Plaintiff asserts that Tabbah "made consistent and ongoing disparaging racist comments against [his] class of clients" by referring to " 'the worth of Africans as investors, etc.' " (Pl.'s Interrog. Resp. at 20.) Plaintiff points to two specific allegedly discriminatory comments

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

made by Tabbah.

First, in January 1999, during a discussion regarding Plaintiff's invitation to participate in the Fifth African American Summit in Ghana, Africa, Tabbah allegedly "stated that [Nigerians] were all a bunch of 'con artists' and that Merrill Lynch didn't want anything to do with them." (Pl.'s Decl. ¶ 32.) Subsequently, when Tabbah refused to grant Plaintiff permission to attend the conference, he stated " 'that these people were no good as investors and that [Plaintiff] should be concentrating on developing more white clients .' " (Pl.'s Interrog. Resp. at 22; *see also* Pl.'s Decl. ¶ 32.)

**\*7** Second, although Plaintiff fails to provide specific dates, he alleges that "Tabbah told me, on more than one occasion, that I was wasting my time courting Black investors, and he point blank told me that I should be devoting my efforts toward obtaining White accounts ." (Pl.'s Decl. ¶ 19.)

### b. Alleged Comments by Donohue

Plaintiff alleges that Donohue made several discriminatory comments during the course of Plaintiff's employment. First, Plaintiff asserts that, on or about January 5, 1998, when he asked Donohue about the allegedly segregated seating arrangements at the office, Donohue stated that " 'it's better than sitting at the back of the bus.' " (Pl.'s Interrog. Resp. at 29.) Second, Plaintiff alleges that, in "early 1998," Donohue "pointed to what he referred to as his 'power zone,' i.e., the desks of his favored Financial Consultants that ringed his work area, [and] told [Plaintiff] that the future of the office lay with young White brokers." (Pl.'s Decl. ¶ 16.)

Third, in July 1998, during a conversation between Donohue and Plaintiff regarding James Byrd, an African American man who was chained to a pickup truck and dragged to death in Jasper, Texas, Plaintiff alleges that Donohue asked him, " 'you don't think he got what was coming to him, do you?' " (Pl.'s Interrog. Resp. at 13; *see also id.* at 32, 46.)

Fourth, on January 23, 1999, a facsimile was sent to Plaintiff at work by a man from Ghana named Kwame Pianim. (*Id.* at 23.) When Donohue saw the communication, he allegedly called Plaintiff to his office, asked if Plaintiff had received the communication from Africa, and stated that " '[y]ou know, Merrill Lynch has had a lot of problems with Nigerians and we don't want anything to do with Africa. They are a bunch of con artists.' " (*Id.*)

Finally, on May 4, 1999, the day before Plaintiff was terminated, Plaintiff asked Donohue why, instead of being terminated, he was not being demoted to a more junior position outside the PDP. (*Id.* at 28.) Plaintiff alleges that Donohue stated: " 'first of all, you could not carry the briefcase (in selling techniques) of any of the young guys and girls we have here. And as it related [to] Mr. Cooperman (a young white FC with Mr. Donohue's selling group), you should not even be in the same room with him.' " (*Id.*) Plaintiff also alleges that Donohue told him " 'that [he] could not carry Cooperman's jock shorts.' " (*Id.* at 46.)

### c. Alleged Comments By Other Employees of Defendant

Additionally, Plaintiff points to two other comments that he alleges were made by his co-workers. First, at some unspecified point during Plaintiff's employment, Plaintiff asserts that a white male named "Healey" interrupted a conversation that he was having with another co-worker and "stated loudly, 'Bookman, get your ass to the meeting.' ... 'get your black ass to the meeting.' " (*Id.* at 33; *see also id.* at 14.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

Second, Plaintiff alleges that, during a meeting of all the FCs in the program in late 1998 or early 1999 that was led by a white male named "Disanza," he was "viciously berated" and called an " 'idiot' " based on his suggestion that Morgan Stanley stock was a good investment. (Pl.'s Decl. ¶ 18; Pl.'s Interrog. Resp. at 15 .)

### B. Procedural History

**\*8** After filing a complaint with the Equal Employment Opportunity Commission, Plaintiff received a "Notice of Right to Sue" letter on November 30, 2001. On February 11, 2002, he commenced this action as a *pro se* litigant, and the case was assigned to the Honorable William H. Pauley III, District Judge. (Doc. No. 1.) On July 2, 2002, Defendant filed its Answer. (Doc. No. 6.)

On August 20, 2002, the Honorable James C. Francis, Magistrate Judge, granted Plaintiff's application for an appointment of counsel and stayed discovery in this matter pending the appearance of volunteer counsel. (Doc. No. 12.) On September 16, 2003, in light of the fact that a year had passed without an attorney volunteering to represent Plaintiff on a *pro bono* basis, Judge Francis lifted the discovery stay and directed that all discovery be completed by February 27, 2004. (Doc. No. 16.)

Following the completion of discovery, Defendant filed a motion for summary judgment on May 12, 2004. (Doc. No. 58.) Due to medical problems, Plaintiff received numerous extensions of the deadline by which he was to submit his opposition to the motion. The case was eventually reassigned to the Honorable Kenneth M. Karas, District Judge, on September 14, 2004. (Doc. No. 71.)

On March 28, 2005, counsel for Plaintiff appeared in this action for the purpose of litigating the pending motion. (Doc. No. 76.) However, on June 9, 2005, Judge Karas suspended the briefing schedule on Defendant's motion for summary judgment in order to permit the parties to pursue settlement discussions. (Doc. No. 80.) On December 15, 2005, Judge Karas entered a conditional order of dismissal, which provided that either party could reopen the case if a settlement was not consummated within sixty days. (Doc. No. 83.) On February 15, 2006, Judge Karas extended that order for an additional ninety days. (Doc. No. 84.) However, by letter dated May 3, 2006, Plaintiff's counsel informed Judge Karas that the parties had been unable to resolve the action. (Doc. No. 85.)

On July 31, 2006, Plaintiff responded in opposition to Defendant's May 12, 2004 motion for summary judgment. ("Pl.'s Mem." (Doc. No. 88).) Defendant filed its reply papers on October 13, 2006. ("Def.'s Reply" (Doc. No. 94).) This case was reassigned to the undersigned on September 4, 2007, and the Court conducted oral argument on the pending motion on December 7, 2007.

### II. LEGAL STANDARD

On a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). Pursuant to Rule 56(c), summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Matican v. City of New York,* 524 F.3d 151, 154 (2d Cir.2008).

**\*9** "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau,* 524 F.3d 160, 163 (2d Cir.2008) (quoting *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir.2007)); *see also Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986).

> Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.

*Global Aerospace, Inc. v. Hartford Fire Ins. Co.,* No. 06 Civ. 7104(LAK), 2009 WL 89122, at *5 (S.D.N.Y. Jan. 13, 2009).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions.... Nonetheless, summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact.

*Schiano v. Quality Payroll Sys.,* 445 F.3d 597, 603 (2d Cir.2006) (internal quotations omitted).

## III. DISCUSSION

Plaintiff's Complaint, which he filed as a *pro se* litigant, contains employment discrimination claims under the ADA, Title VII, and the ADEA. Plaintiff brings four types of discrimination claims: (1) failure to promote, (2) retaliation, (3) discriminatory termination, and (4) hostile work environment. (Compl. at 3.)

After obtaining counsel, Plaintiff has clarified that, with respect to his claims under Title VII and the ADEA, "[t]he gravamen" of his case "is that the prejudicial attitude of [his supervisors] toward the value of Black investors and [Plaintiff's] efforts to market Merrill's services and financial products to the Black community prevented [him] from satisfying Merrill's objective requirements" for PDP FCs. (Pl.'s Decl. ¶ 49.)

For the reasons set forth below, the Court concludes that Plaintiff has abandoned his claims under the ADA, as well as his claims for failure to promote and retaliation under Title VII and the ADEA. However, Plaintiff has adduced sufficient evidence to survive summary judgment on his discriminatory termination claims under Title VII and the ADEA, and his hostile work environment claim under Title VII. Accordingly, Defendant's motion for summary judgment is granted in part and denied in part.

### A. Plaintiff's Abandoned Claims

In Plaintiff's brief in opposition to Defendant's motion, Plaintiff failed to address Defendant's arguments regarding his ADA claims, as well as his claims for retaliation and failure to promote under the ADEA and Title VII. Moreover, at oral argument regarding Defendant's motion, Plaintiff's counsel acknowledged that "[t]here is no ADA claim here ...," and that he had "not analyzed this case from the retaliation point of view." (Tr.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

at 35:2, 16-17.) [FN4] Rather, in the view of Plaintiff's counsel, "this case is purely a discrimination case ...." (*Id.* at 35:17-18.)

> FN4. In Plaintiff's interrogatory responses, he asserted that Defendant's notation in Plaintiff's June 1, 1999 U-5 Form that he was terminated for "failure to perform to PDP standards" constituted retaliation for his prior complaints about workplace discrimination. (Pl.'s Interrog. Resp. at 29.) Plaintiff abandoned that argument in his opposition to Defendant's motion for summary judgment, and instead argued that the U-5 Form was evidence of disparate treatment. (*See* Pl.'s Mem. at 14.) However, despite Plaintiff's conclusory assertion that it is "undisputed" that Defendant had a policy of permitting PDP FCs to resign voluntarily rather than terminating them (Pl.'s Decl. ¶ 54), he has adduced no evidence of such a policy. Indeed, Defendant is obligated by law to truthfully report in a U-5 Form the reason for an employee's departure. (*See* Def.'s Mem. at 15.) Accordingly, the U-5 Form by itself provides no evidence of discriminatory animus, whether the claim is one of disparate treatment or retaliation.

**\*10** Plaintiff's failure to oppose Defendant's motion on these grounds constitutes an abandonment of the claims for which he chose to offer neither legal argument nor evidentiary support. *See, e.g., Bellegar de Dussuau v. Blockbuster, Inc.,* No. 03 Civ. 6614(WHP), 2006 WL 465374, at \*7 (S.D.N.Y. Feb. 28, 2006) (finding pregnancy discrimination claim abandoned by virtue of the plaintiff's failure to address it in opposition to defendant's summary judgment motion on the claim); *Arias v. NASDAQ/AMEX Mkt. Group,* No. 00 Civ. 9827(MBM), 2003 WL 354978, at \*13 (S.D.N.Y. Feb. 18, 2003); *Lauro v. City of New York,* 39 F.Supp.2d 351, 366 n. 13 (S.D.N.Y.1999); *Singleton v. City of Newburgh,* 1 F.Supp.2d 306, 312 (S.D.N.Y.1998); *Douglas v. Victor Capital Group,* 21 F.Supp.2d 379, 393 (S.D.N.Y.1998);

*Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.,* No. 92 Civ. 1735(LAP), 1998 WL 118174, at \*28 (S.D.N.Y. Mar. 16, 1998).[FN5] Accordingly, Plaintiff's ADA claims, as well as his failure to promote and retaliation claims under both the ADEA and Title VII, are dismissed.

> FN5. Plaintiff has likewise failed to respond to Defendant's arguments that: (1) there is no evidence that Plaintiff was denied an adjustment to his PDP training schedule; and (2) there is no evidence that Plaintiff was treated differently than other employees with respect to the timing of his Series 7 exam. (Def.'s Mem. at 12, 14). Accordingly, to the extent Plaintiff initially sought to bring claims relating to these issues, those claims are deemed abandoned and are therefore dismissed.

B. Plaintiff's Discriminatory Termination Claims

With respect to Plaintiff's claims that he was unlawfully terminated for discriminatory reasons, he argues that he has produced both direct and circumstantial evidence of discrimination, and that "[a] reasonable juror could conclude that plaintiff's managers, acting on a race or age bias, or both, intentionally suppressed plaintiff's production, resulting in his termination for failing to meet defendant's production quotas." (Pl.'s Mem. at 6; *see also id.* at 11-12.)

In light of Plaintiff's argument that there is evidence directly reflecting an attitude of unlawful discrimination, the Court analyzes the evidence in the record under the "mixed motive" framework articulated in *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1998). For the reasons set forth below, the Court concludes that summary judgment is inappropriate because of disputed issues of material fact regarding the "ultimate issue": whether a fact finder could reasonably conclude that Defendant unlawfully discriminated against him. *See Stratton v. Dep't*

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

_for the Aging,_ 132 F.3d 869, 878 (2d Cir.1997).

### 1. Applicable Law

#### i. Burden Shifting in Employment Discrimination Cases

"A court's analysis of an unlawful employment discrimination allegation proceeds either according to the familiar burden-shifting framework laid out in _McDonnell Douglas Corp. v. Green,_ 411 U.S. 792, 798 (1973), or under the so-called mixed motive theory" articulated in _Price Waterhouse v. Hopkins,_ 490 U.S. at 244-45. _Knight v. New York City Housing Auth.,_ No. 03 Civ. 2746(DAB), 2007 WL 313435, at *6 (S.D.N.Y. Feb. 2, 2007).

As succinctly stated by the Second Circuit, under the _McDonnell Douglas_ framework,

[A] plaintiff first bears the minimal burden of setting out a _prima facie_ discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.

**\*11** _McPherson v. New York City Dep't of Educ.,_ 457 F.3d 211, 215 (2d Cir.2006).

In _Price Waterhouse v. Hopkins,_ the Supreme Court articulated a burden-shifting framework to be applied in cases where the plaintiff comes forth with evidence that a discriminatory factor played a "motivating part" in an adverse employment action. _See_ 490 U.S. at 244-45. Although _Price Waterhouse_ involved a Title VII claim,

the framework also applies to claims under the ADEA. _See, e.g., Rose v. New York City Bd. of Educ.,_ 257 F.3d 156, 161-62 (2d Cir.2001); _Binder v. Long Island Lighting Co.,_ 933 F.2d 187, 191 (2d Cir.1991).

In a mixed-motive case, "[i]f the [p]laintiff establishes that a prohibited discriminatory factor played a 'motivating part' in a challenged employment decision, the burden shifts to the employer ...." _Knight,_ 2007 WL 313435, at *6; _see also Osborne v. Literacy Partners, Inc.,_ No. 04 Civ. 6652(DAB), 2007 WL 2298354, at *7 (S.D.N.Y. Aug. 9, 2007). "However, '[t]o warrant a mixed motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment.' " _Ahmed v. Heartland Brewery L.L.C.,_ No. 05 Civ. 2652(PKC), 2007 WL 2125651, at *4 (S.D .N.Y. July 25, 2007) (quoting _Raskin v. Wyatt Co.,_ 125 F.3d 55, 61 (2d Cir.1997)). "Evidence potentially warranting a _Price Waterhouse_ burden shift includes, _inter alia,_ policy documents and evidence of statements or actions by decisionmakers 'that may be viewed as _directly reflecting_ the alleged discriminatory attitude.' " _Raskin,_ 125 F.3d at 60-61 (quoting _Lightfoot v. Union Carbide Corp.,_ 110 F.3d 898, 913 (2d Cir.1997) (emphasis in original).

Where there is sufficient evidence of discrimination to justify a _Price Waterhouse_ burden shift, "the employer bears the burden of proving that it would have made the same decision even had there been no such animus." _Jalal v. Columbia Univ.,_ 4 F.Supp.2d 224, 233 (S.D.N.Y.1998). Importantly, however, " '[p]roving 'that the same decision would have been justified ... is not the same as proving that the same decision would have been made.' " _Price Waterhouse,_ 490 U.S. at 252 (quoting _Givhan v. W. Line Consol. Sch. Dist.,_ 439 U.S. 410, 416 (1979)).

"An employer may not, in other words, prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

motivate it at the time of the decision." Nor may the employer "meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason."

Scully v. Summers, No. 95 Civ. 9091(PKL), 2000 WL 1234588, at *15 (S.D.N.Y. Aug. 30, 2000) (quoting Price Waterhouse, 439 U.S. at 252).

However, regardless of whether the Price Waterhouse or McDonnell Douglas framework is applied, the ultimate issue is: "Whether the plaintiff has presented evidence from which a rational finder of fact could conclude that the defendant discriminated against [him] illegally." Jalal, 4 F.Supp.2d at 234.

ii. Verbal Comments and "Stray" Remarks

*12 "[A]ll comments pertaining to a protected class are not equally probative of discrimination." Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir.2007). "Although evidence of one stray comment by itself is usually not sufficient proof to show ... discrimination, that stray comment may 'bear a more ominous significance' when considered within the totality of the evidence." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 136 (2d Cir.2000) (quoting Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir.1998)). Specifically, "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." Tomassi, 478 F.3d at 115.

In determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative "stray remark," a court should consider the following factors: (1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process.

Silver v. N. Shore Univ. Hosp., 490 F.Supp.2d 354, 363 (S.D.N.Y.2007) (citing Minton v. Lenox Hill Hosp., 160 F.Supp.2d 687, 694 (S.D.N.Y.2001)); see also Quinby v. WestLB AG, No. 04 Civ. 7406(WHP), 2007 WL 3047111, at *1 (S.D.N.Y. Oct. 18, 2007).

2. Analysis

Applying the Price Waterhouse "mixed motive" framework, the Court concludes that there are disputed issues of material fact with respect to whether: (1) Plaintiff has adduced sufficient evidence of discrimination to permit a jury to conclude that the burden of proof should shift to Defendant, and (2) Defendant has demonstrated by a preponderance of the evidence that Plaintiff would have been terminated regardless of the impact of the allegedly discriminatory motives displayed by Plaintiff's supervisors. Accordingly, Defendant's motion for summary judgment is denied as to Plaintiff's discriminatory termination claims under both Title VII and the ADEA.

Under Price Waterhouse, "direct" evidence of discrimination includes " 'actions by decisionmakers that may be viewed as directly reflecting the alleged discriminatory attitude.' " Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 173 (2d Cir.2006) (quoting Raskin, 125 F.3d at 60-61)).[FN6] "The Price Waterhouse Court made clear that the burden-shifting threshold a plaintiff must cross is proof that the forbidden animus was at least one of the 'motivating' factors in the employment decision; he or she need not show that it was the sole reason, or the 'true' reason, or the 'principal' reason." Ostrowski v. Atl. Mut.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

Ins. Cos., 968 F.2d 171, 180 (2d Cir.1992) (internal citations omitted).

FN6. In this context, the word "direct" is better understood to indicate that a remark or action directly reflects a discriminatory attitude. *See* Sista, 445 F.3d at 173; Cartagena v. Ogden Servs. Corp., 995 F.Supp. 459, 462 (S.D.N.Y.1998). This is because the phrase " '[d]irect evidence' of discrimination is something of a misnomer, in that any evidence short of a bald statement by the decisionmaker to the effect that they are firing an employee for an impermissible reason requires some inferential step to support a finding of discriminatory motive." Cartagena, 995 F.Supp. at 462. However, "[i]n a mixed-motive case, the term 'direct evidence' is used 'to distinguish direct evidence from the kind of evidence which makes out a *McDonnell Douglas prima facie* case-*i.e.,* evidence from which an inference of discrimination arises only because it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection, and which inference is therefore immediately dispelled once the employer has produced evidence of a nondiscriminatory reason." Ames v. Cartier, Inc., 193 F.Supp.2d 762, 768 (S.D.N.Y.2002) (quoting Cartagena, 995 F.Supp. at 462)).

**\*13** Tabbah and Donohue were employed by Defendant, supervised Plaintiff, and acknowledge that they jointly made the decision to terminate him (Donohue Aff. ¶ 10; Tabbah Aff. ¶ 6). Although the parties dispute whether the allegedly racist and age-related remarks were actually made, Plaintiff's evidence of these comments, if credited, is sufficiently linked to Plaintiff's termination to permit a finder of fact to conclude that Plaintiff is entitled to a *Price Waterhouse* burden shift.

In *Jalal v. Columbia University,* the court noted that the plaintiff had adduced both "direct" and indirect evidence that she was unlawfully discriminated against on the basis of her national origin and religion in connection with the decision of a tenure committee at Columbia University. 4 F.Supp.2d at 227, 234. In assessing the evidence of allegedly discriminatory comments, the court offered two general principles that provide useful guidance on the issue of "[w]hether a decisionmaker's comment supports an inference of bias ...." Id. at 235. First, a comment supports a rational inference of bias where "the speaker is preoccupied with a [protected] classification in a setting where a focus on other issues would ordinarily be expected." Id. at 235. Second, "a statement can reveal a speaker's prejudice if it (1) makes a reference to a [protected] class *and* (2) provides some indication that membership in such a class is disapproved of." Id. at 236 (emphasis in original). The record in this case contains evidence of both types of comments.

The alleged comment made by Donohue on May 4, 1999 fit roughly within the first category identified in *Jalal.* In response to a question from Plaintiff regarding why, as an alternative to being terminated, he was not being demoted out of the PDP, Donohue is alleged to have told Plaintiff that he " 'could not carry the briefcase (in selling techniques) of any of the *young* guys and girls' " in the PDP. (Pl.'s Interrog. Resp. at 28 (emphasis added) .) This remark was allegedly made on the day before Plaintiff was terminated, it related to his termination, and it was made by a person who participated in making the firing decision. The Court cannot conclude as a matter of law that this alleged comment was merely a "stray remark."

Donohue's alleged response to Plaintiff's question regarding the workplace seating arrangement-" 'it's better than sitting at the back of the bus' " (Pl.'s Interrog. Resp. at 29)-likewise suggests a preoccupation with race in a context in which a more fact-based explanation would have sufficed. Indeed, Defendant's proffered non-discriminatory explanation for the seating

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

arrangement-that "no other seats were available" (Def.'s Mem. at 18)-is precisely the sort of race-neutral and non-discriminatory response that Donohue allegedly failed to provide to Plaintiff. A similarly permissible inference of racially driven animus is apparent on the face of Donohue's alleged question to Plaintiff regarding whether James Byrd " 'got what was coming to him .... ' " (Pl.'s Interrog. Resp. at 13.)

**\*14** Plaintiff has also adduced evidence of several comments that fall into the second category discussed in *Jalal.* For example, Donohue's alleged statement in early 1998 that "the future of the office lay with young White brokers" referenced two protected classes-age and race-and supports an inference that non-membership in those classes was disfavored by Donohue in terms of PDP FCs' chances of success in the program. (Pl.'s Decl. ¶ 16.) Similar inferences are available with respect to: (1) Tabbah's alleged statements, which Plaintiff contends were reiterated on more than one occasion, that Plaintiff was "wasting [his] time courting Black investors" and "should be devoting [his] efforts toward obtaining White accounts" (Pl.'s Decl. ¶ 19); and (2) Tabbah's alleged comment in reference to the potential attendees of the Fifth African American Summit that " 'that these people were no good as investors and that [Plaintiff] should be concentrating on developing more white clients.' " (Pl.'s Interrog. Resp. at 22.)

Finally, in connection with a discussion of the Fifth African American Summit, Plaintiff alleges that a supervisor also stated that Nigerians are "all a bunch of 'con artists' and that Merrill Lynch didn't want anything to do with them." (Pl.'s Decl. ¶ 32.) In its Reply Brief, Defendant asserts that this comment "does not relate to race, but only to national origin-and not Plaintiff's national origin." (Def.'s Reply at 13 n. 9.) The Court cannot resolve this issue on a motion for summary judgment. The alleged comment regarding *Nigerians* was allegedly made by Tabbah in the context of a discussion regarding a gathering of *African Americans* to be held in *Ghana.* The comment implicated a Title VII class-either race or

national origin-and expressed plain disapproval for that group by referring to them as "con artists." Although the Court is unable to reach a conclusion from the face of the remark whether the speaker intended it to implicate race or national origin, the comment is probative, to some extent, of discriminatory bias.

In addressing the evidence of these comments, Defendant overemphasizes the fact that Donohue and Tabbah both hired and fired Plaintiff, and exaggerates the force of the "same actor" inference. (*See* Def.'s Mem. at 10.) "The 'same actor' inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand." *Copeland v. Rosen,* 38 F.Supp.2d 298, 305 (S.D.N.Y.1999) (citing, *inter alia, Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997)); *see also Braunstein v. Barber,* No. 06 Civ. 5978(CS)(GAY), 2009 WL 849589, at \*9 (S.D.N.Y. Mar. 30, 2009). Simply put, in light of the evidence in the record of discriminatory comments by Donohue and Tabbah, the application of the "same actor" inference at this stage would improperly usurp the role of the fact finder.[FN7]

FN7. For example, although the Second Circuit applied the "same actor" inference in *Schnabel v. Abramson,* 232 F.3d 83 (2d Cir.2001), "[the] plaintiff ha[d] failed to offer *any* evidence that he was subjected to *any* age-related comments or criticisms on the job." *Id.* at 91 (emphasis added). Here, by contrast, Plaintiff has adduced evidence that he was subjected to both age-and race-related comments *by his supervisors.* Therefore, because there are factual disputes regarding these comments, the Court cannot resolve the applicability of the "same actor" inference in the context of a motion for summary judgment.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

**\*15** Moreover, that Donohue and Tabbah deny making these comments is of no moment in the context of a motion for summary judgment. "If said, a reasonable jury could believe that these remarks 'directly reflect[ ] the alleged discriminatory attitude.' " *Cartagena,* 995 F.Supp. at 463 (quoting *Raskin,* 125 F.3d at 160-61); *see also Ames,* 193 F.Supp.2d at 768 (citing *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 913 (2d Cir.1997)). Based on this evidence, a reasonable juror could conclude that Plaintiff has established "at the least, a 'thick cloud of smoke' supporting his claim of discriminatory treatment." *Silver,* 490 F.Supp.2d at 365 (quoting *Raskin,* 125 F.3d at 61); *see also Ames,* 193 F.Supp.2d at 768 ("Assuming the truth of [the] plaintiff's testimony (as, for purposes of this motion, the court must), ... repeated statements [by the plaintiff's supervisors] undeniably reflect a discriminatory attitude on the part of the decisionmaker."). Therefore, based on the evidence of these comments by Plaintiff's supervisors, there are-at a minimum-disputed issues of material fact as to whether Plaintiff would be entitled to a shift of the burden of proof under *Price Waterhouse.*[FN8]

FN8. The Court notes that, although there is more evidence in the record of race-related comments by Plaintiff's supervisors than there is of age-related remarks, Plaintiff's claim for discriminatory termination under the ADEA need not be dismissed based solely on this relative imbalance. *See Rose,* 257 F.3d at 162 (holding that two comments by the plaintiff's supervisor that he would replace her with someone "younger and cheaper"-one in February 1994 and another at an unspecified time during the 1993-1994 academic year-constituted direct evidence of discrimination in connection with the plaintiff's July 1994 termination).

Next, the Court must consider whether, if the burden were to shift to Defendant under *Price Waterhouse,* Defendant has nevertheless proven "it would have made the same decision even had there been no such animus." *Jalal,* 4 F.Supp.2d at 233. Defendant argues that Plaintiff

was terminated because he failed to obtain sufficient production credits to meet the requirements of the PDP. (Def.'s 56.1 ¶¶ 31-32; *see also* Def.'s Mem. at 9.) Plaintiff concedes that he did not satisfy this requirement. (Pl.'s Dep. at 246:5-20.) However, Plaintiff argues that Defendant's proffered reason for his termination "does not provide any explanation for why plaintiff's managers blocked his efforts to meet his quotas by soliciting business from the African American community." (Pl.'s Mem. at 13.)

In its Reply Memorandum, Defendant seeks to address these arguments from the perspective of the third step of the *McDonell Douglas* framework, in which it is *Plaintif's burden* to prove that the employer's proffered reason was a pretext for discrimination. *See McPherson,* 457 F.3d at 215. However, "[p]roducing direct evidence of discrimination does have its reward .... [O]nce the plaintiff proffers such evidence, the *burden of persuasion not only shifts to the defendant but it remains there."* *Tappe v. Alliance Capital Mgmt., L.P.,* 198 F.Supp.2d 368, 373-74 (S.D.N.Y.2001) (emphasis added). Thus, for the purposes of this analysis, the burden of proof is on Defendant to demonstrate that Plaintiff would have been terminated notwithstanding the evidence that discrimination was a motivating factor in the decision. *See Silver,* 490 F.Supp.2d at 365 (denying summary judgment based on mixed-motive analysis where the defendants had "not shown that a reasonable jury could *only* find that [the] defendants would have made the same decision regardless of [the plaintiff's] age" (emphasis added)). However, Defendant has not addressed this aspect of the *Price Waterhouse* analysis, much less demonstrated that it is entitled to judgment as a matter of law based on the undisputed facts in the record.

**\*16** With respect to Plaintiff's argument that his supervisors "suppressed" his business development efforts, the Court is mindful that "the antidiscrimination statutes do not grant the federal courts a 'roving commission to review business judgments.' " *LaLanne v. Begin Managed Programs,* No. 04 Civ. 9076(NRB), 2007

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

WL 2154190, at *3 (S.D.N.Y. July 24, 2007) (quoting *Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 106 (2d Cir.1969)). Moreover, Plaintiff's examples of instances in which his supervisors "suppressed" his production are not, by themselves, particularly probative of discriminatory intent.[FN9] However, granting Plaintiff the inferences to which he is entitled, the evidence of age- and race-related comments by Tabbah and Donohue is sufficient to preclude summary judgment.

> FN9. The Court notes that the "cumulative effect" of allegedly discriminatory acts cannot be relied on by a plaintiff "to establish that [he] suffered an adverse employment action for purposes of a disparate treatment claim." *Dauer v. Verizon Commc'ns Inc.,* No. 03 Civ. 05047(PGG), 2009 WL 186199, at *3 (S.D.N.Y. Jan. 26, 2009); *Figueroa v. New York City Health & Hosp. Corp.,* 500 F.Supp.2d 224, 230 (S.D.N.Y.2007) (finding no authority "for the proposition that [courts] are to consider the cumulative effect of individually alleged adverse employment actions when evaluating an intentional discrimination claim"). However, Plaintiff has not characterized the alleged instances in which his supervisors "suppressed" his business development efforts-either cumulatively or in isolation-as adverse employment actions. Rather, Plaintiff's theory of this case is that Defendant intentionally hindered his ability to meet the goals of the PDP FC program, which provided a pretextual explanation for his otherwise discriminatory termination.

Indeed, Plaintiff has adduced evidence that some of his supervisors' comments were directly related to his proposed business projects, such as the Fifth African American Summit. (Pl.'s Interrog. Resp. at 22; *see also* Pl.'s Decl. ¶¶ 32, 33.) Plaintiff contends that he was told by Donohue that "the future of the office lay with young White brokers." (Pl.'s Decl. ¶ 16.) He further asserts that

he was instructed to stop "wasting [his] time courting Black clients," and that he "should be devoting [his] efforts toward obtaining White accounts." (*Id.* ¶ 19.) Based on this evidence, a reasonable fact finder could reject Defendant's argument that Plaintiff was terminated solely because of his failure to meet the goals set for PDP FCs.

In conclusion, there are disputed issues of material fact as to whether Defendant's proffered "legitimate reason" for Plaintiff's termination, "standing alone, would have induced it to make the same decision." *Scully,* 2000 WL 1234588, at *15. More generally, there are disputed factual issues with respect to whether "the evidence 'support[s] a reasonable inference that prohibited discrimination occurred.' " *John v. Dep't of Info. Tech. & Telecomms.,* No. 06 Civ. 13119(PAC), 2008 WL 4694596, at *4 (S.D.N.Y. Oct. 23, 2008) (quoting *James v. New York Racing Ass'n,* 233 F.3d 149, 156 (2d Cir.2000)).[FN10] Therefore, summary judgment is inappropriate because (1) there are factual disputes regarding the existence of evidence of discrimination that, once resolved, may permit Plaintiff to shift the burden of proof to Defendant under *Price Waterhouse,* and (2) there are disputed issues of fact regarding the reasons for which Plaintiff was terminated. Accordingly, Defendant's motion for summary is denied as to Plaintiff's discriminatory termination claims under Title VII and the ADEA.

> FN10. In light of the nature of the evidence of discrimination in the record, the Court has analyzed the record under the mixed-motive framework of *Price Waterhouse.* However, the same result would follow from the application of the framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Jalal,* 4 F.Supp.2d at 234. Simply put, regardless of whether the burden of proof ultimately falls on Defendant under *Price Waterhouse,* or remains with Plaintiff under *McDonnell Douglas,* disputed issues of fact preclude the resolution of this issue in a motion for summary judgment.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

C. Hostile Work Environment

With respect to Plaintiff's hostile work environment claims under the ADEA and Title VII, Defendant argues that there is insufficient evidence to support Plaintiff's theory that discriminatory conduct altered the terms and conditions of his employment. However, for the reasons set forth below, the Court concludes that Defendant has mischaracterized the amount of evidence in the record with respect to Plaintiff's hostile work environment claim under Title VII. Accordingly, Defendant's motion is granted as to Plaintiff's hostile work environment claim under the ADEA, but denied as to Plaintiff's hostile work environment claim under Title VII.

1. Applicable Law

**\*17** There are essentially three elements to a hostile work environment claim under both Title VII and the ADEA. First, the plaintiff must establish that the challenged conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Feingold v. New York,* 366 F.3d 138, 150 (2d Cir.2004). "This first element has both a subjective and an objective component. The misconduct must be sufficiently severe or pervasive to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive the environment to be abusive." *Ford v. New York City Dep't of Health & Mental Hygiene,* 545 F.Supp.2d 377, 392 (S.D.N.Y.2008).

Although the Second Circuit has held that there is no "magic" threshold number of harassing incidents that are required as a matter of law to state a claim, *see Richardson,* 180 F.3d at 439, "[i]solated instances of harassment ordinarily do not rise to this level." *Cruz,* 202 F.3d at 570. Rather, a hostile work environment is determined by "all the circumstances," including "the

frequency of the discriminatory conduct; its severity; [and] whether it is physically threatening or humiliating, or a mere offensive utterance .... " *Howley,* 217 F.3d at 154 (quoting *Harris,* 510 U.S. at 23); *see Faragher v. City of Boca Raton,* 524 U.S. 775, 788, (1998) (holding that "simple teasing ... offhand comments, isolated incidents (unless extremely serious)" are not discriminatory changes in the "terms and conditions of employment").

Second, the plaintiff must also establish a link between the offensive conduct and his membership in a protected class. *Ford,* 545 F.Supp.2d at 393. "Abusive conduct in the workplace, if not based on a protected class, is not actionable under Title VII. The statute prohibits discrimination, and is not a civility code." *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998)).

Third, there must be " 'a specific basis ... for imputing the conduct that created the hostile environment to the employer.' " *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996) (quoting *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995)).

2. Analysis

Plaintiff has not provided sufficient evidence to support a hostile work environment claim under the ADEA. *See Ford,* 545 F.Supp.2d at 393 ("[O]n a motion for summary judgment, the nonmoving party 'must present concrete particulars and cannot succeed with purely conclusory allegations.' " (quoting *Cadle Co. v. Newhouse,* No. 01 Civ. 1777(DC), 2002 WL 1888716, at \*4 (S.D.N.Y. Aug. 16, 2002)). The Court finds evidence of only two age-related comments during the sixteen-month period of Plaintiff's employment.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

Specifically, in "early 1998," Donohue told Plaintiff that "the future of the office lay with young White brokers." (Pl.'s Decl. ¶ 16), and on May 4, 1999, Donohue told that Plaintiff he "could not carry the briefcase ... of any of the young guys and girls we have here." (Pl.'s Interrog. Resp. at 28.) Evidence of these two statements is merely indicative of "[i]solated instances of harassment," *Cruz,* 202 F.3d at 570, and is insufficient to sustain a hostile work environment claim.[FN11] Accordingly, Defendant's motion is granted as to Plaintiff's hostile work environment claim under the ADEA.

FN11. As discussed above, the Court finds the evidence of Donohue's comments on May 4, 1999 to be probative of a potentially age-related motive for Plaintiff's termination. However, "a hostile work environment claim requires a different legal analysis from that applicable to an employment discrimination claim ...." *Rivera v. Potter,* No. 03 Civ.1991(LAP), 2005 WL 236490, at *1 n. 2 (S.D.N .Y. Jan. 31, 2005). With respect to Plaintiff's hostile work environment claim under the ADEA, these two statements, taken together, are not indicative of a workplace "permeated with 'discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.' " *Howley,* 217 F.3d at 153 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).

**\*18** However, with respect to Plaintiff's hostile work environment claim under Title VII, Defendant misstates both the quantity and the nature of the evidence in the record. Specifically, Defendant argues that Plaintiff has only alleged that he was subjected to eight instances of relevant comments or conduct, that three of them "objectively have nothing to do with race," and "one, by Plaintiff's own admission, did not offend him." (Def.'s Mem. at 19.) Defendant is not entitled to summary judgment based on this mischaracterization of the record.

"It is ... important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano v. Costello,* 294 F.3d 365, 377 (2d Cir.2002). Therefore, the Court agrees with Defendant that some of the evidence in the record is not relevant to the analysis of Plaintiff's hostile work environment claim. Specifically, the incident involving an exotic dancer and the comments by a co-worker who "viciously berated" Plaintiff are not evidence tending to support a hostile work environment claim.

Nevertheless, the Court has already discussed in detail several comments by Plaintiff's supervisors from which a reasonable juror could infer racial bias on the part of the speaker. *See supra* Part III.B.2. Plaintiff also alleges that one of those comments-the statement by Tabbah that Plaintiff was "wasting [his] time courting Black investors" and "should be devoting [his] efforts toward obtaining White accounts"-was made "on more than one occasion." (Pl.'s Decl. ¶ 19.)

Moreover, although the "stray remarks" doctrine may serve to limit the probative value of some comments in discrimination claims based on adverse treatment, "[c]omments by nondecisionmakers concerning a plaintiff may be admissible to demonstrate a pervasive hostile atmosphere ...." *Quinby,* 2007 WL 3047111, at *1 (citing *Malarky v. Texaco, Inc.,* 983 F.2d 1204, 1210 (2d Cir.1993)). Therefore, the fact finder would be entitled to consider the evidence of Plaintiff's interaction with an employee named Healey, who "stated loudly" to Plaintiff " 'Bookman, get your ass to the meeting.' ... 'get your black ass to the meeting.' " (Pl .'s Interrog. Resp. at 33.)

In addition to race-related comments, actions by Defendant's employees are also relevant to the hostile

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

(Cite as: 2009 WL 1360673 (S.D.N.Y.))

work environment analysis under Title VII. Plaintiff contends that Tabbah and Donohue "encouraged the actions of many [employees] in the office," which "often would emerge in different ways that were both humiliating and embarrassing ...." (*Id.* at 20.) Relevant here is the evidence of segregated seating at the workplace and the January 1999 business meeting between Plaintiff and six African American investors. First, although Defendant disputes that it purposefully created a segregated seating arrangement, Plaintiff has sufficiently alleged that he notified his supervisor of his concerns regarding the seating, and that Donohue allegedly responded " 'it's better than sitting at the back of the bus.' " (*Id.* at 29.) The parties' dispute regarding the probative value of this evidence cannot be resolved in a motion for summary judgment.

**\*19** Second, with respect to the January 1999 business meeting, a reasonable juror could infer racial animus from the alleged behavior of Defendant's employees toward a room in which only African Americans were present. Moreover, Plaintiff alleges that, when he reported the incident to his supervisor, Donohue merely asked, "well, what's the problem?" (*Id.* at 20.) Thus, Plaintiff's contentions regarding these events, including the fact that he notified his supervisors of both situations, are relevant to the analysis of his hostile work environment claim.

Therefore, based on the evidence of race-related comments and actions by Plaintiff's co-workers and supervisors, the Court cannot dismiss Plaintiff's Title VII hostile work environment claim as matter of law. Accordingly, Defendant's motion for summary judgment on this claim is denied.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted in part and denied in part.

The following claims are hereby dismissed: (1) all of Plaintiff's claims under the ADA; (2) Plaintiff's claims under Title VII and the ADEA for failure to promote and retaliation; and (3) Plaintiff's hostile work environment claim under the ADEA. Plaintiff is also deemed to have abandoned any claims relating to his PDP training schedule and the circumstances surrounding his passage of the Series 7 exam. *See supra* note 5.

Remaining to be resolved in this litigation are: (1) Plaintiff's discriminatory termination claims under Title VII and the ADEA, and (2) Plaintiff's hostile work environment claim under Title VII.

SO ORDERED.

S.D.N.Y.,2009.

Bookman v. Merrill Lynch

Slip Copy, 2009 WL 1360673 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 497796 (S.D.N.Y.), 29 NDLR P 240

(Cite as: 2005 WL 497796 (S.D.N.Y.))

H

United States District Court,

S.D. New York.

Antonio D. GIBBS Plaintiff,

v.

THE CITY OF NEW YORK, Defendant.

No. 02-CV-2424-LB.

Jan. 21, 2005.

OPINION AND ORDER

BLOOM, Magistrate J.

**\*1** Plaintiff Antonio Gibbs brings this complaint [FN1] under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000(e) *et seq.,* and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12112-12117, as amended by the Civil Rights Act of 1991, Pub.L. No. 102-166), alleging that defendant discriminated against him in his employment on the basis of his gender and disability. Plaintiff's complaint also alleges retaliation. The parties consented to a decision of this matter by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). Defendant moves for summary judgment under Fed.R.Civ.P. 56. For the reasons set forth below, the Court grants defendant's motion and dismisses plaintiff's complaint.

FN1. Plaintiff originally brought this action *pro se.* Counsel filed a notice of appearance on plaintiff's behalf dated April 14, 2003.

BACKGROUND

Defendant Administration for Children's Services ("ACS") [FN2] serves as the child welfare agency in the City of New York. ACS seeks to protect New York City's children by providing, among other things, abuse and neglect investigations, counseling, drug rehabilitation programs, head start and other day care programs, child support enforcement and foster homes for approximately 34,000 children. (Def. Mem. of Law at 1).

FN2. Although plaintiff's complaint names the Administration for Children's Services as a defendant, City agencies are not suable entities. The proper defendant is therefore the City of New York. *See* N.Y. City Charter § 396; *Lauro v. Charles,* 219 F.3d 202, 205 n. 2 (2d Cir.2000).

Plaintiff Gibbs has been employed as a provisional city employee in the procurement area of the ACS's Administrative Service for the Division of Childcare and Headstart since September, 1997. (*See* Gibbs Depo. 32:9-13, 54:11-12). Plaintiff continues to hold the civil service title of per diem Clerical Associate III under the union job specifications of the District Council 37, AFSCME, AFL-CIO, Local 1549 ("the union"). (*See* Visco Decl. at ¶ 10, Ex. D). Plaintiff asserts that the job assignments of a Clerical Associate III "are and have always been governed by those set forth in the union's Clerical Administrative Employees Job Specifications." (Pla. Opp. at 2). Plaintiff further asserts that "the local 1549 job specs do not include simple repairing of copy machines, faxes, time clocks and/or drinking water

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 497796 (S.D.N.Y.), 29 NDLR P 240

(Cite as: 2005 WL 497796 (S.D.N.Y.))

dispensers; changing toner or cartridges, and/or moving heavy objects and furniture." (*Id.* at 2). Despite these job specifications not being included in his Civil Service title, plaintiff alleges that he has been required by his supervisors to perform these out of title job duties because of his gender.

ACS disputes that the union job specifications govern the work assignments of the Clerical Associate III position. Defendant maintains that the union job specifications provide only general guidance about what tasks may be assigned to individual employees through broad job descriptions and "typical assignments" within each class of position.[FN3] Instead, ACS utilizes master lists of "Tasks and Standards," promulgated by an internal Office of Personnel Administration with the input of the various ACS program areas. These Tasks and Standards outline individual job tasks and performance standards associated with each civil service title. (*See* Wynter Aff. at ¶¶ 5, 6, 8).

FN3. For the Clerical Associate III position, the union job specification states that the job duties "encompass clerical and related office activities utilizing manual and automated office systems." (*See* Visco Decl. at ¶ 10, Ex D).

**\*2** Plaintiff is currently assigned four tasks from the ACS Tasks and Standards associated with the Clerical Associate III title. (*See* Glenn Aff. at 14, ex. B). He is responsible for troubleshooting certain office equipment, responding to staff requests for assistance with such equipment and initiating corrective action. (*See* Gibbs Depo. at 42:15 to 43:03). ACS personnel contact Gibbs when machines are in need of repair. Plaintiff calls in the repairs, escorts the technicians to the relevant machine, and logs the repair activity. Gibbs also maintains inventory, orders supplies and repairs duplicating equipment located at ACS's four resource areas. Until 2001, part of these tasks required that plaintiff monitor

copy machines to ensure that they had an adequate stock of toner and, if necessary, replace toner cartridges in machines. (*See* Glenn Aff. ¶¶ 18-20, 28, 30).

Gibbs's work hours are from 8:00 a.m. to 4:00 p.m. Monday through Friday with a one hour lunch break from 12:00 p.m. to 1:00 p.m. (*See* Gibbs Depo 68:12-14). In 2001, ACS informed plaintiff that city policy prohibited plaintiff from taking an extra fifteen minutes at his lunch hour to cash his paycheck. In 2002, plaintiff was asked to eat breakfast in a designated employee lounge rather than at his desk. (*Id.* at 68:8-14). Plaintiff has never filed an official request for a transfer nor has he officially sought a promotion. (*Id.* 67:10 to 68:2). Plaintiff was terminated on May 13, 2003, but was rehired forty-one days later on June 23, 2003. (Plaintiff's Opposition to Motion for Summary Judgment ¶ 13).

## DISCUSSION

Summary judgment is appropriate if there is no genuine material issue of fact requiring a trial and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' ' *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.1997) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party ." *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000).

"When a motion for summary judgment is made and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 497796 (S.D.N.Y.), 29 NDLR P 240

(Cite as: 2005 WL 497796 (S.D.N.Y.))

supported ..., an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see* Matsushita, 475 U.S. at 586-87 (1986). In other words, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. Anderson, 477 U.S. at 257. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." Niagra Mohawk Power Corp. v. Jones Chemical, Inc., 315 F .3d 171, 175 (2d Cir.2003) (quoting Kerzer v. Kingly Mfg., 156 F .3d 396, 400 (2d Cir.1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Id.* (quoting Anderson, 477 U.S. at 252).

## I. THE AMERICANS WITH DISABILITIES ACT

**\*3** The Americans with Disabilities Act ("ADA") provides that an employer shall not "discriminate against a qualified individual with a disability because of the ability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In order to make out an ADA claim, the plaintiff must show that: (1) his employer is subject to the ADA; (2) he is disabled under the ADA; (3) he is otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir.2001).

Defendant admits that it is an employer subject to the ADA, but contends that plaintiff has not established that he is disabled within the meaning of the ADA and therefore argues that plaintiff fails to state a prima facie case under the ADA.

### A. Disability under the ADA

In Bragdon v. Abbott, 524 U.S. 624 (1998), the Supreme Court articulated the test for whether a plaintiff is disabled within the meaning of the ADA. The ADA defines disability as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U .S.C. § 12102(2). Accordingly, to determine whether plaintiff's disability claim is covered by the ADA, courts begin with subsection (A) and focus first on whether plaintiff suffers from an impairment, whether the impairment affects a "major life activity" under the ADA and finally, whether plaintiff is substantially limited in the identified major life activity. Regional Economic Community Action Program, Inc. v. City of Middletown, 294 F.3d 35, 46 (2d Cir.2002); Colwell v. Suffolk County Police Dep't., 158 F.3d 635, 641 (2d Cir.1998).

### 1. Impairment

The Court must first determine whether plaintiff's condition constitutes a physical impairment. The Department of Health, Education and Welfare (HEW) issued the first regulations interpreting the Rehabilitation Act, the precursor statute to the ADA, in 1977. The regulations are of particular significance because, at the time, HEW was the agency responsible for coordinating the implementation and enforcement of the Rehabilitation Act. *Bragdon,* 524 U.S. at 554-5. The HEW regulations, which appear unchanged in the current regulations issued by the Department of Health and Human Services, define "physical or mental impairment" as:

"(A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 497796 (S.D.N.Y.), 29 NDLR P 240

(Cite as: 2005 WL 497796 (S.D.N.Y.))

*4 "(B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities."

45 CFR § 84.3(j)(2)(i) (1997).

Plaintiff states that he suffers from Bells Palsy, injuries to his Achilles tendons, tendonitis in both knees, bulging disks in his back and blindness in one eye. (Pla. Opp. at 2). Several of these conditions affects the musculoskeletal system. Plaintiff's blindness affects his special senses. As such, the Court finds that plaintiff is impaired within the meaning of the ADA.

2. Major Life Activities

The ADA is not operative unless a claimant's impairment affects a major life activity. *Bragdon,* 524 U.S. at 637. Plaintiff indicates that his impairments limit his ability to perform such major life activities as standing, bending, lifting and reaching. (Pla. Opp. at 2). The Second Circuit has held that the ability to stand, sit, lift objects, work, and sleep are all major life activities within the meaning of the ADA. *Colwell,* 158 F.3d at 643. The Court finds that plaintiff's impairment in his sight as well as his ability to stand, bend, lift and reach do affect major life activities covered by the ADA.

3. Substantially Limiting

The final inquiry in the *Bragdon* analysis is to determine whether the plaintiff's impairment "substantially limits" any major life activity. *Id.* at 643. This inquiry is individualized and fact specific. *Id.* The EEOC regulations recommend that the following factors be considered in determining whether an individual is substantially limited in a major life activity: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630(j)(2); *See also Miller v. Taco Bell Corp.,* 204 F.Supp.2d 456, 459 (E.D.N.Y.2002) (discussing the case-specific inquiry required).

To be substantially limited in any major life activity, "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." *Sacay v. Research Foundation of CUNY,* 193 F.Supp.2d 611, 626 (E.D.N.Y.2002) (citing *Toyota Motor Mfg. v. Williams,* 534 U.S. 184, 198 (2002)). "An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person." *Toyota,* 534 U.S. at 198.

Plaintiff asserts that his impairments substantially limit him as follows: "[t]he Second Circuit has identified sitting, standing, bending, lifting or reaching as major life activities under the ADA. Plaintiff has identified [sitting, standing, bending, lifiting and reaching] as limited by his disabilities. All of these activities are substantially limiting in that plaintiff's employer requires him to perform the activities when he cannot do so." (Pla.Opp.4). This conclusory assertion fails to establish that plaintiff is substantially limited in any major life activity because of his impairments. Nevertheless, the Court considers the effect of each of plaintiff's impairments in turn.

a) Monocular Vision

*5 Plaintiff claims that he is blind in one eye. However, plaintiff fails to establish that he is substantially

Not Reported in F.Supp.2d, 2005 WL 497796 (S.D.N.Y.), 29 NDLR P 240

(Cite as: 2005 WL 497796 (S.D.N.Y.))

limited in any major life activity because of his eyesight. In *Albertson's v. Kirkinburg,* 527 U.S. 555 (1999), the Supreme Court held that an individual like plaintiff, who could not see out of one eye, was not categorically disabled under the ADA. *See also Rivera v. Apple Industrial Corp et al.,* 148 F.Supp.2d 202, 213 (E.D.N.Y.2001) (monocular vision is insufficient to establish a substantial limitation on a major life activity). Although "people with monocular vision 'ordinarily' will meet the [ADA]'s definition of disability," a plaintiff must offer evidence that the extent of the limitation is substantial as in loss of depth perception and visual field. *Albertson's,* 527 U.S. at 567.

In the instant case, plaintiff fails to make such a showing. Plaintiff offers no evidence to demonstrate that his monocular vision affects any major life activity. To the contrary, plaintiff admits that his corrected vision in one eye is 20/20, that he is licensed to drive a car and has done so in the past year. He is able to read and write. (Gibbs Depo 34:17 to 36:2, 99:15). All of these factors are relevant to determine whether plaintiff's impairments substantially limit a major life activity within the meaning of the ADA. *See Sutton v. United Airlines, Inc.,* 527 U.S. 471, 482 (1999) (mitigating measures must be taken into account to determine whether an individual is disabled within the meaning of the ADA). The Court finds that plaintiff has not established that his monocular vision substantially limits him in any major life activity.

b) Bells Palsy

As with his monocular vision, plaintiff fails to describe the limitations he suffers as a result of his Bells Palsy. Plaintiff offers no evidence to demonstrate that his Bells Palsy affects any of his major life activities. An undated doctor's note in plaintiff's personnel file states that, "[plaintiff's physician] saw Antonio Gibbs in neurological consultation on 4/3/01. His tasks should be limited to *not* changing the toner in the photocopy machine as, this may aggravate his condition." (Def's Rule 56.1 Stat. Ex. H) (emphasis in original). Even if the Court

were to construe this note as a diagnosis relating to plaintiff's Bells Palsy, this note alone is insufficient to establish that plaintiff is substantially limited in any major life activity. *See Sacay,* 193 F.Supp.2d at 626-27 (A plaintiff must do more than submit evidence of a medical diagnosis, he must offer "evidence that the extent of the limitation caused by [the] impairments in terms of his own experience is substantial").

Plaintiff stated at his deposition that his eye tears because of his Bells Palsy and that his eye does not shut all the way when he sleeps. (Gibbs Depo 89:21 to 90:4). However, such symptoms do not substantially limit plaintiff in any major life activity. Even if plaintiff's sleeping is affected, "[d]ifficulty sleeping is extremely widespread." *See Colwell,* 158 F.3d at 644 (difficulty sleeping does not constitute a disability under the ADA where plaintiff fails to show that his "affliction is any worse than is suffered by a large portion of the nation's adult population"). The other effects of plaintiff's Bells Palsy, eyes that water and discomfort in cold weather, are similarly not sufficiently severe to be considered "substantially limiting." As such, the Court finds that plaintiff has not established that his Bells Palsy substantially limits him in any major life activity.

c) Tendonitis and Dislocated Disk in Plaintiff's Lower Back

**\*6** Plaintiff also fails to demonstrate that his tendonitis and/or his back problems substantially limit him in any major life activity. Plaintiff alleges that his tendonitis inhibits his ability to sit, stand, bend, lift and reach. However, plaintiff's conclusory allegations are too vague to establish that he is substantially limited in any major life activity as a result of his tendonitis and back problems.

Plaintiff's personnel file contains a medical report dated August 10, 1994 which diagnosed plaintiff with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 497796 (S.D.N.Y.), 29 NDLR P 240

(Cite as: 2005 WL 497796 (S.D.N.Y.))

back ailments resulting from an automobile accident on August 9, 1994. (Def. Rule 56.1 State. Ex. H). However, even if plaintiff's diagnosis was more recent, it would still be insufficient to establish that plaintiff's back problems substantially limit him in any major life activity. Although plaintiff claims that his back condition is permanent, he also admits that he ceased therapy for his back in November of 1994. Plaintiff further states that he suffers from tendonitis in both his knees and an Achilles tendon that is aggravated by weather, long walks and heavy loads on his legs. (Gibbs' Depo. 92:11 to 96:14). However, plaintiff admits that he stopped receiving treatment for tendonitis in early 2002. (Gibbs' Depo. 92:19). Plaintiff makes no showing that his tendonitis and back problems substantially limit him in any major life activity or are worse than those problems suffered by a significant portion of the population. See Colwell, 158 F.3d at 644 (employees failed to show that they were substantially limited where one employee could not sit for "prolonged" periods, lift "very heavy objects", or stand in one particular area for more than an hour, and the other employee had difficulty sitting or standing for "a long period of time" and lifting anything heavy).

The record herein reflects that plaintiff commutes to and from work every day on public transportation and that he walks several blocks to and from the subway without the use of a cane or crutches. Plaintiff also runs and does callisthenics such as push-ups and sit-ups. (Gibbs' Depo. 34:17 to 35:3). Plaintiff regularly engages in a range of activities which belie any claim that his tendonitis and back problems substantially limit him in any major life activity under the ADA.

Although plaintiff has demonstrated that he is impaired, he cannot establish, even when construing the motion in the light most favorable to him, that any major life activity is substantially limited by his impairments. As such, plaintiff is not disabled within the meaning of the Americans with Disabilities Act. Accordingly, defendant's motion for summary judgment is granted and plaintiff's disability claims are dismissed.

## II. PLAINTIFF'S GENDER CLAIMS

Title VII provides that "every person, whether a citizen or not, has a right to be free from discrimination in employment on the basis of race, color, gender, national origin, or religion." 42 U.S.C. § 2000e-3(a). To state a prima facie case of gender discrimination under Title VII, plaintiff must show (1) that he was a member of a protected group; (2) that he was qualified for the job in question; (3) that the defendant took an adverse employment action against him; and (4) that the circumstances support an inference of discrimination on the basis of his membership in that protected class. See McDonnell Douglas Corp. v. Green, 411 U .S. 792 (1973); Graham v. Long Island Rail Road, 230 F.3d 34, 38 (2d Cir.2000). "A plaintiff may raise such an inference [of discrimination] by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." Graham, 230 F.3d at 39 (citations omitted). Moreover, the burden a plaintiff alleging discrimination by his employers carries to survive a summary judgment motion at the prima facie stage is a minimal one. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993); Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir.1997) en banc.

*7 Under the familiar McDonnell Douglas burden-shifting framework in Title VII and ADEA cases, as revisited by the Supreme Court in Reeves v. Sanderson Plumbing Prod. Inc., 530 U.S. 133 (2000), if the plaintiff succeeds in presenting a prima facie case of discrimination, the burden shifts to the defendant to "produce evidence that the plaintiff was rejected, or that someone else was preferred, for a legitimate nondiscriminatory reason." Reeves, 530 U.S. 142, quoting Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). This burden is merely one of production, not persuasion, and it involves no credibility assessment. Id. at 142 (citations omitted); see also Tarshis v. The Riese Org., 195 F.Supp.2d 518, 525 (S.D.N.Y.2002). Once the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 497796 (S.D.N.Y.), 29 NDLR P 240

(Cite as: 2005 WL 497796 (S.D.N.Y.))

defendant meets this burden, the *McDonnell Douglas* framework drops out, and the sole remaining issue is discrimination *vel non*. *Reeves,* 530 U.S. at 142-42 (quoting *St. Mary's,* 509 U.S. at 510). Thus, plaintiff bears the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against him. *Id.*

When deciding a motion for summary judgment in the employment discrimination context, the Court must examine the facts to determine whether the plaintiff could satisfy this ultimate burden. *Windham v. Time Warner, Inc.,* 275 F.3d 179, 187-88 (2d Cir.2001); *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir.2000). In some cases "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false may permit the trier of fact to conclude that the employer unlawfully discriminated." *Windham,* 275 F.3d at 187-88 (quoting *Reeves,* 530 U.S. at 148). However, because *Reeves* requires the Court to examine the entire record, even if a plaintiff establishes some evidence of pretext, summary judgment may still be appropriate when the plaintiff creates only a weak issue of fact as to pretext and there exists abundant and uncontroverted independent evidence that no discrimination occurred. *Schnabel,* 232 F.3d at 90 (quoting *Reeves,* 530 U.S. at 148). With these standards in mind, the Court analyzes plaintiff's Title VII claims.

Plaintiff states that he was assigned tasks outside of his job title that no females in his office were required to do, even though plaintiff presented doctor's notes stating he should not perform those tasks. (Def.Opp5.) Moreover, plaintiff asserts his May 13, 2003 termination was an adverse and retaliatory employment action based on his complaints of discrimination. Defendant does not dispute that plaintiff is a member of a protected class and that plaintiff is qualified for the position he holds. However, defendant contends that there was no employment action taken against plaintiff based on his gender and that, even if there was an adverse employment action taken against him, plaintiff cannot establish that the adverse employment action was taken under circumstances that

give rise to an inference of discrimination.

A. Adverse Employment Action

**\*8** To suffer an adverse employment action, a plaintiff must endure a 'materially adverse change' in terms or conditions of employment ." *Galabaya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d. Cir.2001) (quoting *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 446 (2d Cir.1999)). To be "materially adverse," a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Id.* While adverse employment actions extend beyond readily quantifiable losses, "not everything that makes an employee unhappy is an actionable adverse action." *Phillips v. Bowen,* 278 F.3d 103, 117 (2d Cir.2002); *Sank v. City University of New York,* 219 F.Supp.2d 497, 503 (S.D.N.Y.2002).

In order for an action to be considered an adverse employment action under Title VII, plaintiff must demonstrate that the action "created a materially significant disadvantage with respect to the terms of [his] employment." *Williams v. Donnelly,* 368 F.3d 123, 128 (2d Cir.2004). "Examples of materially adverse employment actions include " 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Feingold v. State of New York et al.,* 366 F.3d 138, 152 (2d Cir.2004); *see also Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) (other examples of adverse employment actions include "discharge, refusal to hire, refusal to promote ... and reprimand").

Plaintiff claims that the out of title assignments which he was required to regularly perform constitute a materially adverse change in the terms and conditions of his employment and that women were not required to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 497796 (S.D.N.Y.), 29 NDLR P 240

(Cite as: 2005 WL 497796 (S.D.N.Y.))

perform these tasks. Specifically, plaintiff claims discrimination in his assignment of Task # 84 from the ACS Tasks and Standards which lists "[t]roubleshooting procedural/ equipment/ other problems, by responding to staff requests for assistance and determine cause/ solution of problem/ recommending/ initiating corrective action in order to resolve non-routine disruption in work activities." (Def. Mem. of Law at 18). Plaintiff alleges that "he was given tasks to perform that no females in his office were required to do, even though plaintiff presented a doctor's note advising him not to perform those tasks." (Pla. Opp. at 5).

However, according to uncontroverted evidence submitted by defendant, after reviewing a sample of the 150 female ACS employees with plaintiff's same title, Clerical Associate III, approximately fifty (one-third of the female Clerical Associate IIIs sampled) were assigned to perform Task # 84. (Aff. Claudette Wynter ¶ 16). Plaintiff disputes defendant's affidavit and states that no females in his office were required to perform this task, but plaintiff offers no evidence to controvert that other female Clerical Associate IIIs employed by defendant performed Task # 84. Plaintiff offers nothing more than his allegation to establish that he was assigned Task # 84 based on his gender. Therefore, plaintiff fails to establish gender discrimination.

**\*9** That plaintiff was unhappy with his assignment of Task 84 is clear, however it is unclear that plaintiff's assignment of Task 84 was an adverse employment action within the meaning of Title VII. An adverse employment action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Weeks v. New York State,* 273 F.3d 76, 85 (2d Cir.2001) abrogated on other grounds by *National RR Passenger v. Morgan,* 536 U.S. 101 (2002). Plaintiff also claims that he was denied fifteen additional minutes at lunch to cash his paycheck and permission to eat at his desk, privileges he claims other workers enjoyed. However, even assuming *arguendo* that these allegations are true, they do not constitute adverse employment actions under Title VII.

Plaintiff's allegations here fall well short of establishing an adverse employment action. That plaintiff was denied an extra fifteen minutes on his lunch hour to cash his paycheck and was not allowed to eat at his desk are not materially significant disadvantages with respect to the terms of his employment. Accordingly, these conditions cannot be considered adverse employment actions under Title VII.

However, plaintiff's firing on May 13, 2003, does constitute an adverse employment action. Title VII specifically provides for discharge as a *per se* adverse employment action. *See* 42 U.S.C. § 2000e-2(a)(1) (unlawful employment practice "to fail or refuse to hire or to discharge any individual ... because of such individual's race, color, religion, sex, or national origin"). Defendant does not dispute that plaintiff was fired and, as such, the Court must consider whether the circumstances surrounding plaintiff's firing give rise to an inference of discrimination.

B. Plaintiff's Discharge

Plaintiff must establish that his discharge occurred under circumstances that give rise to an inference of discrimination on the basis of his membership in a protected class. *Graham,* 230 F.3d at 39. The fourth element of a prima facie case may be satisfied in a variety of ways including: actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, *see Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992), preferential treatment given to employees outside the protected class, *Chertkova v. Connecticut General Life Ins.,* 92 F.3d 81, 90-91 (2d Cir.1996), or a pattern of recommending plaintiff for positions for which he is not qualified and failing to recommend plaintiff for positions for which he or she is well-qualified. *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 205 (2d Cir.1995). A plaintiff may also show that defendant continued to seek applicants to fill the position he was terminated from, or more generally, that the time or sequence of events leading to plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 497796 (S.D.N.Y.), 29 NDLR P 240

(Cite as: 2005 WL 497796 (S.D.N.Y.))

termination give rise to an inference of discrimination. *Chertkova,* 92 F.3d at 91.

Although the Supreme Court in *McDonnell Douglas* noted "the facts necessarily will vary in Title VII cases," 411 U.S. at 802 n. 13, there is nothing in the instant record to infer that plaintiff's discharge was based on gender discrimination.

**\*10** Plaintiff was discharged on May 16, 2003. At that time, defendant had already moved for summary judgment and plaintiff's newly retained counsel had not yet filed an opposition to the action. Plaintiff's counsel's August 25, 2003 letter to the Court states "[n]o reason was given to Mr. Gibbs for his firing ... On June 23, 2003, before I filed any motion, Mr. Gibbs was rehired and transferred to a new location within defendant's offices. After his rehiring and transfer, I asked Mr. Gibbs if he was satisfied with his new position and he indicated that he was." Chachkes letter, August 25, 2003 at 2.

Defendant asserts that plaintiff was terminated for forty-one days "at a time when thousands of city workers [were] being laid off due to a budgetary crisis," and that plaintiff was almost immediately rehired. Def. Rep. at 7. Plaintiff does not dispute that there was a budgetary crisis and citywide layoffs at this time. Moreover, plaintiff submits nothing linking his discharge to his gender. No facts are alleged that give rise to an inference of discrimination. There is no basis upon which a jury could find that plaintiff was discharged based on gender discrimination. Accordingly, defendant's motion for summary judgment as to plaintiff's gender discrimination claim under Title VII is granted.

**III. RETALIATION**

The Court can review only those claims included in plaintiff's EEOC charge and those "reasonably related" to claims presented in the charge. *See Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 686 (2d Cir.2001). Plaintiff did not claim retaliation in his charge of discrimination in November 2000. However claims of retaliation are generally considered "reasonably related" to a previous EEOC charge. *Butts v. City of New York Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1402 (2d Cir.1993), superseded by statute on other grounds as stated in *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684 (2d Cir.1998); *Nonnenmann v.. City of New York,* 174 F.Supp.2d 121, 130 (S.D.N.Y.2001). Although plaintiff failed to raise retaliation in his EEOC charge, the Court shall review his retaliation claim as it is "reasonably related" to his claims of discrimination.

Retaliation claims under Title VII are also analyzed using the *McDonnell-Douglas* burden-shifting framework. *See Coffey v. Dobbs Int'l Servs., Inc.,* 170 F.3d 323, 326 (2d Cir.1999) (burden-shifting analysis applies to retaliation claims under Title VII). To establish a prima facie case of retaliation under Title VII, the plaintiff must show that: (1) he engaged in an activity protected by Title VII; (2) the employer was aware of this activity; (3) the employer took an adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity. *Id.*

Plaintiff has established that he engaged in an activity protected by Title VII; that defendant was aware of this activity; and that plaintiff was terminated, thus suffering an adverse employment action. However, plaintiff has not demonstrated any causal connection between his complaint regarding discrimination and his discharge. As a result, plaintiff fails to demonstrate that his termination was in retaliation for his complaints of discrimination.

**\*11** Absent any other evidence, plaintiff could raise an issue of fact as to causation by demonstrating a short duration between the protected activity and the alleged

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 497796 (S.D.N.Y.), 29 NDLR P 240

(Cite as: 2005 WL 497796 (S.D.N.Y.))

retaliation. *See Cifra v. GE,* 252 F.3d 205, 217-18 (2d Cir.2001) (summary judgment denied when only twenty days elapsed between defendant learning that plaintiff had hired an attorney to pursue gender discrimination claims and plaintiff's termination); *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996) (causal connection is sufficient where only twelve days elapsed between the protected activity and the adverse employment action).

In the instant case, plaintiff filed his administrative charge of discrimination on November 13, 2000, almost two-and-one-half years before the alleged retaliatory firing in May 2003. In analyzing causation, the Court considers when defendant first became aware of plaintiff's protected activity. *See Clark County School Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (defendants did not retaliate because they had no notice of the issuance of a right to sue letter). Defendant clearly had notice of plaintiff's claim when he filed his charge of discrimination with the State Division of Human Rights on November 13, 2000. Compl. at 4. No action was taken against plaintiff when defendant learned that a discrimination charge was filed. The delay of two-and-one-half years between plaintiff's filing of his discrimination charge and his termination is too attenuated to suggest causation in this case. *See Hawana v. City of New York,* 230 F.Supp.2d 518, 530 (S.D.N.Y.2002) (finding that a two-year delay between plaintiff's filing his charge of discrimination and disciplinary charges that resulted in his termination too attenuated to suggest a causal relationship).

Plaintiff proffers nothing in the record to suggest that his May 2003 termination was retaliation for his complaint of discrimination. Moreover, plaintiff does not dispute that he was rehired forty-one days later or that thousands of City workers were being laid off at that time due to a citywide budget crisis. Therefore, plaintiff has not demonstrated any causal connection between his complaint of discrimination and his discharge. Accordingly, defendant's motion for summary judgment on the plaintiff's retaliation claim under Title VII is granted.

CONCLUSION

Defendant's motion for summary judgment is granted in its entirety. Plaintiff has not provided affirmative evidence from which a jury could return a verdict in his favor. The Clerk of Court shall enter judgment and close the case.

SO ORDERED:

S.D.N.Y.,2005.

Gibbs v. City of New York

Not Reported in F.Supp.2d, 2005 WL 497796 (S.D.N.Y.), 29 NDLR P 240

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))

**H**
Only the Westlaw citation is currently available. This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,
Second Circuit.
Joel MURRAY, Plaintiff-Appellant,
v.
George E. PATAKI, Governor of New York State, Kang Yeon Lee, M.D., Daniel Senkowski, Superintendent of Clinton Correctional Facility, Dr. Melendez, R. Leduc, Corrections Officer, N. Irwin, J. Travers, J. Forth, Corrections Officer, R. Girdich, Superintendent at Franklin Correctional Facility, Glenn S. Goord, Commissioner of N.Y.S. D.O.C.S., Richard Roy, Inspector General, T. Reif, Corrections Officer, CNY Psychiatric Center, S. Jones, Defendants-Appellees.[FN*]
**No. 09-1657-pr.**

May 24, 2010.

**Background:** Pro se prisoner brought civil rights action against various government defendants. The United States District Court for the Northern District of New York, dismissed certain § 1983 claims, Lawrence E. Kahn, J., 2007 WL 956941, and granted summary judgment in favor of defendants on his remaining § 1983 and § 1985 claims, and dismissed his claim against prison employee defendant, Suddaby, J., 2009 WL 981217. Prisoner appealed.

**Holding:** The Court of Appeals held that United States Marshals' failure to effect service automatically constituted "good cause" for extension of time in which to serve prison employee defendant.
Affirmed in part, and vacated and remanded in part.

West Headnotes

Federal Civil Procedure 170A ⚷ 417

170A Federal Civil Procedure
    170AIII Process
        170AIII(B) Service
            170AIII(B)1 In General
                170Ak417 k. Time for Making. Most Cited Cases
Pro se prisoner provided information sufficient to identify prison employee defendant, and therefore United States Marshals' failure to effect service automatically constituted "good cause" for an extension of time in which to serve. Fed.Rules Civ.Proc.Rule 4(m), 28 U.S.C.A.

Appeal from a judgment of the United States District Court for the Northern District of New York (Suddaby, J., Treece, M.J.).Joel Murray, pro se, Romulus, NY.

Andrew M. Cuomo, Attorney General of the State of New York; Barbara D. Underwood, Solicitor General; Benjamin N. Gutman, Deputy Solicitor General (Sudarsana Srinivasan, Assistant Solicitor General; Kate H. Nepyeu, of Counsel), New York, NY, for Defendants-Appellees.

Present BARRINGTON D. PARKER, DEBRA ANN LIVINGSTON, and DENNY CHIN, Circuit Judges.

**SUMMARY ORDER**

**\*1 UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED IN PART** and **VACATED AND REMANDED IN PART.**

Plaintiff-Appellant Joel Murray appeals *pro se* from an order of the United States District Court for the Northern District of New York (Suddaby, *J.*), entered March 29,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))

2007, dismissing certain of his 42 U.S.C. § 1983 claims against various of the Defendants-Appellees, and from a second order, entered on April 9, 2009, granting summary judgment in favor of Defendants-Appellees on Murray's remaining claims under 42 U.S.C. §§ 1983 and 1985, and dismissing his claim against Defendant-Appellee Dr. Melendez for failure to timely effect service of process upon her pursuant to Federal Rule of Civil Procedure 4(m). We assume the parties' familiarity with the underlying facts and procedural history of the case, and with the issues presented on appeal.

We review *de novo* a district court's dismissal of claims pursuant to Fed.R.Civ.P. 12(b)(6), "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor ." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim will have facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). We also review a district court's grant of summary judgment *de novo,* and determine whether there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003). While we construe the evidence in the light most favorable to the non-moving party, *id.,* "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion," *Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2002).

We have undertaken a *de novo* review of the record and relevant cases and, except as noted below, we affirm the dismissal of Murray's claims against all defendants for substantially the same reasons set forth in Magistrate Judge Treece's thorough reports and recommendations of March 5, 2007, and March 3, 2009; these reports were adopted by the district court in their entirety.

We vacate the district court's dismissal of Murray's claim against Dr. Melendez for failure to serve process. We

review a district court's dismissal pursuant to Federal Rule of Civil Procedure 4(m) for abuse of discretion. *Zapata v. City of New York,* 502 F.3d 192, 195 (2d Cir.2007). A district court abuses its discretion if it bases its ruling on an erroneous view of the law or clearly erroneous findings of fact, or its decision "cannot be located within the range of permissible decisions." *Lynch v. City of New York,* 589 F.3d 94, 99 (2d Cir.2009) (quoting *Sims v. Blot,* 534 F.3d 117, 132 (2d Cir.2008)).

**\*2** Rule 4(m) provides that "[i]f a defendant is not served within 120 days after the complaint is filed, the court-on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed.R.Civ.P. 4(m). If the plaintiff shows "good cause for the failure" to serve, the district court is required to grant an "appropriate" extension of time in which to serve. *Id.* District courts also have discretion to enlarge the 120-day period even in the absence of good cause. *See Zapata,* 502 F.3d at 196. A *pro se* prisoner proceeding *in forma pauperis,* such as Murray, is "entitled to rely on service by the U.S. Marshals." *Romandette v. Weetabix Co. ,* 807 F.2d 309, 311 (2d Cir.1986). As long as the *pro se* prisoner provides the information necessary to identify the defendant, the Marshals' failure to effect service automatically constitutes "good cause" for an extension of time within the meaning of Rule 4(m). *See, e.g., id.; see also Moore v. Jackson,* 123 F.3d 1082, 1085-86 (8th Cir.1997); *Byrd v. Stone,* 94 F.3d 217, 220 (6th Cir.1996); *Dumaguin v. Sec'y of Health & Human Servs.,* 28 F.3d 1218, 1221 (D.C.Cir.1994); *Sellers v. United States,* 902 F.2d 598, 602 (7th Cir.1990); *Puett v. Blandford,* 912 F.2d 270, 275 (9th Cir.1990). A *pro se* prisoner proceeding *in forma pauperis* is only required to provide the information necessary to identify the defendant, *see, e.g., Sellers,* 902 F.2d at 602, and it is "unreasonable to expect incarcerated and unrepresented prisoner-litigants to provide the current addresses of prison-guard defendants who no longer work at the prison," *Richardson v. Johnson,* 598 F.3d 734, 739-40 (11th Cir.2010).

Here, albeit after receiving a number of extensions of time within which to serve Melendez, Murray provided information that was sufficient to identify Dr. Melendez by full name and as an employee formerly assigned to Clinton Correctional Facility. *See* Doc. 103, *Murray v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))

*Pataki,* 9:03-CV-1263 (N.D.N.Y. Apr. 13, 2007) (letter from Murray to the district court styled "Notification of Defendant"). This was sufficient to satisfy Murray's burden to provide sufficient information for the Marshals to identify the defendant. Although the Marshals subsequently failed to serve Dr. Melendez at the Clinton facility on March 11, 2008, *id.* Doc. 134, they were clearly able to identify her from the information proffered by Murray, and service was unsuccessful merely because Dr. Melendez apparently no longer worked at Clinton. *See id.* As Murray had satisfied his burden, it was an abuse of discretion for the district court to require him to provide additional information regarding Dr. Melendez, and to dismiss Murray's claims against her pursuant to Rule 4(m) for failure to serve process upon her. District courts have a responsibility to assist *pro se* plaintiffs in their efforts to serve process on defendants. *See Valentin v. Dinkins,* 121 F.3d 72, 75-76 (2d Cir.1997) (recognizing district court's obligation to allow *pro se* plaintiff limited discovery to identify defendant for service of process). With the information that Murray provided, the district court here could have ordered the other defendants to contact Dr. Melendez to see if she would accept service or to provide the Marshals with Dr. Melendez's last known address.

**\*3** For the foregoing reasons, the judgment of the district court dismissing the claims against Dr. Melendez for failure to serve process is **VACATED,** and we **REMAND** to the district court for further proceedings in accordance with this decision. The judgment is **AFFIRMED** in all other respects.

FN* The Clerk of the Court is respectfully directed to amend the official caption as it appears above.

C.A.2 (N.Y.),2010.
Murray v. Pataki
Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.